IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2013 OCT -4 P 2 27

DEBRA P. HACKETT, CLK
U S DISTRICT COURT
MIDDLE DISTRICT ALA

SHONELLE JACKSON,     *
    *
      Petitioner,     *
    *
vs.     *
    *     Case No. 2:13-cv-731 WKW
KIM THOMAS,     *
    *
      Commissioner, Alabama     *
      Department of Corrections,     *
    *
      Respondent.     *

## PETITION FOR WRIT OF HABEAS CORPUS
## BY PRISONER IN STATE CUSTODY UNDER DEATH SENTENCE

Petitioner Shonelle Jackson, now incarcerated on death row at Holman State

Prison in Atmore, Alabama, respectfully petitions this Court for relief from his

unconstitutionally obtained conviction and death sentence.

## I.    INTRODUCTION

1.     Petitioner Shonelle Jackson makes application to this Court for a writ of

habeas corpus under 28 U.S.C. § 2254.

2.     Along with three co-defendants, Mr. Jackson was charged by the

Montgomery County District Attorney's office with capital murder-robbery for a

crime that occurred when he was just 18 years old.

3.      The State's theory of the case was that the murder was a capital crime because it occurred during a robbery. The defense was that the victim was killed as a result of a bad drug deal and that the crime was not capital because there was no robbery. The victim was involved with a gang, and was a known drug dealer who had a reputation for selling fake drugs. Prior to trial, however, the trial court granted the State's motion in limine to preclude Mr. Jackson from presenting any evidence "in any manner" about the "alleged drug activity of the victim." (C. 59.) This ruling undermined the reliability of the verdict in the first phase of Mr. Jackson's trial, as without such evidence, Mr. Jackson could not adequately defend against the charges against him. This violation of Mr. Jackson's constitutional right to present a defense entitles him to habeas corpus relief.

4.      The penalty phase of Mr. Jackson's trial suffers from similar constitutional infirmities. Counsel was ineffective by failing to investigate and present any of the numerous mitigating circumstances easily available, including evidence about the complexities of Mr. Jackson's character, his mental and emotional impairments, his troubled upbringing and his familial history of alcohol and drug abuse. At the time of Mr. Jackson's trial, Alabama law capped compensation for the defense counsel's out-of-court work at $1000. See Ala. Code § 15-12-21 (1975)

2

(amended 1999). The circuit court recognized that with regard to the presentation of mitigating evidence: "[N]othing was done in this case." (PR. 14.) As a result of counsel's ineffectiveness, the death sentence in this case is unreliable because neither the judge nor the jury heard any of the compelling mitigating evidence that supported a sentence of life.

5.     Despite the lack of a mitigation presentation, the jury nevertheless sentenced Mr. Jackson to life by a unanimous 12-0 verdict. Once again, trial counsel failed to proffer any additional evidence at the judicial sentencing phase; indeed counsel barely made an argument as to why the jury's verdict was correct and that Mr. Jackson should be sentenced to life without the possibility of parole. The Eleventh Circuit Court of Appeals has held that the "relative weakness of the state's death penalty case is underscored by the fact that the jury recommended a life sentence," and where "the jury decisively voted against the death penalty, . . . [it] weighs heavily in favor of a finding of prejudice," in an ineffectiveness claim. Williams v. Allen, 542 F.3d 1326, 1343 (11th Cir. 2008). The same is true in Mr. Jackson's case.

6.     Despite the fact that Mr. Jackson was just 18, and that the jury unanimously sentenced him to life, the trial judge overrode this verdict and sentenced Mr. Jackson to death. In its order, the trial judge failed to abide by the Eighth Amendment's requirements for an individualized sentence by relying on Mr.

3

Jackson's physical characteristics to minimize the weight that should have been given to his young age. The judge actually copied a sentencing order from another defendant in another state, and failed to make a determination of Mr. Jackson's culpability, instead finding that Mr. Jackson's co-defendant was just as likely responsible for the victim's death. Moreover, because the death sentence was never authorized by the jury's findings, it fails under <u>Ring v. Arizona</u>, 536 U.S. 584 (2002).

7.      Thus, at every stage of Mr. Jackson's capital trial – from the culpability phase to the sentencing phase to the judge's sentencing order – serious constitutional error occurred. The trial court's refusal to allow Mr. Jackson to present a defense, trial counsel's abdication of his role of advocate and the trial court's rejection of the jury's unanimous life verdict renders this capital conviction and death sentence unreliable and unconstitutional. Habeas corpus relief is due to be granted. 28 U.S.C. §2254(d)(1), (d)(2).

## II.    **PROCEDURAL HISTORY**

8.      In September, 1997, a Montgomery County grand jury indicted Shonelle Jackson, who was 18 years old at the time of the crime, on two counts of capital murder and one count of theft or alternatively receiving stolen property pursuant to sections 13A-5-40(a)(2), (17), 13A-8-3, and 13A-8-17 of the Alabama Code of 1975

in the death of Lefrick Moore. (C. 7-10.)[1]

9.    Due to Mr. Jackson's inability to afford a lawyer, attorneys Ben Bruner and Robert Russell, Jr. were appointed to represent Mr. Jackson at his capital trial. At the time of Mr. Jackson's trial, Alabama law provided that court-appointed attorneys in capital cases could not be compensated more than $1,000 for out-of-court work for each phase of a capital trial, based on a $20 hourly rate. See Ala. Code § 15-12-21 (1975) (amended 1999).

10.    The State's theory of the crime was that the victim was murdered during a robbery. In contrast, defense counsel intended to rely on a defense that the victim was killed as a result of a bad drug deal – the victim was involved with a gang, and was a known drug dealer who had a reputation for selling fake drugs. This would allow counsel to argue that Mr. Jackson was not guilty for capital murder: under Alabama law, "murder during a robbery" is a *capital* crime, while murder in

---

[1] Citations to the record are as follows: The trial transcript is cited as "R. __" and references to the clerk's record of trial are cited as "C. __." Volume 6 of the trial transcript begins at page 1, and the sentencing hearing also begins renumbering at page 1. As such, references will as "Vol. 6, R. __" and "S.H. __." References to the suppression hearing transcript are cited as "Supp. R. __" and to the suppression hearing clerk's record are cited as "Supp. C.R. __." References to the transcript of the state postconviction proceedings are cited as "PR. __." References to the clerk's postconviction record are cited as "PC. __,"references to the clerk's first supplemental postconviction record are cited as "SPC1. __," and references to the clerk's second supplemental postconviction record are cited as "SPC2. __." References to the January 20, 2010, hearing are cited as "PC. Supp. __."

5

retaliation for a drug deal is not. Ala. Code § 13A-5-40(a)(2). Prior to trial, however, the trial court granted the State's motion in limine, precluding Mr. Jackson from presenting any evidence "in any manner" about the "alleged drug activity of the victim." (C. 59.)

11.     Prior to trial, Mr. Jackson moved the trial court for a continuance to secure Gerard Burdette, the only eyewitness to the crime (other than the defendant and the co-defendants) and a material defense witness. (R. 19-20.) Burdette had given a statement to the police which supported Mr. Jackson's defense in this case that the motive for the killing was retaliation for a bad drug deal and that the killing did not occur during a robbery. (C. 87-96.) The trial court nevertheless refused to grant a continuance. (C. 100.)

12.     On February 27, 1998, the jury found Mr. Jackson guilty of one count of capital murder (intentional murder during a robbery), and one count of theft of property in the first degree. (R. 526.) That same day, there was a short penalty hearing. Trial counsel did very little: they presented brief testimony of Shonelle's parents, a maternal aunt and girlfriend in a plea to spare Shonelle's life that spanned just fifteen transcript pages. (R. 562-77.) This testimony failed to explain the complexities of Mr. Jackson's character, his mental and emotional impairments, his troubled upbringing and his familial history of alcohol and drug abuse. As the circuit

6

court recognized, with regard to the presentation of mitigating evidence, "**nothing was done in this case**." (PR. 14.) Nevertheless, after only twenty-five minutes of deliberation, the jury returned with a unanimous 12-0 verdict for life without the possibility of parole. (R. 599.)

13.    Relying in part on Mr. Jackson's physical characteristics, the trial court copied nearly verbatim a sentencing order from another defendant in another state, and on July 2, 1998, overrode the jury's unanimous life verdict and sentenced Mr. Jackson to death. (C. 187; R. 602.) In overriding the jury's life verdict, the trial court failed to consider the jury's unanimous life verdict as a mitigating circumstance. (C. 186.)    The trial court concluded that "whether the advisory verdict of life imprisonment without the possibility of parole is considered a mitigating circumstance is an unsettled issue," (C. 180), and without "some concrete direction" from the appellate courts concluded that the "essential function of the advisory verdict is to focus the court in its independent consideration" of weighing the aggravating and mitigating circumstances. (C. 186.)

14.    The Alabama Court of Criminal Appeals affirmed Mr. Jackson's conviction and sentence of death on May 28, 1999. Jackson v. State, 836 So. 2d 915 (Ala. Crim. App. 1999). Mr. Jackson's rehearing application was denied on July 9, 1999.

7

15.   The Alabama Supreme Court remanded the case for the trial court to conduct a hearing outside the presence of the jury to determine the admissibility of Mr. Jackson's custodial statement. Ex parte Jackson, 836 So. 2d 973 (Ala. 2001).

16.   A hearing was conducted on October 24, 2001, and the trial court found that Mr. Jackson's statement was admissible. On February 15, 2002, the Alabama Supreme Court issued its opinion affirming Mr. Jackson's capital conviction and death sentence. Justice Johnstone and Justice Lyons dissented, concluding that the trial court erred in rejecting the jury's unanimous life verdict and sentencing Mr. Jackson to death. Justice Johnstone specifically noted that:

> In assigning no weight nor binding effect to a life-imprisonment recommendation by a jury, Alabama law reduces to a sham the role of the jury in sentencing and allows baseless, disparate sentencing of defendants in capital cases.

Ex parte Jackson, 836 So. 2d 979, 991 (Ala. 2002) (Johnstone, J., dissenting as to sentence); see also Jackson, 836 So. 2d at 993 (Lyons, J., dissenting in part) (Mr. Jackson's "age at the time of the offense and the fact that the evidence pointed to a codefendant as the 'triggerman,' the jury's unanimous recommendation of a sentence of life imprisonment without parole tips the scale in favor of following the jury's recommendation and in sentencing Jackson to life imprisonment without parole.").

17.   Mr. Jackson filed an application for rehearing, which was denied by the

8

Court in a substituted opinion on May 10, 2002. Ex parte Jackson, 836 So. 2d 979 (Ala. 2002).

18.    Mr. Jackson filed a petition for writ of certiorari to the United States Supreme Court on August 8, 2002. That petition was denied on November 18, 2002. Jackson v. Alabama, 531 U.S. 1031 (2002).

19.    Only July 30, 2003, Mr. Jackson filed a Rule 32 petition. (PC. 3.) The State filed an answer on October 28, 2003, and on February 26, 2004, moved for dismissal of some of the claims in Mr. Jackson's petition based on allegations of procedural bar, or failure to satisfy pleading requirements. (PC. 66-122, 123-29, 130-141, 142-51.) The circuit judge subsequently signed the State's proposed orders dismissing a number of Mr. Jackson's claims. (PC. 154-57, 158-50, 161-68.)

20.    Mr. Jackson filed an objection to the circuit court's order and a motion for reconsideration. (PC. 256-61.) Mr. Jackson additionally filed an Amended Rule 32 petition, and two motions in which he moved the circuit court for discovery of prosecution files and institutional records necessary to prove these claims. (PC. 169-255, 262-76, SPC2. 31-50.) On October 13, 2004, the circuit judge held a hearing on the State's motions to dismiss, as well as Mr. Jackson's discovery requests. After hearing arguments from both parties and reviewing the pleadings, the circuit court granted Mr. Jackson's discovery motions (PC. 557, PR. 3), and reserved a ruling on

the State's motions to dismiss. (PR. 19.)

21.    The State petitioned for a writ of mandamus, and on March 18, 2005, the

Alabama Court of Criminal Appeals granted the State's petition and directed the

circuit judge to vacate her rulings on Mr. Jackson's two discovery motions. Ex parte

State (In re: Shonelle Andre Jackson v. State of Alabama), 910 So. 2d 797 (Ala. Crim.

App. 2005). The Alabama Supreme Court subsequently declined to review the case.

22.    On April 21, 2006, Shonelle Jackson filed a Second Amended Petition

which provided additional factual allegations in support of the claims in his petition.

(PC. 591-689.)  Responding to Mr. Jackson's second amended petition, the State

submitted a new motion to dismiss and proposed order, (PC. 694-806), and Mr.

Jackson filed a response to the State's motion.  (PC. 823-51.)

23.    On January 23, 2007, the circuit judge held a status conference at which

the judge articulated her view that she was going to dismiss Mr. Jackson's Rule 32

petition based on her discomfort with "second-guessing" the trial judge[2]:

> And, you know, I will tell y'all right now, this Court is not going to go
> second-guess Judge Gordon and why he did what he did. I just – that's -
> I mean, I'm just not going to do that.

(PR. 61.) Repeatedly throughout the status conference she reiterated that position as

---

[2]Judge Tracy McCooey presided over the Rule 32 proceedings. Judge William
Gordon presided over Mr. Jackson's original capital trial and overrode the jury's
unanimous life verdict. Judge Gordon has since retired.

her basis for dismissing the petition:

> I'm not going to go in back of what Judge Gordon did because I know what kind of judge he was and I know the kind of decisions he makes. And the man, like I said, knows the law better than anyone I know. . . . So what I would have to do is sit here and have a hearing to try to say, well, you know, the judge should have considered this; he should have considered this; he should have done this. And I'm not going to do that. I'm just not. I do not feel that is the correct thing to do, and I'm not going to do it.

(PR. 63.) And again, that:

> Well, we don't know how Judge Gordon would feel because Judge Gordon isn't here. And so, basically, it would be Judge McCooey sitting here and saying, well, now that we have this, this, and this, I think Judge Gordon would have done this. I'm not going to do that.

(PR. 67.)

24.    With regard to Mr. Jackson's claim of ineffectiveness of counsel, the

circuit judge continued to declare that:

> I'm comfortable with looking at what I've done as a judge. But I'm not comfortable looking at what another judge has done. I just - - because I'm always going to be put in the position of saying, well, now we have this information, so you should have done this. No. The only question I have in my mind is based on what Judge Gordon had at the time, did he have good, legal reasons to do what he did with what he had at the time. And, obviously, he did. You know, that's what we've got to look at.

(PR. 69-70.)

25.    Similarly, with regard to Mr. Jackson's claim that he should be

11

resentenced to life without parole pursuant to Alabama law, the circuit judge stated:

> [A]gain, its just a most uncomfortable position because it is not my case. I did not sit on that case. I know nothing about that case. You know, I have no knowledge of that case, the jurors, the lawyers. I don't have any independent recollection of that case. So that puts me in a most uncomfortable position. But I – what I do know for sure is what kind of judge Judge Gordon was, and I do know that for sure. And I know that man would not have made that decision unless he had good grounds to make it. So I feel one hundred percent comfortable with that decision. He wouldn't have made it.

> So, I'm going to deny it and let's get it down the street.

(PR. 78-79.)

26. In fact, the circuit judge stated that the only "question" she had in her mind was whether Judge Gordon had "good, legal reasons" to do what he did at the time, but that because he was "one of the most thorough judges that we've ever had in this courthouse," she was not going to have a hearing on Mr. Jackson's claims unless an appellate court ordered her to:

> Now, if the Supreme Court wants to tell me, no Judge McCooey, we're going to require you to have a hearing and we're going to require you to consider these twenty mitigating circumstances or whatever it is that you guys are saying you can present, then that's what I'll do. But, they're going to have to tell me that I have to do that before I do that. (PR. 70.)

> . . .

> [B]ecause I have to go back and look at it and say, well, now what do we do since we have these twenty [mitigators]. I mean I'm still put right back into the same position that I'm not going to put myself in. Now,

12

the Supreme Court can put me in that position, but I'm not going to put myself in that position. I'm just not. (PR. 75.)

. . .

In other words, I think what I need to do is I need to deny what you guys are asking, let it go down the street, and let the Supreme Court who ultimately is the decision makers anyway tell me, yes, Judge McCooey, you're right . . . or, sorry, Judge McCooey, you're going to have to have hearings. (PR. 76.)

. . .

But [Alabama's appellate courts] are going to have to tell me that before I do it. Because, again, it's just a most uncomfortable position because it is not my case. I did not sit on that case. I know nothing about that case. You know, I have no knowledge of the facts of that case, the jurors, the lawyers. (PR. 78-79.)

27.    The circuit judge then signed the State's proposed order dismissing Mr.

Jackson's Second Amended Rule 32 petition without significant modification. (PC.

870, PR. 80-82.)

28.    On November 13, 2009, the Alabama Court of Criminal Appeals

remanded Mr. Jackson's case back to the Montgomery County Circuit Court for

further consideration of his juror misconduct claims. See Jackson v. State, No. CR-

06-1026, 2009 WL 3805808 (Ala. Crim. App. Nov. 13, 2009). On January 20, 2010,

the circuit court held an evidentiary hearing, at which Jurors J.G., A.W., and W.D.

testified in support of Mr. Jackson's claims. (PC. Supp.3, at 19-45, 45-72, 72-78.)

13

Because Juror J.B. had moved out of state, with the State's agreement, a telephonic deposition of Juror J.B. was conducted on March 1, 2010. (PC. Supp.3, at 93-103.) On May 5, 2010, the Montgomery Court Circuit Court denied Mr. Jackson's allegations, finding "no strong evidence of juror misconduct." (PC. Supp. 3., at 7.)

29.     On May 25, 2012, the Alabama Court of Criminal Appeals affirmed the circuit court's denial of Mr. Jackson's Rule 32 petition. Jackson v. State, No. CR-06-1026, 2009 WL 3805808 (Ala. Crim. App. May 25, 2012) (on return to remand). Mr. Jackson's timely application for rehearing was subsequently overruled. The Alabama Supreme Court denied Mr. Jackson's petition for writ of certiorari on June 21, 2013. Ex parte Jackson, No. 1120031 (Ala. Jun. 21, 2013).

30.     This habeas corpus petition is Mr. Jackson's first and only application for a writ of habeas corpus.

## III.   GROUNDS SUPPORTING PETITION FOR RELIEF

## A.     THE TRIAL COURT VIOLATED MR. JACKSON'S RIGHT TO PRESENT A DEFENSE BY PRECLUDING HIM FROM PRESENTING MOTIVE EVIDENCE.

31.     At trial, the critical issue was whether the killing occurred during a robbery or whether it occurred during a gang-related drug deal. The *State's theory* of the case was that Shonelle Jackson and three other young men were driving around Montgomery in a stolen car on a Friday night. While driving they randomly passed

14

the victim's car which one of the co-defendants knew had a good stereo system in it. According to the State, Mr. Jackson decided he wanted to steal the stereo system and, a few minutes later, swerved his car in front of the victim's car so that the two cars collided. Mr. Jackson and a co-defendant immediately got of their car and the victim got out of his. Shots were fired and, although the testimony is conflicting as to exactly how many guns were fired, the State's theory is that Mr. Jackson shot and killed the victim as he was running away from his car.

32.    The *defense theory* was that the victim was killed as a result of a bad drug deal. The victim was involved with a drug gang, was a known drug dealer, and had a reputation for selling fake drugs. The motive for the killing was retaliation for a prior sale of bad drugs. That is why as soon as the victim was killed, Mr. Jackson left the scene without taking anything. It is clear from the evidence that Mr. Jackson's motive was not to steal the victim's car stereo. When the two cars collided, the victim got out of his car and ran away, so there would have been no reason to kill the victim had the motive been to steal the car stereo. Moreover, after the victim was shot, Mr. Jackson drove away from the crime scene without taking anything, further proving that the motive for the killing was not to steal the victim's car stereo. The difference between these competing theories is critical: murder "during a robbery" is a *capital* crime under Alabama law, Ala. Code § 13A-5-40(a)(2) (1975), but murder

15

in retaliation for a bad drug deal is not.

33.   Prior to trial, the State filed a motion *in limine* to prevent Mr. Jackson from presenting evidence on his defense theory. (C. 59.) At a hearing on the motion, defense counsel informed the trial court that the prosecution's motion *in limine* was merely an attempt to take the case's ultimate factual issue away from the jury:

> DEFENSE COUNSEL: [M]otive is relevant to the State's case. It's just as important to the defense's case. And their motive, their understanding of the motive is they want to rip the car off and rip the stereo out of it. *Our understanding is bad drug deal. We would submit that that's a jury question.* All that evidence should come in and be submitted to the jury and allow them to decide what the motive was.

(R. 30) (emphasis added). Evidence of a bad drug deal was necessary to the defense because it would have shown not only that the motive for the killing was retaliation and *not* robbery, but also that the killing did not take place "during a robbery." Without such evidence, however, Mr. Jackson could not present his defense. Despite this, the trial court granted the State's motion *in limine* and thus precluded Mr. Jackson from showing why the killing took place. (C. 102.) In doing so, the trial court undermined Mr. Jackson's defense and prevented the jury from hearing material evidence essential to resolving the most important factual dispute in the case and the issue of whether this was a capital crime.

16

34.     The trial court's ruling violated Mr. Jackson's right to present a defense.

See Washington v. Texas, 388 U.S. 14, 19 (1967)(Constitution protects "the right to

present the defendant's version of the facts as well as the prosecution's to the jury so

it may decide where the truth lies"); see also Taylor v. Illinois, 484 U.S. 400, 408

(1988) ("this right is an essential attribute of the adversary system itself"); Chambers

v. Mississippi, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than of

an accused to present witnesses in his own defense."); Boykins v. Wainwright, 737

F.2d 1539, 1544 (11th Cir. 1984) ("The right to present witnesses in own's own

defense in a criminal trial lies at the core of the Fifth and Fourteenth Amendments'

guarantee of due process of law.").

35.     The right to present a defense is violated whenever a trial court precludes

a defendant from presenting evidence that is both material and favorable to his or her

case. See United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) ( reviewing

courts must reverse where defendant makes "plausible showing" that preclusion of

evidence violated right to compulsory process); see also Taylor v. Singletary, 122

F.3d 1390, 1394 (11th Cir. 1997) (trial court committed reversible error by denying

the appellant's "well-established" "right to present material witnesses and to mount

a defense"). Prior to trial in this case, defense counsel explicitly told the trial judge

that they believed that this crime was related to drug dealing, informing the judge that

17

they had a statement from a witness who "believes there is some gang influence here." (R. 23.)

36.    At a minimum, had Mr. Jackson been able to present his defense, there is a "reasonable probability" that the jury would have rejected the state's theory that the killing took place during a robbery. See Kyles v. Whitley, 514 U.S. 419, 434 (1995); see also Taylor, 122 F.3d at 1395. Denying Mr. Jackson his right to present a defense was highly prejudicial in this case because the state's evidence as to the robbery element – the very focus of Mr. Jackson's defense  – was tenuous at best as it rested solely on the testimony of the three alleged co-defendants: Antonio Barnes, Eric Williams and Christopher Rudolph.[3]

37.    By precluding Mr. Jackson from eliciting testimony about his theory of defense – that this was a drug deal gone bad – the trial court also denied Mr. Jackson his right to cross-examination, as embodied in the Confrontation Clause of the Sixth

---

[3]The testimony of the co-defendants *as it relates to the alleged robbery* is both flimsy and contradictory. For example, while all three of the co-defendants claimed that Mr. Jackson was responsible for the decision to rob the victim, their testimony, in fact, reveals that Mr. Jackson drove away from the scene without taking the victim's car or his stereo. Moreover, there is no fingerprint evidence linking Mr. Jackson to any of the items taken from the car. (R. 422.) Such testimony severely undermines the State's claim during closing argument that the killing occurred "because that defendant wanted some music." (Vol. 6, R. 38.) There is simply no direct evidence to support the assertion that Mr. Jackson killed the victim "during a robbery."

18

Amendment, see Davis v. Alaska, 415 U.S. 308, 315 (1974), and his right to testify

in his own defense. See Harris v. New York, 401 U.S. 222, 225 (1971) ("Every

criminal defendant is privileged to testify in his own defense, or to refuse to do so.").

38.     The trial court's decision to grant the State's motion *in limine* violated

Mr. Jackson's right to present a defense, in particular as to his motive for committing

the murder, as well as his right to confront and cross-examine witnesses, and his right

to testify protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the

United States Constitution. In rejecting Mr. Jackson's claim, the state court failed to

consider appropriately the aforementioned facts, and relied on facts that are

unsupported by the record. This constitutes an "unreasonable determination of the

facts in light of the evidence." Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003).

The state court's adjudication of the claim resulted in a decision that was both

"contrary to" and an "unreasonable application of" clearly established United States

Supreme Court precedent, thus warranting habeas corpus relief. Williams v. Taylor,

529 U.S. 362, 412-13 (2000).

## B.     MR. JACKSON WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL TRIAL.

39.     Mr. Jackson's trial counsel, Ben Bruner and Robert Russell, Jr., did not

render reasonably effective legal representation before or during Mr. Jackson's

19

capital murder trial. See Williams v. Taylor, 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668 (1984). The errors made by Mr. Jackson's counsel were so serious as to "undermine confidence in the outcome," Strickland, 466 U.S. at 694, and Mr. Jackson now seeks relief from his unconstitutionally obtained conviction and sentence of death. But for defense counsel's ineffectiveness, there is a reasonable probability that Mr. Jackson would not have been convicted of capital murder and sentenced to death. See Williams, 529 U.S. at 420; Strickland, 466 U.S. at 694. This failure of defense counsel denied Mr. Jackson his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Habeas corpus relief is warranted. 28 U.S.C. § 2254(d)(1), (2).

40.   Counsel's ineffectiveness was, in part, the product of the grossly insufficient funds available for defense counsel in capital cases. At the time of Mr. Jackson's trial, Alabama law provided that court-appointed attorneys in capital cases could not be compensated more than $1,000 for out-of-court work for each phase of a capital trial, based on a $20 hourly rate. See Ala. Code § 15-12-21 (1975) (amended 1999). Accordingly, Mr. Jackson's counsel received no compensation whatsoever for out-of-court work in excess of fifty hours, and were compensated at rates far below market level even for the initial fifty hours.

41.   This is simply inadequate given the time required to adequately represent

a capital defendant. The limits that this compensation cap put on the defense counsel was evident at trial: "we have limited resources in this matter. We tried to use them as best we could. . . . if I did something wrong, I apologize to the Court. But there are a zillion people in this. I can only pay [the investigator] a certain amount to go out and see what he can do." (R. 24.)

1. Trial Counsel Was Ineffective During the Penalty and Sentencing Phases of Mr. Jackson's Trial.

43.     Mr. Jackson's trial counsel was ineffective during the penalty phase of the trial and at the judicial sentencing hearing. Though the jury returned a unanimous life verdict in less than an hour, the trial judge nonetheless overrode this verdict and sentenced Mr. Jackson to death. Despite numerous mitigating factors that exist in this case – both statutory and non-statutory – trial counsel put forth very little evidence at the penalty phase of the trial. Sonya Ringstaff, Mr. Jackson's girlfriend, testified that Mr. Jackson was not violent, truthful, and "an understanding, nice young man." (R. 564.) The testimony of Marilyn Jackson, Mr. Jackson's mother, covered only two and a half pages of transcript, and included a plea to the jury to spare her son's life. (R. 567-68.) The combined testimony of these witnesses, as well as Mr. Jackson's aunt and father, which only lasted long enough to fill fifteen pages of transcript, constituted the entirety of Mr. Jackson's penalty phase evidentiary presentation and

21

did not even begin to explain the complexities of Mr. Jackson's character, his mental and emotional impairments, his troubled upbringing and his familial history of alcohol and drug abuse. More critically, after this minimal presentation of evidence to the jury, trial counsel failed to proffer any additional evidence at the judicial sentencing phase; indeed counsel barely made an argument as to why Mr. Jackson should be sentenced to life without the possibility of parole.

44.    Trial counsel's representation of Mr. Jackson at the penalty phase and judicial sentencing hearing of his capital trial was inadequate and denied Mr. Jackson a fair sentencing phase determination as required under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Wiggins v. Smith, 539 U.S. 510 (2003); Williams v. Taylor, 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668 (1984).

> a.    *Trial Counsel Failed to Investigate and Present even a Portion of the Available Mitigation Evidence.*

45.    In a capital case, ttrial counsel has the constitutional duty to fully investigate and prepare for the penalty phase of the trial. Wiggins, 539 U.S. at 534 ("counsel's investigation into Wiggins' background did not reflect reasonable professional judgment," and constituted ineffective assistance of counsel); Williams, 529 U.S. at 396 (counsel has an obligation to conduct a thorough investigation into

22

defendant's background; failure to do so constituted ineffective assistance of counsel); Strickland, 466 U.S. at 690-91(counsel has a duty to investigate at the penalty phase of a capital trial). The trial court and the jury must consider "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978). Thus, trial counsel "has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." Porter v. Singletary, 14 F.3d 554, 557 (11th Cir. 1994).

46.   Trial counsel should have obtained complete and accurate information regarding Mr. Jackson's family and social history, educational history, medical history, mental health history, employment and training history, prior adult and juvenile correctional experiences, and any community, religious and cultural influences. See Wiggins, 539 U.S. at 524 (citing the American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.8.6, p.133 (1989), as "guides to determining what is reasonable" conduct in capital defense work).

47.   Trial counsel in Mr. Jackson's case did not conduct the minimally adequate investigation needed for effective penalty phase representation. Trial counsel made no effort to interview Mr. Jackson's family members regarding

23

available mitigating evidence.    Mr. Jackson has numerous family members and friends, including sisters, Laquanda Jackson and Wanda Jackson; two half-sisters, Dmitri Gaston and Keisha Gaston; a grandmother, Della Jackson; a grandfather, Tommy Taylor; aunts, Joyce Harvest, and Geraldine Taylor; a great aunt, Betty Brawlin; uncles, Freddie Owens, Donald Collins, and Roosevelt Emerson, Jr.; and cousins, Christopher Harvest, Corey Taylor, Julia Taylor, Monica Taylor, Shantay Taylor, Chakka Harvest, Decarlos Harvest, Micky Harvest, Michael Harvest, Detrick Collins, and Gary Collins, who were not interviewed or asked to testify.   Most of these individuals were living in and around Montgomery, Alabama at the time of the trial and were readily available to be interviewed regarding mitigating evidence.   In fact, many of these family members were present at the trial and were ready to testify regarding mitigating evidence.   This constitutes deficient performance.

48.    The fact that trial counsel called some witnesses to the stand during the penalty phase does not render their performance effective.   If trial counsel's purpose was to bring out the humanity and character of Mr. Jackson by having these witnesses testify, this intention "stands in stark contrast to the presentation that actually took place."   Collier v. Turpin, 177 F.3d 1184, 1200 (11th Cir. 1999).   Trial counsel's examination of these witnesses was perfunctory, deficient, and prejudicial.

49.    Marilyn Jackson, Louis Taylor, Thelma Owens, and Sonya Ringstaff

24

were not asked by counsel to present a compelling picture of Mr. Jackson or give the information about Shonelle Jackson that they wanted to give; nor were they prepared by trial counsel for their testimony. Trial counsel failed to meet with any of these witnesses prior to the morning their testimony was delivered. None of them understood the nature of their testimony. Effective trial counsel would have explained to these witnesses the critical importance of presenting a narrative of Mr. Jackson's life to the judge and jury in order to show them Mr. Jackson's humanity, and would have asked them questions during the penalty phase so that the judge and the jury could have heard the mitigating evidence.

50. Moreover, trial counsel failed to elicit any testimony regarding compelling mitigating evidence in this case, including, *inter alia*: Mr. Jackson's lack of a father figure or other male role remodel, his religious influences and experiences, his devotion to family members, and his impoverished childhood characterized by illicit drugs, alcohol, and the continuous threat of random destructive violence. That counsel failed to talk with these witnesses and prepare them for their testimony is evident from the witnesses' testimony at trial. For example, Marilyn Jackson, Mr. Jackson's mother, was asked by trial counsel to "tell me about his upbringing and his school life." (R. 567.) In response, Ms. Jackson's response was simply that "he went to school. He went as far as the ninth grade in school." (R. 567.) Trial counsel's

25

"minimal questioning of [Ms. Jackson] resulted in the jury's being deprived of substantial mitigating evidence regarding [Mr. Jackson]." Cunningham v. Zant, 928 F.2d 1006, 1017 (11th Cir. 1991). This evidence of Mr. Jackson's childhood could also have been presented by the numerous family members who had contact with Mr. Jackson throughout these years, including those individuals listed above.

51.     Mr. Jackson also has numerous friends, including James McGee, Keisha Young, A.C. Williams, Marshal Woods, Samuella McMillian, Sonya Ringstaff, and Latrice Walker, and other community members, including Rick Cotton, Latanya Austin, and Eddie Woods, who were available as sources of mitigating evidence related to Mr. Jackson's family and social history, employment history, medical history, and mental health history. None of these people were contacted by trial counsel; had they been contacted, they would have been willing and able to present testimony about Mr. Jackson's childhood, including testimony about the violence, poverty, drugs, and alcohol that characterized the household in which Mr. Jackson was raised.

52.     Indeed, communication with Mr. Jackson's family and friends was so lacking,they were unaware of the trial court's power to override the jury's 12-0 life recommendation. Family and friends who attended the trial were relieved when they heard the jury's recommendation for life. Because trial counsel never explained the

26

process through which Mr. Jackson would be sentenced, family and friends believed the jury's life recommendation was the final adjudication in Mr. Jackson's case. They were shocked and horrified when they learned, not through Mr. Jackson's attorneys, but through a co-worker of Thelma Owens that Shonelle was actually sentenced to death. Upon hearing this news on the radio, the co-worker informed Mrs. Owens who then called Marilyn Jackson. Ms. Jackson was left with the task of circulating this information among Shonelle's friends and family. Had trial counsel met with Mr. Jackson's family and friends, they would have understood that the trial court had the power to sentence Mr. Jackson to death, and would have been able to provide compelling testimony to persuade the sentencing authority that a sentence of life without possibility of parole was appropriate in this case.

53.    In addition to defense counsel's failure to contact people who would offer useful mitigation evidence, counsel failed to procure necessary records documenting Mr. Jackson's life. These records include education records, housing records, mental and physical health records, employment records, correctional records, and religious records of both Mr. Jackson and his parents and siblings. These records would have been particularly important, as they would have corroborated the testimony that should have been adduced by family members and friends regarding Mr. Jackson's childhood.

27

54.    Had trial counsel obtained these records and interviewed even a portion of the potential witnesses who were willing to testify for Mr. Jackson, trial counsel would have easily uncovered a vast amount of mitigating evidence. This evidence would have illuminated Mr. Jackson's childhood for the court, and revealed that he was raised in a house characterized by neglect, absent or disabled parental figures, poverty, rampant drug and alcohol abuse, and a constant threat of violence.

55.    A reasonable investigation would have uncovered evidence of Mr. Jackson's unstable homelife. Interviews with family members, including Geraldine Taylor, Julia Taylor, Monica Taylor, Joyce Harvest, and Thelma Owens, and medical records would have revealed that Mr. Jackson's parents were heavy drug users, and the fact that Mr. Jackson's mother was using drugs, including crack and smoking marijuana, both before Mr. Jackson's birth and during his early childhood. His parents use of crack and marijuana not only created an unstable homelife, but contributed to Mr. Jackson's impaired mental and emotional development.

56.    Mr. Jackson's parents, Marilyn Jackson and Louis Taylor, had serious drug addiction problems throughout Mr. Jackson's childhood. Thelma Owens, Geraldine Taylor, Julia Taylor, Monica Taylor, and Joyce Harvest would have testified that as a consequence of this drug use, not only was desperately needed family money diverted to purchasing drugs, but the children were exposed to a host

28

of people continuously coming in and out of their home to use illicit drugs.

57.    Members of the community were well aware of Marilyn and Louis' drug

use. Indeed, the level of their use, and their concomitant disability as parents was so

severe that  testimony would have revealed that children at school often teased

Shonelle about Marilyn and  Louis' drug abuse problem.

58.    In Mr. Jackson's impoverished household, this drug abuse created

further financial instability.  Marilyn Jackson was on welfare and barely able to feed

her children, yet nonetheless diverted much of her money to supporting her drug use.

In fact, Marilyn Jackson often sold the family's food stamps in exchange for cash so

she could support her drug habit.

59.    As a result of his parents' drug use, Shonelle's childhood was marked

by extreme instability, absence of a father figure, violence, drugs, and alcohol.  The

testimony of family members and friends, including Joyce Harvest, Marilyn Jackson,

Laquanda Jackson, Wanda Jackson, Geraldine Taylor, Monica Taylor, Thelma

Owens, and Keisha Young, as well as court and correctional records, would have

established that Mr. Jackson's father, Louis Taylor, was chronically imprisoned when

Shonelle was young, and even when not incarcerated, was usually either using drugs

and alcohol or was simply absent.  Mr. Jackson's father was constantly in legal

trouble, in large part because of his drug use and alcoholism; family members and

friends would have testified that as a result he did not provide any support for Mr. Jackson.

60. Court records indicate that Louis Taylor was arrested no less than thirteen times before 1997. In fact, at the time Shonelle Jackson allegedly committed this offense, he was receiving no guidance or support from his father because, as Louis Taylor would have testified, he was in jail at the time.

61. His father's pervasive absence was exacerbated by a complete lack of male adult role models in Mr. Jackson's childhood and youth. Thelma Owens would have testified, for example, that Shonelle attempted to fill this void by spending time with his uncle Freddie Owens, but that Mr. Owens was not able to make up for the absence of stable male role models within Shonelle's household.

62. Family and friends, including Joyce Harvest, Thelma Owens, and Geraldine Taylor would have testified that the only other male relative in Mr. Jackson's life – their brother, Roosevelt Emerson, Jr. – was not around much while Mr. Jackson was growing up because he was either in the military or jail. As a result, as Shonelle got older, he began to fill the void left by his father and uncles with older peers who engaged in illegal and violent behavior.

63. As a consequence of his parents' drug use and his father's absence, records and testimony from family and community members would establish that Mr.

30

Jackson and his siblings suffered from neglect; they grew up in an impoverished home and were not properly cared for. Family members, such as Della Jackson, Geraldine Taylor, Joyce Harvest, and Thelma Owens would have testified that Shonelle and his siblings were not properly clothed and fed by their parents, and that they attempted to make up for these failings by providing the children with food and clothing.

64.     All of the aforementioned family members would have testified to the impoverished conditions Mr. Jackson's family endured.  Because Marilyn Jackson was unable to provide her children with necessities, Wanda and Laquanda Jackson would have testified that they were often forced to acquire nourishment from various sources outside the home, including neighbors, the First Baptist Church and the Trenholm Court Community Center.

65.     Relatives, such as Thelma Owens and Della Jackson, who were aware of Marilyn Jackson's desperate financial situation, would have testified that they knew the children were receiving inadequate care and therefore often dropped off basic necessities, such as food and clothing.

66.     Marilyn Jackson would have testified that as a result of Louis Taylor's sporadic presence she was forced to provide for all three of her children on her own. Despite working long hours, including double shifts lasting from 6:00 a.m. until

31

10:00 p.m., Ms. Jackson was unable to support adequately her children. Consequently, the Jackson family was forced to live in public housing, which was plagued by violence, drugs, and prostitution.

67.     Because his family did not have enough money to eat, Mr. Jackson's mother often asked him to borrow food, such as sugar, flour, and bread, from neighbors. It was approximately at this time that Shonelle began to steal things, and eventually became a gofer for older drug dealers established in the public housing development. His sisters and mother would have testified that while their father was absent, Shonelle tried his hardest to help support the family by selling drugs and obtaining money so he could buy clothes and other necessities.

68.     Geraldine Taylor, Monica Taylor, Julia Taylor, Laquanda Jackson, Wanda Jackson, and Marilyn Jackson also would have testified regarding the Jackson's desperate financial situation. Each of them would have informed the court and the jury that, at one point, after Shonelle and his family had been kicked out of their home, they were forced to live with Shonelle's aunt, Geraldine Taylor. The home was cramped because Ms. Taylor was not only housing the four members of the Jackson family, but her own family as well. The Jackson family changed residences on no less than six occasions during Mr. Jackson's childhood and early teenage years.

69.     This unstable life caused great trauma to Mr. Jackson, as is reflected in

32

school records which, had they been obtained by trial counsel, would have established that in elementary school, Mr. Jackson was missing school on a regular basis, and that by an early age he had begun acting out at school and getting into fights with other kids. Records would have established that by the time that he was thirteen, Mr. Jackson had been suspended from school numerous times and had been expelled twice.

70. In addition to a life of instability, and the resulting emotional trauma, Mr. Jackson has consistently struggled with diminished mental capacity. Education records and juvenile court records as well as testimony from relatives such as Thelma Owens and teachers such as Rosalyn Jordan would confirm his borderline intellectual functioning.

71. Indeed, Thelma Owens would have testified that her family has a history of mental deficiencies, including Marilyn Jackson's biological brother who is "mentally retarded." Moreover, Ms. Jackson suffers from her own mental impairments for which she received specialized training as a youth.

72. Unlike the specialized training received by his mother, Shonelle Jackson received no meaningful parental supervision and, therefore, he continually struggled in school. Had counsel acquired Mr. Jackson's school records, they would have learned that he failed two grades and the only years he consistently received grades

33

in the B range or above were those in which he was taking courses for the second time. Indeed, Shonelle severely struggled in school until the ninth grade when he dropped out.

73.     Soon thereafter, as documented by Department of Youth Services records, it was determined that Shonelle was in the lowest twelve percent of sixteen year olds in terms of intellectual functioning. As a result, he was recommended for special education services.

74.     While average intellectual functioning children also require a certain degree of attention, family members, such as Della Jackson, Joyce Harvest, Geraldine Taylor, Monica Taylor, and Thelma Owens, would have testified that between the drugs, lack of financial support from Louis Taylor, and Marilyn Jackson's brutal work schedule, Shonelle never received even the minimal amount of academic attention one would devote to an average functioning child. Consequently, he certainly did not receive the type of specialized and individual attention needed to compensate for his impaired intellectual capacity.

75.     Moreover, Ms. Jackson's own mental impairments prevented her from providing appropriate and meaningful guidance to Shonelle. In this regard, Mr. Jackson had no one to whom he could turn. Family members, including Geraldine Taylor and Thelma Owens, would have testified that along with his already

34

diminished mental capacity, Shonelle was never required or even encouraged to attend school by his parents.

76.     As a consequence of Mr. Jackson's mental and emotional impairments, individuals such as Rosalyn Jordan and Thelma Owens would have testified that he was not as mature as other kids, that he could be easily swayed by others, and that he was unusually vulnerable to peer pressure. In addition, his Department of Youth Services records indicated that he had difficultly with negative peer influence.

77.     Despite his susceptibility to peer pressure, testimony from family members, including Della Jackson, Dmitri Gatson, Monica Harvest, Joyce Harvest, Geraldine Taylor, and other community members, such as Latanya Austin, Rick Cotton, and his teacher, Rosalyn Jordan, would have established that Mr. Jackson has always been eager to please and incredibly respectful towards members of society.

78.     Eddie Woods and other members of the Trenholm Court Community, amongst others, would have testified that Shonelle occasionally performed yard work for them. Indeed, Shonelle has always been a hard worker who has always done well in structured environments, such as correctional facilities.

79.     As a result of his family's desperate financial situation, Shonelle grew up in a neighborhood that was plagued by rampant drug use and accompanying violence.

35

80.    Latanya Austin would have testified that during the developmental stage of Shonelle's life, the neighborhood in which Shonelle grew up was infiltrated by crack-cocaine. She would have testified that by the mid-1980s Shonelle was living in a neighborhood where crack was rampant and by the early-1990s gun shots were heard on a regular basis.

81.    Indeed, Shonelle's psychological intake report from the Department of Youth Services reveal that violence deeply touched Shonelle's life. At the age of fifteen, Shonelle had one friend who died after being kidnaped and another who was murdered while being robbed.

82.    Shonelle's exposure to violence did not stop at his front door; rather, he was continually exposed to violent activity at the hands of family members. At a very early age, Shonelle's father, Louis Taylor, carried a knife on his person most places he went. Louis Taylor, was often involved in violent altercations and court records would have revealed that on one occasion he was arrested for fighting with a police officer. Louis and Geraldine Taylor would have testified that on another occasion, Louis Taylor returned home with a gun shot wound. A panicked and disturbed Geraldine Taylor began to cry when she recognized that Louis had been shot.

83.    Nor was Louis Taylor the only parent prone to violence. Marilyn Jackson and Louis Taylor fought physically on a regular basis. Laquanda and Wanda

36

Jackson would have testified that every few days Marilyn Jackson and Louis Taylor became physically violent with one another. In one particular incident, Marilyn stomped on Louis as he lay on the ground. Thelma Owens would have testified that Marilyn often had welts, bruises, and knots caused by Louis during their frequent fights.

84.     Violence and the threat of violence was pervasive during Shonelle's childhood. Often it was promulgated by his parents. For example, Geraldine Taylor, Laquanda Jackson, Wanda Jackson, Marilyn Jackson, and Julia Taylor would have testified that Shonelle witnessed his aunt threaten his uncle Louis with being shot when he refused to leave the apartment on one occasion. It was in this environment of a ready resort to violence or a threat of violence in which Mr. Jackson grew up.

85.     Nor did Marilyn Jackson and Louis Taylor spare their children violent treatment. Laquanda and Wanda Jackson would have testified that their mother often gave them whoopings for engaging in childish activity. Unlike his sisters, Shonelle was rarely if ever whooped by his mother; instead, he was thrashed by his father. Roosevelt Emerson, Jr. would have testified Shonelle was repeatedly beaten by his father with an electric cord, which resulted in whip marks on his arms and legs.

86.     Laquanda and Wanda Jackson would have testified that the discipline affected the children in such a way that they eventually began to engage in a routine

37

of disciplining each other when they had engaged in activity they thought was unacceptable.

87.     As a form of discipline, when Shonelle was young, his father and uncles would wrestle with him as if he was an adult, often causing extreme pain and injury. Shonelle's father would often come home drunk and physically fight or wrestle with Shonelle. These confrontations, fueled by alcohol and drugs, were even more violent than usual.

88.     Marilyn Jackson, Louis Taylor, Laquanda Jackson, Wanda Jackson, Thelma Owens, Geraldine Taylor, Della Jackson, Julia Taylor, Monica Taylor, and Joyce Harvest would have testified that due at least in part to his violent behavior, Louis Taylor was often absent from the home. His sporadic presence was attributable to periodic arrests resulting in incarceration and fights with Marilyn that led to short periods of separation.

89.     Shonelle tried to fill the void left by his father by protecting his sisters and buying his family things; however, Mr. Jackson was never able to fill the gap left by his father's absence in his own life. Due to a confluence of factors, including his father's absence and violence, Shonelle began socializing with individuals much older than he, and who were regularly engaged in violent and illegal activity. His family members and friends, including Wanda Jackson and Keisha Young, would

38

have testified that Shonelle joined a gang, which included much older young men than he, when he was a teenager.

90.    Eddie Woods would have testified that Shonelle spent a considerable amount of time at his house, socializing with his children. Mr. Woods' children include Marshall (Bay-Bay), Tyronne, and Eddie. Latanya Austin, Eddie Woods, Laquanda Jackson, Monica Taylor, and Wanda Jackson would have testified that Shonelle was also close with Eddie Woods' grandson, Antwain Rainer ("Cornbread"). At the time Shonelle was fifteen, Antwain Rainer was eighteen and Marshall Woods was twenty-two.

91.    Lacking a responsible male role model, Shonelle instead turned to these individuals, as well as another individual, Tollie Redmon, who were somewhat older than Shonelle. Neither Antwain nor Marshall were capable of providing an appropriate role model; instead, they provided just the opposite. Monica Taylor, Laquanda Jackson, Wanda Jackson, and Latanya Austin would have shown that Marshall and Antwain consistently engaged in violent and illegal activity.

92.    Given his pervasive exposure to violence and criminal activity, it is not surprising that by the age of twelve, Shonelle had already acquired a gun. In addition, Mr. Jackson began using drugs and alcohol at a very young age. Records from the Department of Youth Services indicate that by the time that he was thirteen, Shonelle

39

had been diagnosed as alcohol dependent. This substance abuse was consistent throughout his life up to the time that he was arrested for this crime. In addition to using drugs and alcohol, Dmitri Gaston, Laquanda Jackson, Wanda Jackson, Julia Taylor, Monica Taylor, and Keisha Young would have testified that Shonelle became a gofer for these older gang members, selling crack and other drugs, to make money for both himself and his family.

93.    Much of the money he made selling drugs, he used to provide his sisters and mother with necessities. Laquanda Jackson, Marilyn Jackson, Wanda Jackson, Keisha Young, and Monica Taylor would have testified that Shonelle primarily used this money to provide for his family. In fact, Shonelle never owned a car himself nor did he ever acquire his own residence, but instead biked around the neighborhood.

94.    Mr. Jackson's familial devotion was not limited to his immediate family. Dmitri Gaston, Julia Taylor, Monica Harvest, Laquanda Jackson, Wanda Jackson, Della Jackson, Joyce Harvest, Geraldine Taylor, Betty Brawlin, Freddie Owens, Donald Collins, Christopher Harvest, Shantay Harvest, Chakka Harvest, Decarlos Harvest, Julia Taylor, Monica Taylor, Gary Collins, Detrick Collins, and Sonya Ringstaff all would have testified that Shonelle loved all of them and he was well-loved by them. In addition, Laquanda Jackson, Marilyn Jackson, Wanda Jackson, and Sonya Ringstaff would have testified that he loves his daughter, Zekia Jackson.

40

95.     Mr. Jackson spent a great deal of time with his family growing up. Mr. Jackson's sisters would have testified that three of them spent an exceptional amount of time together. Marilyn Jackson's trust of her son resulted in Laquanda and Wanda being prohibited from leaving the house without Shonelle. Despite the age difference, Mr. Jackson brought his sisters to church, the community center, and the jubilees.

96.     Had counsel acquired Mr. Jackson's records they would have showed that individuals outside Mr. Jackson's family often detected his desire to provide for loved ones and members of the community. This was confirmed by Department of Youth Services' records.

97.     Mr. Jackson's familial devotion extended beyond his immediate family to his half-sister, cousins, aunts, and grandmothers. Growing up, Mr. Jackson spent a great deal of time with his half-sister, cousins, and grandmothers. Shonelle spent many weekends playing sports with his cousin, Christoper Harvest, and neighbors at his grandmother's house. Older relatives, including Betty Brawlin, Joyce Harvest, Geraldine Taylor, and Thelma Owens, found Shonelle respectful and well-mannered. Moreover, he was willing to lend a helping hand when chores needed to be done. His half-sister, Dmitri, would have testified that despite being a few years older than Shonelle, he tried to look out for her by steering her away from nightly hangouts he knew were unsafe.

41

98.     Such devotion extended beyond Mr. Jackson's family to other significant persons in his life.  Latrice Walker would have testified that Mr. Jackson was different from most young men who grew up in Trenholm Court.  Rather, he was respectful and considerate.  She would have recalled times when Mr. Jackson inquired into her well-being by asking after a long day whether she had enough to eat.

99.     Evidence would have also established that Mr. Jackson is well loved by those who know him.  He has always played and continues to play an important role in his family, and make emotional contributions to his family members, including his grandmother, aunts, parents, siblings and his daughter. Had counsel conducted a reasonable investigation, they would have presented testimony revealing Mr. Jackson's dedication to his family.

100.    Despite the vast amount of readily available mitigating evidence available related to Mr. Jackson's family history, medical history, criminal history, correctional history, educational history and good character, trial counsel failed to adequately prepare and present this evidence at either the penalty or judicial sentencing phases of Mr. Jackson's trial.  Had this evidence been presented, Mr. Jackson would have been sentenced to life without possibility of parole.  Their performance was clearly deficient and prejudicial to Mr. Jackson. See Wiggins, 539 U.S. at 537 (the "available mitigating evidence, taken as a whole, might well have

42

influenced the jury's appraisal of Wiggins' moral culpability" (citation omitted));

Williams, 529 U.S. at 420 (stating that prejudice determination must rest on

assessment of totality of omitted and presented evidence rather than on idea that one

piece of omitted evidence must require a new hearing). In Mr. Jackson's case, there

was a reasonable probability that but for trial counsel's deficient performance in

failing to present all the available mitigating evidence, the judge would not have

imposed a sentence of death.

> b.    *Trial Counsel Failed to Develop and Present*
>       *a Penalty and Sentencing Phase Strategy to*
>       *Convince the Sentencing Authority that Life*
>       *without Parole was the Appropriate Sentence.*

101. Because trial counsel had not conducted a constitutionally adequate

investigation of the circumstances of Mr. Jackson's life, they to failed to develop a

defense to the death penalty. Trial counsel's lack of penalty phase strategy is

apparent from the record.[4] At the conclusion of the guilt phase, trial counsel moved

for a continuance because they intended to call probation officer Carolyn Flack as

witness, but because "she wouldn't come in voluntarily," and because trial counsel

had failed to anticipate the possibility of a penalty phase trial, she had not been

---

[4]Indeed, counsel did not even know how many jurors were required to impose
a sentence of life without parole. When discussing jury instructions, trial counsel
expressed surprise at the number of jurors needed: "Seven jurors, your honor? I
always thought it was ten." (R. 578.)

subpoened and so she was not present in the courtroom. In assessing whether to grant a continuance, the trial court conducted an *ex parte* hearing with the District Attorney – agreed to by defense counsel – in which the trial court agreed with the District Attorney's statement that defense counsel had "known all along, Judge, about this," and expressed his frustration with trial counsel: "I couldn't agree with you more. I'm so mad I could chew nails." (R. 530.)[5]

102. Trial counsel's opening and closing arguments at the penalty phase, as well as counsel's argument at the judicial sentencing hearing, were constitutionally deficient and prejudicial. See Dobbs v. Turpin, 142 F.3d 1383, 1389 (11th Cir. 1998) (citing Penry v. Lynaugh, 492 U.S. 302, 316 (1989)). At the judicial sentencing hearing, trial counsel's argument covered less than three pages in the transcript and consisted primarily of defense counsel's explanation that the jury's recommendation should be given "great weight." (R. 58.)

103. Trial counsel then failed to present any additional evidence to the judge, instead informing the trial court that "most of the other argument that we would have

---

[5]Only part of this hearing is on the record. At some point, the trial court states, "[l]et's go off the record," and nothing else about their conversation is recorded. (R. 532.) Because defense counsel declined to be involved in this hearing, and failed to ensure the presence of his client at all of these hearings, defense counsel did not have the opportunity to object to any improper decisions, or to effectively advocate on his client's behalf.

44

on this case has been included either in our proposed findings on what the court has heard at the penalty phase hearing and I don't think there is any use in my going over that." (S.H. 11.)

104. Given that the sentencing authority – under Alabama law – was authorized to reject the jury's verdict, trial counsel needed to marshal and present the mitigating evidence of Mr. Jackson's violent upbringing, impoverished community, lack of a father figure or other male remodel, mental impairments and familial devotion in order to persuade the sentencing authority that the jury had reached the correct decision when it unanimously sentenced Mr. Jackson to life without the possibility of parole. Counsel should have then argued to both the jury and the judge that these compelling mitigating circumstances constituted a basis for the imposition of a sentence of life without the possibility of parole. Counsel's failure in this regard constitutes ineffective assistance of counsel.

> c. *Trial Counsel Failed to Obtain and Present Independent Expert Witnesses.*

105. Trial counsel also failed to obtain and present independent expert witnesses at the sentencing phase of Mr. Jackson's trial. These experts would have reviewed medical, social services, school, mental health, and other institutional records; interviewed Mr. Jackson and members of his family; developed a family

45

history assessment; expressed an opinion as to the connection between Mr. Jackson's childhood and the behavior for which he was convicted; assisted counsel in understanding and presenting evidence of the effect of Mr. Jackson's background on his behavior; and testified about his or her findings and conclusions regarding Mr. Jackson's background, family history, mental health, and history of alcohol and drug abuse. In addition, trial counsel failed to present meaningful evidence concerning Mr. Jackson's intellectual disabilities and argue that this was a reason for a sentence less than death. Expert witnesses such as a social worker, an investigator, a mental health expert and an expert on drug and alcohol abuse would have explained the likely causes of Mr. Jackson's mental and emotional problems and how those problems were relevant both to Mr. Jackson's defense and to his moral culpability.

106. An investigator "who has received specialized training [would have been] indispensible [in] discovering and developing the facts [that would have been] unearthed at trial. . . ." American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Commentary to Guideline 4.1 (2003). As an attorney's expertise does not extend to the area of investigation and his time is more wisely used when focusing on the legal research, this expert would have devoted the due amount of time to thoroughly researching and discovering all relevant mitigating evidence relating to Mr. Jackson's life. Id. Specifically, the

investigator would have uncovered the myriad mitigating evidence identified previously.

107. A social worker or mitigation specialist would have synthesized and evaluated the significance of the information obtained by the investigator, as described previously. By compiling a psycho-social history of Mr. Jackson, such an expert would have "analyzed the significance of the information in terms of impact on development, including effect on [Mr. Jackson's] personality and behavior." Id. Had a social worker or mitigation specialist been called, he or she would have explained to the judge and the jury the multiple risk factors present in Shonelle's life, as described *infra,* and how they affected his actions and development

108. A mental health expert would have gathered information relating to Mr. Jackson's familial history of mental impairments and his stunted mental and academic development, as well as Mr. Jackson's intellectual disabilities, as described previously. Such an expert would then have explained the significance of Mr. Jackson's mental impairments and the multiple ways in which they affected his life, including, particularly, how these limitations would have rendered Mr. Jackson particularly ill-equipped to overcome the milieu of poverty, drugs, alcohol, neglect, and violence in which Mr. Jackson grew up.

109. An expert on drug and alcohol abuse would have testified about Mr.

47

Jackson's lifelong battle with alcohol and substance abuse and how his use of drugs and alcohol impaired his mental state, as described in previously. This expert would have also assisted counsel in recognizing the importance of finding, developing, and presenting evidence regarding Mr. Jackson's drug use and alcohol abuse, as well as that of his parents and other role models. This expert could then have synthesized this evidence for the jury and the court, and would have elucidated how these factors resulted in an impaired and suggestible individual.

110. Trial counsel's failure to obtain and present independent expert witnesses at the sentencing phase constituted deficient performance that prejudiced Mr. Jackson. Such evidence would have made it clear to both the jury and judge that the appropriate punishment for Mr. Jackson was life without the possibility of parole. But for counsel's deficient performance, the outcome of Mr. Jackson's trial would have been different and he would not have been sentenced to death. Williams, 529 U.S. at 420.

111. These errors constitute a violation of Mr. Jackson's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, the Alabama Constitution and Alabama law. Wiggins v. Smith, 539 U.S. 510 (2003); Williams v. Taylor, 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668 (1984). The state court's determination that Mr. Jackson was not entitled to relief on

48

this claim was both an unreasonable determination of the facts and contrary to or an unreasonable application of, clearly established federal law. Mr. Jackson is thus entitled to habeas corpus relief on this ground. See 28 U.S.C. § 2254(d)(1), (d)(2).

### 2. Trial Counsel Were Ineffective During the Guilt/Innocence Phase of Mr. Jackson's Trial.

112. Mr. Jackson was denied effective legal representation during the guilt/innocence phase of his capital trial. But for counsel's deficient performance, Mr. Jackson would not have been convicted of capital murder and sentenced to death. Wiggins v. Smith, 539 U.S. 510 (2003); Williams v. Taylor, 529 U.S. 362 (2000); Strickland v. Washington, 466 U.S. 668 (1984).

113. First, trial counsel failed to investigate and interview the "only actual eyewitness to the shooting," Gerard Burdette. (R. 19.) Mr. Burdette gave a statement on the night of the crime which identified individuals other than Mr. Jackson as the responsible parties. His testimony was therefore critical; as defense counsel noted at trial: "[i]f he testifies to what was in his statement, he could very well exonerate our client." (R. 20.) Despite the critical importance of this witness, trial counsel did not find or interview him, and thus was unable to present his testimony. In fact, trial counsel did not even know that they could not find him "until the State told Mr. Bruner that they had issued a subpoena on him and couldn't find him." (R. 23.) As

49

the court acknowledged at trial, "If y'all thought you needed him – doesn't sound to me like y'all tried to do anything. Coincidentally found out he was being looked for." (R. 23.) In light of this information, trial counsel filed a motion for a continuance three days before trial. (C. 83.) This motion was denied by the trial court. See Claim E (incorporated by reference). Mr. Burdette never showed up to trial, (R. 38), and when defense counsel sought to introduce a tape recording of his statement at trial, counsel learned that the "tape was never impounded." (R. 38.) By virtue of their failure to find and interview this witness, counsel was thus forced to read Mr. Burdette's statement into the record at trial. (Vol. 6, R. 33.)

114. Second, counsel failed to conduct a constitutionally adequate investigation of the State's capital charges against Mr. Jackson. Counsel should have investigated and presented evidence in support of this theory in response to the State's motion *in limine* to prevent Mr. Jackson from presenting evidence that the killing occurred during a drug deal. This evidence would have included testimony from witnesses such as Gerard Burdette and the victim's wife, Lacreama Moore. These witnesses could have established not only that the victim was involved in gang activity, but that this activity involved selling drugs.[6] Additionally, had trial counsel

---

[6]Indeed, counsel was on notice about this as the prosecutor acknowledged that the victim was a drug dealer, and that his wife could establish his reputation as such. (R. 31.)

investigated and interviewed family members and friends such as Marilyn Jackson,

LaQuanda Jackson, Wanda Jackson, Keisha Young, Monica Taylor, Julia Taylor,

LaTanya Austin and Greg McGee, counsel would have uncovered and presented

evidence that Shonelle began selling drugs at a very young age as a "drug gofer" for

older men in the neighborhood who were gang members, and that Shonelle himself

was a gang member and was involved in gang activity.   Such interviews and

investigation would have also revealed that Mr. Jackson and a co-defendant had

previously been convicted of drug offenses, (R. 394, C.177), and that Mr. Jackson

used drugs on the day of the crime. (C.105, 112, 121, 122.)

115.   Had counsel marshaled the evidence of the victim's drug use and gang

activity, as well as Mr. Jackson's history of selling drugs and gang involvement, and

alerted the trial court to this evidence, the trial court would have denied the State's

motion *in limine*, and allowed counsel to present evidence that the motive for this

crime was not robbery, but instead was a result of a drug deal gone bad.   Counsel

could then have presented this theory of defense to the jury both in evidence and

argument, and the jury would have not have convicted Mr. Jackson of capital murder.

116.   Without this investigation, trial counsel failed to present a viable theory

of defense.   During opening argument, counsel simply referred to the State's burden

of proof, and reminded the jury to consider the bias of the co-defendants when

assessing the reliability of their statements. (R. 168-73.) After the State had rested, counsel then failed to present any witnesses, save for the statement of Gerard Burdette, which was read into the transcript by the two defense attorneys. (Vol. 6, R. 33.) Trial counsel's closing statement was similarly inadequate. After the State had an opportunity to rebut Mr. Burdette's statement, defense counsel then presented a closing argument in which counsel once again reminded the jury of the burden of proof, pointed out the inconsistencies in the co-defendant's statements and argued that the facts and the story "ought to tell you and give you a gut feeling that the State has proven its case beyond a reasonable doubt." (R. 58.) Mr. Jackson's counsel failed entirely in argument to advocate on his behalf. See Herring v. New York, 422 U.S. 853 (1975) (". . . no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.").

117. Third, counsel failed to adequately object to the prosecutor's use of discriminatory strikes against the veniremembers. See Claim G (incorporated by reference). Mr. Jackson is African American. There were 42 prospective jurors on Mr. Jackson's jury venire, of which 19 were black. The prosecutor had 15 peremptory strikes, of which he used 8 remove African-American veniremembers. Instead of simply arguing to the judge that the prosecutor struck "six out of seven

[black jurors] in a row," (R.156), as a basis for a prima facie case, the defense should have presented evidence and argument to show that the struck jurors were as heterogeneous as the community as a whole; that there was a lack of meaningful voir dire in this case and that the District Attorney for Montgomery County has a history of discrimination in jury selection[7] in support of his objection under Batson v. Kentucky, 476 U.S. 79 (1986). See Eagle v. Linahan, 279 F.3d 926 (11th Cir. 2001) (finding counsel ineffective for failing to adequately raise Batson claim). The trial court would have found a prima facie case of discrimination and counsel would then have been able to show that the prosecution was removing jurors from the venire solely on the basis of race, which is necessarily prejudicial not only to Mr. Jackson but to the jurors and the entire criminal justice system as well. Trial counsel's failures during voir dire denied Mr. Jackson the right to a fair trial and impartial jury.

118.   Finally, counsel failed to request and failed to object to the trial court's failure to instruct the jury on the lesser included offense of robbery. Although the State's evidence showed that the victim was killed and that the victim's car was

_____

[7] See, e.g., Bui v. Haley, 321 F.3d 1304 (11th Cir. 2003) (habeas relief granted where Montgomery County prosecutor engaged in racially discriminatory jury selection); Ex parte Yelder, 630 So. 2d 107, 109 (Ala. 1992); Ex parte Bird, 594 So. 2d 676, 681 (Ala. 1991); Parker v. State, 568 So. 2d 335 (Ala. Crim. App. 1990); Powell v. State, 548 So. 2d 590 (Ala. Crim. App. 1988); Williams v. State, 548 So. 2d 501 (Ala. Cr. App. 1988); Acres v. State, 548 So. 2d 459 (Ala. Crim. App. 1987).

stolen, the State's evidence also showed that the car was stolen only as an "afterthought" and that the robbery was thus a separate crime from the murder. Trial counsel's failure to ensure that the trial court properly instructed the jury on the lesser included offense of robbery, by first requesting and then objecting to the trial court's failure to do so, constitutes ineffective assistance of counsel that prejudiced Mr. Jackson. As Alabama Supreme Court Justice Johnstone recognized, had counsel "requested such a jury instruction, it would have been due [Mr. Jackson]." Ex parte Jackson, 836 So. 2d 979, 991 (Ala. 2002) (Johnstone, J., concurring in part and dissenting in part). See Claim D (incorporated by reference).

119.   These errors denied Mr. Jackson the effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. But for counsel's deficient performance, Mr. Jackson would not have been convicted of capital murder and sentenced to death. Strickland v. Washington, 466 U.S. 668 (1984); Williams v. Taylor, 529 U.S. 362 (2000). The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

54

**C. THE TRIAL COURT'S REJECTION OF THE JURY'S UNANIMOUS LIFE VERDICT IN AND INSTEAD IMPOSING A SENTENCE OF DEATH VIOLATES UNITED STATES SUPREME COURT PRECEDENT.**

120. Shonelle Jackson was just 18 years old at the time of this crime. After finding Mr. Jackson guilty of one count of capital murder during a robbery, the jury returned a verdict sentencing Mr. Jackson to life without the possibility of parole by a vote of 12-0. In spite of the jury's unanimous verdict for life without parole, the trial court nonetheless overrode and sentenced Mr. Jackson to death. Habeas corpus relief is now warranted for the following reasons.

1. The Trial Court's Sentencing Order Overriding the Jury's 12-0 Verdict of Life Violates Clear Federal Law.

121. The trial court's sentencing order rejecting the jury's life verdict is constitutionally infirm for three reasons. First, the trial court improperly copied a sentencing order written by a different judge, from a different case and from a different state. Second, the trial court improperly considered Mr. Jackson's physical characteristics. Finally, the trial court failed to make a constitutionally adequate determination of Mr. Jackson's culpability. Individually and collectively, these constitutional violations warrant habeas corpus relief. 28 U.S.C. § 2254(d)(1), (2).

        *a. The Trial Court Improperly Copied A Sentencing Order Written By A Different Judge, From a Different Case And From A Different State.*

55

122.   "The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant." Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir. 1991) (quoting Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987) (quoting Eddings v. Oklahoma, 455 U.S. 104 (1982))).   In this case, the trial court abandoned these principles when it overrode the jury's 12-0 verdict of life.   Specifically, instead of making a determination of mitigation based on the individual characteristics of Mr. Jackson, the trial court wrote an order which is based on a sentencing order written by a different judge from a different state about the characteristics of a different defendant. The fact is that the trial court used the sentencing order of a Florida court as a mere fill-in-the-blank form, thereby failing to fulfill the requisite individualized finding for the imposition of the death penalty.   A comparison between the order in this case and the order in Shellito v. State, 701 So. 2d 837 (Fla. 1997), is made on the next page:

| **In Shellito the sentencing order reads:** | **In Mr. Jackson's case, the order reads:** |
|---|---|
| At the time of the murder, the defendant was 6'4' tall, weighed 176 pounds and was 19 years of age. He is now 20 years old. He was and is a physically mature adult male. The murder victim . . . was 18 years of age. | At the time of the homicide Jackson was 6 feet tall, weighed 175 pounds and was within 35 days of being 19 years old. He is now 20 years old. At the time of the offense he apparently was, and he is, a physically mature adult. The victim was 23 years old. |
| The defendant's criminal record started at age 13 in Juvenile Court. He was arrested 14 times as a juvenile and adjudged guilty of 4 felonies and committed to HRS. At age 16, he was certified from Juvenile Court to adult Felony Court for prosecution. | Jackson's criminal record started at the age of 12 in Juvenile court. He was arrested 8 times as a juvenile, and was adjudicated guilty of 4 felonies (burglary in the third degree, theft of property in the third degree, robbery in the first degree, and robbery in the first degree), and he was committed to the department of Youth Services on adjudications for assault in the third degree and 2 charges of robbery in the first degree. At age 17 he was waived from the Juvenile court to adult court for prosecution on charges of burglary in the second degree, theft of property in the first degree, and possession of marijuana in the first degree. |
| The defendant's total criminal records as a juvenile and as an adult show that he was arrested 22 times, has been charged with 30 separate crimes and has not been convicted of 8 felonies as an adult. He also has 4 felony convictions as a juvenile. | Jackson's combined criminal records shows that he has been arrested 13 times and he has been charged with 14 separate crimes--5 of which are felonies. Two of the felonies and 1 misdemeanor (assault in the third degree) are violent crimes. |
| The defendant was on probation for 2 violent felonies at the time he committed this murder. | He was on probation for three felonies at the time he committed the homicide. . . . |
| The PSI [pre-sentence investigation] and testimony show that the defendant has been using alcohol and drugs since an early age . . . . | According to the pre-sentence report [PSI], he was a daily user of marijuana since age 14 and a regular consumer of alcohol. He does not consider his marijuana use or his alcohol consumption a problem. |
| The defendant's age is a marginal mitigating circumstance . . . . Id. at 843. | Jackson's age is a marginal mitigating circumstance. (C. 177-78.) |

122.   The trial court did not consider factors other than those mentioned by the Florida court. As a consequence of the court's reliance on another order, factors relevant to the court's analysis of Mr. Jackson's age as a mitigating element are absent. Directly relevant to the consideration of age as a mitigating factor is the level of education attained by Mr. Jackson. Mr. Jackson attended school only until the ninth grade. (R. 567.) The trial court made no mention of Mr. Jackson's education in its analysis, although education is as at least as relevant to an evaluation of Mr. Jackson's maturity at the time of the offense as his height and weight, which the court did consider. (C. 177.) This underscores the fact that the trial court considered only the factors considered by the Florida court in Shellito, and thereby omitted relevant factors from its analysis.

123.   In copying a sentencing order from a different case, the court contravened the fundamental requirement that a defendant receive an individualized sentencing determination. See, e.g., Zant v. Stephens, 462 U.S. 862, 879 (1983) ("What is important . . . is an individualized determination on the basis of the character of the individual and the circumstances of the crime."). By relying on a sentencing order from a different case, from a different trial judge, and from a different jurisdiction, the trial court violated Mr. Jackson's rights to due process, a fair trial, to have mitigating evidence considered, and an individualized and reliable

58

sentencing protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

> b. *The Trial Court Improperly Considered Mr. Jackson's Physical Characteristics.*

124. Overruling the jury's unanimous life verdict, the trial judge sentenced Mr. Jackson to death based upon his height and weight. At the time of the crime, Mr. Jackson was only 18 years old. However, the trial judge minimized the weight to be given to Mr. Jackson's age as a mitigating factor, by considering the fact that "[a]t the time of the homicide Jackson was 6 feet tall, weighed 175 pounds . . . ." (C. 177.)

125. Fundamental death penalty jurisprudence insists on "individualized" consideration of "relevant facets" of the accused's character. Woodson v. North Carolina, 428 U.S. 280, 304 (1976). The trial court's consideration of Mr. Jackson's size in rejecting the jury's unanimous life verdict is the essence of arbitrariness and the state court's acceptance of such consideration, contravenes clear precedent and violates his rights to due process, a fair trial, and an individualized and reliable sentencing determination protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

> c. *The Trial Court Failed To Make An Adequate Determination of Mr. Jackson's Culpability.*

126. The Eighth Amendment requires that before sentencing a defendant to

death, a court must determine the fundamental issue of personal culpability. <u>See</u>
<u>Cabana v. Bullock</u>, 474 U.S. 376 (1986) (as prerequisite to imposing death penalty,
a court must determine that defendant killed, attempted to kill or intended that killing
take place); <u>Enmund v. Florida</u>, 458 U.S. 782 (1982) (death penalty disproportionate
for person who aids and abets in commission of murder, but does not kill, attempt to
kill or intend to kill); <u>Tafero v. Wainwright</u>, 796 F. 2d 1314 (11th Cir. 1986)
(requiring <u>Cabana</u> finding in state proceedings in order to uphold death sentence).

127.   In Mr. Jackson's case, the trial court failed to satisfy these Eighth
Amendment concerns which require an adequate finding of culpability.   In its
sentencing order, the trial court did not make a determination as to whether Mr.
Jackson was the shooter.   The trial court stated that "there is evidence that [Mr.
Jackson] was the shooter," (C. 176), and that "there is also evidence that suggests that
Barnes, *not Jackson*, fired the shot that killed Moore."   (C. 176 n.6) (emphasis
added).

128.   The trial court's failure to make a determination of the defendant's
culpability, violated Mr. Jackson's rights to due process, a fair trial, and an
individualized and reliable sentencing protected by the Fifth, Sixth, Eighth and
Fourteenth Amendments to the United States Constitution.

2. The Trial Court's Rejection of the Jury's Unanimous
Life Verdict Conflicts with *Ring v. Arizona*.

129. Under Ring v. Arizona, 536 U.S. 584 (2002), juries, not judges, must determine "any fact on which the legislature conditions an increase in [a capital defendant's] maximum punishment." Id. at 588. In Alabama, a death sentence can only be imposed when two conditions are met: 1) statutory aggravating circumstance(s) must be proved to exist beyond a reasonable doubt, *and* 2) those aggravating circumstances must be found to outweigh the mitigating circumstances. Ex parte Woodard, 631 So. 2d 1065, 1071 (Ala. Crim. App. 1993); see also Ala. Code § 13A-5-46(e)(2)(1975) (if aggravating circumstances do not outweigh mitigating circumstances, penalty "shall" be life imprisonment without parole); Ala. Code § 13A-5-45(f) (1975) (if aggravating circumstances do not exist, "the sentence shall be life imprisonment without parole."). In Mr. Jackson's case, there was a violation of Ring because the jury never made the factual findings in the penalty phase necessary to expose Mr. Jackson to a death sentence.[8]

130. Indeed, the aggravating circumstances for which the death sentence was imposed in this case were not reliably determined to exist by the jury in violation of Mr. Jackson's rights. In rejecting the jury's unanimous verdict in this case, the trial

---

[8]Mr. Jackson's jury's unanimous verdict of life without parole constitutes a rejection of a factual basis for imposition of the death penalty.

61

judge found the existence of two aggravating circumstances: 1) that the murder was committed while Mr. Jackson was engaged or was an accomplice in the commission of a robbery, under Ala. Code § 13A-5-49(4), and 2) that the murder was committed by a person under sentence of imprisonment under Ala. Code § 13A-5-49(4) (1975).[9] Jackson v. State, 836 So. 2d 915, 965 (Ala. Crim. App. 1999).

131.   Although the jury was instructed on both of these aggravating circumstances at the penalty phase of the trial, there is no basis for concluding that the aggravating circumstances found by the judge were factually found by the jury to exist beyond a reasonable doubt. In fact, the jury's unanimous verdict sentencing Mr. Jackson to life without the possibility of parole constitutes a rejection of these aggravating circumstances.

132.   Alabama does not permit juries to make a showing of what, if any, aggravating circumstances were found at the penalty phase of the trial, and in this case, the jury returned a verdict of life without the possibility of parole. There is thus no way to conclude that Mr. Jackson's jury determined that the murder was committed by a person under sentence of imprisonment. The trial court's reliance on

---

[9]The aggravating circumstance under Ala. Code § 13A-5-49(1) – the capital offense was committed by a person under sentence of imprisonment – which the trial judge found in this case, is distinct from Ala. Code § 13A-5-49(2) – the defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person  – which is not at issue in this case.

this aggravator thus clearly violated Mr. Jackson's Sixth Amendment rights under Ring.[10] To the extent that the jury's first-phase finding that Mr. Jackson was guilty of capital murder would permit the judge to automatically impose death, this was a violation of clear law requiring that both the jury and the defendant be aware of the process and consequences of determinations made at trial. Simmons v. South Carolina, 512 U.S. 154, 162 (1994) (plurality op.) (where State puts in issue whether death is appropriate sentence, due process entitles defendant to inform jury about nature and consequences of their decision); Adams v. Texas, 448 U.S. 38 (1980) (jury must make life or death decisions with awareness of consequences of decisions).

133.   Mr. Jackson's sentence also fails under Ring because the aggravating circumstance of a murder committed by a person under a sentence of imprisonment was not alleged in the indictment. See Jones v. United States, 526 U.S. 227, 243 n.6 (1999) ("[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.")  Mr. Jackson was sentenced to death on the basis of factual findings that the capital offense was

---

[10]The Alabama Supreme Court has recognized that where the death sentence is based in part on consideration of an invalid aggravator, such a sentence cannot be affirmed. Ex parte Williams, 556 So. 2d 744, 745 (Ala. 1987).

committed by a person under sentence of imprisonment. Under Apprendi[11] and Ring, the trial court violated Mr. Jackson's due process rights by sentencing him to death based on an element the State did not charge in the indictment.

134. Finally, by providing that the judge, not the jury, is the final sentencer, see Ala. Code § 13A-5-47(e) (jury's verdict not binding on the sentencing court), Alabama law is unique in its "refusal to constrain its judges' power to condemn defendants over contrary jury verdicts." Harris v. Alabama, 513 U.S. 504, 524 (1995) (Stevens, J., dissenting). By holding that the Sixth Amendment right to a jury trial applies to the penalty phase of capital trials – that "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment," Ring, 536 U.S. at 589 – the United States Supreme Court invalidated Alabama's death penalty scheme.

135. The Supreme Court has repeatedly held that "because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense." Spaziano v. Florida, 468 U.S. 447, 468 (1984) (Stevens, J., concurring in part and dissenting in part). Without such special

---

[11]Apprendi v. New Jersey, 560 U.S. 466 (2000).

procedural safeguards, "the constitutional prohibition against 'cruel and unusual' punishments would forbid its use." Ring, 536 U.S. at 614 (Breyer, J., concurring in the judgment) (citing Furman v. Georgia, 408 U.S. 238 (1972) (per curiam)).

136. Even though judges are democratically elected in Alabama, "the jury remains uniquely capable of determining whether, given the community's views, capital punishment is appropriate in the particular case at hand." Ring, 536 U.S. at 616 (Breyer, J., concurring in judgment). In Mr. Jackson's case, the jury unanimously rejected a verdict of death. The legitimacy of capital punishment in light of the Eighth Amendment's mandate concerning the proportionality of punishment critically depends upon whether its imposition in a particular case is consistent with the community's sense of values. Spaziano, 468 U.S. at 489 (Stevens, J., concurring in part and dissenting in part). "If the prosecutor cannot convince a jury that the defendant deserves to die, there is an unjustifiable risk that the imposition of that punishment will not reflect the community's sense of the defendant's 'moral guilt.'" Id.

137. Facially, and as applied in this case, Alabama's statute "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."

Lockett v. Ohio, 438 U.S. 586, 605 (1978) (plurality opinion).

   3.   The Trial Court's Override of the Jury's 12-0 Verdict of Life
        Imprisonment without Parole was Improper, Arbitrary and
        Unconstitutional.

   138.   Alabama is the only state in the country which allows trial courts to reject jury capital sentencing verdicts without reference to any uniform norm or standard.   Ala. Code § 13A-5-47(3)(1975).[12]   In upholding Florida's override provision, the Supreme Court specifically "recognized the significant safeguard the Tedder standard affords a capital defendant." Spaziano v. Florida, 468 U.S. 447, 465 (1984). In Dobbert v. Florida, 432 U.S. 282, 295 (1977), Justice Rehnquist described the Tedder[13] rule as the "crucial protection" against arbitrary or standardless override. The capital system in Alabama lacks such a protective measure. Because the override

---

   [12]The only other two states that allow a trial judge to reject a jury life verdict are Florida and Delaware.

   [13]Florida trial judges, who are selected by nonpartisan election or by appointment with retention elections (varying by judicial circuit), may override a jury's verdict only where "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So. 2d 908, 910 (Fla. 1975). As a result, no death sentence has been imposed by override in Florida since 1999.   See Equal Justice Initiative, The Death Penalty in Alabama: Judge Override 10-11 (2011), http://eji.org/eji/files/Override_Report.pdf.   In Delaware, the only other state that permits judicial override, no prisoner is on death row as a result of override. Id. at 10.   The Delaware courts have maintained strict standards on override of life verdicts, and trial judges – who are not elected – have refrained from such overrides. Id. at 11.

66

is standardless in Alabama, there is a haphazard and inconsistent application of the
ultimate sanction in a manner that is inconsistent with the precedents of the Supreme
Court. See Maynard v. Cartwright, 486 U.S. 356, 362 (1988). Without requiring
sentencing judges to conform to some standard for consideration of jury verdicts there
can be little uniformity in when or how they are accepted or rejected.[14] Moreover,
although appropriate appellate review is integral to the constitutionality of any death
penalty system, Gregg v. Georgia, 428 U.S. 153, 195 (1976), at the time that Shonelle
Jackson was sentenced, Alabama appellate courts did not review the appropriateness,
reliability, or equal exercise of judicial overrides. Alabama appellate courts have
upheld overrides both where trial courts considered the jury's recommendation as a
mitigating circumstance and where they did not; where the trial court believed the
jury had been improperly influenced and where it did not; and where the trial courts
explained why an override was warranted and where they did not. Under Alabama's
practice – where trial courts approach the override in an inconsistent manner, and
where a capital defendant may be subject to override in one court but not in another
– there is no appellate mechanism for ensuring evenhandedness. See Parker v.

---

[14] Compare Ex parte Burgess, 811 So. 2d 617 (Ala. 2000) (trial court found that
"a mitigating circumstances does exist with respect to the sentencing recommendation
made by the jury" and gave "significant amount of mitigation to the fact that the jury
recommended life.") with Jones v. State, 456 So. 2d 366 (Ala. 1983) (no mitigating
circumstances found by trial court, despite jury's life recommendation).

Dugger, 498 U.S. 308, 321 (1991)(appellate review plays "crucial role . . . in ensuring that the death penalty is not imposed arbitrarily or irrationally"). It has become clear that absent some standard, there is no way to prevent arbitrary application of the procedure. The constitutional requirement that there be "measured, consistent application" of the death penalty and "fairness to the accused" is thus clearly not met. Eddings v. Oklahoma, 455 U.S. 104, 110-11 (1982).

139.   Indeed, the override in this case did not even comport with Alabama Supreme Court caselaw issued while Mr. Jackson was pending on direct appeal[15] which attempted to make clear that a trial court's authority to override is not untrammeled. See Ex parte Carroll, 852 So. 2d 833, 836 (Ala. 2002) ("further explain[ing]" standard for justifying override). In order for a death sentence imposed by override to be valid, (1) the judge must find the jury's verdict to be a mitigating factor, (2) the judge must accord the life verdict due weight, and (3) the judge may only consider facts unknown to the jury when those facts properly undermine the mitigating circumstances. See Carroll, 852 So. 2d at 836[16]; see also Ex parte Tomlin,

---

[15] See Jackson v. Alabama, 123 S. Ct. 582 (2002).

[16] In Carroll, the Court set out a clear formula for assigning weight to the mitigating circumstances of the jury's recommendation:

The weight . . . should depend upon the number of jurors recommending a sentence . . . .upon the strength of the factual basis for such a

909 So. 2d 283, 287 (Ala. 2003). There is no question that the requirements to justify an override of a jury life verdict under current Alabama law have not been met in this case.

140. First, in rejecting the jury's unanimous life verdict, the trial court did not consider the jury's life verdict as a mitigating factor in determining whether Mr. Jackson should be sentenced to death, because, as it noted, the caselaw did not establish how it was to consider the jury's life verdict. See, e.g., C. 180 ("unlike the states of Florida and Indiana, neither the Alabama Death Act nor Alabama case authority informs the trial court how it is to consider the advisory verdict"); C. 186 ("Without some concrete direction from an appellate court, the final conclusion is that the essential function of the advisory verdict is to focus the court in its independent consideration of weighing the aggravating circumstances and weighing the mitigating circumstances, and weighing them against each other.").

141. Second, the trial court failed to accord the jury life verdict the "great

----

recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the 'triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury when such information can properly be used to undermine a mitigating circumstance.

Carroll, 852 So. 2d at 836.

weight" to which it was entitled because all twelve of the jurors voted unanimously to sentence Mr. Jackson to life without the possibility of parole. See Ex parte Tomlin, 909 So. 2d 283, 287 (Ala. 2003) (observing that a unanimous jury life verdict "must be afforded great weight"). Moreover, this case falls squarely within the type of case in which the facts would support the jury's verdict, as recognized by the Court in Carroll.: the trial court explicitly recognized that there are serious questions about whether Mr. Jackson is in fact the triggerman in this case. See C.176, n.6 ("There is also evidence that suggests that Barnes [Mr. Jackson's codefendant], not Jackson, fired the shot that killed Moore."); see also Ex parte Jackson, 839 So. 2d at 993 (Lyons, J., dissenting) ("based on this evidence, the jury could have believed that Barnes, not Jackson, fired the fatal shot, giving the jury a basis for its recommendation of a sentence of life imprisonment without parole."). Additionally, as counsel argued to the circuit court, the victim's family has expressed opposition to the imposition of the death penalty for Mr. Jackson. (PR. 84.)[17] Finally, the trial court relied on Mr. Jackson's juvenile adjudications to override the jury's verdict, (C. 177, 179), in conflict with Alabama law. See Ex parte Burgess, 811 So. 2d 617, 623 (Ala. 2000)(juvenile adjudications are not convictions for purpose of negating no

---

[17]In Carroll, this Court noted that a "recommendation of leniency from the victim's family," would also support a verdict of life. 852 So. 2d at 836.

70

significant prior criminal history). This haphazard scheme of evaluating jury verdicts does not comport with the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Gregg v. Georgia, 428 U.S. 153 (1976).

142. Judicial override also constitutes a violation of the Equal Protection Clause. See Harris v. Alabama, 513 U.S. 504, 515(1995) (noting that Harris did not "bring an equal protection claim."); Minnick v. Anderson, 151 F.Supp. 2d 1015, 1038 (N.D. Ind. 2000) ("However the Equal Protection Clause is fundamental and the State of Indiana has constitutionally flawed conflicting rules where a jury has recommended against the death penalty and the judge goes ahead and imposes it. The Equal Protection Clause is thus violated."). The judicial override in Mr. Jackson's case was improper as a violation of the Equal Protection Clause because similarly situated capital defendants have not been sentenced to death pursuant to a judicial override because no standard exists to guide trial courts in deciding whether to override the life verdict of an Alabama jury, resulting in the wildly disparate treatment of jury verdicts.

143. The hallmark of the modern death penalty is the "guided discretion" afforded the sentencer. Gregg v. Georgia, 428 U.S. 153, 220 (1976). That guidance is wholly absent here and the override in this case violated Mr. Jackson's rights to due process, a fair trial, equal protection, and a reliable sentencing determination

protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

144. The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## D.   THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF ROBBERY.

145. Alabama law is clear: a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under Alabama Code § 13A-5-40(a)(2) for the capital offense of murder-robbery. Ex parte Johnson, 620 So. 2d 709, 712 (Ala. 1993) ("under Alabama law, a robbery committed as a 'mere afterthought' and unrelated to the murder will not sustain a conviction for the capital offense of robbery murder"). In this case, the trial court instructed the jury on three options with regard to the capital murder charge: capital murder/roberry, intentional murder, or not guilty. (Vol. 6, R. 93-95.) Accordingly, if Mr. Jackson's jury believed that he was responsible for the victim's murder and that there was a robbery but it had doubts that

72

the murder took place "during" a robbery, then it would have been required to either convict Mr. Jackson of capital murder, or acquit him entirely.

146. The trial court's failure to properly instruct the jury on the lesser included offense of robbery removed the "third option" from the jury, and thus increased the risk of an unwarranted conviction of capital murder. Beck v. Alabama, 447 U.S. 625, 638 (1980). "Such a risk cannot be tolerated in a case in which the defendant's life is at stake." Id. at 637.

147. The evidence in this case strongly supports a theory fact that the robbery occurred as an afterthought to the killing. As an initial matter, the robbery case against Mr. Jackson rested almost solely on the testimony of the three co-defendants: Antonio Barnes, Eric Williams and Christopher Rudolph. The State had indicted each of these co-defendants for capital murder (R. 299, R. 369, R. 424), so each of them had an enormous incentive to testify favorably for the state. But even with the incentive to help convict Mr. Jackson and the opportunity to synchronize their stories, (R. 17), their testimony *as it relates to the "during" element* is both flimsy and contradictory. First, their reveals that Mr. Jackson drove away from the scene without taking the victim's car or his stereo. Moreover, there is no fingerprint evidence linking Mr. Jackson to any of the items taken from the car. (R. 422.)

148. Although two co-defendants, Antonio Barnes and Eric Williams, took

73

the victim's car after the shooting, they did so only because Mr. Jackson and another co-defendant drove away in another car, leaving them at the scene. Indeed, Eric Williams testified that he took the victim's car because after the shooting, "they pulled off and left me and [Barnes] in the middle of the street. So that's when we jumped in [the victim's] car to pull off and get away from the scene of the crime." (R. 387.) The killing thus did not occur "during a robbery." Rather, the victim was killed in retaliation for a bad drug deal and then, separate from the killing, two other co-defendants – and not Mr. Jackson – decided to take the victim's car to get away.

149. The trial court's failure to allow the jury the choice of the lesser included offense of robbery resulted in an improper conviction that violated Mr. Jackson's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

74

E.   **THE TRIAL COURT'S REFUSAL TO GRANT MR. JACKSON A CONTINUANCE TO SECURE A CRITICAL WITNESS VIOLATED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.**

150.   Prior to trial, Mr. Jackson moved the trial court for a continuance to secure Gerard Burdette, the only eyewitness to the crime (other than the defendant and the co-defendants) and a material defense witness. (R. 19-20.) Moreover, Burdette gave a statement to the police which supported Mr. Jackson's defense in this case that the motive for the killing was retaliation for a bad drug deal and that the killing did not occur during a robbery.[18] (C. 87-96.) The trial court's failure to grant a continuance (C. 100), contravened the United States Supreme Court's warning that the swift administration of justice should never override a defendant's right to due process and a fair trial. Powell v. Alabama, 287 U.S. 45, 59 (1932).

151.   "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Greenwald v. State, 579 So. 2d 38, 40 (Ala. Crim. App. 1991) (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964) (citation omitted)). In this case, the circumstances argued by defense counsel to the trial court

---

[18]The trial court violated Mr. Jackson's right to present a defense by precluding him from presenting evidence to support this theory of the case. See Claim A.

indicate the probability that Burdette would be located and would testify if the trial were continued.

152.   First, Burdette was unquestionably material and competent as he was an eyewitness to the shooting, (R. 19), and gave a statement to the police which supported Mr. Jackson's defense that the motive for the killing was retaliation for a bad drug deal.[19] (C. 87-96.) Not only was Burdette critical to Mr. Jackson's defense, but even the prosecutor conceded Burdette "was a material witness." (R. 22.); see also Jackson v. State, 836 So. 2d 915, 940 (Ala. Crim. App. 1999). More importantly, the trial court itself made a factual and legal determination that Burdette was a material witness: "I would say [Burdette] is a material witness . . . ." (R. 22.) There is therefore no question that Burdette was a material and competent witness.

153.   Second, it was highly probable that Burdette would have testified if the court had continued the case. Defense counsel had found out just the day before the trial began that the State of Alabama and the United States government had issued arrest warrants for Burdette. (R. 21.) The trial judge ordered the State to interview Burdette's mother to ascertain his whereabouts. (R. 24.) When the State reported

---

[19]Burdette told police that one of the perpetrators was a Bloods gang member who, along with up to three young men, had threatened with a pistol the victim, Burdette and a third person on the day prior to the murder. (C. 87-96.)

that Burdette's mother had not seen him in a year, the trial judge issued an order denying the motion for continuance and began the trial. (C. 100.) Defense counsel was given only four days to find Burdette before the trial started. This period of time was simply insufficient to conclude that Burdette would not be able to testify if the trial were continued.

154. Moreover, Burdette was a fifteen-year-old child who lived with his mother. (R. 21.) Even the prosecutor admitted that he would not be surprised if the witness' mother knew where he was located. (R. 21.) Besides, as a minor and a dependant without any financial means, the witness would certainly not be very far from home. (R. 21.) In fact, because both the state and the federal government had warrants out for him, his arrest was imminent. (R. 20-21.) Given these facts, Burdette would have been able to testify had the trial court granted a continuance.

155. Finally, Mr. Jackson was diligent in attempting to secure the witness, as the trial court and the Court of Criminal Appeals noted. See Jackson, 836 So. 2d at 940-41. As soon as the State told defense counsel that it had not found Burdette, defense counsel brought it to the court's attention. In fact, defense counsel made a written and oral motion for a continuance the very day after they learned the

government had not arrested Burdette.[20] (R. 19-25; C. 83.) Prior to that defense counsel had no reason to believe the witness was unavailable as the government had previously planned to call Burdette as a witness and they had subpoenaed him. (R. 22-23; C. 61.) Also, Burdette was on the prosecutor's witness list and had been included in the State's voir dire questions. (R. 24; C. 61.) Again, as soon as defense counsel realized the State was not going to arrest Burdette, they notified the court and had their own investigator look for the witness. (R. 19; C. 83-84.)

156. Mr. Jackson's life was at stake, and the trial court's failure to grant a continuance in order for defense counsel to secure the critical witness resulted in a verdict based on incomplete evidence. See Ford v. Wainwright, 477 U.S. 399, 411 (1986) (in death penalty case "factfinding proceedings aspire to a heightened standard of reliability"(citations omitted)). Although the State stipulated that Burdette's statement be admitted into evidence, even the trial court acknowledged that the statement was "convoluted." (R. 20.) Reading such a statement into the record did not afford Mr. Jackson the opportunity to cross-examine Mr. Burdette, nor to clarify his statement.

157. The trial court's failure to grant a continuance prejudiced Mr. Jackson

---

[20] Defense counsel learned that Burdette was missing on February 19, 1998; trial started on February 23, 1998.

in that he was deprived of his Sixth Amendment right to question Mr. Burdette, and

thereby denied the opportunity to present evidence with regards to motive. See Claim

A. The trial court's failure to grant a continuance deprived Mr. Jackson of his rights

to due process, to present a defense, a fair trial, and a reliable sentence protected by

the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States. The state

court's adjudication of this claim is an "unreasonable determination of the facts," Bui

v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was

both "contrary to" and an "unreasonable application of" clearly established United

States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## F. THE STATE WITHHELD FAVORABLE EVIDENCE FOR THE DEFENSE THUS VIOLATING MR. JACKSON'S FEDERAL RIGHTS.

158. Prior to trial, Mr. Jackson's trial counsel filed a request for discovery

pursuant to Brady v. Maryland, 373 U.S. 83, 87 (1963), (C.20), and a motion to

require the disclosure of deals and inducements, which was granted by the trial court.

(C. 50.)   In response, the State asserted that it had turned over "all exculpatory

material," (C. 25), as well as all discovery material pursuant to the Alabama rules of

discovery. With regard to any deals made with co-defendants or witnesses, the State

asserted that it would notify Mr. Jackson of any deal prior to trial. (C. 55.)   Despite

79

defense counsel's request, and the trial court's order, the State withheld exculpatory information and information favorable to the defense, in violation of clear federal law. See Brady, 373 U.S. at 87 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

159.   Specifically, the State failed to turn over to defense counsel the evidence of – among other things – deals or agreements that had been entered into between the prosecution and the three co-defendants who testified for the State.   Giglio v. United States, 405 U.S. 150 (1972) ( favorable evidence includes evidence that would affect jury's determination of credibility of witnesses).   The mandate to turn over favorable evidence extends to both the determination of guilt or innocence and the sentencing proceeding. Brady, 373 U.S. at 87-88; Ex parte Monk, 557 So. 2d 832 (Ala. 1989).

160.   Additionally, the evidence introduced at trial and in the records that Mr. Jackson has received strongly indicates that additional discoverable material exists:

   (a)   In Gerard Burdette's April 26, 1997 statement to Corporal D. Cunningham, he stated that he thought an individual named P.J. was responsible for the victim's death.   Notably, Mr. Burdette did not reference P.J.'s real name nor did he mention the name Jay.   However, while interviewing witness Lacrema Moore on April 26, 1997, Detective A.J. Signore suggested that P.J.'s real name is Patrick Stinson.   He also suggested that someone named Jay hung around with an individual

named "Big Leon." None of the offense reports or statements provided by the District Attorney's office explain how Detective Signore learned P.J.'s real name or obtained information referring to an individual named Jay. This suggests that some investigation occurred which was not disclosed to Mr. Jackson.

(b)     In her April 27, 1996 statement, Victoria Moss, one of the few witnesses at the scene of this incident, drew a map of the crime scene for Detective Signore. Mr. Jackson's trial counsel was never provided with a copy of the map drawn by Ms. Moss for Detective Signore.

(c)     As indicated in a April 28, 1997 offense report, after witnessing three African-American men on his property, A.C. Porterfield  contacted Deputy Smithy at the Montgomery County Sheriff's Department. Mr. Jackson's trial counsel never received any information from the Montgomery County Sheriff's Department relating to this complaint.

(d)     In his statement to law enforcement officials, Antonio Barnes recalled returning with Shonelle Jackson, and an individual named Roderick Crawford (a.k.a. Fido), to Old Hayneville Road the day after the incident.   Law enforcement officials interviewed many individuals named by the co-defendants as people they came in contact with after the alleged incident. However, no offense reports relating to Roderick Crawford or interviews with Mr. Crawford were given to Mr. Jackson's trial counsel.

(e)     Members of law enforcement impounded both cars involved in this incident. These cars were examined by officials; however, Mr. Jackson never received the results of any tests or examinations that were performed on the inside of these automobiles. It is unreasonable to believe that the State would not have conducted any tests of the interior of either car in order to ascertain whether or not the seats or upholstery contained evidence of blood, hair, or other fibers, especially because Shonelle Jackson was initially charged with shooting into the car.

(f)     Other gaps in the evidence indicate that the State has not provided all of the required evidence to Mr. Jackson. Mr. Jackson's co-defendants

understood there to be a verbal agreement by which they would receive lesser sentences in exchange for their testimony against Shonelle Jackson. Nonetheless, statements to at least one co-defendant's trial judge and statements made by that court indicate that the co-defendants' sentencing was deeply intertwined with the State's having already secured a conviction and sentence against Shonelle Jackson. Evidence of these deals between the co-defendants and the prosecution were not disclosed to Mr. Jackson's trial counsel.

(g) Sometime after this crime occurred, law enforcement officials questioned Mr. Jackson's girlfriend at the time, Latrice Walker. Not only did they speak with her, they asked her to accompany them to her former residence. No evidence or information obtained during these meetings were provided to Mr. Jackson's trial counsel.

161. Due to the State's withholding of the above evidence, as well as other evidence material to Mr. Jackson's case, defense counsel did not have the ability to fairly challenge the State's evidence at both the guilt and penalty phase of Mr. Jackson's trial. Specifically, had this evidence been turned over, trial counsel would have been able to more effectively challenge the State's case, by, for example, 1) using evidence of deals with the State to completely undermine the credibility of the three co-defendants, thereby virtually eliminating any evidence that the motive behind this crime was robbery, as the State contended; and 2) effectively undermining the testimony of the co-defendants and state witnesses that Mr. Jackson went with Antonio Barnes on the day after the murder to retrieve items from the car, which would have further buttressed Mr. Jackson's theory of defense that this crime resulted

82

from a drug deal gone bad. Had this evidence been revealed, there is a reasonable probability that the outcome of Mr. Jackson's trial and sentencing would have been different.

162. Because the State concealed this evidence, trial counsel simply could not have raised this claim at trial or on direct appeal. See Banks v. Dretke, 540 U.S. 668, 693 (2004) (where State asserted on eve of trial that it would disclose all Brady material, "Banks cannot be faulted for relying on that representation" in failing to develop Brady claim). The State's suppression of this material violated Mr. Jackson's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## G. THE STATE DISCRIMINATED ON THE BASIS OF RACE IN VIOLATION OF CLEAR FEDERAL LAW.

163. At Mr. Jackson's capital trial, the State engaged in discriminatory jury selection when it used 8 of its15 peremptory strikes to remove 8 of the 19 qualified

black veniremembers. <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). Defense counsel objected and argued that there was a prima facie case of discrimination in violation of <u>Batson</u> and its progeny. (R. 156.) In overruling defense counsel's timely objection under <u>Batson</u>, the trial court erroneously refused to find a prima facie case. (R. 156.) Given the totality of the circumstances in this case, the trial court should have required the State to give race and gender neutral reasons for its use of its peremptory strikes.

161. First, Mr. Jackson is African American and the State had 15 peremptory strikes and used 8 to strike black veniremembers. In addition, there was a lack of meaningful voir dire and the Montgomery County District Attorney's office has a history of racial discrimination in jury selection. <u>See, e.g.</u>, <u>Bui v. Haley</u>, 321 F.3d 1304 (11th Cir. 2003) (habeas relief granted where Montgomery County prosecutor engaged in racially discriminatory jury selection); <u>Ex parte Yelder</u>, 630 So. 2d 107, 109 (Ala. 1992); <u>Ex parte Bird</u>, 594 So. 2d 676, 681 (Ala. 1991); <u>Parker v. State</u>, 568 So. 2d 335 (Ala. Crim. App. 1990); <u>Powell v. State</u>, 548 So. 2d 590 (Ala. Crim. App. 1988); <u>Williams v. State</u>, 548 So. 2d 501 (Ala. Cr. App. 1988); <u>Acres v. State</u>, 548 So. 2d 459 (Ala. Crim. App. 1987).

162. Given these circumstances, the trial court erred by not requiring the state to articulate its reasons for striking qualified African Americans from Mr. Jackson's

84

jury and thus violated his rights to due process, a fair trial, equal protection and a reliable sentencing protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution as well as the jurors' rights to equal protection under the law.    The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000).   Habeas corpus relief is warranted.   28 U.S.C. §2254(d)(1), (2).

## H.   THE TRIAL COURT IMPROPERLY ADMITTED INTO EVIDENCE MR. JACKSON'S INVOLUNTARY CONFESSION.

163.   There is a presumption that the will of every accused is likely to be overborne by the inherent pressures of custodial interrogation. Miranda v. Arizona, 384 U.S. 436 (1966).   For a confession to be admissible, the State must show that the statement "was the product of a free and deliberate choice rather than intimidation, coercion, or *deception*." Moran v. Burbine, 475 U.S. 412, 421 (1986) (emphasis added); see also Jackson v. Denno, 378 U.S. 368, 376 (1964) ("It is now axiomatic that a defendant is deprived of due process of law if his conviction is founded in whole or in part, upon an involuntary confession . . . even though there is ample

85

evidence aside from the confession to support the conviction.").

164.   In this case, there is no question that the police deliberately and blatantly lied to Shonelle Jackson as a means of obtaining a confession. This, combined with the all of the circumstances surrounding the interrogation, render Shonelle's confession involuntary. Moran, 475 U.S. at 421. As an initial matter, because Shonelle voluntarily came to the police station, he was particularly vulnerable to police tactics of deception. (R. 517.)   In this case, Detective Signore lied to Mr. Jackson about the state of the evidence against him by telling him that his fingerprints had been found on a cup in the stolen vehicle used in the crime when in fact no such fingerprints existed. (Supp. C.R.10.)   Officer Signore testified at trial and at the suppression hearing that he had "lied to bring [Mr. Jackson] back to reality." (Vol. 6, R.7; Supp. R. 46.) This "technique" worked: as soon as Officer Signore told Mr. Jackson that he had his fingerprints on the cup, "he then altered his statement and put himself in the stolen vehicle and holding the Dairy Queen cup prior to the offense." (Vol. 6, R.7; Supp. R. 55.)

165.   Additional circumstances support a finding of involuntariness:   Mr. Jackson was initially interrogated in Officer Signore's office, an eight foot by eight foot windowless room containing several pieces of furniture (Supp. R. 22-23); Mr. Jackson was questioned for several hours by Officer Signore, who visibly carried his

weapon on his duty belt, and Officer Phillips, who also carried a weapon (Supp. R. 23); and during the interrogation, Mr. Jackson was seated approximately one to two feet from one of the officers, (Supp. R. 24), he was not permitted to smoke, (Supp. R. 24), he was not told that he could be executed for the crime with which he was charged, (Supp. R. 29), and a bond was never discussed prior to the interrogation, (Supp. R. 26).

166. Additionally, the trial court failed to consider evidence that Mr. Jackson's ability to resist this pressure was seriously compromised. At the time of his interrogation, Mr. Jackson was eighteen years old and under investigation for capital murder. Additionally, the testimony at the suppression hearing revealed that Mr. Jackson was a "low achiever," (Supp. R. 61, 64), who was susceptible to suggestion, (Supp. R. 62), respectful of his elders, (Supp. R. 67), and eager to please, (Supp. R. 67).

167. By admitting Mr. Jackson's involuntary confession, the trial court violated Mr. Jackson's rights to due process, a fair trial, and a reliable sentencing protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application

of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## I. THE TRIAL COURT IMPROPERLY ADMITTED PHOTOGRAPHS THAT SERVED ONLY TO INFLAME AND PREJUDICE THE JURY.

168. Photographs or videotapes that "serve little or no purpose except to arouse the passion, prejudice, or sympathy of the jury" should be excluded from evidence. Ott v. Smith, 413 So. 2d 1129, 1132 (Ala. 1982). At Mr. Jackson's capital trial, the State introduced photographs of the victim after he had been shot and killed. (C. 206, 214, 246, 248; R. 191.) The presentation of these slides and pictures seriously prejudiced Mr. Jackson.

169. The introduction of these cumulative and prejudicial photographs was not only a violation of state law, but also infringed on Mr. Jackson's rights to due process and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Osborne v. Wainwright, 720 F.2d 1237, 1238 (11th Cir. 1983). Especially in a capital case, cumulative and prejudicial videotapes and photographs create a grave risk that the sentence of death will be imposed under the influence of passion, prejudice, or another arbitrary factor. Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Gardner v. Florida, 430 U.S. 349, 357-58 (1977).

88

The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## J.   THE MISCONDUCT OF JUROR J.B. AND JUROR J.G. AT MR. JACKSON'S TRIAL PREJUDICED MR. JACKSON IN VIOLATION OF CLEAR UNITED STATES SUPREME COURT PRECEDENT.

170.   The United States Supreme Court has made clear the qualitative difference between death and all other punishments requires a "heightened need for reliability" in capital trial proceedings. Caldwell v. Mississippi, 472 U.S. 320, 329 (1985). Not only is the reliability of Mr. Jackson's conviction and death sentence undermined by the trial court's refusal to allow him to present his defense, his lawyer's failure to investigate and present any mitigating evidence, and the trial court's rejection of the jury's life verdict, but it is also compromised by the misconduct of Jurors J.B. and J.G.

171.   First, under United States Supreme Court precedent, any evidence that does not "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination,

89

and of counsel" is deemed presumptively prejudicial.   Turner v. Louisiana, 379 U.S.

466, 473 (1965); see also Irwin v. Dowd, 366 U.S. 717, 722 (1961).

172.   In a sworn affidavit dated April 1, 2004,[21] and presented during

postconviction proceedings in the state court, Juror J.B. attested that during Mr.

Jackson's trial she "drove by the Smiley Court area and the area where the shooting

[in this case] occurred. I also drove to the home of Ms. Flowers, where the car theft

occurred." She stated that she was

> was very concerned that nobody witnessed the shooting except the man
> across the street. I had concerns about whether Shonelle Jackson was
> the shooter in this case.

She also affirmed that "[d]uring the deliberations this information was important and

I did not feel that I could make a judgment about what happened on the night of the

crime before I had visited these places." (PC. Supp.3, at 97-100, 104.)

173.   The totality of the circumstances surrounding Juror J.B.'s unauthorized

visit to the crime scene, all establish that the State failed to meet its burden of

demonstrating harmlessness. See McNair v. Campbell, 416 F.3d 1291, 1307-08 (11th

---

[21] Juror J.B.'s affidavit was introduced as a past recollection recorded when she testified at the 2010 deposition that as a result of memory loss, she could not recall whether or not she went to the crime scene during Mr. Jackson's trial.   See Ala. R. Evid. 803(5), Advisory Committee Notes (once witness is unable to recollect that to which she/he is called to testify, she/he may rely on statements made when she/he had better memory of event).

Cir. 2005). There was no dispute that each of the three individuals in the car with Mr.

Jackson had guns,[22] and as Juror J.B. expressly stated, she and the other jurors had

concerns about whether Shonelle Jackson was the shooter. (PC. Supp.3, at 99, 104.)

J.B.'s visit to the crime scene helped her resolve those concerns in ways that she

otherwise was unable to. (PC. Supp.3, at 98, 104). As such, her consideration of this

extraneous material was prejudicial to Mr. Jackson. See Remmer v. United States,

347 U.S. 227, 229 (1954) (where juror considered extraneous evidence, new trial

required unless State rebuts presumption of prejudice with showing of harmlessness).

174.   In addition to J.B.'s visit to the crime scene, Juror J.G. failed to truthfully

answer questions during voir dire, in violation of Mr. Jackson's right to strike Juror

J.G. for cause, see Morgan v. Illinois, 504 U.S. 719, 727 (1992); Irwin v. Dowd, 366

U.S. 717, 722 (1961); Rogers v. McMullen, 673 F.2d 1185, 1188 (11th Cir. 1982),

as well as Mr. Jackson's right to freely and informatively exercise peremptory strikes,

so as to ensure a fair trial. See McDonough Power Equip., Inc. v. Greenwood, 464

U.S. 548, 554 (1984).

175.   During voir dire at Mr. Jackson's trial, defense counsel asked the venire

panel on which Juror J.G. was seated whether any of the potential jurors "own[ed]

---

[22] At trial, each of Mr. Jackson's co-defendants testified that Mr. Jackson had
a .380, Christopher Rudolph had a 9mm, Antonio Barnes had a .357, and Eric
Williams had a shotgun. (R. 305-08, 373-76, 394-95, 428.)

any weapons, guns?" (R. 59.) After numerous, unidentified jurors raised their hands, counsel made clear that they were particularly interested in learning whether jurors owned the types of guns involved in this offense: "Anybody that raised their hand a minute ago that said they had a pistol, do any of you have a .380 caliber pistol, a .357, or a nine-millimeter?" (R. 61.) In response, Juror J.G. stated that he had "just purchased a nine-millimeter." (R. 61.) Following up, counsel then inquired of Juror J.G., "[d]o you know the differences in a nine-millimeter caliber gun and ammunition and a .357 type ammunition?" (R. 61.) In response, Juror J.G. stated, "I have never seen a .357." (R. 61.) However, at the state postconviction hearing, Juror J.G. testified that, at the time of trial, he owned both a .357 *and* a 9 mm, (PC. Supp.3, at 22), and that just three months prior to trial, he had compared the .357 bullets with the 9 mm bullets and determined that the .357 bullets were larger than those fired from the 9 mm. (PC. Supp.3, at 39-40.)

176. In this case, Juror J.G.'s failure to honestly and accurately answer questions related to his gun ownership and knowledge of guns undermined Mr. Jackson's ability to remove a biased juror, in violation of his fundamental right to a fair trial. McDonough, 464 U.S. at 556. J.G.'s failure to reveal that in addition to a 9 mm, he *also* owned a .357 alone would have provided a basis for counsel to strike J.G.; the fact that J.G. failed to disclose he had compared the ammunition between the

92

two guns, and knew "the differences in a nine-millimeter caliber gun and ammunition and a .357 type ammunition" as inquired by trial counsel, provided an additional basis for removal. (R. 61.) That counsel would have removed J.G. if they knew he owned both a 9mm and a .357 (two of the guns involved in this case) is evidenced by the fact that counsel struck the only other juror (C.B.) who did. (R. 61, C. 145.)

177. Juror J.B.'s unauthorized visit to the crime scene, and Juror J.G.'s failure to reveal that he owned a .357 and just three months prior to trial compared the bullets of a .357 and 9 mm violated Mr. Jackson's Fifth, Sixth and Fourteenth Amendment rights to due process, equal protection and a fair trial. The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## K.   THE IMPOSITION OF THE DEATH PENALTY ON ONE WHO IS INTELLECTUALLY DISABLED VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS.

178. Application of the death penalty to, and execution of, an intellectually disabled person violates the Eighth and Fourteenth Amendments to the United States Constitution. Atkins v. Virginia, 536 U.S. 304 (2002). In Atkins, the Court

emphasized that while intellectually disabled persons "frequently know the different between right from wrong and are competent to stand trial," because of their impairments, "by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Id. at 321.

179.   In determining whether an individual is intellectually disabled, and therefore exempt from execution, the Court looked to the following as a generally accepted definition: "significantly subaverage intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years. (Criterion C)." Atkins, 536 U.S. 304 n.3 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th Ed. 2000)); see also Ex parte Perkins, 851 So. 2d 453, 456 (Ala. 2002) ("a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves

94

during the developmental period (i.e., before the defendant reached age 18)").

180.    As documented in records from the Department of Youth Services, Mr. Jackson was diagnosed with borderline intellectual functioning at the age of fifteen. School records – introduced into evidence at the suppression hearing held in 2001 – support this diagnosis.  Mr. Jackson failed both the first and third grade, and repeatedly made D's and F's throughout his school career, which ended in the ninth grade.  (Supp. C.R. 60.)  Additionally, the testimony at the suppression hearing revealed that Mr. Jackson was a "low achiever," (Supp. R. 61, 64), who was susceptible to suggestion, (Supp. R. 62), respectful of his elders, (Supp. R. 67), and eager to please, (Supp. R. 67).  All of these descriptions are consistent with an individual who is intellectually disabled.

181.    Records of the Alabama Department of Corrections in 1997 establishes that Mr. Jackson received an Full Scale IQ score of 75 on a Beta II Test.[23]

182.    Additionally, investigation reveals that Mr. Jackson's mother, Marilyn Jackson, is mentally impaired and at some point in her youth resided at the Elks Memorial Center in Chisholm, Alabama, through the State Department of Mental Health and/or the State Department of Rehabilitation.  A family history of mental

---

[23] The Supreme Court recognized in Atkins that "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."  536 U.S. at 309 n.5.

retardation has been identified as a possible predisposing factor to mental retardation in a particular individual. See American Association on Mental Retardation, *Mental Retardation: Definition, Classification and Systems of Supports,* 123-41 (10th ed. 2002).

183. This evidence establishes that Mr. Jackson meets the definition of intellectual disability identified by the Atkins Court and as such, his death sentence violates the Eighth and Fourteenth Amendments. The state court's determination of this claim is both an unreasonable determination of the facts, and contrary to or an unreasonable application of clearly established federal law. See Burgess v. Comm'r, Ala. Dep't of Corr., 723 F. 3d 1308, 1315-16 (11th Cir. 2013) (state court's determination that defendant was not "mentally retarded" based on pre-Atkins trial record unreasonable determination of facts; case remanded for evidentiary hearing on Atkins claim). The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

96

L.   IMPOSING A SENTENCE OF DEATH FOR A CRIME
     COMMITTED WHEN SHONELLE JACKSON WAS JUST
     EIGHTEEN YEARS OLD VIOLATES HIS FEDERAL
     CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO BE
     FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

184.   At the time of the charged crime, for which he was sentenced to death,

Shonelle Jackson was just 18 years old.  The United States Supreme Court has

determined that, as a consequence of limitations in reasoning and judgment, juveniles

possess diminished culpability and as such, "it is evident that the penological

justifications for the death penalty apply to them with lesser force than to adults."

Roper v. Simmons, 543 U.S. 551, 571 (2005); see also Miller v. Alabama, 132 S. Ct.

2455, 2465 (2012) ("Roper and Graham emphasized that the distinctive attributes of

youth diminish the penological justifications for imposing the harshest sentences on

juvenile offenders, even when they commit terrible crimes"); Graham v. Florida, 130

S. Ct. 2011, 2026 (2010) ("developments in psychology and brain science continue

to show fundamental differences between juvenile and adult minds.").

185.   For the same reasons, the diminished culpability of eighteen-year-old

offenders renders the death penalty inappropriate for Shonelle Jackson.  In Roper, the

Court held that "[t]he differences between juvenile and adult offenders are too

marked and well understood to risk allowing a youthful person to receive the death

penalty despite insufficient culpability." Id. at 572-73.  The Court relied upon social

97

science data to conclude that the three general differences between adolescents and adults "demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." Roper, 543 U.S. at 569. Because these differences apply with equal force to eighteen year-olds like Shonelle Jackson, he is similarly ineligible for the death penalty.

186. First, the Court in Roper found that adolescents tend to suffer from a lack of maturity and an "underdeveloped sense of responsibility," which often result in "impetuous and ill-considered actions and decisions." Roper, 543 U.S. at 569 (citing Johnson v. Texas, 509 U.S. 350, 367 (1993)). A teenager's lack of responsibility and immaturity is consonant with research indicating that the human brain continues to develop into an individual's early twenties. Second, teenagers, like juveniles under the age of eighteen, are more susceptible to negative influences and peer pressure than adults. Roper, 543 U.S. at 569. Finally, teenagers under the age of twenty, like those under the age of eighteen, have characters that are not as well formed as those of adults. Roper, 543 U.S. 570.

187. The limitations in reasoning and judgment that resulted from Mr. Jackson's young age at the time of the crime – just 18 years old – were compounded by Mr. Jackson's mental impairments. See Claim K (incorporated by reference). It is apparent that in this case, the combination of Mr. Jackson's youth and his mental

98

impairments render him less culpable than an adult offender. Roper, 543 U.S. at 571.

For these reasons, the imposition of a death sentence in this case is both inappropriate

and a violation of Mr. Jackson's rights to due process and to be free from cruel and

unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United

States Constitution. The state court's adjudication of this claim is an "unreasonable

determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and

resulted in a decision that was both "contrary to" and an "unreasonable application

of" clearly established United States Supreme Court precedent. Williams v. Taylor,

529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C.

§2254(d)(1), (2).

## M. THE DEATH SENTENCE IN THIS CASE IS DISPROPORTIONATE, IN VIOLATION OF MR. JACKSON'S STATE AND FEDERAL RIGHTS.

188. Mr. Jackson has been convicted of a capital crime and sentenced to

death. The United States Supreme Court has made clear that the application of the

death penalty must be narrowed to an ascertainable and distinct class of offenses.

> If a State has determined that death should be an available
> penalty for certain crimes, then it must administer that
> penalty in a way that can rationally distinguish between
> those individuals for whom death is an appropriate sanc-
> tion and those for whom it is not.

Spaziano v. Florida, 468 U.S. 447, 460 (1984). Based on the facts of this case, the

99

death penalty is a disproportionate punishment. Pulley v. Harris, 465 U.S. 37 (1984).

189. First, Mr. Jackson was just 18 years old at the time of the crime. See Roper v. Simmons, 543 U.S. 551, 571 (2005) ("it is evident that the penological justifications for the death penalty apply to [juveniles] with lesser force than to adults"); Eddings v. Oklahoma, 455 U.S. 104, 115 n.11 (1982)("crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to thing in long-range terms than adults.").

190. Moreover, because none of the other co-defendants received the death penalty, the death penalty in this case is disproportionate to others who participated in the crime. There were three other people involved in the crime for which Mr. Jackson was sentenced to die. All three of these co-defendants were given the opportunity and did plead to lesser offenses than capital murder. Antonio Barnes, who was involved in the robbery and as the trial court acknowledged in its sentencing order, may actually be responsible for shooting and killing Mr. Moore, was sentenced to twenty-five years. Eric Williams, another co-defendant who was also involved in the robbery, and as established by his own testimony, shot a gun at the crime scene, was sentenced to life with the possibility of parole. A third person, Christopher Rudolph, who was also involved in the crime was sentenced to twenty years.

100

191.   There is no adequate explanation for such a disparity in sentencing that meets the Eighth Amendment's requirement that the death penalty be applied with some rationality and review ability.  Luck of the draw does not and cannot explain why Mr. Jackson is facing death while three other people involved intricately involved in the crime are not.  Spaziano, 468 U.S. at 460.  Mr. Jackson's sentence violates his rights to due process, a fair trial and a proportionate sentence protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent.  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Habeas corpus relief is warranted.  28 U.S.C. §2254(d)(1), (2).

## N.   DOUBLE COUNTING ROBBERY AS AN ELEMENT OF THE CAPITAL OFFENSE AND AS AN AGGRAVATING CIRCUMSTANCE WAS IMPROPER.

192.   At the penalty-phase of Mr. Jackson's trial, the State relied on the aggravating circumstance that Mr. Jackson been found guilty of committing an intentional murder during the course of a robbery.  (C. 171.)  This conviction rendered him eligible for the death penalty under Alabama law, and the trial court

101

gave weight to this conviction in sentencing Mr. Jackson to death. (C. 175.)

193. The use of robbery both as an elevator in the guilt-phase <u>and</u> as an aggravator in the penalty-phase failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty. <u>See, e.g.,</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 197 (1976); <u>Zant v. Stephens</u>, 462 U.S. 862, 877 (1983). Further, double counting robbery subjected Mr. Jackson to two punishments as a result of being convicted of a single criminal charge. <u>See</u> <u>North Carolina v.</u> <u>Pearce</u>, 395 U.S. 711, 717 (1969). The double counting of robbery both as an elevator in the guilt-phase and as an aggravator in the penalty-phase violated Mr. Jackson's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The state court's adjudication of this claim is an "unreasonable determination of the facts," <u>Bui v. Haley</u>, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## O. ALABAMA'S MANNER OF EXECUTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.

194. The Eighth Amendment requires states to take all feasible measures to

102

minimize the risk of cruelty in administering capital punishment. See Zant v. Stephens, 462 U.S. 862 (1983). Evolving standards of decency have rendered Alabama's current method of execution, lethal injection, unconstitutional. See Arthur v. Thomas, 674 F.3d 1257, 1261 (11th Cir. 2012) ("[t]here has been no finding about the manner in which Alabama administers its lethal injections, no evaluation of whether Alabama's representations are accurate, and no opportunity whatsoever to contradict the State's assertions with Arthur's own evidence. And the lack of factual development in this record is only exacerbated by Alabama's policy of maintaining secrecy surrounding every aspect of this three-drug execution method.")

195. The undeveloped procedures for administering lethal injection, and the cruelty of lethal injection, violate the Eighth Amendment. Mr. Jackson's death sentence constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## IV.  **PRAYER FOR RELIEF**.

For all of the above stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Mr. Jackson respectfully asks this Honorable Court to grant him the following relief:

(a)  Grant petitioner's motion to proceed in this matter *in forma pauperis*;

(b)  Afford petitioner an opportunity to reply to any responsive pleading filed by respondent;

(c)  Grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and further grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(d)  Grant petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in this petition;

(e)  Permit petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(f)  Issue a writ of habeas corpus granting Mr. Jackson relief from his unconstitutionally obtained conviction and sentence of death;

(g)  Grant such further and other relief as may be appropriate.

Respectfully submitted,

Angela L. Setzer (ASB-0140-S77A)
Randall S. Susskind (ASB-4930-S74R)
Equal Justice Initiative
122 Commerce Street
Montgomery, AL 36104
(334) 269-1803

October 4, 2013                    *Counsel for Shonelle Jackson*

## ATTORNEY'S VERIFICATION

I affirm under penalty of perjury that, upon information and belief, this Petition for Writ of Habeas Corpus is true and correct. Executed on October 4, 2013.

_Angela L. Setzer_
Angela L. Setzer

106

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 4, 2013, a copy of the attached document was served

by first-class mail on:

> Luther Strange
> Jon Hayden
> Kevin Blackburn
> Office of the Attorney General
> 501 Washington Avenue
> Montgomery, AL 36104

Angela L. Setzer

107