IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHONELLE JACKSON,          *
                                   *
         Petitioner,     *
                                   *
vs.                     *   Case No.: 2:13-cv-00731-WKW-CSC
                                   *
KIM T. THOMAS,           *
                                   *
     Commissioner, Alabama   *
     Department of Corrections,   *
                                   *
         Respondent.    *

---

**BRIEF ON MERITS**

---

RANDALL S. SUSSKIND (ASB-4930-S74R)
Equal Justice Initiative
122 Commerce Street
Montgomery, AL 36104
Phone:    (334) 269-1803
Fax:      (334) 269-1806
E-mail:   rsusskind@eji.org

August 8, 2014          *Counsel for Shonelle Jackson*

## TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

I.  TRIAL COUNSEL FOR MR. JACKSON WAS INEFFECTIVE
    DURING THE CULPABILITY PHASE OF HIS CAPITAL
    TRIAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  Mr. Jackson's Trial Lawyers Were Ineffective Under
        *Strickland v. Washington*.. . . . . . . . . . . . . . . . . . . . . . . . .  3

    B.  The State Court Unreasonably Rejected Mr. Jackson's
        Claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

        1.  Mr. Jackson's Ineffective Assistance of
            Counsel Claim Is Not Procedurally Defaulted.
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

        2.  The Court of Criminal Appeals' Decision to
            Affirm the Postconviction Court's Summary
            Dismissal Was Unreasonable.. . . . . . . . . . . . . . . . . . .  19

II. TRIAL COUNSEL FOR MR. JACKSON WAS INEFFECTIVE
    DURING THE PENALTY PHASE OF HIS CAPITAL TRIAL.. . . .  23

    A.  Trial Counsel's Performance Was Deficient.. . . . . . . . . . . .  24

        1.  Trial Counsel Failed to Investigate or Present
            the Significant Mitigation Evidence that Was
            Readily Available.. . . . . . . . . . . . . . . . . . . . . . . . . . .  24

i

2.    Trial Counsel's Representation During the Penalty Phase of Trial Fell Well Below an Objective Standard of Reasonableness.. . . . . . . . . . . . 33

B.    <u>Mr. Jackson Was Prejudiced by Trial Counsel's Failures.</u>. . . 36

C.    <u>The State Courts' Rejection of Mr. Jackson's Ineffectiveness Claim Was Unreasonable.</u>. . . . . . . . . . . . . . 42

1.    The Court of Criminal Appeals Unreasonably Failed to Recognize the Constitutional Significance of the Mitigation Evidence in Mr. Jackson's Rule 32 Petition. . . . . . . . . . . . . . . . . 44

2.    The State Courts Unreasonably Failed to Give Mr. Jackson an Opportunity to Discover and Present Evidence Supporting His Ineffectiveness Claim.. . . . . . . . . . . . . . . . . . . . . . . . . 51

III.    THE TRIAL COURT VIOLATED MR. JACKSON'S RIGHT TO PRESENT A DEFENSE BY PRECLUDING HIM FROM PRESENTING MOTIVE EVIDENCE.. . . . . . . . . . . . . . . . . . . . . . 56

A.    <u>The Trial Court's Ruling Violated Mr. Jackson's Right to Present a Defense.</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

B.    <u>The State Court's Rejection of Mr. Jackson's Claim that the Trial Court Violated his Right to Present a Defense Was Unreasonable.</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

IV.    THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF ROBBERY VIOLATED MR. JACKSON'S RIGHT TO DUE PROCESS AND LED TO AN UNRELIABLE VERDICT.. . . . . . . . . . . . . . . . 65

A.     The Trial Court's Failure to Instruct the Jury on Robbery Was in Clear Violation of Mr. Jackson's Constitutional Rights.......................................... 67

B.     The State Court's Rejection of Mr. Jackson's Claim Regarding the Trial Court's Refusal to Instruct on Robbery Was Unreasonable................................. 70

V.     THE TRIAL COURT'S REFUSAL TO GRANT MR. JACKSON A CONTINUANCE TO SECURE A CRITICAL WITNESS VIOLATED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL........................................... 75

VI.     THE TRIAL JUDGE SENTENCED MR. JACKSON TO DEATH, DESPITE A UNANIMOUS JURY VERDICT FOR LIFE WITHOUT PAROLE, IN VIOLATION OF UNITED STATES SUPREME COURT PRECEDENT.................... 83

A.     The Trial Judge's Override Was Not a Determination Based on the Particular Characteristics of This Case........ 84

B.     The Trial Judge's Override Was an Unreasonable Application of *Ring v. Arizona*........................ 88

       1.     Mr. Jackson's Jury Unanimously Voted to Sentence Him to Life without Parole, Rejecting the Findings Necessary for a Death Sentence..................................... 89

       2.     The Trial Judge's Override Unconstitutionally Diminished the Jury's Role in Capital Sentencing................................... 93

       3.     Mr. Jackson Properly Presented This Claim in State Court.................................. 97

C.     The Trial Judge's Override Is Unconstitutionally Arbitrary and Unreliable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

VII.   THIS COURT SHOULD GRANT HABEAS RELIEF BECAUSE THE STATE WITHHELD FAVORABLE EVIDENCE FROM THE DEFENSE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

A.     Mr. Jackson's *Brady* Claim Is Not Procedurally Defaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

B.     The State Court's Rejection of Mr. Jackson's *Brady* Claim Was Unreasonable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

VIII.  THE STATE COURT ERRED IN DENYING MR. JACKSON'S BATSON CLAIM.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

IX.    THE TRIAL COURT IMPROPERLY ADMITTED INTO EVIDENCE MR. JACKSON'S INVOLUNTARY CONFESSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

X.     MISCONDUCT BY MEMBERS OF MR. JACKSON'S JURY PREJUDICED HIM IN VIOLATION OF CLEAR UNITED STATES SUPREME COURT PRECEDENT.. . . . . . . . . . . . . . . 123

A.     Juror J.B. Conducted an Unauthorized Investigation of the Crime Scene and Considered Extraneous Evidence in Her Deliberations, Violating Mr. Jackson's Right to a Fair and Impartial Jury.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

B.     Juror J.G. Failed to Answer Truthfully a Key Question during Voir Dire, Violating Mr. Jackson's Right to a Fair and Impartial Jury.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

XI.    THE DEATH SENTENCE IS DISPROPORTIONATE TO MR. JACKSON'S PERSONAL CULPABILITY.. . . . . . . . . . . . . . . . . . 129

A.     Mr. Jackson's Role in the Crime. . . . . . . . . . . . . . . . . . . . . 130

iv

B.  <u>Mr. Jackson's Young Age</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . 132

C.  <u>Mr. Jackson's Diminished Intellectual Capacity</u>. . . . . . . . . . 133

D.  <u>Disproportionate Sentences of Mr. Jackson's Co-Defendants</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

XII.  THIS COURT SHOULD GRANT HABEAS RELIEF FOR THE REMAINING ISSUES IN MR. JACKSON'S PETITION. . . . . . . . 135

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

# TABLE OF AUTHORITIES

## CASES

Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007). . . . . . . . . . . . . . . . . . . . . . . . . 38

Acres v. State, 548 So. 2d 459 (Ala. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . 11

Adkins v. Warden, Holman CF, 710 F.3d 1241 (11th Cir. 2013). . . . . . . . . . . . 107

Anderson v. Bessemer City, N.C., 470 U.S. 564 (1985). . . . . . . . . . . . . . . . . . . . 43

Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . 6

Apprendi v. New Jersey, 530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . . . . . . . 88, 91

Armstrong v. Dugger, 833 F.2d 1430 (11th Cir. 1987). . . . . . . . . . . . . . . . . . . . 87

Atkins v. Virginia, 536 U.S. 304 (2002).. . . . . . . . . . . . . . . . . . . . . . . . . . 130, 133

Banks v. Dretke, 540 U.S. 668 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 105, 110

Batson v. Kentucky, 476 U.S. 79 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Beck v. Alabama, 447 U.S. 625 (1980). . . . . . . . . . . . . . . . . . . . 12, 66, 67, 69, 74

Ex parte Beckworth, No. 1091780, 2013 WL 3336983
     (Ala. Jul. 3, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108, 110

Bell v. State, 518 So. 2d 840 (Ala. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . 68

Ex parte Bird, 594 So. 2d 676 (Ala. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ex parte Boatwright, 471 So. 2d 1257 (Ala. 1985). . . . . . . . . . . . . . . . . . . . . . . 51

Borden v. Allen, 646 F.3d 785 (11th Cir. 2011).. . . . . . . . . . . . . . . 15, 21, 43, 112

Ex parte Borden, 60 So. 3d 940 (Ala. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Boyd v. State, 699 So. 2d 967 (Ala. Crim. App. 1997). . . . . . . . . . . . . . . . . . . 71

Brady v. Maryland, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Breedlove v. Moore, 279 F.3d 952 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . 55

Brownlee v. Haley, 306 F.3d 1043 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . 39

Bryant v. State, No. CR-08-0405, 2011 WL 339585
    (Ala. Crim. App. Feb. 4, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 53, 118

Bui v. Haley, 321 F.3d 1304 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . passim

Burgess v. Comm'r, 723 F.3d 1308 (11th Cir. 2013). . . . . . . . . . . . . . 51, 53, 55, 73

Ex parte Burgess, 811 So. 2d 617 (Ala. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . 96

Cabana v. Bullock, 474 U.S. 376 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 87

Caldwell v. Mississippi, 472 U.S. 320 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 128

Ex parte Carroll, 852 So. 2d 833 (Ala. 2002). . . . . . . . . . . . . . . . . . . . . . . . 95, 96

Chambers v. Armontrout, 907 F.2d 825 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . 6

Chambers v. Mississippi, 410 U.S. 284 (1973). . . . . . . . . . . . . . . . . . . . . . . 57, 63

Clewis v. Texas, 386 U.S. 707 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . 120, 121

Cochran v. Herring, 43 F.3d 1404 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . 17, 109

Code v. Montgomery, 799 F.2d 1481 (11th Cir. 1986). . . . . . . . . . . . . . . . . . . . 9

Coker v. Georgia, 433 U.S. 584 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Collier v. Turpin, 177 F.3d 1184 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . 35, 41

Colorado v. Connelly, 479 U.S. 157 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Cone v. Bell, 556 U.S. 449 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Connolly v. State, 500 So. 2d 57 (Ala. Crim. App. 1985). . . . . . . . . . . . . . . . . 68

Cooper v. Sec'y, 646 F.3d 1328 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . 37, 40, 47

Crane v. Kentucky, 476 U.S. 683 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 63

Cunningham v. Zant, 928 F.2d 1006 (11th Cir. 1991). . . . . . . . . . . . . . . . . . 35, 87

Davis v. Alaska, 415 U.S. 308 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Eagle v. Linahan, 279 F.3d 926 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 11

Eddings v. Oklahoma, 455 U.S. 104 (1982). . . . . . . . . . . . 37, 49, 84, 85, 103, 130

Enmund v. Florida, 458 U.S. 782 (1982). . . . . . . . . . . . . . . . . . . . . . 87, 130, 131

Ferrell v. Hall, 640 F.3d 1199 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 46

Fikes v. Alabama, 352 U.S. 191 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Florida v. Nixon, 543 U.S. 175 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Ford v. Georgia, 498 U.S. 411 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 108

Ford v. Wainwright, 477 U.S. 399 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 76, 83

Francis v. Franklin, 471 U.S. 307 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Frazier v. Bouchard, 661 F.3d 519 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . 21, 43

Gardner v. Florida, 430 U.S. 349 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 90

viii

Giglio v. United States, 405 U.S. 150 (1972). . . . . . . . . . . . . . . 105, 108, 110, 113

Goodwin v. Balkcom, 684 F.2d 794 (11th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . 9

Graham v. Collins, 506 U.S. 461 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Grayson v. Thompson, 257 F.3d 1194 (11th Cir. 2001).. . . . . . . . . . . . . . . . . . . 85

Greer v. Mitchell, 264 F.3d 663 (6th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . 55

Gregg v. Georgia, 428 U.S. 153 (1976). . . . . . . . . . . . . . . . . . . . . 84, 100, 101, 135

Griffin v. California, 380 U.S. 609 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Griffith v. Kentucky, 479 U.S. 314 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Hall v. Florida, 134 S. Ct. 1986 (2014).. . . . . . . . . . . . . . . . . . . . . . . . . . 130, 133

Hamilton v. State, 677 So. 2d 1254 (Ala. Crim. App. 1995). . . . . . . . . . . . . . . 107

Hansbrough v. Latta, 11 F.3d 143 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 109

Hardwick v. Crosby, 320 F.3d 1127 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 39

Harris v. Alabama, 513 U.S. 504 (1995).. . . . . . . . . . . . . . . . . . . . . . 94, 100, 103

Harris v. New York, 401 U.S. 222 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Harris v. Reed, 489 U.S. 255 (1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 100

Herring v. New York, 422 U.S. 853 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Holmes v. South Carolina, 547 U.S. 319 (2006). . . . . . . . . . . . . . . . . . . . . . . . . 60

Hooks v. State, 21 So. 3d 772 (Ala. Crim. App. 2008). . . . . . . . . . . . . . . . . . . . 46

Horsley v. Alabama, 45 F.3d 1486 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 15

ix

Hubbard v. State, 500 So. 2d 1204 (Ala. Crim. App. 1986).. . . . . . . . . . . . . . . . 91

Ex parte Ingram, 51 So. 3d 1119 (Ala. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Irvin v. Dowd, 366 U.S. 717 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123, 126

Isaacs v. Head, 300 F.3d 1232 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 112

J.D.B. v. North Carolina, 131 S. Ct. 2394 (2011).. . . . . . . . . . . . . . . . . . . . . . . . 121

Jackson v. Alabama, 123 S. Ct. 582 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Jackson v. Denno, 378 U.S. 368 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Jackson v. Dugger, 837 F.2d 1469 (11th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . 90

Jackson v. State, 836 So. 2d 915 (Ala. Crim. App. 1999). . . . . . . . . 62, 70, 80, 122

Ex parte State (Jackson v. State), 910 So. 2d 797
          (Ala. Crim. App. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 111

Jackson v. State, 133 So. 3d 420 (Ala. Crim. App. 2012). . . . . . . . . . . . . . passim

Ex parte Jackson, 836 So. 2d 979 (Ala. 2002). . . . . . . . . . . . . . . . . . . . . . . passim

James v. Kentucky, 466 U.S. 341 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . 16, 108

Johnson v. California, 545 U.S. 162 (2005). . . . . . . . . . . . . . . . . . . . . . . 116, 117

Johnson v. Sec'y, 643 F.3d 907 (11th Cir. 2011). . . . . . . . . . . . . . . . . . 26, 29, 46

Johnson v. Texas, 509 U.S. 350 (1993). . . . . . . . . . . . . . . . . . . . . . . . 85, 86, 132

Ex parte Johnson, 620 So. 2d 709 (Ala. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Jones v. United States, 526 U.S. 227 (1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

x

Ex parte Jones, 456 So. 2d 380 (Ala. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Keen v. State, 775 So. 2d 263 (Fla. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Kennedy v. Louisiana, 554 U.S. 407 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

Kuenzel v. State, 577 So. 2d 474 (Ala. Crim. App. 1990). . . . . . . . . . . . . . . . . . 90

Kyles v. Whitley, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Lawhorn v. Allen, 519 F.3d 1272 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 36

Lee v. Comm'r, 726 F.3d 1172 (11th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . 92, 93

Lee v. Kemna, 534 U.S. 362 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Lockett v. Ohio, 438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . 48, 49, 84, 104, 130

Lucero v. City of Birmingham, 592 So. 2d 656 (Ala. Crim. App. 1991). . . . . . . . 12

Madison v. Comm'r, 677 F.3d 1333 (11th Cir. 2012). . . . . . . . . . . . . . . . . 117, 118

Mancill v. Hall, 545 F.3d 935 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 108

Martin v. State, 839 So. 2d 665 (Ala. Crim. App. 2001). . . . . . . . . . . . . . . . . . . 107

Martinez v. Ryan, 132 S. Ct. 1309 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548
(U.S. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 128

McGahee v. State, 885 So. 2d 191 (Ala. Crim. App. 2003). . . . . . . . . . . . . . . . . 50

McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . 125

Miller-El v. Dretke, 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . 115, 116

Minnick v. Anderson, 151 F. Supp. 2d 1015 (N.D. Ind. 2000). . . . . . . . . . . . . 103

Miranda v. Arizona, 384 U.S. 436 (1966).. . . . . . . . . . . . . . . . . . . . . . . . . 119, 121

Moran v. Burbine, 475 U.S. 412 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Morgan v. Illinois, 504 U.S. 719 (1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

O'Sullivan v. Boerckel, 526 U.S. 838 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . 98

Padgett v. State, 668 So. 2d 78 (Ala. Crim. App. 1993). . . . . . . . . . . . . . . . . . . 68

Parker v. Dugger, 498 U.S. 308 (1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Parker v. State, 568 So. 2d 335 (Ala. Crim. App. 1990). . . . . . . . . . . . . . . . . . . 11

Payne v. State, 791 So. 2d 383 (Ala. Crim. App. 1999). . . . . . . . . . . . . . . . . . . 108

Penry v. Lynaugh, 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Perkins, 748 F.2d 1519 (11th Cir. 1984). . . . . . . . . . . . . 124, 125

United States v. Pessefall, 27 F.3d 511 (11th Cir. 1994). . . . . . . . . . . . . . . . . . 124

Porter v. McCollum, 558 U.S. 30 (2009). . . . . . . . . . . . . . . . . . . 25, 40, 42, 45, 48

Powell v. Alabama, 287 U.S. 45 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 83

Powell v. Allen, 602 F.3d 1263 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . 43

Powell v. State, 548 So. 2d 590 (Ala. Crim. App. 1988). . . . . . . . . . . . . . . . . . . 11

Price v. Allen, 679 F.3d 1315 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . 3

Remmer v. United States, 347 U.S. 227 (1954). . . . . . . . . . . . . . . . . . . . . . . . . 124

Ring v. Arizona, 536 U.S. 584 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ex parte Roberts, 735 So. 2d 1270 (Ala. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 50

Rogers v. McMullen, 673 F.2d 1185 (11th Cir. 1982). . . . . . . . . . . . . . . . . . . . 126

Rompilla v. Beard, 545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . 25, 29, 45

Roper v. Simmons, 543 U.S. 551 (2005). . . . . . . . . . .   38, 86, 129, 130, 132, 134

Routly v. Singletary, 33 F.3d 1279 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 48

United States v. Scheffer, 523 U.S. 303 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . 57

Sears v. Upton, 130 S. Ct. 3259 (2010). . . . . . . . . . . . . . . . . 25, 31, 39, 40, 47, 48

Shellito v. State, 701 So. 2d 837 (Fla. 1997). . . . . . . . . . . . . . . . . . . . . . 84, 85, 86

Simmons v. South Carolina, 512 U.S. 154 (1994). . . . . . . . . . . . . . . . . . . . . . . . 91

Sims v. State, 587 So. 2d 1271 (Ala. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . 11

Spano v. New York, 360 U.S. 315 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Spaziano v. Florida, 468 U.S. 447 (1984). . . . . . . . . . . . . . . . . . 101, 102, 129, 134

Spencer v. Zant, 715 F.2d 1562 (11th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . 18

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). . . . . . . . . . . . . . . . . . . . 116

Strickland v. Washington, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . .   passim

Strickler v. Greene, 527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

Swain v. Alabama, 380 U.S. 202 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Tafero v. Wainwright, 796 F. 2d 1314 (11th Cir. 1986). . . . . . . . . . . . . . . . . . . . 87

Taylor v. Illinois, 484 U.S. 400 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

xiii

Taylor v. Singletary, 122 F.3d 1390 (11th Cir. 1997). . . . . . . . . . . . . . . . 62, 63, 65

Ex parte Taylor, 10 So. 3d 1075 (Ala. 2005). . . . . . . . . . . . . . . . . . . . . . . . 15, 20

Tedder v. State, 322 So. 2d 908 (Fla. 1975). . . . . . . . . . . . . . . . . . . . . . . . . 102

Tennard v. Dretke, 542 U.S. 274 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Thompson v. Oklahoma, 487 U.S. 815 (1988). . . . . . . . . . . . . . . . . . . . . . 131, 132

Tison v. Arizona, 481 U.S. 137 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 130, 131

Ex parte Tomlin, 909 So. 2d 283 (Ala. 2003). . . . . . . . . . . . . . . . . . . . . . . . 95, 96

Tuilaepa v. California, 512 U.S. 967 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . 104

Turner v. Louisiana, 379 U.S. 466 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Ungar v. Sarafite, 376 U.S. 575 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Ward v. Hall, 592 F.3d 1144 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . 109

Washington v. Texas, 388 U.S. 14 (1967). . . . . . . . . . . . . . . . . . . . . . . 57, 60, 64

Wiggerfall v. Jones, 918 F.2d 1544 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . 67

Wiggins v. Smith, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . passim

Williams v. Allen, 542 F.3d 1326 (11th Cir. 2008). . . . . . . . 29, 36, 40, 42, 46, 47

Williams v. Humphrey, No. CV412-106, 2013 WL 3877750
   (S.D. Ga. Jul. 26, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Williams v. State, 548 So. 2d 501 (Ala. Crim. App. 1988). . . . . . . . . . . . . . . . 11

Williams v. Taylor, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . passim

Ex parte Williams, 651 So. 2d 569 (Ala. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Witherspoon v. Illinois, 391 U.S. 510 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Ex parte Woodard, 631 So. 2d 1065 (Ala. Crim. App. 1993). . . . . . . . . . . . . . . 92

Woodson v. North Carolina, 428 U.S. 280 (1976). . . . . .   25, 37, 87, 102, 130, 135

Woodward v. Alabama, 134 S. Ct. 405 (2013). . . . . . . . . . . . . . . . . . . . . . 100, 102

Woodward v. State, 123 So. 3d 989 (Ala. Crim. App. 2011). . . . . . . . . . . . . . . . 49

Ex parte Yelder, 630 So. 2d 107 (Ala. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ylst v. Nunnemaker, 501 U.S. 797 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Zant v. Stephens, 462 U.S. 862 (1983). . . . . . . . . . . . . . . . . . . . . . . . . 84, 102, 135

## STATUTES

28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Ala. Code § 13A-5-40(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Ala. Code § 13A-5-46(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 92

Ala. Code § 13A-5-47(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 88

Ala. Code § 13A-5-47(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 102

Ala. Code § 15-12-21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 33, 34

Ala. R. App. P. 28(a)(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Ala. R. Crim. P. 32.1(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106, 108

Ala. R. Crim. P. 32.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Ala. R. Crim. P. 32.6(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Ala. R. Crim. P. 32.7(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# ARGUMENT

Shonelle Jackson was eighteen years old in April of 1997, when he and three co-defendants were arrested and charged for the death of Lefrick Moore. The lawyers who were appointed to represent Shonelle did not adequately investigate the case, prepare a defense, or advocate on his behalf at his capital trial. There are real questions about who actually killed the victim in this case; the trial judge ultimately concluded that a determination could not be made about whether the shooter was Shonelle or one of his co-defendants. Because of counsel's ineffectiveness, however, the jury was not presented with a credible defense, and Shonelle was convicted of capital murder. The lack of a meaningful adversarial process undermined the reliability of the guilt phase verdict.

Even more problematic is the sentence of death in this case. None of the three and arguably more culpable co-defendants was given a death sentence and all were sentenced to prison terms *with* the possibility of parole. With respect to counsel's performance, the state court postconviction judge in the case reviewed the record and stated that, in her view, Shonelle's lawyers did nothing at the sentencing phase. Counsel did not adequately investigate mitigation and therefore failed to discover that Shonelle's parents were severely impaired by their drug and alcohol abuse. His upbringing was marked by neglect and poverty as a result of his parents' habits, and

1

he consistently witnessed violence among his family members and in his neighborhood. Shonelle struggled to stay in school and was himself diagnosed with alcohol abuse as a thirteen-year-old before also being exposed to the neighborhood drug trade. Although this evidence was readily available through official records and conversations with Shonelle's family members, his lawyers did not present any of it.

Even without knowledge of this compelling mitigation, Shonelle's jury voted 12-0 to sentence him to life without parole. Had the trial judge been presented with the absent mitigating evidence, he would not have decided to reject the jury's unanimous life verdict and sentence Shonelle to death.

## I.   TRIAL COUNSEL FOR MR. JACKSON WAS INEFFECTIVE DURING THE CULPABILITY PHASE OF HIS CAPITAL TRIAL.

The Sixth Amendment right to counsel is the "right to effective counsel" and is necessary to protect the fundamental right to a fair trial. Strickland v. Washington, 466 U.S. 668, 684–86 (1984). In this case, Shonelle Jackson's trial lawyers were unprepared for the guilt phase of these capital proceedings. They failed to adequately investigate the case, failed to develop a sound strategy for Shonelle's defense, and failed to properly object to the significant errors of the State and the trial judge. Their lack of advocacy before and during trial deprived Mr. Jackson of the counsel guaranteed him by the Sixth Amendment. Id. at 687. Based on the facts raised in

Mr. Jackson's second amended Rule 32 petition, a substantial probability exists that, but for counsel's errors, he would not have been convicted of capital murder and thus would not have been eligible for the death penalty.  Id. at 694.

A.      Mr. Jackson's Trial Lawyers Were Ineffective Under *Strickland v. Washington*.

To effectively prepare for a capital trial, counsel must investigate possible avenues of defense, investigate and challenge assertions by the State, and subject the State's case to rigorous examination and testing.   Strickland, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); see, e.g., Price v. Allen, 679 F.3d 1315, 1323 (11th Cir. 2012) ("Professionally competent assistance includes a duty to conduct a reasonable investigation.").

At the outset, Shonelle was appointed lawyers who were faced with severe financial limitations based on Alabama law at the time of his trial.  Ala. Code § 15-12-21 (before amendment in 1999, compensation for out-of-court work at each phase of capital trial capped at $1,000, based on $20 hourly rate).  Defense counsel received no compensation whatsoever for any out-of-court work in excess of fifty hours, and they were compensated at rates far below market level even for the initial fifty hours. This structural flaw severely limited the ability for Mr. Jackson's lawyers to be

3

effective, and the failure to provide adequate funding curtailed his Sixth Amendment right.  However, the lawyers were also entirely ineffective based on their own failures and omissions.

Here, the prosecution's case that Mr. Jackson was guilty of capital murder-robbery hinged largely on the testimony of three co-defendants, Antonio Barnes, Eric Williams, and Christopher Rudolph.  The State had indicted each of these suspects for capital murder (Vol. 4, Tab R-10, TR. 299, 369; Vol. 5, Tab R-10, TR. 424), so they each had an enormous incentive to testify against Mr. Jackson.  Yet despite the obvious weaknesses in the State's evidence, trial counsel failed to conduct an independent investigation or develop any of the ample and readily-available sources of exculpatory evidence.[1]

**First**, trial counsel made no real attempt to investigate and interview Gerard Burdette, the "only actual eyewitness to the shooting."  (Vol. 3, Tab R-3, TR. 19.) Mr. Burdette was seated in the passenger seat of the victim's car and fled from the vehicle during the shooting.  (Id.)  He spoke to police immediately after the incident,

---

[1] As alleged in the Rule 32 petition, trial counsel should have, but did not, speak to the following potential witnesses as part of their case investigation: family members, Marilyn Jackson, LaQuanda Jackson, Wanda Jackson, Keisha Young, Monica Taylor, and Julia Taylor; friends, LaTanya Austin and Greg McGee; witnesses to the crime scene, Victoria Moss, Leroy Geary, and A.C. Porterfield; and other witnesses with exculpatory information, Joe Saloom, Andrew Signore, and Latiki Denis Williams.  (Vol. 16, Tab R-62, C. 597–600.)

and defense counsel told the court that Mr. Burdette "indicate[d] that our guy didn't do it. . . . If he testifies to what was in his statement, he could very well exonerate our client." (Vol. 3, Tab R-3, TR. 20.)  Mr. Burdette's version of events was significantly different from the stories presented by Mr. Jackson's co-defendants, and he identified suspects other than Mr. Jackson as the responsible party.  (Vol. 1, Tab R-1, C. 86–96 (describing prior encounter with armed assailants).)

Despite the critical importance of this witness, Mr. Jackson's lawyers did not try to locate Mr. Burdette until the week before trial, when they were told by the prosecution that it had been unable to subpoena him.  (Vol. 1, Tab R-1, C. 83; Vol. 3, Tab R-3, TR. 23.)  Instead, three days before the start of trial, defense counsel was forced to ask for a continuance to give them time to do what they should have done months before trial: locate Mr. Burdette.  (Vol. 1, Tab R-1, C. 83–84.)  The trial judge recognized that counsel had failed to do anything to contact the most important witness in this case, stating on the record that it did not "sound to me like y'all tried to do anything." (Vol. 3, Tab R-3, TR. 23.)  The judge also noted that the only reason counsel was asking for a continuance was that they "[c]oincidentally found out he was being looked for."  (Id.)  In response, defense counsel admitted they mistakenly assumed that Mr. Burdette would have been present at trial because he was listed on the State's witness list and that he was not "a priority" for them.  (Vol. 3, Tab R-3,

5

TR. 23–24.)  Counsel's reply succinctly reveals the depth of their ineffectiveness. They failed to comprehend the importance of Mr. Burdette's statement to police, which was the only evidence introduced in the defense case.  (Vol. 6; Tab R-23, TR. 33–34.)  They also failed to recognize any need to speak with their key witness before he was scheduled to take the stand.

Trial counsel's failure even to attempt investigating the only impartial eyewitness in this case was deficient performance under Strickland.  See, e.g., Anderson v. Johnson, 338 F.3d 382, 393–94 (5th Cir. 2003) (counsel's failure to interview one of two adult eyewitnesses was ineffective assistance of counsel); Chambers v. Armontrout, 907 F.2d 825, 831 (8th Cir. 1990) (en banc) (counsel's failure to interview only eyewitness who could have corroborated defendant's claim of self-defense was ineffective assistance of counsel).  Their failure to investigate was compounded by another mistaken assumption that the jury would see a tape of Mr. Burdette's statement (Vol. 3, Tab R-3, TR. 29); however, the prosecution informed them on the day trial began that this tape was not available (Vol. 3, Tab R-4, TR. 38).  As a result, defense counsel was forced to read Mr. Burdette's statement into the record, depriving the jury of a way to evaluate the witness's credibility. (Vol. 6, Tab R-23, TR. 33.)

The failure of Shonelle's lawyers to investigate and develop the eyewitness

testimony of Gerard Burdette was significant and prejudicial.  In its sentencing order, the trial court noted that Mr. Burdette's statement was inconsistent with that of the co-defendants. (Vol. 1, Tab R-1, C. 183–84.) However, the court also concluded that because Mr. Burdette was friends with the victim, it would "presume[] his statement would be favorable to Moore." (Id.)  Instead of testimony that would have exonerated Mr. Jackson or at least raised a reasonable doubt about the State's theory of the case, defense counsel's incompetence turned their strongest potential evidence into support for the prosecution's case – the exact opposite of what was intended by the Sixth Amendment.

**Second**, counsel's lack of investigation and preparation allowed the State to preclude Mr. Jackson from presenting a viable theory of defense.  Two weeks before the start of trial, the State sought and was granted a motion in limine to preclude any evidence that the victim dealt drugs.  (Vol. 1, Tab R-1, C. 59; Vol. 1, Tab R-1, C. 102.)  Defense counsel should have known that a defense to capital murder was to show that the motive for this shooting was a retaliation for a "bad drug deal" rather than a robbery.[2] (Id. at C. 81; Vol. 3, Tab R-3, TR. 28–30.)  However, when the trial court asked for the evidentiary support of this theory, trial counsel offered nothing

---

[2] Murder "during a robbery" is a capital crime under Alabama law, Ala. Code § 13A-5-40(a)(2), but murder committed in retaliation for a bad drug deal is not.

more than agreement with an assertion by the prosecutor that the victim was described by his wife as a "[s]mall time drug dealer."  (Vol. 3, Tab R-3, TR. 31.)

The trial court's decision to grant the motion in limine was devastating to Mr. Jackson's defense because it took away his strongest evidence that this was not a murder-robbery case for which he could be sentenced to death.  Because the lawyers failed to investigate and speak with any witnesses, they had nothing to offer the judge to rebut the prosecutor's assertions.  Even with no evidence of their own, counsel could have at least argued that the prosecutor's assertions were unreliable because they were based on hearsay statements made to police officers.  But instead of advocating for Mr. Jackson, counsel actually *agreed* with the State's characterization of statements made by the victim's wife, who had an incentive to minimize her husband's disrepute.  (Vol. 3, Tab R-3, TR. 31.)

In addition, a minimal investigation by counsel into the available witnesses and records would have substantially bolstered their opposition to the State's motion in limine.  Shonelle's family members and friends could have established the extent that the drug trade was a motivating force for Shonelle, his co-defendants, and others in the community.  Defense counsel could have presented evidence that Mr. Jackson began selling drugs at a very young age as a "gofer" for older gang members in the neighborhood and that he himself was a gang member and was involved in gang

8

activity.   Such interviews and investigation would have also revealed that Mr. Jackson and a co-defendant had previously been convicted of drug offenses. (Vol. 1, Tab R-1, C. 177; Vol. 4, Tab R-10, TR. 394.)

Defense counsel had a constitutional obligation to investigate fully the factual support for a "bad drug deal" because it was a viable defense to capital murder.  See, e.g., Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986) (finding ineffective assistance of counsel where defense failed to interview witnesses in support of alibi defense theory); Goodwin v. Balkcom, 684 F.2d 794, 817 (11th Cir. 1982) (finding ineffective assistance where counsel failed to investigate or make an "informed evaluation of a potential defense").  Had counsel simply collected the easily available evidence that the victim, Mr. Jackson, and his co-defendants were involved with drugs, the trial court would have denied the State's motion in limine and allowed the jury to consider whether Mr. Jackson had a motive to commit robbery.

**Third**, aside from their failure to investigate, Shonelle's lawyers also failed to act as advocates.  For example, defense counsel actually informed the trial judge and prosecution at a motions hearing that Shonelle told them that he knew the location of the murder weapon.  (Vol. 3, Tab R-3, TR. 25.)  The trial court responded with: "[t]hat's your client's problem.  If he wants to start helping convict himself, then that's his prerogative."  (Id. at TR. 26.)  Counsel here had no acceptable justification

for revealing their client's incriminating statement to the judge and prosecutor, and the violation of Mr. Jackson's attorney-client privilege was an abdication of counsel's role in the adversarial process. See Florida v. Nixon, 543 U.S. 175 (2004) (requiring reasonable strategy before counsel may concede guilt).

Defense counsel also misunderstood the law and had to be corrected by the trial judge in front of members of the jury. During the voir dire proceedings, trial counsel asked whether potential jurors could acquit if "the defendant proved a reasonable doubt." (Vol. 3, Tab R-6, TR. 146.) Even after the judge alerted counsel that he was misstating the law, the defense lawyer repeated his voir dire question: "If there is a reasonable doubt proven in the case by either the State *or the defense* . . . ." (Id. (emphasis added)). Thus, even before the State presented any of its evidence, Shonelle's lawyers had engaged in conduct that undermined his ability to get a fair trial. This was ineffective. Strickland, 466 U.S. at 689 ("The purpose [of the effective assistance guarantee] is to ensure that criminal defendants receive a fair trial.").

Further, defense counsel made a cursory and inadequate objection to the prosecutor's use of discriminatory strikes. In this case, although the State had fifteen peremptory strikes, he chose to use only thirteen of them, leaving the remaining two challenges to chance. (Vol. 3, Tab R-6, TR. 154–56.) Eight of the prosecutor's

10

thirteen peremptory strikes were used to remove African-American veniremembers, including six of the last seven strikes.  (Id.)  Although defense counsel objected under Batson v. Kentucky, 476 U.S. 79 (1986), they offered nothing other than the numbers to support the objection, and the trial court denied the motion by stating "[t]hat's not enough."  (Id.)

As explained in Mr. Jackson's Rule 32 petition, defense counsel could have supported a prima facie case of bias by presenting evidence and argument that the struck jurors were as heterogeneous as the community as a whole, that there was a lack of meaningful voir dire in this case, and that the District Attorney for Montgomery County has a history of discrimination in jury selection.[3]  See Eagle v. Linahan, 279 F.3d 926 (11th Cir. 2001) (finding counsel ineffective for failing to

---

[3] Alabama courts have repeatedly found the history of discrimination by this office to be relevant and significant.  Sims v. State, 587 So. 2d 1271, 1277 (Ala. Crim. App. 1991) (noting "number of cases prosecuted in Montgomery County have been reversed because of a Batson violation," this District Attorney's Office "does not write on a clean slate." (citations omitted)); Ex parte Yelder, 630 So. 2d 107, 110 (Ala. 1992) ("We regret that the conduct of the prosecution has, because of actions taken on the basis of race, once again necessitated a retrial . . . ."); see also Ex parte Bird, 594 So. 2d 676, 681 (Ala. 1991); Parker v. State, 568 So. 2d 335 (Ala. Crim. App. 1990); Powell v. State, 548 So. 2d 590 (Ala. Crim. App. 1988); Williams v. State, 548 So. 2d 501 (Ala. Crim. App. 1988); Acres v. State, 548 So. 2d 459 (Ala. Crim. App. 1987).  Habeas relief has also been granted due to racial bias during jury selection from this prosecutor's office.  Bui v. Haley, 321 F.3d 1304 (11th Cir. 2003) (habeas relief granted in death penalty case where Montgomery County prosecutor engaged in racially discriminatory jury selection).

adequately raise <u>Batson</u> claim).  With effective advocacy, the trial court would have found a prima facie case of discrimination, and counsel could have shown that the State was striking jurors on the basis of race.

**Fourth**, Shonelle's lawyers failed to ask for an instruction that would effectively allow the jury to return a verdict less than capital murder.  In light of the evidence presented by the State, the jury could reasonably have determined that Mr. Jackson's co-defendants only took the victim's vehicle as an afterthought to the shooting.  Under state and federal law, defense counsel should have asked for a robbery charge so that the jury could give effect to this potential verdict of intentional murder followed by robbery.  <u>See, e.g.</u>, <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980); <u>Lucero v. City of Birmingham</u>, 592 So. 2d 656, 657 (Ala. Crim. App. 1991) (defendant "entitled to have the trial court instruct the jury on his theory of defense, provided that the theory has legal foundation and is supported by the evidence"); <u>see also</u> <u>Francis v. Franklin</u>, 471 U.S. 307, 313 (1985) (holding that due process prohibits instructional error that lessens State's burden of proving a critical element).  Here, the only available lesser-included charge was intentional murder, giving the jury no choice but to convict Mr. Jackson of capital murder even if it did not believe that the murder had taken place during a robbery.  Defense counsel's error was particularly prejudicial because, but for their error, the trial court would have needed to grant an

instruction on robbery.   Ex parte Jackson, 836 So. 2d 979, 991 (Ala. 2002) (Johnstone, J., concurring in part and dissenting in part) ("Had the defendant requested such a jury instruction, it would have been due him.").

In this case, counsel's lack of investigation precluded their ability to make a strategic choice as to a viable theory of defense.  The readily-available evidence could have allowed trial counsel to advocate that Mr. Jackson had no intent to rob the victim or that another suspect fired the fatal bullet.  Here, counsel chose neither. During opening argument, counsel simply referred to the State's burden of proof, and reminded the jury to consider the bias of the co-defendants when assessing the reliability of their statements.  (Vol. 3, Tab R-9, TR. 168–73.)  The closing statement was similarly inadequate, and defense counsel chose only to remind the jury of the burden of proof and to point out inconsistencies in the co-defendants' statements. (Vol. 6, Tab R-25, TR. 50, 52.)  Mr. Jackson's counsel failed entirely in argument to advocate on his behalf.  See Herring v. New York, 422 U.S. 853 (1975) ("[N]o aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment.").

Shonelle's lawyers failed to play "a role that is critical to the ability of the adversarial system to produce just results."  Strickland, 466 U.S. at 685.  But for their errors, there is a reasonable probability that the jury would have had a reasonable

13

doubt concerning Shonelle's guilt and would not have convicted him of capital murder.  Id. at 695.  Under the Sixth Amendment, his counsel was ineffective.

B.    The State Court Unreasonably Rejected Mr. Jackson's Claim.

1.    *Mr. Jackson's Ineffective Assistance of Counsel Claim Is Not Procedurally Defaulted.*

The last reasoned state-court decision to address Mr. Jackson's claim that his counsel was ineffective during the guilt phase of his trial was the Alabama Court of Criminal Appeals.  Jackson v. State, 133 So. 3d 420 (Ala. Crim. App. 2012).  In that decision, the Court of Criminal Appeals stated that several subparts of Mr. Jackson's ineffective assistance of counsel claim were waived on appeal because they were not sufficiently briefed.  Id. at 457 (citing Ala. R. App. P. 28(a)(10) which requires arguments to cite "cases, statutes, other authorities, and parts of the record relief [sic] on").  The State argues that the state court decision was an adequate and independent state law ground and procedurally bars Mr. Jackson from relief on the allegations presented in paragraphs 113 to 117 of his habeas petition (failure to interview Gerard Burdette, failure to investigate, and failure to properly object under Batson).  (Doc. 11 at 32–34; Doc. 32 at 8–10.)

As an initial matter, the Court of Criminal Appeals made a judgment on the merits regarding the bulk of Mr. Jackson's ineffectiveness allegations.  Jackson v.

14

State, 133 So. 3d at 459–61.  The appellate court affirmed the lower court's holding that summary denial on the merits was appropriate because the underlying issues had been addressed on direct appeal.  Id. at 459–60 (trial counsel failed to assert theory of defense (drug deal gone bad); failed to request jury instruction on robbery).  In addition to addressing the merits, denying relief on this ground is inconsistently done by the Alabama courts and is not a basis for precluding federal review.  See Ex parte Taylor, 10 So. 3d 1075, 1078 (Ala. 2005) (rejecting very analysis used by Court of Criminal Appeals to deny Mr. Jackson's ineffectiveness of counsel claims).

The appellate court also held that Mr. Jackson "failed to meet the specificity requirements" for his claim that trial counsel did not interview family members and other witnesses, including Mr. Burdette.  Id. at 460–61.  A dismissal for this reason is a ruling on the merits that must be reviewed by this Court.  See, e.g., Borden v. Allen, 646 F.3d 785, 816 (11th Cir. 2011).  Because the Court of Criminal Appeals addressed the merits of Mr. Jackson's constitutional claim, this claim is not procedurally defaulted.  See, e.g., Harris v. Reed, 489 U.S. 255, 262–66 (1989) (no default where state court opinion "falls short of an explicit reliance on a state ground"); Horsley v. Alabama, 45 F.3d 1486, 1489–90 (11th Cir. 1995) ("When a state court decides a constitutional question, even though it does not have  to, the considerations of comity and federalism which would ordinarily preclude federal

review of procedurally defaulted issues no longer apply.").

The State does not address the fact that these claims were reviewed by the Court of Criminal Appeals.  Instead, it asserts that these claims was not reviewed because Mr. Jackson failed to brief the issue properly.  The State's argument is not persuasive because state appellate Rule 28(a)(10) is inadequate to sustain a procedural default.  In Ex parte Borden, 60 So. 3d 940, 944 (Ala. 2007), the Alabama Supreme Court specifically overruled the Court of Criminal Appeals' similar conclusion that the appellant had waived his ineffective assistance of counsel claim through a failure to comply with Rule 28(a)(10).  The Alabama Supreme Court found that the brief in Borden included eleven pages of argument regarding ineffective assistance of counsel and was "sufficient to apprise the Court of Criminal Appeals of Borden's contentions with regard to his ineffective-assistance-of-counsel claims." Id.  Because the reasoning of the Alabama Court of Criminal Appeals has been expressly rejected and, at a minimum, is inconsistently followed, the State's reliance on this procedural bar is misplaced.

A state rule must be "firmly established and regularly followed" in order to bar habeas review by this Court of a federal constitutional claim.  Ford v. Georgia, 498 U.S. 411, 423–24 (1991); James v. Kentucky, 466 U.S. 341, 348–49 (1984).  Like the brief in Borden, Mr. Jackson's brief to the appellate court contained over twenty-one

16

pages of argument on trial counsel's ineffectiveness at the guilt phase of trial. (Vol. 34, Tab R-81, pp. 54–75.) The brief cites more than twenty court cases and repeatedly references allegations in the second amended Rule 32 petition, the only evidence in the record on appeal since Mr. Jackson's petition was summarily dismissed. (Id.) Mr. Jackson's brief was filed at the Court of Criminal Appeals just months after the decision in <u>Borden</u>. Thus, the state courts' reliance on Rule 28(a)(10) to find that Mr. Jackson had waived his ineffectiveness of counsel claim was not the application of a rule that was "firmly established and regularly followed," especially for briefs like the one in this case. <u>Ford</u>, 498 U.S. at 423 (1991) (federal court may *not* defer to state court's procedural finding where state court inconsistently applies that procedural default rule); <u>Cochran v. Herring</u>, 43 F.3d 1404, 1409–10 (11th Cir. 1995) (Alabama procedural ruling did not bar federal review because it had not been consistently applied).

Even if Alabama Rule of Appellate Procedure 28(a)(10) was consistently followed, Mr. Jackson substantially complied with the rule, and it should not be applied to hinder consideration of his Sixth Amendment claim. In <u>Borden</u>, 60 So. 3d at 943, the Alabama Supreme Court explained that the purpose of Rule 28(a)(10) is "to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." Mr. Jackson unquestionably

17

satisfied this requirement at all levels of the postconviction litigation.[4]  With regard to the specific allegations that the State claims are procedurally defaulted (failure to interview Gerard Burdette, failure to investigate, and failure to properly object under Batson), Mr. Jackson's brief in question fully and fairly presented to the appellate court his factual and legal arguments that summary dismissal was inappropriate: because his petition was sufficiently specific (Vol. 34, Tab R-81, pp. 57–59), because the standard of review for ineffectiveness claims were not addressed on direct appeal (Id. at pp. 62–66), and because his allegations were meritorious (Id. at pp. 66–75).

In Lee v. Kemna, 534 U.S. 362, 385–88 (2002), the Supreme Court held that federal claims may still be adjudicated if the petitioner has substantially complied with the purpose of a state procedural rule and that further compliance would not have changed the subsequent decision.  As in Lee, Mr. Jackson substantially made the showings required by Rule 28(a)(10) that qualifies him for adjudication of his federal claim.  534 U.S. at 366–67; see also Spencer v. Zant, 715 F.2d 1562, 1573 (11th Cir. 1983) ("While respect for principles of comity and federalism requires deference to state procedural rules that may foreclose presentation of federal claims, this respect

---

[4] Rule 32 petition to the circuit court (Vol. 16, Tab R-62, C. 596–600, 611–12); Briefs to the Court of Criminal Appeals (Vol. 34, Tab R-81, pp. 54–75; Vol. 35, Tab R-83, pp. 26–31; Vol. 35–36, Tab R-87, pp. 51–67); and Petition for certiorari to the Alabama Supreme Court (Vol. 36, Tab R-88, pp. 80–104).

18

cannot extend to defendants who vigorously assert their rights . . . , only to have those who make the rules apply them in a new or unexpected way.").

> 2.   *The Court of Criminal Appeals' Decision to Affirm the Postconviction Court's Summary Dismissal Was Unreasonable.*

The Court of Criminal Appeals ruled that portions of Mr. Jackson's ineffectiveness claim had been previously addressed on direct appeal, was insufficiently pled, and assuming every allegation in his petition was true, still warranted summary dismissal. Jackson v. State, 133 So. 3d at 456–62. This decision "was contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

The Court of Criminal Appeals found that, on direct appeal, the appellate courts had affirmed the trial court's decision to grant the State's motion in limine to preclude any reference to the victim's drug activity. Jackson v. State, 133 So. 3d at 459. Similarly, the Court of Criminal Appeals found that the propriety of a lesser-included instruction on robbery had been determined on direct appeal. Id. at 460. The court unreasonably applied Supreme Court precedent by refusing to consider the merits of Mr. Jackson's claim under Strickland. The opinions on direct appeal did not

19

and could not have addressed whether trial counsel's deficient performance led to the erroneous results below.  Indeed, the Alabama Supreme Court has firmly rejected the analysis relied on in this case.  In <u>Ex parte Taylor</u>, 10 So. 3d 1075, 1078 (Ala. 2005), the court held that "a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under <u>Strickland</u> to sustain a claim of ineffective assistance of counsel."

Further, the underlying allegations in Mr. Jackson's Sixth Amendment claim were denied as a result of his lawyers' ineffectiveness.  With regard to the State's motion in limine, the trial court granted the motion based largely on trial counsel's inadequate and untimely assertion of this potential theory of defense.  (Vol. 3, Tab R-3, TR. 31 (counsel unable to articulate witnesses or records in support of theory that shooting was motivated by drugs instead of robbery).)  As alleged in Mr. Jackson's second amended Rule 32 petition, had defense counsel conducted an adequate investigation into this theory of defense, the trial court would have denied the State's motion and permitted the jury to consider whether Mr. Jackson had the necessary intent to commit robbery.  (<u>See</u> Vol. 16, Tab R-62, C. 599–600.)  And with regard to the propriety of a lesser-included instruction on robbery had been determined on direct appeal, Justice Johnstone noted that, "[h]ad the defendant requested such a jury instruction, it would have been due him." <u>Ex parte Jackson,</u>

20

836 So. 2d at 991 (Johnstone, J., concurring in part and dissenting in part). These issues were denied on direct appeal solely because of trial counsel's errors, and the Court of Criminal Appeals' reliance on the direct appeal disposition was unreasonable.[5]

The Court of Criminal Appeals then held that Mr. Jackson failed to plead with specificity the allegation the trial counsel was ineffective for interviewing potential witnesses. Jackson v. State, 133 So. 3d at 460–61. This is a merits determination, and this Court must review whether the state courts unreasonably applied Strickland. See, e.g., Frazier v. Bouchard, 661 F.3d 519, 525-27 (11th Cir. 2011); Borden v. Allen, 646 F.3d 785, 808-16 (11th Cir. 2011). As detailed above, defense counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. Mr. Jackson's postconviction petition explained at length how an adequate investigation would have provided counsel with the opportunity to develop a theory of defense for trial. (Vol. 16, Tab R-62, C. 596–601.) In particular, investigating and

---

[5] Although the Court of Criminal Appeals did not specifically address Mr. Jackson's allegation that counsel was ineffective for improperly objecting under Batson v. Kentucky, the postconviction court concluded that the issue was disposed of on direct appeal. (Vol. 38, Tab R-103, C. 902–03.) This, too, was unreasonable because the trial judge had denied Mr. Jackson's Batson motion because defense counsel did not make enough of a showing to establish a prima facie case of discrimination. (Vol. 3, Tab R-6, TR. 154–56.)

developing the testimony of Gerard Burdette would have changed the jury's understanding of the facts and their evaluation of the co-defendants' credibility. (Vol. 16, Tab R-62, C. 8–9.)

Mr. Jackson's second amended Rule 32 petition clearly and specifically alleged how the actions and omissions by defense counsel were constitutionally deficient, and how the impact of those errors could reasonably have changed the jury's mind on the issue of reasonable doubt. Assuming every allegation of the petition to be true, it was unreasonable for the state court to affirm the summary dismissal of Mr. Jackson's ineffectiveness claim. See Jackson v. State, 133 So. 3d at 458 (citing Ala. R. Crim. P. 32.7(d)). Because Mr. Jackson's trial lawyers deprived him of the effective assistance of counsel throughout all phases of his capital trial, their misconduct violated his rights to effective counsel, to due process, and to a fair trial, as protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The state court's ruling constitutes an "unreasonable determination of the facts in light of the evidence." Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003). Its adjudication of the claim resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent, thus warranting habeas corpus relief. Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

## II.     TRIAL COUNSEL FOR MR. JACKSON WAS INEFFECTIVE DURING THE PENALTY PHASE OF HIS CAPITAL TRIAL.

Shonelle Jackson's counsel was constitutionally ineffective at the penalty phase of his trial.   In the approximately four months between their appointment to Shonelle's case and the beginning of trial, counsel failed to adequately investigate his social or family history; did not collect any of his educational, juvenile, or correctional records; and declined to consult with a single expert or mitigation specialist regarding the case.  Had trial counsel conducted even a minimal sentencing investigation, they would have uncovered powerful evidence of Shonelle's impoverished childhood home, the neglect of his parents, his exposure to violence, the drug and alcohol abuse that surrounded him, as well as evidence of his own mental impairments and their effect on his ability to deal with his chaotic and violent environment.   Instead, counsel presented only cursory and misleading evidence elicited from the brief testimony of four witnesses.  Had the trial judge – the ultimate sentencer in this case – seen even a fraction of the mitigation evidence available to counsel, he would have sufficiently understood Shonelle, his personal history, and his culpability in the crime, and he would have found that life imprisonment was the only appropriate result in this case.

The Sixth Amendment guarantees capital defendants the effective assistance

of counsel at the penalty phase of a trial.  In addition to their guilt phase obligations, defense counsel in a capital case are obligated to "conduct a thorough investigation of the defendant's background" in preparation for penalty proceedings.  Williams v. Taylor, 529 U.S. 362, 396 (2000).  Such investigation is necessary in order to "uncover and present [] mitigating evidence," including a defendant's "troubled history[,] . . . relevant to assessing a defendant's moral culpability."  Wiggins v. Smith, 539 U.S. 510, 522, 535 (2003).

Under Strickland v. Washington, 466 U.S. 668 (1984), an ineffective assistance of counsel claim has two components: deficient performance and prejudice.  In this case, the representation provided by Mr. Jackson's counsel at the penalty phase of his trial was wholly ineffective and satisfies both prongs of Strickland.  It thereby denied Mr. Jackson his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

A.    Trial Counsel's Performance Was Deficient.

1.    Trial Counsel Failed to Investigate or Present the Significant Mitigation Evidence that Was Readily Available.

The Sixth Amendment requires capital trial counsel to conduct a thorough investigation for potentially relevant mitigation evidence in the defendant's background, including his childhood, social history, and mental health, for use in the

24

penalty and sentencing hearings.  Sears v. Upton, 130 S. Ct. 3259 (2010) (per curiam) (noting deficient performance found where counsel conducted cursory investigation and failed to present defendant's history of abuse); Rompilla v. Beard, 545 U.S. 374, 390-93 (2005) (further investigation would have led to very different picture of childhood and mental health).  The most essential purpose of the sentencing proceeding is to allow the sentencer to undertake a "particularized consideration of relevant aspects of the character and record of [the] convicted defendant before the imposition upon him of a sentence of death."  Woodson v. North Carolina, 428 U.S. 280, 303–04 (1976).  As Mr. Jackson detailed in his second amended Rule 32 petition, trial counsel's penalty phase investigation was constitutionally deficient because they did not interview readily-available witnesses, obtain any of the available records that were essential to understanding Shonelle's life, or consult any mitigation specialist or other expert to develop a theory that he deserved a sentence less than death.

**First**, trial counsel made no attempts to interview the readily-available family members or members of the community who knew Shonelle in advance of the hearings.[6]  See Porter v. McCollum, 558 U.S. 30, 39 (2009) (per curiam) (finding

---

[6] As alleged in the Rule 32 petition, trial counsel should have, but did not, speak to the following family members as part of their mitigation investigation: sisters, Laquanda Jackson and Wanda Jackson; two half-sisters, Dmitri Gaston and

25

ineffectiveness in part because counsel failed to interview any members of defendant's family); <u>Johnson v. Sec'y</u>, 643 F.3d 907, 932–33 (11th Cir. 2011) (ineffective assistance of counsel where counsel spoke only with defendant's father in advance of penalty phase).  This failure to conduct a thorough investigation has been held to be deficient by the Supreme Court.  <u>Wiggins</u>, 539 U.S. at 524 (finding deficient performance for abandoning investigation after acquiring "rudimentary knowledge" from "narrow set of sources").

As alleged in his Rule 32 petition, even a cursory investigation into Shonelle's life would have revealed that he had grown up in an environment rife with physical abuse, neglect, poverty, malnutrition, rampant drug and alcohol abuse, and the constant threat of deadly violence both in his family and in the community at large. (Vol. 16, Tab R-62, C. 629, 633–34.)  This investigation would have shown that Mr. Jackson, still a teenager at the time of trial, suffered from trauma and significant mental impairments as a result of his dysfunctional childhood.

The judge who sentenced Mr. Jackson did not know that he was raised in a

---

Keisha Gaston; a grandmother, Della Jackson; a grandfather, Tommy Taylor; aunts, Joyce Harvest, and Geraldine Taylor; a great aunt, Betty Brawlin; uncles, Freddie Owens, Donald Collins, and Roosevelt Emerson, Jr.; and cousins, Christopher Harvest, Corey Taylor, Julia Taylor, Monica Taylor, Shantay Taylor, Chakka Harvest, Decarlos Harvest, Micky Harvest, Michael Harvest, Detrick Collins, and Gary Collins. (Vol. 16, Tab R-62, C. 625–26.)

disturbingly chaotic, neglectful, and violent environment.  Readily-available evidence would have shown that Mr. Jackson was continuously exposed to violence at the hands of family members – violence directed toward each other as well as violence directed at Shonelle.  (Vol. 16, Tab R-62, C. 636–40.)[7]  Witnesses would have testified to the fact that both Shonelle's parents were heavy drug users; and his mother was using drugs, including crack cocaine and marijuana, both before Shonelle's birth and during his early childhood.  (Vol. 16, Tab R-62, C. 629–30.) Further, Mr. Jackson's father was often in prison when Shonelle was young and absent even when not incarcerated.  (Vol. 16, Tab R-62, C. 631.)[8]  As a result of his parents' drug use, Mr. Jackson and his siblings suffered from profound neglect, to the point that friends and relatives took it upon themselves to provide them with food and

---

[7] Roosevelt Emerson, Jr., would have testified that Shonelle was repeatedly beaten by his father with an electrical cord.  Shonelle's sisters Laquanda and Wanda Jackson would have testified to his parent's violence towards each other.  Geraldine Taylor, Laquanda Jackson, Wanda Jackson, Marilyn Jackson, and Julia Taylor would have testified that Shonelle witnessed his aunt threaten to shoot her brother. (Vol. 16, Tab R-62, C. 636–40.)

[8] Witnesses including Marilyn Jackson, Louis Taylor, Laquanda Jackson, Wanda Jackson, Thelma Owens, Geraldine Taylor, Della Jackson, Julia Taylor, Monica Taylor, and Joyce Harvest would have testified that Louis Taylor was often absent from the home, often attributable to periodic arrests resulting in incarceration and fights with Marilyn that led to short periods of separation.  (See, e.g., Vol. 16, Tab R-62, C. 638.)  These allegations could have been further supported by the introduction of the correctional records of Louis Taylor. (Vol. 16, Tab R-62, C. 629.)

clothing.  (Vol. 16, Tab R-62, C. 632–33.)[9]  The trial judge was not aware of any of this mitigation before sentencing Shonelle to death.

Minimal investigation would also have also revealed that the larger community in which Shonelle was forced to live was no less dysfunctional than his own home. Older boys in the neighborhood were involved with gangs and encouraged Shonelle at a young age to act as a gofer for them.  Violence in the community impacted him on a personal level; by the time he was fifteen, Shonelle had one friend who had died after being kidnapped and another who had been murdered during a robbery.  (Vol. 16, Tab R-62, C. 636, 640.)[10]  Again, even though this is classic and compelling mitigation, the judge who sentenced Shonelle to death was not presented with this evidence.

Rather than adequately investigating Mr. Jackson's home and family life, trial counsel merely asked four family members, who were already at the courthouse to watch Shonelle's trial, to testify during the penalty phase of trial – his mother, father,

---

[9] Witnesses Della Jackson, Geraldine Taylor, Joyce Harvest, and Thelma Owens who could have testified to this information.  (Vol. 16, Tab R-62, C 642.)

[10] Mr. Jackson identified witnesses, including Monica Taylor, Laquanda Jackson, Wanda Jackson, and Latanya Austin would have testified that Shonelle's older peers in the neighborhood consistently engaged in violent and illegal activity, and Dmitri Gaston, Laquanda Jackson, Wanda Jackson, Julia Taylor, Monica Taylor, and Keisha Young could have provided information regarding Shonelle's work as a gofer.  (See, e.g., Vol. 16, Tab R-62, C. 639-41.)

aunt, and girlfriend.  As in other cases in which the Eleventh Circuit has found deficient performance, counsel in this case limited their entire presentation to just a few family members.  Johnson, 643 F.3d at 912, 932–33; Williams v. Allen, 542 F.3d 1326, 1339, 1341 (11th Cir. 2008); see also Williams v. Taylor, 529 U.S. at 369, 395–96 (limiting investigation to petitioner's mother, neighbor, and psychiatrist). Additionally, as Mr. Jackson asserted in his Rule 32 petition, trial counsel failed to meet with these witnesses or prepare them in advance, and as a result they did not understand the nature or importance of their testimony.  (Vol. 16, Tab R-62, C. 626–27.)

Second, counsel did not gather a single record regarding Shonelle's personal history, including educational records, medical records, or records from the Department of Youth Services.  See Rompilla, 545 U.S. at 390–93 (finding that counsel fell below level of reasonable performance for failing to examine defendant's readily-available court, school, and prison records); see also ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor").

As explained in Mr. Jackson's Rule 32 petition, Mr. Jackson's records from

schools, the Department of Youth Services, and the Department of Corrections would have uncovered evidence that Mr. Jackson suffered from marked cognitive limitations and had been exposed to drugs and alcohol during key developmental periods of his childhood.   Because of counsel's deficient performance, the sentencer was not provided with Mr. Jackson's school records that would have shown that he was diagnosed with borderline intellectual functioning at the age of 15 and had since been assessed as having an IQ of 75 and recommended for special education services. (Vol. 16, Tab R-62, C. 634–35.)   Those records could have further shown that, as a result, Mr. Jackson struggled in school, failing both the first and the third grade and dropping out with failing grades by the ninth grade.   (Vol. 16, Tab R-62, C. 662–63.)[11]   Further, Department of Youth Services records would have shown that Mr. Jackson was exposed to drugs and alcohol at a very young age and, by the time he was 13 years old, had been diagnosed as alcohol dependent.   (Vol. 16, Tab R-62, C. 639–40.)   The available records from the Department of Youth Services would also have shown the trial judge that Shonelle had been traumatized by his exposure

---

[11] His educational records and records from the Departments of Correction and Youth Services would also have clearly illuminated his intellectual and educational struggles.   (Vol. 16, Tab R-62, C. 634–35, 662–63.)   This evidence could have been corroborated by "testimony from relatives such as Thelma Owens and teachers such as Rosalyn Jordan [who] would confirm his borderline intellectual functioning." (Vol. 16, Tab R-62, C. 634.)

30

to violence in his family and the community and by the violent deaths of his friends at an early age.  (Vol. 16, Tab R-62, C. 636.)

**Third**, not only did counsel fail to investigate and present any of the above evidence in mitigation, but they did not hire a mitigation specialist or consult any independent experts in preparation for the penalty and sentencing hearings.  See Wiggins, 539 U.S. at 524–25 (counsel deficient, in part, because "[d]espite the fact that the Public Defender's office made funds available for the retention of a forensic social worker [for the preparation of a social history report], counsel chose not to commission such a report")); see also Sears, 130 S. Ct. at 3264 (counsel deficient, in part, for not identifying and presenting personality disorder of defendant, as diagnosed by a "well-credentialed expert" in post-conviction proceedings).

r. Jackson's Rule 32 petition alleged that trial counsel failed to obtain expert assistance to explain how these events shaped Shonelle's life and mitigated in favor of a sentence of life without parole.  (Vol. 16, Tab R-62, C. 647–49.)  Expert witnesses such as a social worker, mitigation specialist, mental health expert, neuropsychologist, and an expert on drug and alcohol abuse would have explained the likely causes of Mr. Jackson's mental and emotional problems and how those problems were relevant both to Mr. Jackson's defense and his moral culpability.  (Vol. 16, Tab R-62, C. 647.)  They would have reviewed medical, social services,

31

school, mental health, and other institutional records; interviewed Mr. Jackson and members of his family; developed a family history assessment; expressed an opinion as to the connection between Mr. Jackson's childhood and the behavior for which he was convicted; assisted counsel in understanding and presenting evidence of the effect of Mr. Jackson's background on his behavior; and testified about their findings and conclusions regarding Mr. Jackson's background, family history, mental health, and history of alcohol and drug abuse.  (Vol. 16, Tab R-62, C. 647–49.)

Trial counsel's failure to investigate is indefensible because most of the potential witnesses in Mr. Jackson's case lived in or around Montgomery at the time, and many were even present in court during the trial.  (Vol. 16, Tab R-62, C. 625.)  Additionally, most of the records containing important mitigation evidence could have been retrieved from institutions in the immediate area and would have been relatively recent at the time given Mr. Jackson's young age.  Counsel's failure to make even a preliminary effort was unreasonable and fell below professional norms at the time.  See, e.g., Williams v. Taylor, 529 U.S. at 396 (trial counsel deficient because did not fulfill their "obligation to conduct a thorough investigation of the defendant's background").  Trial counsel's preparation for the sentencing and penalty hearings in Mr. Jackson's trial pales in comparison to the investigation done by other attorneys found to have been ineffective.  See, e.g., Wiggins, 539 U.S. at 523, 531

(noting deficient attorney had hired psychologist and obtained foster care records).

> 2. *Trial Counsel's Representation During the Penalty Phase of Trial Fell Well Below an Objective Standard of Reasonableness.*

An attorney's performance is constitutionally deficient if it falls "below an objective standard of reasonableness" based on "prevailing professional norms." Strickland, 466 U.S. at 688.  In this case, not only did trial counsel fail to conduct an adequate investigation of Mr. Jackson's life, but their actual presentation during the penalty phase was also harmful.  At the time of Mr. Jackson's trial, Alabama law capped the compensation for out-of-court work at $1,000, based on a $20 hourly rate. Ala. Code § 15-12-21 (1995).  That means counsel received no compensation beyond fifty hours of work.  Because this statutory cap was so low, trial counsel would have been hard-pressed to provide a constitutionally adequate defense at the penalty phase. However, trial counsel's representation was so inadequate that the Rule 32 judge, upon reviewing the record, stated that **"Nothing was done in this case."** (Vol. 18, Tab R-67, TR. 14–15 (emphasis added).)

Because defense counsel had not investigated Mr. Jackson's life before the penalty phase, their examination of the few witnesses they presented was superficial and failed to elicit any of the substantial mitigating evidence discussed above.  Even worse, counsel's generic, uninformed questions resulted in the presentation of facts

that were substantively aggravating and tended to corroborate the *prosecution's* evidence at the penalty phase.  For example, counsel asked both of Mr. Jackson's parents to affirm, for the first time before the jury, that Mr. Jackson had been in trouble at school, received suspensions, and had dropped out during the ninth grade. (Vol. 5, Tab R-15, TR. 567, 572 (testifying that Mr. Jackson was "mainly just running the streets").)  Counsel did not attempt to contextualize this behavior or explain why it could reflect mitigating considerations such as parental neglect or Mr. Jackson's cognitive limitations (nor could they have, given their failure to investigate).  When asked by counsel if Shonelle had ever "given you any problems" as a teenager, Shonelle's father responded that Shonelle "chose" to "hang[] out with the wrong type peoples" against his advice.  (Id. at TR. 571–72.)  Trial counsel also elicited from Shonelle's girlfriend that he had never met his own baby daughter.  (Vol. 5, Tab R-15, TR. 564.)  Again, they did not ask any follow-up questions that could have illuminated a fuller picture of Mr. Jackson's role in his child's life.

The only thing that counsel did ask their witnesses was a series of primarily yes or no questions, ending by asking each witness if he or she considered Shonelle "truthful" and if the witness had ever seen Shonelle act violently.  (Vol. 5, Tab R-15, TR. 564-65, 567-68, 573, 576.)  These questions were patently unreasonable in light of the fact that the jury had just convicted Mr. Jackson of capital murder.  This

cursory approach was precisely the one that the Eleventh Circuit has found to be inadequate. Collier v. Turpin, 177 F.3d 1184, 1200–02 (11th Cir. 1999) (finding that counsel's errors at sentencing frustrated entire purpose of hearing because counsel only asked witnesses to give brief answers as to defendant's reputation for veracity and support for family); see also Cunningham v. Zant, 928 F.2d 1006, 1017 (11th Cir. 1991) ("[M]inimal questioning . . . resulted in the [sentencing authority]'s being deprived of substantial mitigating evidence.").

Counsel's lack of preparation was evidenced by their last-minute efforts to identify and obtain witnesses for their penalty phase presentation.  They began the first day of the penalty hearing by requesting a continuance in order to subpoena an important witness they had *not yet contacted*.  (Vol. 5, Tab R-11, TR. 529–33.) Counsel's last-minute request for a continuance irritated and frustrated both the trial judge and the prosecutor.  Id.  "My problem," explained the prosecutor, "is that they have known all along, judge, about [the need to subpoena the witness]."  (Id. at TR. 530.)  "I couldn't agree with you more," responded the judge.  (Id.)  After this hearing, the court secured the defense witness itself, but defense counsel inexplicably opted not to put her on the stand – or even, to talk to her.  (Id. at TR. 533, 562.)

Aside from trial counsel's failure to prepare and effectively examine the penalty phase witnesses, they were also ineffective because they did not know the law

35

governing the penalty phase of capital trials.  As alleged in the Rule 32 petition, counsel did not know how many jurors were required to impose a sentence of life without parole.  When discussing jury instructions in court, counsel expressed surprise; "Seven jurors, your honor? I always thought it was ten." (Vol. 5, Tab R-15, TR. 578; Vol. 16, Tab R-62, C. 645 n.7.)  It is ineffective to not understand basic legal issues such as this.  See Lawhorn v. Allen, 519 F.3d 1272, 1293–97 (11th Cir. 2008) (finding counsel ineffective for "a gross misunderstanding of a clear rule of Alabama criminal procedure" in decision to waive closing argument).

Counsel's sentencing presentation was at times aggravating and, at best, inadequate and misleading.  See Williams v. Allen, 542 F.3d at 1339 (finding counsel ineffective for presenting sentencer with evidence that was "insufficient 'to formulate an accurate life profile of defendant'").  This Court should find that trial counsel's performance was constitutionally deficient.

B.     Mr. Jackson Was Prejudiced by Trial Counsel's Failures.

In this case, there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 695.  **First**, the evidence described in the above section regarding Shonelle's childhood, during which he was surrounded by violence and poverty in the home as a consequence of his parents' drug and alcohol abuse, is

36

undoubtedly mitigating.   <u>Wiggins</u>, 539 U.S. at 535 ("'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse.'" (quoting <u>Penry v. Lynaugh</u>, 492 U.S. 302, 319 (1989)); <u>Williams v. Taylor</u>, 529 U.S. at 398 ("[T]he graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."); <u>Woodson</u>, 428 U.S. at 304 ("[C]onsideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death.").

Specifically, the evidence that Shonelle was exposed to violence throughout his life would have been particularly relevant in this case because he was only eighteen years old at the time of the crime, making him more proximate to the damaging events of his upbringing.  <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 115–16 (1982) ("[T]here can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant [in case involving youthful defendant].");  <u>Cooper v. Sec'y</u>, 646 F.3d 1328, 1355 (11th Cir. 2011) (finding that unpresented, nonstatutory mitigation of defendant's

volatile upbringing would have strengthened the statutory mitigator of age because defendant was eighteen at time of offense).  Shonelle was less than a year from actually being ineligible for the death penalty. See Roper v. Simmons, 543 U.S. 551, 568 (2005) (prohibiting imposition of the death penalty on juveniles under the age of eighteen).  The Roper Court declared that teenagers' "own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment." Id. at 570.  In this light, counsel's failure to present evidence of compelling childhood mitigation is even more prejudicial because of Shonelle's youth.

**Second**, the substance abuse by Shonelle's parents created a dysfunctional environment of instability and neglect, and he was forced to depend on the mercy of other relatives for food and clothing.  This type of upbringing, characterized by inattention and the lack of any true family support, has also been recognized as classic mitigation evidence.  See Abdul-Kabir v. Quarterman, 550 U.S. 233, 262 (2007) (reversing capital case where jury not permitted to give meaningful effect to mitigation, including childhood neglect and abandonment).

**Third**, the fact that Shonelle was permitted to use drugs and alcohol reflects the deficiencies of his family life and the negative role models of his childhood.

Records from the Department of Youth Services showed that Shonelle had been diagnosed as alcohol-dependent at the age of thirteen. Because his involvement with drugs was directly related to the dysfunction in his upbringing, trial counsel should have presented this information to the sentencer as relevant and compelling mitigation. Hardwick v. Crosby, 320 F.3d 1127, 1186 n.209 (11th Cir. 2003) (finding drug and alcohol addictions can be relevant to jury); Brownlee v. Haley, 306 F.3d 1043, 1054–57, 1070 (11th Cir. 2002) (same).

**Fourth**, Mr. Jackson's mental limitations and the history of mental impairments in his family are significant evidence that must be considered mitigating under United States Supreme Court precedent. See Williams v. Taylor, 529 U.S. at 396 (counsel ineffective for failing to present evidence of defendant's borderline intellectual functioning); Brownlee, 306 F.3d at 1070 (finding that evidence of borderline intellectual disability, psychiatric disorders, and history of drug and alcohol abuse is "powerful mitigating evidence").

Trial counsel presented none of these clear categories of mitigating evidence. Although this information was readily available through even a cursory investigation of Mr. Jackson's records and conversations with his relatives, trial counsel failed to elicit any of this information in their penalty phase presentation. As explained by the United States Supreme Court in Sears, 130 S. Ct. at 3265–67, a proper analysis of

39

prejudice must take into account the evidence that trial counsel should have discovered to determine "whether there is a reasonable probability that [the defendant] would have received a different sentence after a constitutionally sufficient mitigation investigation." See also Porter, 558 U.S. at 41 (explaining that court must weigh evidence of aggravation against the totality of available mitigation evidence, including evidence adduced in postconviction). The compelling mitigation of Shonelle's upbringing would have substantially altered the sentencing profile presented to the decisionmaker. See Sears, 130 S. Ct. at 3266 (citing Strickland, 466 U.S. at 700).

In this case, trial counsel only argued that Shonelle should be sentenced to life without parole on the basis of only two mitigating factors: his age and his decision to turn himself in to police. (Vol. 1, Tab R-1, C. 161.) Not only was this presentation incomplete, but the information that was actually proffered was even more prejudicial because it was misleading. Counsel elicited inaccurate information from Shonelle's father that the family "tried to provide him with a decent home and, you know, giving him things that he needed." (Vol. 5, Tab R-15, TR. 567–71); see Cooper v. Sec'y, 646 F.3d 1328, 1353 (11th Cir. 2011) (finding that mother's testimony of her own victimization did not reveal a substantial part of the defendant's disadvantaged childhood). As in Williams v. Allen, 542 F.3d at 1342–43, the mitigation that trial

counsel failed to discover "paints a vastly different picture of his background than that created by [the family members'] abbreviated testimony." See also Collier, 177 F.3d at 1202–04 (finding prejudice where counsel elicited nothing more than defendant's reputation for honesty and loyalty to family).

Defense counsel further harmed Shonelle by introducing aggravating evidence and by undermining their own witnesses. There was no reasonable purpose for counsel to elicit from Shonelle's mother the fact that he had been suspended from school, (Vol. 5, Tab R-15, TR. 567) nor was it strategic to elicit from Shonelle's girlfriend the fact that he had never met his daughter. (Id. at 564.) And in their penalty phase argument, trial counsel told the jury that Shonelle failed to meet with his probation officer for seven months. (Id. at 583–84.) These are facts that prosecutors typically try to elicit. At a minimum, they had no mitigating effect, and counsel's decision to introduce them was a total abdication of their duties as advocates.

Trial counsel never presented, or even discovered, the necessary mitigation that Mr. Jackson was traumatized by his parents' addiction to drugs, was impoverished and neglected as a consequence of their habits, and was constantly exposed to violent and criminal behavior in his family and in his neighborhood. As a result, the trial judge had no explanation for Mr. Jackson's criminal history and therefore determined

that the jury incorrectly weighed the available aggravating and mitigating circumstances. (Vol. 1, Tab R-1, C. 184–87.)  In light of all the available mitigation adduced both at trial and presented in Mr. Jackson's second amended Rule 32 petition, there is a "probability sufficient to undermine confidence" in the trial judge's decision to override the unanimous jury verdict for life imprisonment without parole. Porter, 558 U.S. at 44 (quoting Strickland, 466 U.S. at 693–94).  Because adequate investigation would have enabled counsel to correct a positively misleading sentencing profile, and to present a vastly different picture than that created by the actual trial testimony, there is a reasonable probability that the deficient performance of Mr. Jackson's trial counsel caused him to suffer prejudice during the penalty and sentencing phases of his capital trial.  See, e.g., Williams v. Allen, 542 F.3d at 1342.

    C.    The State Courts' Rejection of Mr. Jackson's Ineffectiveness Claim Was Unreasonable.

The Alabama Court of Criminal Appeals was the last state court to issue a reasoned decision addressing Mr. Jackson's claim that his trial counsel was constitutionally ineffective in investigating and presenting relevant mitigation evidence.[12]  Jackson v. State, 133 So. 3d 420 (Ala. Crim. App. 2012).  The court

[12] On January 24, 2007, the circuit court summarily dismissed Mr. Jackson's second amended Rule 32 petition by signing the State's proposed order without significant modification.  (Vol. 38, Tab R-103; Vol. 18, Tab R-67, TR. 80–82.)  This type of practice has routinely been criticized by appellate courts and it fails to reflect

rejected the claim, stating that "counsel's failure to present evidence of Jackson's impoverished childhood, the lack of a father figure, the fact that he sold drugs to help his family, and his mental health had no impact on the sentence in this case." Id. at 450–51. Under Eleventh Circuit precedent, because no opportunity was made for Mr. Jackson to present evidentiary support for his claim, this Court must accept as true the facts alleged in his Rule 32 petition in determining whether the state courts unreasonably applied Strickland. Borden v. Allen, 646 F.3d 785, 815 (11th Cir. 2011); Frazier v. Bouchard, 661 F.3d 519, 528 (11th Cir. 2011); see also Powell v. Allen, 602 F.3d 1263, 1273 (11th Cir. 2010) (considering whether allegations in Rule 32 petition "sufficiently state a claim for ineffective assistance of counsel"). Here, the state court's adjudication of Mr. Jackson's ineffectiveness claim both "was contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

---

any critical review of Mr. Jackson's claims. Anderson v. Bessemer City, N.C., 470 U.S. 564, 572 (1985). Later decisions from the Alabama Supreme Court have reversed cases where postconviction courts' adoption of State's pleadings as their own order call into question the trial judges' independent and impartial judgment. See Ex parte Scott, No. 1091275, 2011 WL 925761 (Ala. Mar. 18, 2011); Ex parte Ingram, 51 So. 3d 1119 (Ala. 2010) (same).

1.   *The Court of Criminal Appeals Unreasonably Failed to Recognize the Constitutional Significance of the Mitigation Evidence in Mr. Jackson's Rule 32 Petition.*

As detailed above, trial counsel's failure to conduct an investigation of Shonelle's family and social history, educational history, and mental health history, *inter alia*, prevented them from giving the judge and the jury a complete picture of the dysfunction that permeated his childhood. Mr. Jackson proffered in his second amended Rule 32 petition evidence that his parents regularly used crack cocaine which led to an impoverished home, to their neglect of Shonelle's need for food and clothing, and to his father's repeated imprisonment. The petition explained that he was regularly beaten by his father, that both his parents fought violently with each other, and that two of his friends were murdered by the time he was fifteen. Mr. Jackson's petition referenced school records that demonstrated his borderline intellectual functioning and difficulties in school, and it noted that records from the Department of Youth Services showed that Shonelle struggled with alcohol abuse even at the age of thirteen. And the Rule 32 petition detailed the necessity for independent experts in mitigation investigation, social work, mental health, and substance abuse because these witnesses could have explained for the judge and the jury the relevance of Shonelle's traumatic upbringing to the question of whether death is an appropriate sentence.

The Alabama Court of Criminal Appeals "considered the mitigation evidence that Jackson contends should have been presented and [] reweighed that evidence against the evidence that was presented at trial." Jackson, 133 So. 3d at 450. Nevertheless, the court found that the totality of the evidence presented in Mr. Jackson's Rule 32 petition "had no impact on the sentence in this case." Id. at 450–51. This decision unreasonably applied Supreme Court precedent on counsel's duty at the penalty phase of a capital trial, on the impact that a jury verdict for life has on the prejudicial effect of counsel's errors, and on the scope of evidence that a sentencer must consider before imposing a sentence of death.

**First**, this decision is an unreasonable application of the clearly established Supreme Court precedent regarding trial counsel's obligation to conduct a thorough investigation of the defendant's background and present mitigating evidence in support of a sentence of life without parole. Porter, 130 S. Ct. at 452–55 ("It is unreasonable to discount to irrelevance the evidence of [the defendant's] abusive childhood."); Williams v. Taylor, 529 U.S. at 396 (counsel's failure to uncover and present voluminous mitigating evidence ineffective); Strickland, 466 U.S. at 690-91 (underscoring that counsel has a duty to make reasonable investigation).[13] Testimony

---

[13] See, e.g., Rompilla, 545 U.S. at 390–93 (further investigation would have led to very different picture of childhood and mental health); Wiggins, 539 U.S. at 524 (2003) (finding deficient performance for abandoning investigation after acquiring

45

from numerous witnesses, including family members, friends, community members and experts, as well as various educational, correctional and other records would have established the myriad mitigating circumstances detailed previously.  Given the voluminous evidence that was neither uncovered nor presented, the state court's decision affirming the denial of this claim on the grounds that none of this evidence could have made a difference to the outcome was an unreasonable application of clearly established precedent.

**Second**, the Court of Criminal Appeals held, in direct conflict with Supreme Court precedent, that prejudice is diminished because Mr. Jackson's jury recommended a sentence of life without parole.  See Jackson, 133 So. 3d at 448–49 (quoting Hooks v. State, 21 So. 3d 772, 791 (Ala. Crim. App. 2008) ("Appellant's contention that his trial counsel rendered ineffective assistance of counsel during the penalty phase of the trial is repudiated by the fact that the jury recommended life in this case.")).  The jury's unanimous vote against death showed that the State's case for capital punishment was extremely weak.  Under Strickland, this "verdict or

---

"rudimentary knowledge" from "narrow set of sources"); Johnson, 643 F.3d at 931–38 (undiscovered evidence of childhood abuse and trauma different from counsel's understanding of "bad childhood"); Ferrell v. Hall, 640 F.3d 1199, 1226–33 (11th Cir. 2011) (failure to investigate or discover evidence of mental health and impoverished, abused childhood was unreasonable); Williams v. Allen, 542 F.3d at 1337–42 (further investigation would paint "vastly different picture" of defendant's background than limited description offered by mother).

conclusion[,] only weakly supported by the record[,] is *more likely to have been affected by errors* than one with overwhelming record support."  466 U.S. at 696 (emphasis added); see also Wiggins, 539 U.S. at 538 (finding prejudice where state's evidence in support of death penalty was "far weaker" than in prior case).  Instead of being diminished, the prejudice in this case was amplified because an adequate mitigation presentation would have caused the trial judge to uphold the unanimous jury verdict.

The Eleventh Circuit has similarly explained that "the fact that the jury decisively voted against the death penalty, even without the powerful evidence adduced at postconviction, **weighs heavily in favor of a finding of prejudice**." Williams v. Allen, 542 F.3d at 1343 (emphasis added) ("[P]rejudice is more easily shown in jury override cases because of the deference shown to the jury recommendation." (citation omitted)); see also Cooper, 646 F.3d at 1356 (noting that finding of prejudice justified because some jurors were "inclined to mercy" despite paucity of mitigating evidence and that substantial mitigation was available if counsel had done thorough investigation).  It was unreasonable for the state court to foreclose a full prejudice inquiry solely because the jury returned a verdict for life.  See Sears v. Upton, 130 S. Ct. 3259, 3265–67 (2010), (even when trial counsel advances "a superficially reasonable mitigation theory," Strickland requires "probing and

47

fact-specific analysis").

The State's reliance on <u>Routly v. Singletary</u>, 33 F.3d 1279 (11th Cir. 1994), is similarly misplaced.  (Doc. 11 at 25–26.)  The United States Supreme Court has made clear in opinions after the <u>Routly</u> decision that reviewing courts must always conduct a full <u>Strickland</u> inquiry to assess the probability of a different outcome in light of the totality of the available mitigation evidence.  <u>Sears</u>, 130 S. Ct. at 3266 (quoting <u>Porter</u>, 558 U.S. at 453–54).  Further, the sentencing judge in <u>Routly</u> *had considered* "the essence of the mitigating evidence" through the presentence investigation and the report of a defense expert.  33 F.3d at 1297.  The trial judge in Shonelle's case, however, was never presented with any of the substantial mitigation evidence described in the Rule 32 petition.

**Third**, whether mitigation was admissible at Mr. Jackson's sentencing hearing is immaterial to counsel's ineffectiveness.  As the record shows, Shonelle's lawyers never provided the judge with critical mitigating evidence about his life, not at the penalty phase hearing and not at the sentencing hearing.  Clearly established United States Supreme Court precedent holds that, at some juncture, mitigation evidence *must be considered* by the trial judge – the ultimate sentencing authority in Alabama. <u>Lockett v. Ohio</u>, 438 U.S. 586, 608–09 (1978) (Burger, C.J., plurality opinion) (death penalty statute is unconstitutional if it "preclude[s] consideration of relevant

mitigating factors" by sentencer); Eddings, 455 U.S. at 113–14 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence."); see also Woodward v. State, 123 So. 3d 989, 1033–35 (Ala. Crim. App. 2011) (recognizing that Alabama statute has always complied with Lockett and Eddings because sentencer must consider all mitigation). The Supreme Court specifically explained in Graham v. Collins, 506 U.S. 461, 475 (1993), that the Constitution prohibits a scheme that places "relevant mitigating evidence . . . beyond the effective reach of the sentencer." Thus, the Court of Criminal Appeals' suggestion that Alabama's capital scheme could constitutionally preclude defense counsel from providing a complete picture of mitigation to the final sentencing authority was an unreasonable application of Lockett and Graham. Cf. Jackson, 133 So. 3d at 448 ("[A]t the time of Jackson's 1998 trial, there was no established caselaw concerning the scope of what evidence a defendant could present at the judicial sentencing hearing held pursuant to § 13A-5-47(c), Ala. Code 1975.").[14]

---

[14]This decision was not an accurate description of state law at the time of Mr. Jackson's trial. Ala. Code §13A-5-47(d) ("Based upon the evidence presented at trial, *the evidence presented during the sentencing hearing*, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings . . . .") (emphasis added). Alabama's appellate courts explicitly recognized that state law, before Mr. Jackson's trial, provided for the presentation of mitigation evidence to the trial judge at the sentencing phase of a

Moreover, trial counsel did have several opportunities to submit further mitigation to the trial judge: a proposed sentencing order before the judge's override decision (Vol. 1, Tab R-1, C. 159–63); a sentencing hearing at which counsel argued only the sparse mitigation that was offered at penalty phase (Vol. 6 ,Tab R-28, TR. 9–11); and written objections to the judge's sentencing order (Vol. 1, Tab R-1, C. 194–97). The prosecution even suggested that a continuance of the penalty phase was unnecessary because defense counsel could present further mitigation witnessses at "a formal sentencing hearing." (Vol. 5, Tab R-11, TR. 530.) Trial counsel's failure to investigate, develop, and present the powerful mitigating evidence to the trial judge was constitutionally ineffective.

Finally, the state court's determination that, assuming Mr. Jackson's allegations are true, the myriad mitigation is outweighed by the aggravating circumstances is an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding," 28 U.S.C. § 2254(d)(2), because the record provides no facts to support this conclusion. See Burgess v. Comm'r, 723 F.3d 1308, 1318–19 (11th Cir.

---

capital trial. See Ex parte Roberts, 735 So. 2d 1270, 1279 (Ala. 1999) (remand hearing on additional mitigation evidence can be held by trial judge); McGahee v. State, 885 So. 2d 191, 221 (Ala. Crim. App. 2003) ("Trial counsel could have called more witnesses at the penalty phase hearing before the trial judge, with the hope that the additional information would have convinced the trial judge to agree with the jury's recommendation and to sentence McGahee to life without parole.").

2013) (state court finding "is an unreasonable determination of fact because it was based upon a combination of erroneous factual findings directly contradicted by the record and a record that was insufficient to support its conclusions").

> 2. *The State Courts Unreasonably Failed to Give Mr. Jackson an Opportunity to Discover and Present Evidence Supporting His Ineffectiveness Claim.*

Despite his diligence, Mr. Jackson has never been afforded an opportunity to prove that he was denied his right to effective assistance of counsel. First, he presented his claim in a Rule 32 petition and requested an evidentiary hearing in a manner that entitled him to an evidentiary hearing under Alabama law. (Vol. 14, Tab R-48, C. 253); see Ex parte Williams, 651 So. 2d 569, 572–73 (Ala. 1992) (court "cannot find . . . any matter that would indicate a valid basis for the trial court's dismissal on these claims" of ineffectiveness; court must conduct evidentiary hearing where ineffectiveness allegations, if true, entitle claimant to relief); Ex parte Boatwright, 471 So. 2d 1257, 1258–59 (Ala. 1985) (same). Mr. Jackson also filed an extensive motion for discovery of institutional records, files, and information necessary to a fair Rule 32 evidentiary hearing. (Vol. 14, Tab R-49.) Although the Rule 32 judge initially granted these discovery requests (Vol. 37, Tab R-99), the Alabama Court of Criminal Appeals granted the State's writ of mandamus and directed the Rule 32 judge to vacate her rulings on Mr. Jackson's two discovery

motions.  Ex parte State (Jackson v. State), 910 So. 2d 797 (Ala. Crim. App. 2005).

Mr. Jackson petitioned the Alabama Supreme Court to reinstate the original grant of

discovery (Vol. 27, Tab R-76), but the Alabama Supreme Court declined to review

the case.  Ex parte Jackson, No. 1040962 (Ala. Jan. 20, 2006).

Subsequently, Mr. Jackson filed a second amended Rule 32 petition in which

he provided additional factual allegations in support of his claims (Vol. 15, Tab R-62)

and again requested a hearing to present evidence (Vol. 16, Tab R-62, C. 685).

Mr. Jackson also renewed his discovery requests.  (Vol. 17, C. 811; Vol. 18, Tab R-

67, TR. 51–54).  Nevertheless, the Rule 32 judge decided that she would not have a

hearing on Mr. Jackson's ineffectiveness claim unless ordered to by an appellate

court:

> Now, if the Supreme Court wants to tell me, no Judge
> McCooey, we're going to require you to have a hearing and
> we're going to require you to consider these twenty
> mitigating circumstances or whatever it is that you guys are
> saying you can present, then that's what I'll do.  But,
> they're going to have to tell me that I have do to that before
> I do that.

(Vol. 18, Tab R-67, TR. 70; see also id., at TR. 75–79 ("Let's say we have a hearing

and I say, yes, you know, they should have presented these twenty mitigating things,

but they didn't and that was ineffective . . . I'm still put right back into the same

position that I'm not going to put myself in.").)  The judge incorrectly found that it

was not her place to "second-guess" the trial judge's sentencing decision. (Vol. 18, Tab R-67, TR. 61 ("[I]f Judge Gordon didn't feel like he had the appropriate information to make that decision, he would have gotten it from the attorneys.  He obviously felt very comfortable with what he had heard and the information he had to make that decision.").)

As a result, the Rule 32 judge denied Mr. Jackson's requests for discovery and an evidentiary hearing.  On appeal, the Alabama Court of Criminal Appeals affirmed by stating that "'[w]here a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit, or is precluded, the circuit court [may] summarily dismiss that petition.'" Jackson, 133 So. 3d at 444–45 (quoting Bryant v. State, No. CR-08-0405, 2011 WL 339585 (Ala. Crim. App. Feb. 4, 2011)).  Thus, the state court record demonstrates that Mr. Jackson diligently attempted at every opportunity "to investigate and pursue claims in state court."[15]  Williams v. Taylor, 529 U.S. at 435; see also Burgess, 723 F.3d at 1320.

Nevertheless, the Alabama Court of Criminal Appeals affirmed the Rule 32 judge's ruling that Mr. Jackson did not specifically allege his claim that trial counsel

---

[15] (See Vol. 13, Tab R-43, C. 57; Vol. 14, Tab R-48, C. 253; Vol. 14, Tab R-49; Vol. 15, Tab R-56; Vol. 15, Tab R-57; Vol. 16, Tab R-62, C. 685; Vol. 17, Tab R-64, C. 828; Vol. 34, Tab R-81 at 33, 99; Vol. 36, Tab R-88 at 32-45.)

was ineffective for failing to obtain and present investigators and expert witnesses in mitigation, social work, mental health, and substance abuse.[16]  Jackson, 133 So. 3d at 451–52.  Contrary to the state court ruling, Mr. Jackson's second amended Rule 32 petition *did* identify the content of the expected expert testimony.  (Vol. 16, Tab R-62, C. 647–50.)  With regard to each individual expert, the petition referred back to dozens of paragraphs describing mitigation evidence that the experts would have uncovered, assisted in developing, and synthesized and contextualized for the sentencing authority.  Id. (referencing mitigation evidence described in Vol. 16, Tab R-62, C. 624–44).  Moreover, Mr. Jackson repeatedly asked for and was denied the opportunity to develop the evidentiary support for his claim.  The state court ruling unfairly precluded him from discovery and then faulted him for the insufficiency of the state record.  As in Burgess, the record clearly establishes that Mr. Jackson was

---

[16] The Rule 32 circuit court judge signed the State's proposed order dismissing Mr. Jackson's claim on this issue.  (Vol. 38, Tab R-103, C. 932–34.)  However, during a hearing on the State's motion to dismiss, the judge stated that

> [Counsel is] not competent unless you hire the mitigation experts, because lawyers, they don't have the training, the expertise, to be able to do that. . . .
> Justice O'Connor was pretty clear in her opinion.  I mean, I think it tells lawyers you better have the necessary experts.  We're talking about someone's life, and you better have them, and you better jump through all the hoops or it's not correct.

(Vol. 18, R-67, TR. 13–14.)

diligent in explaining the "type of evidence he sought to present;" thus, no affidavit or specifically-named expert is required.  Burgess, 723 F.3d at 1318–20.

Under United States Supreme Court precedent, the state courts' dismissal of Mr. Jackson's claims without providing for an evidentiary hearing was unreasonable. See Williams v. Taylor, 529 U.S. at 437 ("[C]omity is not served by saying a prisoner has failed to develop the factual basis of a claim where he was unable to develop his claim in state court despite diligent effort.").[17]  This was an unreasonable application of Strickland v. Washington because Mr. Jackson's Rule 32 petition stated a claim regarding trial counsel's ineffectiveness that, if true, warranted relief.  The state courts' decisions also contradict recent precedent from the United States Supreme Court emphasizing the importance of at least one fair collateral-review proceedings,

---

[17] See Breedlove v. Moore, 279 F.3d 952, 960 (11th Cir. 2002) ("In the instant case, the record clearly indicates that Breedlove sought an evidentiary hearing on his Brady claim at every stage of his state proceedings.  The state courts denied him the opportunity to present evidence related to his Brady claim; therefore, he was prevented from developing a factual basis for his claim in state court.  In light of this fact, § 2254(e)(2) does not preclude an evidentiary hearing in Breedlove's case."); see also Greer v. Mitchell, 264 F.3d 663, 681 (6th Cir. 2001) ("In the case before us, petitioner pursued his ineffective assistance of appellate counsel claim with proper diligence . . . .  Both of these pleadings requested an evidentiary hearing, which was never afforded by the Ohio courts.  Consistent with Williams v. Taylor, therefore, we conclude that petitioner is not precluded from an evidentiary hearing as he exercised the necessary diligence in attempting to establish the factual record in state court.  Accordingly, we remand this matter to the district court with instructions to accord petitioner an evidentiary hearing . . . .").

especially for ineffective assistance of counsel claims.   See Martinez v. Ryan, 132 S. Ct. 1309, 1317–20 (2012) (holding that procedural default rules should not impede petitioner from ability to present both legal and factual basis of claim of ineffective assistance of trial counsel).

Mr. Jackson fairly presented his ineffective assistance of counsel claims in his Rule 32 petition, and the postconviction court dismissed the meritorious petition without providing him an opportunity to prove the claim at an evidentiary hearing. Because he fully and clearly alleged trial counsel's deficient performance and the resulting prejudice of an inadequate mitigation presentation in his case, this Court should grant habeas relief.  At a minimum, this Court should permit discovery and an opportunity to present evidence in support of his claims at an evidentiary hearing.

## III.   THE TRIAL COURT VIOLATED MR. JACKSON'S RIGHT TO PRESENT A DEFENSE BY PRECLUDING HIM FROM PRESENTING MOTIVE EVIDENCE.

Based on the prosecution's evidence at trial, the critical issue in this case was whether the killing occurred during a robbery or whether it was done in retaliation for a prior conflict over a drug deal.  The trial judge, however, excluded all evidence of the victim's involvement in the drug trade – essential evidence on which this central question of fact hinged – by granting the prosecution's pretrial motion to exclude the evidence and finding such evidence to be categorically irrelevant.   This ruling

56

violated Mr. Jackson's right to present a defense, his right to confront and cross-examine witnesses, and his right to testify as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Habeas corpus relief is required because the state appellate court's rejection of Mr. Jackson's claim was an unreasonable application of United States Supreme Court precedent.

> A.   The Trial Court's Ruling Violated Mr. Jackson's Right to Present a Defense.

The Supreme Court has held that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302 (1973); see also Taylor v. Illinois, 484 U.S. 400, 408 (1988) ("[T]his right is an essential attribute of the adversary system itself."); Crane v. Kentucky, 476 U.S. 683, 690 (1986) (Constitution guarantees "a meaningful opportunity to present a complete defense"); Washington v. Texas, 388 U.S. 14, 19 (1967) (Constitution protects "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies").  This right is violated whenever the exclusion of defense evidence "infringes upon a weighty interest of the accused" and is "arbitrary or disproportionate" to the purpose the exclusion was intended to serve. United States v. Scheffer, 523 U.S. 303, 308 (1998).  In Mr. Jackson's case, the trial court's categorical bar on all evidence relating

57

to the victim's drug-dealing activity prevented the jury from considering crucial information regarding how Mr. Jackson and his co-defendants may have known the victim and what their motive was for confronting him.

The question of Mr. Jackson's motive in confronting the victim was the central issue in this case. While the prosecution's theory was that Mr. Jackson had killed the victim in an attempt to rob his car stereo, there was information indicating that Mr. Jackson and his co-defendants had sought out the victim to retaliate against him for selling them "fake crack" in the past. (Vol. 3, Tab R-3, TR. 27–29.) This would have been crucial in this case because if the defense had been able to use this evidence to raise a reasonable doubt as to the prosecution's robbery theory, then Mr. Jackson would not have been eligible for the death penalty: murder "during a robbery" is a capital crime under Alabama law, Ala. Code § 13A-5-40(a)(2), but murder committed in retaliation for a bad drug deal is not.

Prior to Mr. Jackson's trial, the prosecution filed a motion in limine to prevent Mr. Jackson from presenting evidence on "the alleged drug dealing of the victim." (Vol. 1, Tab R-1, C. 59.) At a hearing on the motion, the prosecution justified the motion as follows:

> It is clear that the circumstances of this case has nothing to do with any type of drug dealing or drug activity. What this case simply was a car-jacking over a car stereo and a

58

good set of rims.  And the only reason that I can see how [the defense] could try to introduce it would be to some way impugn the victim's character.  It's just not relevant to this case.

(Vol. 3, Tab R-3, TR. 26–27.)

Evidence of the victim's involvement in the drug trade, however, was not only relevant, it was central to a defense against the death penalty in this case.  As defense counsel explained, the prosecution's motion was merely an attempt to take the case's ultimate factual issue away from the jury:

> [M]otive is relevant to the State's case.  It's just as important to the defense's case.  And their motive, their understanding of the motive is they want to rip the car off and rip the stereo out of it.  *Our understanding is bad drug deal*.  *We would submit that's a jury question.*  All that evidence should come in and be submitted to the jury and allow them to decide what the motive was.

(Id. (emphasis added).)  Defense counsel noted that "the victim was a known crack dealer" who was "known to sell fake crack."  (Id. at TR. 27.)  Further, Mr. Jackson's co-defendants "seem[ed] to know [the victim] based on their statements," and thus the defense needed to be able to able to cross-examine them regarding how they knew him and if he had ever sold them "bad drugs."  (Id. at TR. 27–28.)  The prosecution's response was to simply reassert their confidence in the strength of their own evidence, (Id. at TR. 29), and to point out that the statement they had obtained from

59

Mr. Jackson did not contain evidence of "any type of drug deal." (Id. at TR. 30–31.) The trial court granted the prosecution's motion *in limine*, precluding the jury from hearing any evidence about the victim's involvement in the drug trade. (Vol. 1, Tab R-1, C. 100.)

In granting the motion, the trial court improperly credited the prosecution's assertion that "this case simply was a car-jacking over a stereo and a good set of rims." (Vol. 3, Tab R-3, C. 26–27). By precluding Mr. Jackson from eliciting evidence about his theory of the case, the trial court violated his right to present a defense as established by clear United States Supreme Court precedent. Washington, 388 U.S. at 19 (Constitution protects "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies").[18]  It was the jury's role, as factfinder, to determine through an adversarial trial process whether reasonable doubt existed as to Mr. Jackson's intent to rob in this case, and the trial court's ruling usurped the jury's fact-finding function to consider

_____

[18] The Supreme Court has noted that defense evidence cannot be excluded as frivolous simply because it contradicts prosecution evidence that initially appears convincing or even overwhelming. Holmes v. South Carolina, 547 U.S. 319, 330 (2006) ("Just because the prosecution's evidence, *if credited*, would provide strong support for a guilty verdict, it does not follow that [defense] evidence [is irrelevant] to the central issues in the case.  And where the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact[.]").

Mr. Jackson's evidence.

Further, the court's premature order had significant collateral impact because it also denied Mr. Jackson his right to cross-examination, as embodied in the Confrontation Clause of the Sixth Amendment, see Davis v. Alaska, 415 U.S. 308, 315–16 (1974) (key function of cross-examination is "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand"), and his right to testify in his own defense. See Harris v. New York, 401 U.S. 222, 225 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so."). Mr. Jackson needed to be able to confront witnesses and question them about their involvement in drug dealing and whether they had encountered the victim through past dealings. By ruling that he could not, the trial court denied him his right to test the witnesses' credibility and explore their "possible biases, prejudices, or ulterior motives." Davis, 415 U.S. at 316.

The trial court also violated Mr. Jackson's right to testify. "Every criminal defendant is privileged to testify in his own defense," the Supreme Court has noted, "or to refuse to do so." Harris, 401 U.S. at 225. In this case, the court put Mr. Jackson in an intolerable bind regarding his own testimony. Had Mr. Jackson testified himself that the killing was related to a drug deal, he would have been the

first witness to do so and the jury would not have known that this disparity resulted

from the court's exclusion of corroborating evidence.  Yet the court also, in effect,

forced Mr. Jackson to choose to testify if he wanted to present evidence of his theory

of the case.  The ruling thus "cut down on the privilege [to remain silent] by making

its assertion costly."  Griffin v. California, 380 U.S. 609, 614 (1965).

Given the centrality of the questions of motive and intent in this case, the

excluded evidence regarding the motive of Mr. Jackson and his co-defendants in

seeking out the victim would have been so central to the dispositive issues as to

"reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict."  Taylor v. Singletary, 122 F.3d 1390, 1395 (11th Cir.

1997).

B.    The State Court's Rejection of Mr. Jackson's Claim that the Trial
      Court Violated his Right to Present a Defense Was Unreasonable.

The Supreme Court of Alabama was the last state court to issue a reasoned

decision addressing the merits of Mr. Jackson's claim that the trial court's granting

of the prosecution's motion in limine violated his right to present a defense.[19]  Ex

parte Jackson, 836 So. 2d 979, 985–87 (Ala. 2002).  That court rejected the claim on

---

[19] Mr. Jackson raised this claim at the Court of Criminal Appeals, which denied
the claim on the merits.  Jackson v. State, 836 So. 2d 915, 929–31 (Ala. Crim. App.
1999).  Mr. Jackson then sought and was granted review of this claim at the state
supreme court.

the merits, holding that the trial court's ruling was proper because defense counsel's response to the motion was "[s]peculation and conjecture," which "[did] not establish relevant evidence of the existence of a viable defense." Id. at 986.  In light of Chambers, Taylor, Crane, and Washington, discussed above, the state court's adjudication of this claim both "was contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

The state court decision was also an unreasonable determination of the facts in light of the record in this case.  In dismissing this claim, the state court asserted that "[n]othing in the record, other than defense counsel's speculation, supports Jackson's theory that the killing was the result of a drug deal gone bad." Ex parte Jackson, 836 So. 2d at 986.  First, as set forth above, defense counsel stated that the evidence would show that Mr. Jackson was known for selling "fake crack,"[20] and explained that the statements of Mr. Jackson's co-defendants indicated that they knew the victim and had prior interactions with him.  (Vol. 3, Tab R-3, TR. 27–28.)

---

[20] The state court acknowledged that the victim was reported to be a drug dealer, but omitted any mention of his reputation for defrauding people to whom he sold.  Ex parte Jackson, 836 So. 2d at 986.

63

Second, counsel submitted that Mr. Jackson's testimony would contradict the prosecution's facts regarding the killing being motivated by a robbery, and would provide evidence of "a drug deal."  (Id. at TR. 38.)  These assertions plainly set out a defense that, had it not been prematurely and unjustifiably precluded, would have raised a substantial question for the jury.

It was additionally unreasonable for the state court to fault Mr. Jackson for not having raised his trial defense in his initial statement to the police.  A defendant need not "preserve" a certain theory of defense by raising it in a police interrogation; certainly, inconsistencies across various statements would weigh against the defendant's credibility, but such credibility assessments are to be left to the jury.  To expect Mr. Jackson to be able to establish fully his theory of defense before trial has begun – or even, as the state courts have implied, while he was being interrogated by the police – in order to be allowed to present it to the jury is a direct violation of the right to present a defense.  Washington, 388 U.S. at 19.

In this case, the trial court prevented Mr. Jackson from presenting evidence on an essential aspect of the theory of defense, and thus deprived him of his right "to present the defendant's version of the facts" so that "the jury [] may decide where the truth lies."  Washington, 388 U.S. at 19.  This erroneously foreclosed a central and dispositive question of fact from reaching the jury, and the excluded evidence could

"reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Taylor v. Singletary</u>, 122 F.3d at 1395.  The trial court's decision to grant the prosecution's motion *in limine* violated Mr. Jackson's right to present a defense as well as his right to confront and cross-examine witnesses, his right to testify, and his right to present mitigation, as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Because the state court rejection of this claim was an unreasonable application of United States Supreme Court precedent and of the facts, this Court should grant Mr. Jackson habeas corpus relief.

## IV.   THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF ROBBERY VIOLATED MR. JACKSON'S RIGHT TO DUE PROCESS AND LED TO AN UNRELIABLE VERDICT.

In this case, the prosecution tried to prove that Mr. Jackson was guilty of capital murder because he committed a murder during a robbery.  Based on the evidence presented at trial, however, even if Mr. Jackson was liable for both murder and robbery, it would have been reasonable for the jury to conclude that the two crimes were separate in this case – that any intent to rob was not formed until after the murder.  This is a critical distinction under Alabama law because if the jury had convicted Mr. Jackson of murder and robbery as separate offenses, he would not have

been guilty of capital murder and thus would not have been not eligible for the death penalty. The trial judge, however, did not give Mr. Jackson's jury the option of convicting him of murder and robbery as separate offenses. If the jury believed that Mr. Jackson was liable for both crimes, it had no choice but to convict him of capital murder even if it did not believe that the prosecution had met its burden to prove that the murder had taken place during a robbery. Thus, by depriving the jury of the non-capital option of robbery as an afterthought of murder, the trial judge rendered the verdict in this case unreliable. Further, the state appellate court's rejection of Mr. Jackson's claim was an unreasonable application of United States Supreme Court precedent.

The United States Supreme Court has mandated that capital juries be given the option of convicting defendants of lesser-included non-capital offenses because the failure to do so "introduce[s] a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." Beck v. Alabama, 447 U.S. 625, 638 (1980). As the Beck Court explained: "[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted

66

conviction." Id. at 636.  Such a risk is intolerable when the defendant's life is at stake.  Id.; see also Wiggerfall v. Jones, 918 F.2d 1544, 1551 (11th Cir. 1990).  In this case, the evidence strongly supported a lesser-included charge of murder and robbery as separate offenses.  Thus, the trial court's failure to give this instruction was error under Beck.

A.    The Trial Court's Failure to Instruct the Jury on Robbery Was in Clear Violation of Mr. Jackson's Constitutional Rights.

In Mr. Jackson's capital trial, the judge did not instruct the jury on robbery, which was a lesser included offense of the capital murder-robbery charge that Mr. Jackson faced under Alabama Code § 13A-5-40(a)(2).  Instead, the trial court gave only the following options for a verdict: capital murder-robbery; intentional murder; and not guilty.  (Vol. 6, Tab R-27, TR. 93-95.)  By so doing, the court precluded the jury from convicting Mr. Jackson of intentional murder and robbery as separate offenses, a non-capital and lesser-included combination of charges that was strongly supported by the evidence at trial.

In this case, one of the primary questions before the jury was whether Mr. Jackson intended to rob the victim when he sought out the victim on the day of the murder.  Under Alabama law, to obtain a conviction of capital murder-robbery, the prosecution must specifically prove that the murder took place "during" a robbery.

See Ex parte Johnson, 620 So. 2d 709, 712 (Ala. 1993) ("[U]nder Alabama law, a robbery committed as a 'mere afterthought' and unrelated to the murder will not sustain a conviction for the capital offense of robbery murder, pursuant to § 13A-5-40(a)(2)."). Evidence showing that Mr. Jackson did not have the intent to rob the victim at the time of the killing – that, instead, the robbery had occurred as an "afterthought" to the killing – will not sustain a conviction under Alabama Code § 13A-5-40(a)(2) for the capital offense of murder-robbery. Id.; Bell v. State, 518 So. 2d 840, 841 (Ala. Crim. App. 1987) (in prosecution for capital crime of murder-robbery, jury was instructed on lesser included charges of both murder and robbery); Connolly v. State, 500 So. 2d 57, 62 (Ala. Crim. App. 1985) (there is no "capital robbery-murder where the intent to rob was formed only after the victim was killed" (citations omitted)); see also Padgett v. State, 668 So. 2d 78, 83 (Ala. Crim. App. 1993) (no capital murder if appellant formed intent to rape after victim murdered even if sexual intercourse occurred within minutes of murder). Thus, counsel merely had to raise a reasonable doubt as to whether the intent to rob had been formed prior to, or during, the commission of the murder. If the intent to rob did not exist with the intent to murder, then the murder did not take place "during" a robbery and therefore

68

would not constitute capital murder-robbery under Alabama law.[21]

Given the pivotal importance of the question as to when or if Mr. Jackson formed the intent to rob the victim, the jury should have been provided with a set of possible verdicts that reflected the two alternate conclusions at which the jurors could reasonably have arrived. Had the jury concluded that Mr. Jackson was liable for the robbery, but that he and/or his co-defendants had formed the intent to commit that robbery only after the murder had occurred, the appropriate verdict would have been conviction of intentional murder and robbery as two separate crimes. Such a verdict would not have constituted a capital crime and thus would have rendered Mr. Jackson ineligible for the death penalty.

That option, however, was not available to the jury in this case. Under the instructions provided by the trial judge, if the jury believed that Mr. Jackson was liable for intentional murder and also for robbery, he was either guilty of capital murder-robbery or not guilty of robbery at all. This is in clear violation of Beck. 447 U.S. at 642 (failure to instruct the jury on a lesser included offense "may encourage the jury to convict for an impermissible reason - its belief that the defendant is guilty of some serious crime and should be punished" despite the prosecution's inability to

---

[21] In this case, given that the evidence clearly indicated that the victim's car had been taken, it was unlikely that the jury would have found the absence of a robbery.

69

meet the burden for the capital crime as charged).  The verdict in Mr. Jackson's case was thereby rendered unreliable and improper in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

> B.   The State Court's Rejection of Mr. Jackson's Claim Regarding the Trial Court's Refusal to Instruct on Robbery Was Unreasonable.

The Alabama Court of Criminal Appeals was the last state court to issue a reasoned decision addressing Mr. Jackson's claim that the trial court erred unconstitutionally in its failure to instruct the jury on the charge of robbery.[22] Jackson v. State, 836 So. 2d 915, 938–39 (Ala. Crim. App. 1999).  That court rejected the claim on the merits, stating that a robbery instruction would have been inappropriate because a conviction for robbery and murder as separate crimes would have been entirely unsupported by the facts in the record.  Id. at 939.  The state court's adjudication of this claim both "was contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

---

[22] Mr. Jackson also sought review at the state supreme court, but that court chose not to rule on this claim.  Ex parte Jackson, 836 So. 2d 979, 985 (Ala. 2002).

In dismissing this claim, the Court of Criminal Appeals concluded that a robbery charge was not required because there was no "rational basis for a verdict convicting" Mr. Jackson of robbery.  Jackson, 836 So. 2d at 939 (quoting Boyd v. State, 699 So. 2d 967, 972 (Ala. Crim. App. 1997)).  In arriving at this conclusion, the court raised and dismissed offhand the defense theory of the evidence:

> The appellant . . . contends that the jury could have believed that the robbery did not occur during the murder but still could have found him guilty of being an accomplice to the robbery.  This contention is not supported by the record. . . . [T]he evidence clearly showed that the appellant's intent when he started following the victim was to rob the victim.

Id. at 939.  The question of when or if Mr. Jackson had formed the intent to rob the victim, however, was a substantial and unresolved question before the jury.  Indeed, the only evidence indicating that Mr. Jackson had formed any intent to rob the victim was the testimony of Mr. Jackson's three co-defendants.  It was the jury's responsibility to determine the credibility of that testimony, and there was substantial cause for the jury to view it with skepticism.  Yet the Court of Criminal Appeals resolved the jury question by itself and simply asserted that there is no rational basis on which a jury could have concluded otherwise.  This is unreasonable in light of the record in this case.

The evidence in Mr. Jackson's case strongly supports a theory that the victim's

71

car was taken only as an afterthought to the murder. As an initial matter, the evidence shows that, after the shooting, two of Mr. Jackson's co-defendants left the area with the victim's car. Antonio Barnes and Eric Williams testified that they took the vehicle only because Mr. Jackson and a third co-defendant, Christopher Rudolph, had already driven away, leaving them at the scene of the murder. (See Vol. 4, Tab R-10, TR. 387 (Eric Williams testifying that he took the victim's car because, after the shooting, "they pulled off and left me and [Barnes] in the middle of the street. So that's when we jumped in [the victim's] car to pull off and get away from the scene of the crime.").) In addition, no fingerprint evidence linked Mr. Jackson to any of the items that were taken from the car. (Vol. 5, Tab R-10, TR. 422.)

Instead, the prosecution's allegations that Mr. Jackson had formed a scheme to rob the victim rested solely on the trial testimony of the three co-defendants. There were a number of reasons, however, for the jury to have questioned the credibility of that testimony. First, the prosecution had indicted each of these men for capital murder, giving each an undeniable incentive to provide testimony that the prosecution would view favorably. (Vol. 4, Tab R-10, TR. 299, 369; Vol. 5, Tab R-10, TR. 424.) Second, the co-defendants had an opportunity to coordinate their version of the events while held together pre-trial at the county jail. (Vol. 3, Tab R-2, C. 16-17.) And third, even disregarding these considerations, the co-defendants' testimony is flimsy

and contradictory.  Despite their assertion that Mr. Jackson had planned the encounter in order to steal the victim's car stereo, all three men also conceded that Mr. Jackson in fact left the scene of the murder without taking, or attempting to take, the victim's car or his car stereo.  (Vol. 4, Tab R-10, TR. 320-21, 387; Vol. 5, Tab R-10, TR. 439-40.)  Thus, the jury could easily have discredited the co-defendants' allegation that Mr. Jackson had an intent to rob the victim in advance of, or during, his encounter with the victim on the day of the murder.

Given this evidence, the Court of Criminal Appeals made an unreasonable determination of the facts when it asserted that "the evidence clearly showed that the appellant's intent when he started following the victim was to rob the victim." Jackson, 836 So. 2d at 939.  This assumption is contrary to the clear record in this case and is an "unreasonable determination of the facts in light of the evidence presented in the state court proceedings."  28 U.S.C. § 2254(d)(2); see Burgess v. Comm'r, 723 F.3d 1308–19 (11th Cir. 2013) (state court finding "is an unreasonable determination of fact because it was based upon a combination of erroneous factual findings directly contradicted by the record and a record that was insufficient to support its conclusions").

Finally, contrary to clearly established federal law, the Alabama Court of Criminal Appeals relied exclusively on non-capital case law in its argument

73

supporting dismissal of this claim.[23]  This is despite the fact that the rule put forth in

Beck applies exclusively to capital cases, and is premised on the principle that "there

is a significant constitutional difference between the death penalty and lesser

punishments."  447 U.S. at 637–38 (citing Gardner v. Florida, 430 U.S. 349, 357–58

(1977)).  The cases relied upon by the appellate court are all therefore inapposite to

this claim.

In this case, the trial court's refusal to instruct the jury on robbery rendered the

verdict unreliable.  If Mr. Jackson's jury believed, as it reasonably could have based

on the evidence presented at trial, that Mr. Jackson was guilty of murder and robbery

but had not committed the robbery "during" the murder, then the prosecution would

not have met its burden to prove capital murder and Mr. Jackson would not have been

eligible for the death penalty.  Yet in that situation, the jury would have had no

appropriate option before it: under the trial court's instructions, either Mr. Jackson

was guilty of capital murder-robbery or no robbery at all.  The trial court's failure to

allow the jury the choice of the lesser included offense of robbery thereby resulted in

an improper conviction that violated Mr. Jackson's rights under the Fifth, Sixth,

---

[23] In fact, in its treatment of this claim the court fails to address or reference
Beck, the primary case setting forth the principles asserted here, and the primary case
upon which Mr. Jackson relied in his direct appeal brief.  (Vol. 8, Tab R-29, pp.
31–36.)

Eighth, and Fourteenth Amendments to the United States Constitution.  Accordingly, this Court should grant Mr. Jackson habeas relief.

## V.   THE TRIAL COURT'S REFUSAL TO GRANT MR. JACKSON A CONTINUANCE TO SECURE A CRITICAL WITNESS VIOLATED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

Gerard Burdette was a key eyewitness at Mr. Jackson's capital trial. Mr. Burdette was in the victim's car with the victim immediately prior to his death and witnessed the killing; he gave a statement to the police in the immediate aftermath of the crime and was recognized by both parties and the trial court as a material witness.  Yet when defense counsel filed their sole request for a continuance in order to locate Mr. Burdette – after realizing, on the eve of trial, that they had not yet secured him as a witness – the trial court denied the continuance.   The court's written order denying the request relied on hearsay representations of prosecution investigators, who had conducted a single interview with the teenaged witness's mother, in order to find that Mr. Burdette could not be secured within a reasonable time.  As a result, defense counsel were forced to rely on Mr. Burdette's convoluted and incomplete written statement as crucial defense evidence.

The trial court's refusal to grant defense counsel's request for a continuance deprived Mr. Jackson of his rights to due process, to present a defense, a fair trial, and a reliable sentence as protected by the Fifth, Sixth, Eighth, and Fourteenth

75

Amendments to the United States Constitution.  Habeas corpus relief is required because the state appellate court's rejection of this claim was an unreasonable application of United States Supreme Court precedent.

The Supreme Court has warned that the swift administration of justice should never override a defendant's right to due process and a fair trial.  Powell v. Alabama, 287 U.S. 45, 59 (1932) ("To do [so] is to not proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob.").  In considering whether a trial court has violated those rights by denying a defendant's request for a continuance, there are no mechanical tests.  Ungar v. Sarafite, 376 U.S. 575, 589 (1964).  Rather, "[t]he answer must be found in the circumstances presented in every case," the Supreme Court has explained, "particularly in the reasons presented to a trial judge at the time a request is denied."  Id.  In this case, there were compelling reasons why a continuance was necessary in order to adequately pursue a material eyewitness to the events of an alleged capital crime.  See Ford v. Wainwright, 477 U.S. 399, 411 (1986) (in death penalty case "factfinding proceedings aspire to a heightened standard of reliability").

As discussed in Issue I, defense counsel failed to conduct an adequate investigation in this case.  As a result of their ineffectiveness, three days before trial they had to admit that they had yet to make any contact with the primary witness in

the case and thus had no choice to but to move for a continuance to secure Gerard

Burdette as a witness.  (Vol. 1, Tab R-1, C. 83; Vol. 3, Tab R-3, TR. 19–25.)  Counsel

informed the court that they made no effort to contact Mr. Burdette until the day

before moving for a continuance, but he nevertheless was a crucial witness for the

defense because was "the only actual eyewitness to the shooting," and "was in the car

when the shooting happened."  (Vol. 3, Tab R-3, TR. 19–20.)  Counsel continued:

"[Mr. Burdette's] statement indicates that [Mr. Jackson] didn't do it.  Somebody else

did it, a different description, different gun, different automobile.  And he has run out

on us."  (Id. at TR. 20.)  Prior to learning that the prosecution had not arrested

Mr. Burdette, counsel mistakenly had believed they could rely on the opposing party

to secure him as witness.  (Id. at TR. 21, 23–24.)  Responding to the motion, the

prosecution conceded that Mr. Burdette was a material witness, but asserted that "the

State can go to trial and is ready to go to trial without his testimony."  (Id. at TR. 22.)

The trial court then ordered the prosecution to interview Mr. Burdette's mother to

ascertain his whereabouts, (Id. at TR. 24), and when their investigator reported that

his mother told them she had not seen him in a year, the court denied the continuance

and began trial.  (Vol. 1, Tab R-1, C. 100–01.)

    Mr. Burdette was a key defense witness, and was unquestionably material and

competent.  Not only was he an eyewitness to the alleged crime, but the statement that

he provided to the police contradicted prosecution evidence and supported a defense that the motive for the killing was retaliation rather than robbery. (Vol. 1, Tab R-1, C. 87–96; Vol. 3, Tab R-3, TR. 20.) "If he testifies to what was in his statement," defense counsel explained, "he could very well exonerate our client." (Id.) Hearing this, the trial court made a factual and legal determination that Mr. Burdette was a material witness: "I would say Mr. Burdette is a material witness . . ." (Id. at TR. 22.) Despite this, however, the court deprived counsel of any meaningful opportunity to locate or interview him by denying their request for a continuance.

By not doing the most basic and necessary investigation in this case, defense counsel neglected to secure the most important defense witness in this case. There is no excuse for this failure, and the reliability of the verdict and Mr. Jackson's right to counsel were undermined as a result. However, with respect to the trial court's ruling, it is clear that counsel's request for a continuance was not submitted for any dilatory purpose. This was the first and only such request made by Mr. Jackson's counsel at trial, and they made both written and oral motions only one day after learning that they had failed to secure the appearance of Mr. Burdette. (Vol. 3, Tab R-3, TR. 21.) It was clear from the circumstances, and from the representations of all parties, that defense counsel requested the continuance out of a concern that they would not be able to secure Mr. Burdette otherwise. (Id. at TR. 23-24.)

78

Further, had the trial court granted the continuance, the record suggests that Mr. Burdette could have been located and would have testified. Mr. Burdette was a fifteen-year-old child who reportedly lived with his mother. (Vol. 3, Tab R-3, TR. 21.) Even the prosecutor conceded that he "would not be surprised" if Mr. Burdette's mother knew where he was located. (Id.) As a minor and a dependant without any financial means, it was unlikely that Mr. Burdette would have been very far from his home in Montgomery. (Id.) Both the state and federal governments had issued arrest warrants for Mr. Burdette, which only increased the likelihood of his apprehension. (Id. at TR. 20–21.)

Finally, in denying the defense's motion, the court relied exclusively on representations made by the prosecution's investigators, reporting hearsay statements regarding Mr. Burdette's mother's lack of knowledge as to his whereabouts. (Vol. 1, Tab R-1, C. 100 (court's finding that there is "no reasonable likelihood that Burdette's appearance could be secured" based on "the report received from [prosecution] investigators and the Deputy District Attorney").) At the hearing, the trial court acknowledged that the prosecution's questioning of Mr. Burdette's mother may have been insufficient to motivate her to disclose her son's whereabouts. (Vol. 3, Tab R-3, TR. 24–25.) Yet in the end, this was the process upon which the court relied in concluding that Mr. Burdette was unavailable. This was inappropriate

79

given the importance of defense counsel's request.  (Vol. 1, Tab R-1, C. 83 (asserting need to interview Mr. Burdette themselves); Vol. 3, Tab R-3, TR. 22–23 (asserting that Mr. Burdette may provide more material information to someone who "can ask questions a little more [effectively] than a police [officer]").)

The Alabama Court of Criminal Appeals was the last state court to issue a reasoned decision addressing the merits of Mr. Jackson's claim that the trial court violated his right to due process and a fair trial by denying defense counsel's request for a continuance.[24]  Jackson v. State, 836 So. 2d 915, 939–41 (Ala. Crim. App. 1999).  That court rejected the claim on the merits, holding that "[Mr. Jackson] did not present any evidence that, even if the trial court granted a continuance, Burdette could be located."  Id. at 941.  The court further noted that the absence of Mr. Burdette as a witness was ameliorated by the fact that his statement to the police was entered into evidence.  Id.  The state court's adjudication of this claim both "was contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

––––––––––––––

[24] After the Court of Criminal Appeals ruled on the claim, Mr. Jackson sought review at the state supreme court, but that court chose not to address this claim.  Ex parte Jackson, 836 So. 2d 979, 985 (Ala. 2002).

The appellate court's assertion that Mr. Jackson "did not present any evidence" regarding whether or not Mr. Burdette could be located if a continuance were granted, Jackson, 836 So. 2d at 941, is unreasonable in light of the evidence in the record. First, counsel indicated that Mr. Burdette, as a fifteen-year-old, could reasonably be assumed to be in contact with his family and "is not going to get very far." (Vol. 3, Tab R-3, TR. 21.) Conceding to this logic, the prosecution acknowledged that, despite her initial reticence, the witness's mother likely knew his whereabouts, (id.), and even the court expressed optimism that continued questioning of the mother would reveal Mr. Burdette's location. (Id. at TR. 24–25.) Second, both state and federal warrants had been issued for Mr. Burdette's arrest (Vol. 1, Tab R-1, C. 86; Vol. 3, Tab R-3, TR. 21); it was improbable that the teenaged witness would be able to escape detection on those charges for any sustained period of time. Finally, the Court of Criminal Appeals stated that "both the prosecution and the defense had attempted to secure Burdette's attendance at trial, but neither have been successful," Jackson, 836 So. 2d at 941, but the defense had only been looking for the witness for a single day. (Vol. 3, Tab R-3, TR. 21.) Given the significance of Mr. Burdette's role in Mr. Jackson's case, a single-day search does not qualify as an "attempt" to locate him.

Additionally, the Court of Criminal Appeals unreasonably found that the

availability of Mr. Burdette's written statement was sufficient to prevent a violation of Mr. Jackson's due process rights.   That written statement, however, was insufficient if presented alone.   The trial court, having reviewed a copy of the statement, described it as "convoluted."  (Vol. 3, Tab R-3, TR. 20, 24.)  Even after having read it, the judge asked the parties to clarify basic information purportedly contained in the statement.  (Id. at TR. 20 ("I have read his statement.  It's kind of convoluted.  Who does he say shot [the victim]?).)  Defense counsel defended the potential evidentiary value of Mr. Burdette's statement, but argued that its full meaning was "[a]ll [] speculative" without any follow-up with the witness in person. (Id. at TR. 23.)

The trial court's refusal to grant a continuance in this case, finding Mr. Burdette unavailable without even allowing defense counsel to conduct their own investigation into his whereabouts, deprived Mr. Jackson from developing a crucial source of information in his defense.  In submitting their request for the continuance, counsel provided clear evidence as to why they believed Mr. Burdette could be located, and indicated a willingness to make an effort to find him.  Yet the court deprived them of the time to do so, rushing to a trial in which Mr. Jackson's life was at stake.  Accordingly, the trial court's failure to grant a continuance deprived Mr. Jackson of his rights to due process, to present a defense, a fair trial, and a

82

reliable sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. See Ford v. Wainwright, 477 U.S. 399, 411 (1986) (in death penalty case "factfinding proceedings aspire to a heightened standard of reliability"); Powell v. Alabama, 287 U.S. 45, 59 (1932) ("[A] defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense."). The state court's rejections of this claim was unreasonable. This Court should grant Mr. Jackson habeas corpus relief.

## VI. THE TRIAL JUDGE SENTENCED MR. JACKSON TO DEATH, DESPITE A UNANIMOUS JURY VERDICT FOR LIFE WITHOUT PAROLE, IN VIOLATION OF UNITED STATES SUPREME COURT PRECEDENT.

Shonelle Jackson was 18 years old at the time of this offense. The jury found him guilty of capital murder and issued a verdict sentencing him to life imprisonment without the possibility of parole by a vote of 12 to 0. (Vol. 1, Tab R-1, C. 157.) Nevertheless, the trial judge chose to override this unanimous verdict and sentenced Shonelle to death. (Id. at 186–87.) The override in this case was unconstitutional because the judge failed to make an individualized determination of the proper sentence in this case; because it conflicts with the role of juries as explained in Ring v. Arizona, 536 U.S. 584 (2002); and because it was an arbitrary and standardless imposition of the death penalty. The state courts' affirmation of the trial court's

override in Mr. Jackson's case "was contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2).

A.    The Trial Judge's Override Was Not a Determination Based on the Particular Characteristics of This Case.

The United States Supreme Court has emphasized that individualized sentencing is necessary in capital cases and that the sentencer must be focused "on the characteristics of the person who committed the crime." Eddings v. Oklahoma, 455 U.S. 104, 112 (1982) (quoting Gregg v. Georgia, 428 U.S. 153, 197 (1976)); see also Zant v. Stephens, 462 U.S. 862, 879 (1983); Lockett v. Ohio, 438 U.S. 586, 602–05 (1978).  In this case, the trial judge improperly discounted the statutory mitigating circumstance of Shonelle's young age by liberally quoting and paraphrasing a sentencing order written by a different judge from a different state about the characteristics of a different defendant.  Compare (Vol. 1, Tab R-1, C. 177–78), with Shellito v. State, 701 So. 2d 837, 843 (Fla. 1997).  As Mr. Jackson's petition visually demonstrates (Doc. 1 at 57), his judge utilized a Florida court's sentencing order as a fill-in-the-blank form, thereby failing to fulfill the requisite

84

individualized finding for the imposition of the death penalty.

On appeal, the Alabama Supreme Court recognized that the judge adopted the analysis used in Shellito but held that there was still an individualized sentencing determination. Ex parte Jackson, 836 So. 2d 979, 988 (Ala. 2002). This conclusion is unreasonable, given the United States Supreme Court's emphasis that the "mitigating qualities of youth" are wide-ranging and more than just a "chronological fact." Johnson v. Texas, 509 U.S. 350, 367 (1993); Eddings v. Oklahoma, 455 U.S. 104, 116 (1982) ("[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing."). Here, the trial judge did not consider any mitigating aspects of Shonelle's youth other than the items mentioned by the *Florida* court. As a consequence, the judge omitted any mention of Shonelle's level of education and his failure to continue after the ninth grade. (Vol. 5, Tab R-15, TR. 567.) Shonelle's lack of education should have been considered in evaluating the weight of the mitigation, see, e.g., Grayson v. Thompson, 257 F.3d 1194, 1228 (11th Cir. 2001), and the trial court's reliance on another judge's analysis of another defendant prevented it from making an individualized and reliable determination of the proper sentence.

The trial judge was further misled by the Florida sentencing order into a

85

consideration of Shonelle's height and weight.  (Vol. 1, Tab R-1, C. 177 (finding

Shonelle "was, and he is, a physically mature adult") (quoting Shellito, 701 So. 2d at

843).)  The physical characteristics of a teenager are not relevant to the mitigating

qualities of youth; rather the Supreme Court has asked sentencing judges to focus on

the juvenile's "lack of maturity and an underdeveloped sense of responsibility . . . .

These qualities often result in impetuous and ill-considered actions and decisions."

Johnson, 509 U.S. at 367.  Here, the trial judge adopted the Shellito order's analysis

and conclusion to unfairly marginalize the mitigating nature of Shonelle's age, even

though he was less than a year removed from being ineligible for the death penalty.

Roper v. Simmons, 543 U.S. 551, 568 (2005).

Finally, the trial judge overrode the jury's verdict for life without even

determining whether Shonelle was personally culpable for the victim's death.  In its

sentencing order, the trial court stated that "there is evidence that [Shonelle] was the

shooter," but that "there is also evidence that suggests that Barnes, *not Jackson*, fired

the shot that killed Moore."  (Vol. 1, Tab R-1, C. 176 & n.6) (emphasis added); see

also (Id. at C. 184 (citing evidence from eyewitness and medical examiner that Barnes

fired the fatal shot)).  An individualized consideration of the facts requires, at the very

least, a determination of Mr. Jackson's responsibility.  See Cabana v. Bullock,

474 U.S. 376 (1986) (as prerequisite to imposing death penalty, a court must

determine that defendant killed, attempted to kill or intended that killing take place);
Enmund v. Florida, 458 U.S. 782 (1982) (death penalty disproportionate for person who aids and abets in commission of murder, but does not kill, attempt to kill or intend to kill); Tafero v. Wainwright, 796 F. 2d 1314 (11th Cir. 1986) (requiring Cabana finding in state proceedings in order to uphold death sentence).

The majority opinion in the Alabama Supreme Court refused to find error in these shortcomings of the trial judge's override decision.  Although Mr. Jackson argued in his brief that the sentencing order failed to comply with United States Supreme Court precedent requiring individualized sentencing and consideration of the relevant mitigating factors (Vol. 9, Tab R-34, pp. 33–47), the state court did not address any of the federal caselaw in its decision.  Ex parte Jackson, 836 So. 2d at 987–88.  In Woodson v. North Carolina, 428 U.S. 280, 304 (1976), the Supreme Court held that "consideration of the *character and record of the individual offender* and the *circumstances of the particular offense* [are] a constitutionally indispensable part of the process of inflicting the penalty of death."  See also Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir. 1991) ("The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant." (quoting Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987))).   Here, the jury weighed the aggravating and mitigating

87

circumstances relevant to Shonelle Jackson, and each and every juror voted for life without parole. The trial judge, however, looked to caselaw from a different state and chose to override the jury's verdict. Under Supreme Court precedent, this was unreasonable.

B.    The Trial Judge's Override Was an Unreasonable Application of *Ring v. Arizona*.

In *Ring v. Arizona*, 536 U.S. 584, 602 (2002), the United States Supreme Court held that if a "defendant's authorized punishment [is] contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt."[25]   Alabama law provides that a death sentence can only be imposed when two factual findings are made: first, at least one statutory aggravating circumstances must be found to exist beyond a reasonable doubt; and second, the aggravating circumstances must be found to outweigh the mitigating circumstances. Ala. Code § 13A-5-47(d), (e). In this case, these necessary factual findings were made only by the trial judge in his decision to override the jury's unanimous verdict for life without parole. Because the Constitution requires juries, not judges, to determine "any fact on which the legislature conditions an increase in [a capital

---

[25] The <u>Ring</u> Court recognized that the Sixth Amendment requirement for jury determinations, as explained in <u>Apprendi v. New Jersey</u>, 530 U.S. 446 (2000), applies to capital trials. <u>Ring</u>, 536 U.S. at 589, 609.

defendant's] maximum punishment," the state court's affirmation of this judicial override is an unreasonable application of Ring.  536 U.S. at 589.

> 1.   *Mr. Jackson's Jury Unanimously Voted to Sentence Him to Life without Parole, Rejecting the Findings Necessary for a Death Sentence.*

Mr. Jackson's jury determined by a vote of 12 to 0 that the penalty in this case should be life imprisonment without parole.  (Vol. 1, Tab R-1, C. 157.)  This verdict means that the jury determined that no aggravating circumstances as defined under Alabama law existed or that any existing aggravators failed to outweigh the mitigating circumstances.  Ala. Code § 13A-5-46(e)(1), (2).  The judge's unilateral decision to reject the jury's determination was therefore a violation of Ring.

**First**, the Alabama Supreme Court decision, the last reasoned state court opinion to address this issue, did not hold that the jury made any of the findings necessary for a death sentence.  Ex parte Jackson, 836 So. 2d 979, 988–91 (Ala. 2002) (finding that trial court made specific written findings concerning aggravation and independently weighed mitigating and aggravating circumstances).  Instead, the state court ruled that it is constitutional for "a judge, not the jury, [to] determine the punishment in a capital case."  Id. at 989 (citing Ex parte Apicella, 809 So.2 d 865 (Ala. 2001)).  This holding is directly opposed to the rule established in Ring and warrants habeas relief.

89

**Second**, the jury did not find at the penalty phase the existence of either aggravating circumstance noted in the trial judge's sentencing order. (Vol. 1, Tab R-1, C. 174–75 (robbery; under sentence of imprisonment).)  The Alabama Supreme Court did not and could not hold that Mr. Jackson's conviction of capital robbery-murder at the guilt phase of trial was legally equivalent to the finding of the robbery aggravating circumstance at the penalty phase.  There can be no presumption of death at the penalty phase of a capital trial.  See Jackson v. Dugger, 837 F.2d 1469, 1473 (11th Cir. 1988) (presumption of death at penalty phase vitiates individualized sentencing determination required by Eighth Amendment).  And Alabama law, at the time of his trial, required the jury to play a role in sentencing.  See Kuenzel v. State, 577 So. 2d 474, 487–88 (Ala. Crim. App. 1990).

And here, the jury was expressly told that its decision on guilt or innocence had no bearing on Mr. Jackson's sentence.  (Vol. 6, Tab R-25, TR. 58 (sustaining State objection and instructing jury to disregard comment that verdict could lead to death sentence).)  Due process requires that the defendant be on notice that the jury's guilt/innocence verdict is sufficient to permit a death sentence and have a chance to respond.  Gardner v. Florida, 430 U.S. 349, 362 (1977) (imposing death "on the basis of information which he had no opportunity to deny or explain" violates due process).  Due process also entitles the defendant to inform the jury about the nature and

consequences of that decision.  Simmons v. South Carolina, 512 U.S. 154, 162 (1994) (plurality opinion) (rejecting death sentence, based on defendant's future dangerousness, when State concealed from jury information that alternative to death was life without parole).  When this jury had the opportunity to decide Mr. Jackson's sentence, it unanimously rejected death; therefore, any reliance on their unknowing determination of an aggravating factor at the guilt/innocence phase would be improper.

The jury also never made a finding that Mr. Jackson was under a sentence of imprisonment.  This aggravating circumstance was not alleged in the indictment, and Supreme Court precedent makes clear that Mr. Jackson's right to due process would be violated through reliance on facts omitted from the indictment.  Apprendi v. New Jersey, 530 U.S. 466, 483 n.10, 490 (2000) (sentencing scheme that allows judge to increase punishment based on facts not in indictment is unconstitutional); see also Jones v. United States, 526 U.S. 227, 243, n.6 (1999) ("[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."); see also Hubbard v. State, 500 So. 2d 1204, 1215 (Ala. Crim. App. 1986) (holding the same under Alabama law).

91

**Third**, not one juror found that the alleged aggravating circumstances outweighed the mitigating circumstances in this case.   Alabama law specifically provides that defendants are not eligible for the death penalty unless a finding is made that aggravating circumstances outweigh mitigating circumstances.   Ala. Code § 13A-5-46(e)(2) (if aggravating circumstances do not outweigh mitigating circumstances, penalty "shall" be life imprisonment without parole); see also Ex parte Jones, 456 So. 2d 380, 382 (Ala. 1984) (requiring aggravators to outweigh mitigators before defendant may be sentenced to death); Ex parte Woodard, 631 So. 2d 1065, 1071 (Ala. Crim. App. 1993) ("A greater punishment—death—*may* be imposed on a defendant convicted of a capital offense, but *only* if one or more of the aggravating circumstances enumerated in § 13A-5-49 is found to exist *and* that aggravating circumstance(s) outweighs any mitigating circumstance(s) that may exist." (emphasis in original)).   Thus, the override decision violated the core holding of Ring that a "defendant may not be expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone."  536 U.S. at 602 (internal quotation marks omitted).

While acknowledging the Eleventh Circuit's decision in Lee v. Comm'r, 726 F.3d 1172, 1197–98 (11th Cir. 2013), petitioner does not believe it accurately reflects the holding of Ring and further maintains that this case is distinguishable.

Unlike in <u>Lee</u>, where the jury verdict for life was by the minimum of seven votes, Mr. Jackson's jury unanimously and unmistakably expressed their determination that the mitigating circumstances outweigh the aggravating circumstances. Thus, there was not basis for a sentence of death. Also in <u>Lee</u>, the state court had concluded that the jury's guilt-phase verdict sufficiently exposed the defendant to the imposition of the death penalty. But here, the state court reasoned that the trial judge need not credit the jury's decision, in direct conflict with <u>Ring</u>.

> 2. *The Trial Judge's Override Unconstitutionally Diminished the Jury's Role in Capital Sentencing.*

In its sentencing order, the trial judge stated that he was independently weighing the aggravating and mitigating circumstances. (Vol. 1, Tab R-1, TR. 186.) Instead of treating the jury's unanimous verdict for life without parole as a mitigating circumstance, the trial judge rejected the jury's decision. (<u>Id.</u> at TR. 180–86 (finding that essential function of jury verdict is "to focus the court in its independent consideration").) The judge's order acknowledged that there were several objective bases for the jury verdict and that the jury likely properly followed the court's sentencing instructions. (<u>Id.</u> at TR. 185–86.) Nonetheless, the trial judge chose to substitute his own evaluation and sentence Shonelle to death.

The Alabama Supreme Court also did not question the reliability of the jury's

unanimous verdict; rather, the majority held that the judge's independent determination of the mitigation and aggravation was sufficient because the record does not indicate judicial bias, passion, or prejudice.  Ex parte Jackson, 836 So. 2d at 990–91.  In dissent, Justice Johnstone stated that the court's failure to assign any weight to the jury verdict

> reduces to a sham the role of the jury in sentencing and allows baseless, disparate sentencing of defendants in capital cases.  The first of these consequences of Alabama law is a denial of due process of law, and the second is both a denial of due process and a denial of equal protection.

Id. at 991 (Johnston, J., concurring in part and dissenting in part).  Similarly, Justice Lyons dissented, stating that the jury's unanimous recommendation must be given weight as a mitigating circumstance.  Id. at 993–94 (Lyons, J., concurring in part and dissenting in part).  By relying on its prior decisions that the judge, not the jury, can be the only sentencer, the Alabama Supreme Court unreasonably applied Ring and affirmed a sentencing scheme that is unique in its "refusal to constrain its judges' power to condemn defendants over contrary jury verdicts."  Harris v. Alabama, 513 U.S. 504, 524 (1995) (Stevens, J., dissenting).

Further, two months after its decision in this case and while Mr. Jackson was still pending on direct appeal, the Alabama Supreme Court issued another opinion to

clarify that a trial court cannot completely discount a jury's life verdict.  Ex parte Carroll, 852 So. 2d 833, 836 (Ala. 2002) ("further explain[ing]" standard for justifying override).  In order for a death sentence imposed by override to be valid, the trial judge must (1) find the jury's verdict to be a mitigating factor, (2) accord the life verdict due weight,[26] and (3) support the decision to override with facts unknown to the jury that properly undermine the mitigating circumstances.  Carroll, 852 So. 2d at 836; Ex parte Tomlin, 909 So. 2d 283, 287 (Ala. 2003).  There is no question that the requirements to justify a judicial override under these opinions were not met in this case, and Mr. Jackson timely raised this issue in his postconviction petition. (Vol. 16, Tab R-62, C. 679–81.)

As noted above, the trial court did not treat the jury's life verdict as a mitigating factor.  (See, e.g., Vol. 1, Tab R-1, C. 180 ("neither the Alabama Death Act

---

[26]      The weight . . . should depend upon the number of jurors recommending a sentence . . . upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the 'triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury when such information can properly be used to undermine a mitigating circumstance.

Carroll, 852 So. 2d at 836.

nor Alabama case authority informs the trial court <u>how</u> it is to consider the advisory verdict").) And because all twelve of the jurors voted to sentence Mr. Jackson to life without parole, its "unanimous recommendation . . . provides even more 'overwhelming support' of such a sentence and, therefore, must be afforded great weight." <u>Tomlin</u>, 909 So. 2d at 287. In addition, the trial judge recognized that there was factual support for the jury's verdict because he had family support, the co-defendants might receive a verdict less than death, and a co-defendant may have fired the fatal shot. (Vol. 1, Tab R-1, C. 184–85.)[27] Finally, the trial court relied on juvenile adjudications to override the jury's verdict (Vol. 1, Tab R-1, C. 177, 179), in conflict with Alabama law. <u>See Ex parte Burgess</u>, 811 So. 2d 617, 623 (Ala. 2000) (juvenile adjudications are not convictions for purpose of negating factor that defendant had no significant prior criminal history).

The Court of Criminal Appeals dismissed Mr. Jackson's claim under <u>Carroll</u> and <u>Tomlin</u>, holding that the issue had been decided on direct appeal, that the Alabama Supreme Court cases were inapplicable, and that the trial judge "complied with the intent of those decisions." <u>Jackson v. State</u>, 133 So. 3d 420, 441–44 (Ala.

---

[27] Further, as alleged in the postconviction petitions, the victim's family has expressed opposition to the imposition of the death penalty for Mr. Jackson. (Vol. 18, Tab R-67, TR. 84.) Under <u>Carroll</u>, 852 So. 2d at 836, a "recommendation of leniency from the victim's family," would also support a verdict of life.

Crim. App. 2012).  The state court opinion unreasonably found that the trial judge had "meticulously documented why it chose to disregard the jury's unanimous recommendation" of life without parole.  Id. at 443–44 (setting forth several explanations that would bolster, not weaken, the jury's decision).  As explained above, the trial judge did not find the jury's verdict to be mitigating, let alone entitled to great weight.  Instead, the judge clearly stated in the sentencing order that, despite the rational bases for the jury verdict, he would override that decision and conduct an independent, "clinical judicial evaluation" on his own.  (Vol. 1, Tab R-1, C. 186–87.)

The United States Supreme Court held in Ring, 536 U.S. at 589, that, under the Sixth Amendment, "[c]apital defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  See also id. at 616 (Stevens, J., concurring) (juries are "uniquely capable of determining whether, given the community's views, capital punishment is appropriate in the particular case at hand.").  Because the judge's override decision completely discredited the jury verdict, the state courts' affirmation of Mr. Jackson's sentence is unreasonable.

### 3.    *Mr. Jackson Properly Presented This Claim in State Court.*

The State alleges that Mr. Jackson failed to exhaust this claim and presented it for the first time in his federal habeas petition.  (Doc. 11 at 46; Doc. 32 at 11.)  The

97

State is wrong.  Mr. Jackson fully presented on direct appeal his claim that the judicial override in this case violated the Sixth Amendment and gave the state courts "an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).

On February 5, 2002, counsel for Mr. Jackson filed a letter brief to the Alabama Supreme Court, informing the court of the United States Supreme Court's decision to grant certiorari in Ring v. Arizona, 534 U.S. 1103 (Jan. 11, 2002). (Vol. 10, Tab R-38, pp. 1–3.)  Mr. Jackson argued that United States Supreme Court precedent "applies to and invalidates capital sentencing statutes, like Alabama's, in which the judge may override a jury's recommended sentence."  (Id. at p. 1.)  The State moved to strike Mr. Jackson's letter brief (Petitioner's Exhibit E),[28] but its motion to strike was denied by the Alabama Supreme Court on February 14, 2002 (Petitioner's Exhibit F).  By denying the State's motion to strike, the state court explicitly ruled that it was not refusing to consider the arguments made in Mr. Jackson's letter brief.

Mr. Jackson further raised his Sixth Amendment claim under Ring in his application for rehearing to the Alabama Supreme Court.  (Vol. 10, Tab R-39, pp.

---

[28] Petitioner has filed, also on August 8, 2014, several exhibits that were omitted from the record submitted by Respondents.

9–12.)  The state court had issued an opinion on February 15, 2002 (Petitioner's

Exhibit G), and Mr. Jackson presented the federal claim in that pleading.  On May 10,

2002, the Alabama Supreme Court withdrew its previous opinion and issued an

amended decision.  Ex parte Jackson, 836 So. 2d 979 (Ala. 2002).  The court's

modifications were direct responses to assertions in Mr. Jackson's rehearing

application so there is no question the pleading was considered by the court.  Thus,

the Alabama Supreme Court unquestionably was presented with and considered

Mr. Jackson's Ring claim.[29]  (Vol. 10, Tab R-39, pp. 9–12.)

C.  The Trial Judge's Override Is Unconstitutionally Arbitrary and Unreliable.

Mr. Jackson's sentence of death was imposed entirely on the basis of the trial

judge's sole evaluation that the aggravation in this case outweighed the mitigating

evidence.  The judge rejected the jury's 12 to 0 verdict and also found that comparing

this case to other similar trials was not satisfactory.  (Vol. 1, Tab R-1, C. 181–87

(noting that "sentencing is ultimately judge done" and he was "[w]ithout some

concrete direction from an appellate court").)  This procedure, where one person has

---

[29] The State also asserts that Ring is not retroactive. (Doc. 11 at 47.) However,
Mr. Jackson's direct appeal was not final until November 18, 2002, when the United
States Supreme Court denied his petition for certiorari, Jackson v. Alabama,
123 S. Ct. 582 (2002) (denial almost five months after opinion in Ring). See Griffith
v. Kentucky, 479 U.S. 314, 321 n.6, 328 (1987) (case not final until petition for
certiorari denied).

unrestrained discretion on the ultimate punishment, is precisely the "wholly arbitrary and capricious action" that is prohibited by the Constitution in capital sentencing. Gregg v. Georgia, 428 U.S. 153, 189, 195 (1976).

In addition to the other violations caused by the trial judge's decision, Mr. Jackson has consistently claimed that his punishment is also improper because Alabama's override creates an unconstitutional risk of arbitrary sentencing. While the United States Supreme Court did address the propriety of Alabama's capital sentencing scheme almost two decades ago, Harris v. Alabama, 513 U.S. 504 (1995), Mr. Jackson argued on direct appeal that the rejection of an unanimous verdict in this specific case is "haphazard and inconsistent." (See, e.g., Vol. 9, Tab R-34, pp. 95–101.) Justice Sotomayor, in a dissent from the denial of certiorari last term, noted that much has changed in the eighteen years since Harris and, in particular, that Alabama is the only state actively permitting death sentences by judicial override. Woodward v. Alabama, 134 S. Ct. 405, 407–11 (2013) (Sotomayor, J., dissenting from denial of cert.). For reasons that are fully consistent with Mr. Jackson's arguments, Justice Sotomayor found that "Alabama's sentencing scheme has led to curious and potentially arbitrary outcomes. . . . These results do not seem to square with our Eighth Amendment jurisprudence." Id. at 409–10 (Sotomayor, J., dissenting from denial of cert.). Thus, Mr. Jackson continues to maintain his argument that the

100

trial judge's override was wholly arbitrary and capricious, especially in light of the trial judge's decision to copy a sentencing order from Florida, the denial of his Sixth Amendment right to a jury, and a unanimous jury verdict for life without parole.

The United States Supreme Court has acknowledged the jury's role in safeguarding against the danger of arbitrary sentences. Gregg, 428 U.S. 153 at 189; Witherspoon v. Illinois, 391 U.S. 510, 519 & n.15 (1968) (jury "maintain[s] a link between contemporary community values and the penal system" and is necessary to reflect evolving standards of decency); see also Ring, 536 U.S. at 616 (Breyer, J., concurring in judgment) ("[T]he jury remains uniquely capable of determining whether, given the community's views, capital punishment is appropriate in the particular case at hand."). The legitimacy of capital punishment, in light of the Eighth Amendment's mandate concerning the proportionality of punishment, critically depends upon whether its imposition in a particular case is consistent with the community's sense of values.  Spaziano v. Florida, 468 U.S. 447, 489 (1984) (Stevens, J., concurring in part and dissenting in part) ("If the prosecutor cannot convince a jury that the defendant deserves to die, there is an unjustifiable risk that the imposition of that punishment will not reflect the community's sense of the defendant's 'moral guilt.'").

Alabama is the only state in the country that allows trial courts to reject jury

capital sentencing verdicts without reference to any uniform norm or standard.  Ala. Code § 13A-5-47(e).  In upholding Florida's override scheme, the Supreme Court specifically "recognized the significant safeguard the <u>Tedder</u> standard affords a capital defendant."[30]  <u>Spaziano v. Florida</u>, 468 U.S. 447, 465 (1984).  Alabama's unique system, however, allows an elected trial judge to unilaterally issue a death sentence, in violation of federal law prohibiting capital punishment on the basis of social or political pressures, racial bias, or any other arbitrary factor.  <u>Zant v. Stephens</u>, 462 U.S. 862, 885 (1983); <u>Woodson v. North Carolina</u>, 428 U.S. 280, 303–04 (1976).

Without requiring sentencing judges to conform to a particular standard for consideration of jury verdicts, there can be little uniformity in when or how they are accepted or rejected.  And at the time Shonelle Jackson was sentenced, Alabama appellate courts did not review the appropriateness, reliability, or equal exercise of

---

[30] Florida trial judges may override a jury's verdict only where "the facts suggesting a sentence of death [are] ***so clear and convincing that virtually no reasonable person could differ***."  <u>Tedder v. State</u>, 322 So. 2d 908, 910 (Fla. 1975) (emphasis added); <u>Keen v. State</u>, 775 So. 2d 263, 283 (Fla. 2000) (inquiring whether there is "a reasonable basis in the record to support the jury's recommendation of life." (internal quotation marks omitted)).  As a result, no death sentence has been imposed by override in Florida since 1999.  <u>Woodward</u>, 134 S. Ct. at 408 (2013) (Sotomayor, J., dissenting from denial of cert.).  Delaware, the only other state to permit judicial override, also enforces strict standards and has not upheld any judicial life-to-death override.  <u>Id</u>. at 408 n.5.

judicial overrides.  See Parker v. Dugger, 498 U.S. 308, 321 (1991) (appellate review plays "crucial role . . . in ensuring that the death penalty is not imposed arbitrarily or irrationally").   Thus, the constitutional requirement that there be "measured, consistent application" of the death penalty and "fairness to the accused" is thus clearly not met.  Eddings v. Oklahoma, 455 U.S. 104, 110–11 (1982).

Judicial override in Alabama is also a violation of the Equal Protection Clause. See Harris v. Alabama, 513 U.S. 504, 515(1995) (noting that Harris did not "bring an equal protection claim"); Minnick v. Anderson, 151 F. Supp. 2d 1015, 1038 (N.D. Ind. 2000) (finding violation of Equal Protection "where a jury has recommended against the death penalty and the judge goes ahead and imposes it").  The judicial override in Mr. Jackson's case was improper as a violation of the Equal Protection Clause because similarly situated capital defendants have not been sentenced to death pursuant to a judicial override.  Because no standard exists to guide trial courts in deciding whether to override the life verdict of an Alabama jury, the result is a wildly disparate treatment of jury verdicts and capital defendants.

Facially, and as applied in this case, Alabama's statute "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.  When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."

103

Lockett, 438 U.S. at 605 (1978) (plurality opinion); see also Tuilaepa v. California, 512 U.S. 967, 973 (1994) (requiring process that is "neutral and principled so as to guard against bias or caprice in the sentencing decision"). The trial judge's decision to reject the jury's unanimous life verdict and impose a death sentence violated Mr. Jackson's rights to due process, a fair trial, equal protection, and a reliable sentencing determination, as protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The state courts' rulings constitutes an "unreasonable determination of the facts in light of the evidence." Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003). Their adjudication of the claim resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent, thus warranting habeas corpus relief. Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

## VII.   THIS COURT SHOULD GRANT HABEAS RELIEF BECAUSE THE STATE WITHHELD FAVORABLE EVIDENCE FROM THE DEFENSE.

As Mr. Jackson detailed in his Rule 32 petition (Vol. 16, Tab R-62, C. 657–61), the prosecutor in this case withheld significant exculpatory information and information favorable to the defense, including evidence of agreements with the three co-defendants.[31]   Had this evidence, such as the prosecutor's files and visitor logs

---

[31] As alleged in Mr. Jackson's Rule 32 petition, the State also withheld critical materials vital to the investigation and testimony of the following potential witnesses:

from the Montgomery County Jail, been been provided to the defense, trial counsel would have been able to effectively undermine the credibility of the co-defendants who supplied the prosecution's only evidence that Mr. Jackson had a motive of robbery.  Counsel would then have been able to argue persuasively that the taking of the victim's car was clearly an afterthought to the shooting, making Mr. Jackson ineligible for a capital murder-robbery conviction and for the death penalty.  The State's withholding of this vital information was a violation of its obligation under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).  See Banks v. Dretke, 540 U.S. 668, 691 (2004) (reiterating that Brady claim requires prejudicial suppression of evidence favorable to accused).

A.    Mr. Jackson's *Brady* Claim Is Not Procedurally Defaulted.

The last reasoned state-court decision to address Mr. Jackson's Brady claim was the Alabama Court of Criminal Appeals.  Jackson v. State, 133 So. 3d 420, 462–63 (Ala. Crim. App. 2012).  The Court of Criminal Appeals stated:

> This Court has repeatedly held that in order to assert a Brady claim in a postconviction petition the petitioner must plead and prove the requirements for newly discovered evidence. . . .

---

Detective A.J. Signore, Victoria Moss, A.C. Porterfield, Roderick Crawford, and Latrice Walker.  (Vol. 16, R-62, C. 657–61.)  In addition, the State never provided any information from any tests or examinations of the vehicles in this case.  (Id.)

> Jackson failed to plead the requirements for newly
> discovered evidence. In fact, at a hearing on the petition,
> he asserted that he did not have to show that this claim was
> based on newly discovered facts. Clearly, Jackson failed
> to meet his burden of pleading sufficient facts to meet the
> specificity requirements of Rule 32.6(b), Ala. R. Crim. P.
> Thus, this claim was correctly dismissed.

Id. (citing Ala. R. Crim. P. 32.1(e)). Although the State cites this portion of the state

court opinion, the State incorrectly alleges that Mr. Jackson's claim was barred under

Ala. R. Crim. P. 32.2(a)(3), (5), for not raising the claim at trial or on direct appeal.

(Doc. 23 at 14–15; Doc. 32 at 12.)[32]

During the Rule 32 proceedings, the circuit court signed the State's proposed

order dismissing Mr. Jackson's claim under multiple procedural rules. (Vol. 18, Tab

R-67, TR. 80–81; Vol. 38, Tab R-103, C. 943–48.) In paragraphs 144 and 145 of the

order, the circuit court stated that Mr. Jackson's allegations are barred under Rule

32.2(a)(3) and (5); paragraphs 146 and 147 barred the claim for failing to meet the

specificity requirements under Rule 32.6(b). (Vol. 38, Tab R-103, C. 944–46.) But

in paragraphs 148 and 149, the circuit court order provided an "[a]lternative[]"

holding – namely that the Brady claim fails to meet the five requirements of Rule

32.1(e) for newly discovered evidence. On appeal, the Court of Criminal Appeals

_____

[32] This Court has asked the parties to first address whether this *Brady* claim is
procedurally barred before ruling on Mr. Jackson's discovery request and the merits
of the claim. (Doc. 27 at 5–6.)

quoted only from paragraphs 148 and 149, clearly and unambiguously opting to preclude Mr. Jackson's <u>Brady</u> claim because of and only because of Rule 32.1(e). <u>Jackson</u>, 133 So. 3d at 462–63; <u>see also id.</u> at 471 ("Jackson's <u>Brady</u> claim was barred because Jackson failed to plead the grounds for newly discovered evidence.). Because the Court of Criminal Appeals never mentions Rule 32.2(a)(3) and (5), the State's procedural default defense must fail.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991) (federal court must conduct habeas analysis based on state court that conducted "the last reasoned opinion on the claim . . . ."); <u>see also</u> <u>Cone v. Bell</u>, 556 U.S. 449, 468 (2009) ("When a state court declines to find that a claim has been waived by a petitioner's alleged failure to comply with state procedural rules, our respect for the state-court judgment counsels us to do the same."); <u>Adkins v. Warden,</u> <u>Holman CF</u>, 710 F.3d 1241, 1250 (11th Cir. 2013) (focusing analysis on last reasoned state court decision to address claim).

The State understandably does not invoke a procedural default under Rule 32.1(e) because this rule is not consistently applied.[33]  The Alabama Supreme Court

---

[33] <u>Compare</u> <u>Martin v. State</u>, 839 So. 2d 665 (Ala. Crim. App. 2001) (death sentenced petitioner entitled to new trial in state postconviction where prosecutor suppressed numerous pieces of evidence in violation of <u>Brady</u> without requiring petitioner to meet requirements of 32.1(e)), <u>and</u> <u>Hamilton v. State</u>, 677 So. 2d 1254 (Ala. Crim. App. 1995) (in death penalty case, new trial granted in state postconviction where prosecution suppressed evidence that key witness received favorable treatment in exchange for testimony against defendant, in violation of

has recently reaffirmed that "the elements of a claim of 'newly discovered material facts' as contemplated by Rule 32.1(e) need not be proved in order to entitle the petitioner to relief under Rule 32.1(a) – and accordingly, need not be pleaded in order to avoid a summary dismissal for failure to state a claim based on Rule 32.1(a)." Ex parte Beckworth, No. 1091780, 2013 WL 3336983, at *3 (Ala. Jul. 3, 2013); see also Ex parte Sockwell, No. 1120561, 2013 WL 4618784, at *1 (Aug. 30, 2013) (Shaw, concurring in part and dissenting in part from denial of writ) ("[A] claim that a petitioner's constitutional rights were violated under Brady may be alleged under Rule 32.1(a), Ala. R. Crim. P., and need not be required to meet the elements of a claim of newly discovered material facts under Rule 32.1(e).").

Because Rule 32.1(e) is not "regularly followed" as a bar on Brady allegations, the state court's reliance on it should not preclude federal review of Mr. Jackson's claim.  Ford v. Georgia, 498 U.S. 411, 423-25 (1991) (for state procedural rule to bar federal review, it must be "regularly followed state practice") (quoting James v. Kentucky, 466 U.S. 341 (1984)); see also Mancill v. Hall, 545 F.3d 935, 942 (11th Cir. 2008) (holding that where Georgia had no "regularly followed practice" requiring

---

Brady and Giglio without requiring petitioner to meet requirements of Rule 32.1(e)); with Payne v. State, 791 So. 2d 383, 398 (Ala. Crim. App. 1999) (postconviction Brady claim raised in Rule 32 petition must meet all five prerequisites of newly discovered evidence in Ala. R. Crim. P. 32.1(e)).

108

prevailing state habeas petitioner to cross-appeal remaining, unaddressed claims, petitioner's failure to do so could not constitute procedural bar in federal court); Cochran v. Herring, 43 F.3d 1404, 1409-10 (11th Cir. 1995) (holding that district court properly addressed merits because Alabama procedural bar did not bar federal review where it had not been consistently applied); Hansbrough v. Latta, 11 F.3d 143, 146 (11th Cir. 1994) (reversing district court's denial of habeas petition on grounds of procedural default and remanding for merits review because striking of petitioner's notice of appeal by Alabama Court of Criminal Appeals was "not grounded on a 'firmly established, regularly followed' procedural rule").[34]

Additionally, even the procedural bar invoked by the State is inadequate to bar federal review. The (a)(3) and (a)(5) bars relate to claims that *could have been* presented at trial or on direct appeal. Of course, a claim that the State suppressed evidence at trial necessarily means that trial counsel could not have raised this claim at trial or on appeal. In this case, prior to trial, defense counsel filed a discovery

---

[34] Because the bar is not consistently applied, this Court need not determine whether cause and prejudice exists. See Ward v. Hall, 592 F.3d 1144, 1157, 1175-76 (11th Cir. 2010) (court first determined whether procedural bar was regularly followed before determining whether defendant had demonstrated cause and prejudice to overcome bar). Of course, the State's suppression of evidence, where, as here, the petitioner reasonably relies on the State's assertions regarding discovery, constitutes "cause" for the default of a Brady claim. See Strickler v. Greene, 527 U.S. 263, 288 (1999).

motion, which included a request for all <u>Giglio</u> information. (Vol. 1, Tab R-1, C. 20.)
Subsequently, defense counsel filed a motion for disclosure of "all deals and inducements," which was granted by the trial court. (<u>Id.</u> at C. 50.) In response, the Montgomery County District Attorney asserted that it had "turned over all exculpatory material" and that it had "not entered into any deal with any other co-defendant at this time. If any deal is reached prior to their testimony, the State will notify the Defendant." (<u>Id.</u> at C. 25, 55.) Thus, because the State concealed this evidence, Mr. Jackson asserted in his second amended Rule 32 petition that trial counsel simply could not have raised this claim at trial or on direct appeal. (Vol. 16, Tab R-62, C. 661); <u>see, e.g.</u>, <u>Banks v. Dretke</u>, 540 U.S. 668, 693 (2004) (where State asserted on eve of trial that it would disclose all <u>Brady</u> material, "Banks cannot be faulted for relying on that representation" in failing to develop <u>Brady</u> claim); <u>Beckworth</u>, No. 1091780, 2013 WL 3336983, at *4–5 (requiring opportunity for petitioner to explain whether <u>Brady</u> claim could have been raised at trial or on direct appeal).

B.     <u>The State Court's Rejection of Mr. Jackson's *Brady* Claim Was Unreasonable.</u>

Mr. Jackson has diligently pursued the discovery of the factual basis of this claim in state court. After filing an amended Rule 32 petition, Mr. Jackson filed a

motion for discovery of prosecution files necessary to prove these claims.  (Vol. 21, Tab R-68, C. 31–51.)  He specifically requested access to the District Attorney's files as they related to him[35] and his three codefendants, as well as the Montgomery County Jail logs.  Id.  Although the circuit court initially granted these discovery requests, (Vol. 37, Tab R-99), the State successfully petitioned the Alabama Court of Criminal Appeals for a writ of mandamus, and Mr. Jackson's subsequent petition to the Alabama Supreme Court was unsuccessful.

Subsequently, Mr. Jackson filed a Second Amended Rule 32 Petition in which he provided additional factual allegations in support of the claims in his petition. (Vol. 15, Tab R-62.)  Additionally, Mr. Jackson renewed his discovery requests, (Vol. 18, Tab R-67, TR. 51–54) and detailed the basis for his request for the prosecution's files and the Montgomery County Jail logs (Vol. 17, C. 811–18).  The circuit court denied these requests, and this denial was affirmed on appeal to the Alabama Court of Criminal Appeals.  Jackson, 133 So. 3d at 471.  Mr. Jackson again challenged the denial of this discovery at the Alabama Supreme Court, (Vol. 36, Tab R-88, pp. 104–15, 131–36), which denied certiorari without opinion.  Ex parte

---

[35]The State initially conceded that Mr. Jackson was entitled to the District Attorney's file as it related to him, but denied that he was entitled to the prosecutor's files on the three codefendants.  Ex parte State (Jackson v. State), 910 So. 2d 797, 804 n.3 (Ala. Crim. App. 2005).

Jackson, No. 1120031 (Ala. Jun. 21, 2013).

The state court record demonstrates that Mr. Jackson undoubtedly "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Williams v. Taylor, 529 U.S. 420, 437 (2000); Isaacs v. Head, 300 F.3d 1232, 1249 (11th Cir. 2002); see also Williams v. Humphrey, No. CV412-106, 2013 WL 3877750, at *4 (S.D. Ga. Jul. 26, 2013) (granting discovery in § 2254 case after finding petitioner was diligent in pursuing Brady claim in state court).

Further, with respect to the merits of the Brady claim, the state court unreasonably held that Mr. Jackson failed to specifically plead that he was innocent of the crime.[36] Jackson, 133 So. 3d at 462–63 (citing Ala. R. Crim. P. 32.1(e)(3), (5)). The court's holding that, in order to allege a constitutional violation under Brady v. Maryland, the facts must not amount to impeachment and must establish that the petitioner is innocent, is contrary to clearly established United States Supreme Court precedent which recognizes a due process violation under Brady even where the evidence is impeachment and thus does not establish innocence. See Kyles v.

_____

[36] To the extent that the Court of Criminal Appeals rested its finding on the specificity bar in Ala. R. Crim. P. 32.6(b), it constitutes a merits finding. See Borden v. Allen, 646 F.3d 785, 816 (11th Cir. 2011) (dismissal of claim pursuant to Ala. R. Crim. P. 32.6(b) constitutes ruling on merits).

Whitley, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); Giglio v. United States, 405 U.S. 150, 154 (1972) (government's failure to disclose deal with key government witness violated defendant's due process rights). As such, the state court's ruling is not entitled to deference.

The State's suppression of material favorable to Mr. Jackson's defense violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. He was not required to raise this claim as one of newly discovered evidence, and this Court must review his allegations. The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Habeas corpus relief is warranted. 28 U.S.C. §2254(d)(1), (2).

## VIII.  THE STATE COURT ERRED IN DENYING MR. JACKSON'S BATSON CLAIM.

At the trial of Mr. Jackson, who is African-American, the prosecutor used

peremptory strikes to remove African-American jurors because of their race.  The State was given 15 peremptory strikes, 13 of which it used to remove qualified prospective jurors.  Of these 13 struck jurors, 8 were African Americans.  The State conducted no meaningful voir dire of these jurors; instead it struck black jurors at a rate nearly twice that of white jurors, striking 6 of them nearly in a row.  This was in a county with a long, well documented history of racial discrimination in jury selection.  Despite this evidence, the Alabama courts held that Mr. Jackson failed to establish a prima facie case of racial discrimination.  This was an unreasonable application of clearly established Supreme Court law and was based on an unreasonable determination of the facts.

In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court overruled the requirement of Swain v. Alabama, 380 U.S. 202 (1965), that the defendant must prove systematic exclusion of minorities in order to make out a prima facie case of racial discrimination in jury selection.  476 U.S. at 92.  Instead, the Court held that a defendant could make out a prima facie case merely "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  Batson, 476 U.S. at 94.  The Court went on to outline examples of circumstances that would give rise to such an inference, including a "pattern" of strikes against black jurors and the prosecutor's questions and statements during voir dire.  Id. at 96-97.

114

Although no longer requiring a showing of a history of discrimination to establish an Equal Protection Clause violation, Batson and subsequent Supreme Court cases made clear that history was still a relevant, probative factor in detecting racial discrimination in a particular case. Id. at 94 ("Proof of systematic exclusion . . . raises an inference of purposeful discrimination because the result bespeaks discrimination." (internal quotation marks omitted)); accord Miller-El v. Dretke, 545 U.S. 231, 266 (2005) ("If anything more is needed for an undeniable explanation of what was going on, history supplies it.").

Here, Mr. Jackson presented numerous facts to the state courts that supported an inference of discrimination. First, as defense counsel pointed out at trial, 8 of the 13[37] jurors the prosecutor selected for peremptory strikes were African-American, (Vol. 3, Tab R-6, TR. 156; Vol. 8, Tab R-29, p. 48), and the prosecutor struck 6 black jurors out of 7 in a row, suggesting a pattern,[38] (Vol. 3, Tab R-6, TR. 156). Second,

---

[37] Although the State had 15 peremptory strikes, it struck the last 2 randomly. (Vol. 3, Tab R-6, TR. 155.)

[38] These were the only arguments made by defense counsel at trial. (Vol. 3, Tab R-6, TR. 156.) As argued above, counsel failed to advocate for Mr. Jackson from the time they were appointed through the sentencing proceedings. The trial court asked for additional evidence, stating that what defense counsel presented was not enough to establish a prima facie case, and inquiring, "What's your prima facie case?" (Vol. 3, Tab R-6, TR. 156.) Defense counsel failed to marshal any of the additional arguments that were available to them, and the additional arguments in support of a prima facie case were presented (and rejected) on appeal in state court.

115

after strikes for cause, there were 42 jurors left in the venire, 19 of whom were black. (Vol. 3, Tab R-6, TR. 152; Vol. 8, Tab R-29, p. 47.)  Eight of 19 blacks were struck, which is a rate of 42%.  Five of 23 whites were struck, which is a rate of 21.7%. Accordingly, black jurors were struck at a rate nearly twice that of whites.  Third, the district attorney did not conduct meaningful voir dire of the black jurors that he struck.  (Vol. 8, Tab R-29, p. 48.)  Fourth, Mr. Jackson presented to the appellate court numerous Alabama cases showing a history of unlawful exclusion by the Montgomery County district attorney's office.  (Id.)[39]

This evidence was more than sufficient to meet the relatively low threshold of making out a prima facie case. The Supreme Court has held that the burden a defendant must meet to establish a prima facie case under Batson is "minimal."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).   A mere "inference" of discrimination satisfies a prima facie case.  Batson, 476 U.S. at 96; see also Johnson v. California, 545 U.S. 162, 170 (2005) (burden of establishing prima facie case is not

---

[39] In Mr. Jackson's briefs to the Court of Criminal Appeals and the Alabama Supreme Court, he pointed to the well documented history of racial discrimination by the district attorney's office in Montgomery County.  (Vol. 8, Tab R-29, p. 48 (citing Ex parte Yelder, 630 So. 2d 107, 109 (Ala. 1992); Ex parte Bird, 594 So. 2d 676, 681 (Ala. 1991); Parker v. State, 568 So. 2d 335 (Ala. Crim. App. 1990); Powell v. State, 548 So. 2d 590 (Ala. Crim. App. 1988); Williams v. State, 548 So. 2d 501 (Ala. Crim. App. 1988); Acres v. State, 548 So. 2d 459 (Ala. Crim. App. 1987)); accord Vol. 9, Tab R-34, pp. 79–80.)

"so onerous"; defendant must produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred"). The Court of Criminal Appeals found, however, that "the record on appeal does not include any documents that show the race . . . of the prospective jurors," (Vol. 37, Tab R-92, p. 45), and held: "We cannot predicate error on a silent record." (Id. (internal quotation marks omitted).) The court accordingly found no constitutional violation. (Id. at 45-46.)

The state court's ruling was an unreasonable determination of the facts because the record was not silent on the race of the prospective jurors. Defense counsel put the race of 8 of the jurors peremptorily struck by the State on the record. (Vol. 3, Tab R-6, TR. 156.) The state court's ruling was also an unreasonable application of Batson and its progeny because Mr. Jackson presented precisely the quantum of evidence that those cases have held proves a prima facie case: a pattern of strikes against minorities, evidence of the prosecutor's voir dire questioning (or, in this case, lack thereof) supporting an inference of discrimination, and a history of systematic exclusion by the prosecutor's office.

In Madison v. Comm'r, 677 F.3d 1333, 1339 (11th Cir. 2012), the petitioner presented to the Alabama courts several circumstances to support an inference of discrimination, including: (1) the prosecutor used a number of his strikes against a variety of black jurors; (2) the prosecutor failed to ask questions to three of the

117

challenged jurors; (3) the case had racially sensitive subject matter; and (4) the district attorney's office has a history of discrimination in jury selection.  The state courts held this was insufficient to make out a prima facie case under <u>Batson</u> and the federal district court denied habeas relief.  <u>Madison v. Allen</u>, No. 1:09-00009-KD-B., 2011 WL 1004885, at *35 (S.D. Ala. Mar. 21, 2011).  The Eleventh Circuit reversed, holding that "[b]y presenting several relevant circumstances that in sum were sufficient to raise an inference of discrimination, Madison met his burden of establishing a prima facie case."  677 F.3d at 1339.  Three of the four circumstances presented in <u>Madison</u> exist in this case, and Mr. Jackson has presented additional circumstances.  Consequently, the state court's adjudication of this claim is an "unreasonable determination of the facts," <u>Bui v. Haley</u>, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  Habeas corpus relief is warranted.  28 U.S.C. § 2254(d)(1), (2).

## IX.   THE TRIAL COURT IMPROPERLY ADMITTED INTO EVIDENCE MR. JACKSON'S INVOLUNTARY CONFESSION.

The police obtained a confession from Shonelle Jackson through the blatant use of trickery and deceit.  This confession was not voluntarily made.  Shonelle was an

eighteen-year-old juvenile who was particularly susceptible to dishonest police tactics such as those used against him.  The trial court erred by admitting his confession into evidence and violated Mr. Jackson's rights to due process, a fair trial, and a reliable sentencing protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  The state court's rejection of Mr. Jackson's claim was an unreasonable application of United States Supreme Court precedent.

In all criminal proceedings, there is a presumption that the will of every accused is likely to be overborne by the inherent pressures of custodial interrogation. Miranda v. Arizona, 384 U.S. 436 (1966).  For a confession to be admissible, the prosecution must show that the statement "was the product of a free and deliberate choice rather than intimidation, coercion, or *deception*." Moran v. Burbine, 475 U.S. 412, 421 (1986) (emphasis added); see also Jackson v. Denno, 378 U.S. 368, 376 (1964) ("It is now axiomatic that a defendant is deprived of due process of law if his conviction is founded in whole or in part upon an involuntary confession . . . even though there is ample evidence aside from the confession to support the conviction."). If the state cannot make such a showing, a court will exclude the involuntary confession because it is untrustworthy and resulted from the violation of due process. See Spano v. New York, 360 U.S. 315, 320 (1959) ("The abhorrence of society to the use of involuntary confessions does not turn alone on the inherent untrustworthiness.

119

It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law.").  In determining the admissibility of a statement, courts must undergo a particularized analysis of the circumstances in which the statement was obtained.  Clewis v. Texas, 386 U.S. 707, 708 n.3 (1967) (citing Fikes v. Alabama, 352 U.S. 191, 197 (1957)).

In this case, the circumstances of Mr. Jackson's interrogation support a finding of involuntariness.  Prior to giving his statement, Shonelle was questioned by two armed police officers, Officers Signore and Phillips, for four hours in an eight-by-eight foot windowless room at the Montgomery Police Department Headquarters. (Petitioner's Exhibit A, pp. 22–23.) Teenaged Shonelle had been sent to the police department by his mother, who had learned that the police were looking for him. (Vol. 5, Tab R-10, TR. 517.)  When the police interrogated Shonelle, they did not inform him that he could face the death penalty for the crime of which he was suspected.  (Petitioner's Exhibit A, p. 29.)  Further, he was denied any food and was not permitted to smoke during this time.  (Id. at 24.)

Most importantly, when the interrogating officers were unable to obtain an inculpatory statement from Shonelle, Officer Signore told Shonelle that his fingerprints had been found on a cup recovered from the stolen vehicle used in the crime.  (Vol. 5, Tab R-10, TR. 519–22; Petitioner's Exhibit A, p. 10.)  As Officer

120

Signore testified at trial and at the suppression hearing, this was an overt lie; no fingerprints had been found on the cup. (Id.) After Officer Signore lied to him about the state of the evidence, Shonelle made a different statement that was offered into evidence at trial, in which he placed himself in the stolen vehicle with the co-defendants on the day of the crime. (Id.)

At that time, Shonelle was unusually vulnerable to such coercive tactics. Only eighteen,[40] he had a documented history of mental impairments (discussed at length in Claim II, and Claim XII) and was a "low achiever" who had struggled at school and was susceptible to suggestion. (Petitioner's Exhibit A, pp. 61, 64.) Further, Shonelle was eager to please (Id. at 62) and respectful of his elders. (Id. at 67.) All of these traits combined to make Shonelle unusually susceptible to the suggestions of authority figures.

The Supreme Court of Alabama was the last state court to issue a reasoned decision addressing the merits of Mr. Jackson's claim that the court had improperly

---

[40] In J.D.B. v. North Carolina, 131 S. Ct. 2394, 2403 (2011), the Supreme Court held that a proper Miranda analysis involves consideration of the age of the accused, with the understanding that younger people are more susceptible to coercive police practices. Id. ("[A] reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go.").

121

admitted his involuntary statement.[41]  Ex parte Jackson, 836 So. 2d 979, 982–85 (Ala. 2002).  That court rejected the claim on the merits, holding that "the State met its burden in proving that Jackson voluntarily and knowingly waived his Miranda rights and that he made his statement voluntarily."  Id. at 985.  In particular, the court noted that "[t]he record does not reveal that Jackson was threatened or coerced into giving a statement."  Id.  The state court's adjudication of this claim was an unreasonable application of clearly established Federal law and was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(1), (2).

Shonelle was a teenager who had a false impression of the situation, and, after hours of interrogation, the police admittedly deliberately lied about the existence of fingerprint evidence placing him at the scene of the crime.  Contrary to the state court's holding, given the circumstances of the interrogation and the police officers' intentional deceit, the prosecution did not establish that the confession was voluntary in the constitutional sense of being the product of free choice absent of any "police

---

[41] Mr. Jackson first raised this claim on direct appeal.  After the Court of Criminal Appeals denied the claim on the merits, Jackson v. State, 836 So. 2d 915, 931–35 (Ala. Crim. App. 1999), Mr. Jackson sought and was granted review of this claim at the state supreme court.  That court remanded the case back to the trial court with instructions to conduct a hearing on the admissibility of Mr. Jackson's statement.  Ex parte Jackson, 836 So. 2d 973, 976 (Ala. 2001).  After conducting a hearing as instructed, the trial court found that the statement was voluntary and admissible.  (Petitioner's Exhibit A, pp. 11–12.)  The case was then returned to the Alabama Supreme Court.

overreaching." Colorado v. Connelly, 479 U.S. 157, 170 (1986). By admitting Mr. Jackson's involuntary confession, the trial court violated Mr. Jackson's rights to due process, a fair trial, and a reliable sentencing protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The state court's rejection of this claim was unreasonable. This Court should grant Mr. Jackson habeas corpus relief.

## X.   MISCONDUCT BY MEMBERS OF MR. JACKSON'S JURY PREJUDICED HIM IN VIOLATION OF CLEAR UNITED STATES SUPREME COURT PRECEDENT.

### A.   Juror J.B. Conducted an Unauthorized Investigation of the Crime Scene and Considered Extraneous Evidence in Her Deliberations, Violating Mr. Jackson's Right to a Fair and Impartial Jury.

Under United States Supreme Court precedent, any evidence that does not "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" is deemed presumptively prejudicial. Turner v. Louisiana, 379 U.S. 466, 473 (1965); see also Irvin v. Dowd, 366 U.S. 717, 722 (1961) (defendant guaranteed right to fair trial by panel of impartial, indifferent jurors). In this case, Mr. Jackson presented testimony that juror J.B. visited the crime scene in order to resolve her concerns about whether Mr. Jackson fired the shot that killed the victim. Juror J.B. relied on extraneous evidence to determine the culpability of Mr. Jackson, and such

reliance is presumptively prejudicial.  Remmer v. United States, 347 U.S. 227, 229 (1954) (where juror considered outside evidence, new trial required unless State rebuts presumption of prejudice with showing of harmlessness); see also United States v. Pessefall, 27 F.3d 511, 516 (11th Cir. 1994) ("The jury's consideration of extrinsic evidence requires a new trial 'if the evidence poses a reasonable possibility of prejudice to the defendant.'"); United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir. 1984).

In a sworn affidavit dated April 1, 2004, and presented to the circuit court through a transcribed deposition hearing on March 1, 2010, juror J.B. attested that

> [d]uring the trial, I drove by the Smiley Court area and the area where the shooting occurred.  I also drove to the home of Ms. Flowers, where the car theft occurred.  It was important for me to see the place where the shooting and the car theft occurred.   During the deliberations this information was important and *I did not feel that I could not make a judgment about what happened on the night of the crime before I had visited these places*.

> I, along with other jurors, was very concerned that nobody witnessed the shooting except the man across the street. I had concerns about whether or not Shonelle Jackson was the shooter in this case.

(Vol. 22, Tab R-69, C. 98–99 (emphasis added).)  Juror J.B. explained in her 2010 deposition that her memory had worsened since 2004 because, during the intervening time, she had been involved in two car accidents, each leading to a stay in the trauma

unit.  (Id. at 97.)

The totality of the circumstances surrounding juror J.B.'s unauthorized investigation of the crime scene establishes that the State failed to meet its burden of demonstrating harmlessness.  See McNair v. Campbell, 416 F.3d 1291, 1307–08 (11th Cir. 2005).  There was no dispute that each of the three individuals in the car with Mr. Jackson had guns,[42] but the State's evidence at trial was tenuous and conflicting as to which suspect killed the victim.  (See, e.g., Vol. 3–4, Tab R-10, TR. 197–206 (witness of gunfire could not give clear description of shooter); Vol. 5, Tab R-10, TR. 504–05 (State's expert testifying that bullet could have come from multiple guns).)  While there was conflicting evidence at the Rule 32 hearing about juror J.B.'s ability to remember in 2010, she nevertheless read her 2004 affidavit and explained why her memory had lapsed.  Because juror J.B. was unable to resolve her concerns about the case until she independently investigated the crime scene, her actions were both presumptively and actually prejudicial.

On appeal, the Court of Criminal Appeals found without explanation that "this case does not present a situation where prejudice is presumed as a matter of law." Jackson v. State, 133 So. 3d 420, 441 (Ala. Crim. App. 2012).  However, juror J.B.

---

[42] At trial, each of Mr. Jackson's co-defendants testified that Mr. Jackson had a .380, Christopher Rudolph had a 9mm, Antonio Barnes had a .357, and Eric Williams had a shotgun.  (Vol. 4–5, Tab R-10, TR. 305–08, 373–76, 394–95, 428.)

testified that she felt she could not make a decision on Mr. Jackson's guilt until she visited the crime scene. (Vol. 22, Tab R-69, C. 98–99.) Thus, it was unreasonable for the state court to fail to presume prejudice in this case and to fail to find a violation of Mr. Jackson's right to a fair trial.

### B. Juror J.G. Failed to Answer Truthfully a Key Question during Voir Dire, Violating Mr. Jackson's Right to a Fair and Impartial Jury.

The Sixth Amendment protects Mr. Burgess's right to an impartial jury. Irvin v. Dowd, 366 U.S. 717, 722 (1961). And the United States Supreme Court has stated that "truthful answers by prospective jurors" are an essential part of the voir dire process in order to assist parties in exercising for-cause and peremptory challenges. McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (U.S. 1984); see also Morgan v. Illinois, 504 U.S. 719, 727 (1992); Rogers v. McMullen, 673 F.2d 1185, 1188 (11th Cir. 1982). During a postconviction hearing, Mr. Jackson presented testimony that juror J.G. failed to disclose that, at the time of trial, he owned both a 9 mm caliber gun and a .357 caliber gun. These were two of the types of handguns possessed by the suspects on the night of the shooting, and trial counsel needed to know whether any prospective juror understood the differences between the weapons.

During voir dire, defense counsel asked the venire whether they "own[ed] any weapons, guns?" (Vol. 3, Tab R-3, TR. 59.) After numerous, unidentified jurors

126

raised their hands, counsel made clear that they were particularly interested in learning whether jurors owned the types of guns involved in this offense: "Anybody that raised their hand a minute ago that said they had a pistol, do any of you have a .380 caliber pistol, a .357, or a nine-millimeter?" (Id. at 61.) Juror J.G. informed counsel that he had "just purchased a nine-millimeter." (Id.) As a follow-up, counsel asked, "[d]o you know the differences in a nine-millimeter caliber gun and ammunition and a .357 type ammunition?" (Id.) "I have never seen a .357," replied juror J.G. (Id.)

At the postconviction hearing, however, juror J.G. testified that, at the time of trial, he owned both a .357 *and* a 9 mm. (Vol. 22, Tab R-69, C. 22.) Juror J.G. also admitted that, just three months prior to trial, he had performed a comparison of the .357 bullets and the 9 mm bullets; juror J.G. determined that the .357 bullets were larger in size than those fired from the 9 mm. (Id. at 39–40.)

Knowledge of the different types of guns carried by the suspects was vital in this case. The State's evidence could not connect the fatal bullet to a specific type of gun. (Vol. 5, Tab R-10, TR. 504–09.) Therefore, it was possible that the victim was killed by one of Mr. Jackson's co-defendants. During voir dire, trial counsel asked several questions of jurors who were familiar with guns, particularly those jurors who owned multiple weapons and might harbor preconceived notions about the

127

interchangeability of the bullets between the weapons.  (Vol. 3, Tab R-3, TR. 60-61.)
Here, juror J.G. was unambiguously asked about the guns that he had experience
with, and his voir dire response that he had "never seen a .357" was neither honest
nor accurate.  (Id.)  His failure to reveal that he actually owned a .357 would alone
have provided a basis for counsel to strike.  And when asked specifically if he knew
the differences between ammunition for a 9 mm and a .357, juror J.G. refused to
accurately state that he had recently compared bullets of those guns.  Had juror J.G.
been honest, trial counsel would have removed him from the jury, as evidenced by the
fact that counsel struck the only other juror (C.B.) who owned a 9 mm and a .357.
(R. 61; C. 145.)  On this record, the juror's failure to respond accurately undermined
Mr. Jackson's ability to remove a biased juror, in violation of his fundamental right
to a fair trial.  McDonough, 464 U.S. at 556.

Juror J.B.'s unauthorized visit to the crime scene, and Juror J.G.'s failure to
reveal that he owned a .357 and just three months prior to trial compared the bullets
of a .357 and 9 mm, violated Mr. Jackson's Fifth, Sixth, Eighth, and Fourteenth
Amendment rights to due process, equal protection and a fair trial.  The United States
Supreme Court has made clear the qualitative difference between death and all other
punishments requires a "heightened need for reliability" in capital trial proceedings.
Caldwell v. Mississippi, 472 U.S. 320, 329 (1985).  Not only is the reliability of

128

Mr. Jackson's conviction and death sentence undermined by the trial court's refusal to allow him to present his defense, his lawyer's failure to investigate and present any mitigating evidence, and the trial court's rejection of the jury's life verdict, but it is also compromised by the misconduct of Jurors J.B. and J.G.   The state court's adjudication of this claim is an "unreasonable determination of the facts," Bui v. Haley, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent.  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Habeas corpus relief is warranted.  28 U.S.C. §2254(d)(1), (2).

## XI.   THE DEATH SENTENCE IS DISPROPORTIONATE TO MR. JACKSON'S PERSONAL CULPABILITY.

The Eighth Amendment forbids the imposition of the death penalty where the ultimate punishment is disproportionate to the culpability of the defendant.  Roper v. Simmons, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution." (internal quotation marks omitted)); Spaziano v. Florida, 468 U.S. 447, 460 (1984) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those

129

individuals for whom death is an appropriate sanction and those for whom it is not."); Enmund v. Florida, 458 U.S. 782, 801 (1982) ("[P]unishment must be tailored to . . . personal responsibility and moral guilt.").  The Court has repeatedly ruled that the personal characteristics of the defendant and his role in the crime are relevant to the culpability determination that the sentencing court must make.  See, e.g., Enmund, 458 U.S. at 801; Eddings v. Oklahoma, 455 U.S. 104, 115 (1982); Lockett v. Ohio, 438 U.S. 586, 608–09 (1978).[43]  As Mr. Jackson has argued throughout this litigation, his questionable role in the crime, his youth, and his low intellectual functioning, combined with the lesser sentences imposed on his co-defendants, render the death sentence grossly disproportionate in this case and contrary to the Eighth Amendment.

A.   Mr. Jackson's Role in the Crime[44]

The sentencing court in this case did not determine who shot the victim.  To the

---

[43]  The Court has never wavered from this precedent, reaffirming it in an unbroken line of cases.  See Hall v. Florida, 134 S. Ct. 1986, 1993 (2014); Kennedy v. Louisiana, 554 U.S. 407, 435–36 (2008); Roper, 543 U.S. at 570; Atkins v. Virginia, 536 U.S. 304, 331 (2002); Tison v. Arizona, 481 U.S. 137, 157–58 (1987); Coker v. Georgia, 433 U.S. 584, 592 (1977); Woodson v. North Carolina, 428 U.S. 280 (1976).

[44]  Respondent argues that Mr. Jackson's claim that his death sentence is disproportionate is procedurally barred because "it was never presented to any state court."  (Doc. 32 at 10.)  This is wrong.  Mr. Jackson argued on direct appeal that the sentencing court failed to determine his personal culpability based on his role in the crime.  (Vol. 8, Tab R-29, p. 30 (citing Enmund); Vol. 9, Tab R-33, p. 2; id. at 45–47 (citing Enmund)).

contrary, the court stated that either Mr. Jackson or one of his co-defendants, Antonio Barnes, was the shooter.   (Vol. 1, Tab R-1, C. 176.)   The sentencing court consequently did not determine Mr. Jackson's personal culpability in the crime.

In Enmund v. Florida, the Supreme Court held that the death penalty was disproportionate for a defendant "who does not himself kill, attempt to kill, or intend that a killing take place."  458 U.S. at 797.  The Court emphasized that even though a murder occurs, the validity of the death sentence depends upon the *particular defendant's* culpability, not simply the result of his co-defendants' actions. Id. at 798. The Court has insisted that the death penalty is appropriate only for defendants with "a highly culpable mental state," whose "personal involvement in the crimes was not minor, but rather, . . . substantial."  Tison v. Arizona, 481 U.S. 137, 157–58 (1987) (internal quotation marks omitted).  A sentencing court therefore must consider the defendant's personal culpability to impose a sentence of death.  See Thompson v. Oklahoma, 487 U.S. 815, 853 (1988) (O'Connor J., concurring) ("[P]roportionality requires a nexus between the punishment imposed and the defendant's blameworthiness." (internal quotation marks omitted)).  Here, the sentencing court's override of the jury's life verdict despite its admitted ignorance of who was more personally culpable–Jackson or Barnes–failed to comport with the Supreme Court's longstanding precedent.

131

B.    Mr. Jackson's Young Age[45]

Mr. Jackson was eighteen years old at the time of the crime.  The Supreme

Court has repeatedly emphasized that, as a consequence of their limitations in

reasoning and judgment, juveniles possess lesser culpability than adults.  Roper,

543 U.S. at 571 ("[I]t is evident that the penological justifications for the death

penalty apply to [juveniles] with lesser force than adults.");  Thompson, 487 U.S. at

835 ("[The Supreme] Court has . . . endorsed the proposition that less culpability

should attach to a crime committed by a juvenile than to a comparable crime

committed by an adult.").  The lack of maturity and "impetuous and ill-considered

actions and decisions" that diminish the culpability of a seventeen-year-old, Roper,

543 U.S. at 569, apply with equal force to an eighteen-year-old, even if the latter

group is not categorically ineligible for the death penalty.  See Johnson v. Texas,

509 U.S. 350, 367 (1993) (defendant's age of nineteen at time of crime was factor that

mitigated culpability and that sentencer must be able to consider).  Moreover,

Mr. Jackson's young age combined with his questionable role in the crime further

reduces his culpability.

---

[45] Mr. Jackson argued in his Rule 32 petition that his death sentence violated
the Eighth Amendment in light of his age.  (Vol. 16, Tab R-62, C. 664; see Jackson
v. State, 133 So. 3d 420, 465–66 (Ala. Crim. App. 2012).)  Because Mr. Jackson's
direct appeal preceded the Supreme Court's decision in Roper, his Rule 32 petition
was the first opportunity to raise this issue.

C.   Mr. Jackson's Diminished Intellectual Capacity[46]

Mr. Jackson was diagnosed with borderline intellectual functioning at age fifteen.  He failed the first and third grade, and received D's and F's throughout his school career before dropping out in the Ninth Grade.  He has an I.Q. of seventy-five, a score within the range of intellectual disability.  See Hall, 134 S. Ct. at 1996.

The Supreme Court's decision in Atkins v. Virginia establishes that the death penalty is disproportionate when the defendant has these types of intellectual deficits. 536 U.S. at 320-21.  Moreover, the Court has held that "impaired intellectual functioning is inherently mitigating" regardless of whether "the defendant also establishes a nexus to the crime."  Tennard v. Dretke, 542 U.S. 274, 287 (2004).

The state court here refused to hold a hearing to allow Mr. Jackson to present evidence of his intellectual deficits either for the purpose of establishing ineligibility for the death penalty or to develop mitigating evidence that would reduce his personal culpability.  Mr. Jackson's documented deficits, combined with his young age, further diminish his blameworthiness and make the death penalty inappropriate.

---

[46] Mr. Jackson argued in his Rule 32 petition that his death sentence violated the Eighth Amendment in light of his intellectual deficits.  (Vol. 16, Tab R-62, C. 661; see Jackson v. State, 133 So. 3d 420, 463–64 (Ala. Crim. App. 2012).)  Because Mr. Jackson's direct appeal preceded the Supreme Court's decision in Atkins, his Rule 32 petition was the first opportunity to raise this issue.

D.     Disproportionate Sentences of Mr. Jackson's Co-Defendants[47]

All of these factors–Mr. Jackson's questionable role in the crime, his young age, and his intellectual deficits–put him well outside of the "narrow category" of offenders "whose extreme culpability makes them the most deserving of execution." Roper, 543 U.S. at 568.   The imposition of the death penalty on Mr. Jackson is especially disproportionate when viewed in comparison with the sentences imposed on his co-defendants.   Antonio Barnes, who the sentencing court acknowledged may have been the actual shooter, (Vol. 1, Tab R-1, C. 176), received a sentence of twenty-five years.   Eric Williams, who admitted that he shot a gun during the crime, was sentenced to life with the possibility of parole.   Christopher Rudolph, a third person involved in the crime, was sentenced to twenty years.   The state courts made no attempt to "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."   Spaziano, 468 U.S. at 460.

For these reasons, the imposition of the death sentence in this case is both inappropriate and a violation of Mr. Jackson's rights to due process and to be free from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.   The state court's adjudication of this

---

[47]   Mr. Jackson argued in his Rule 32 petition that  his sentence was disproportionate given the lesser sentences received by his co-defendants. (Vol. 16, Tab R-62, C. 664–65.)

134

claim is an "unreasonable determination of the facts," <u>Bui v. Haley</u>, 321 F.3d 1304, 1315 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412–13 (2000).  Habeas corpus relief is warranted.  28 U.S.C. § 2254(d)(1), (2).

## XII.  THIS COURT SHOULD GRANT HABEAS RELIEF FOR THE REMAINING ISSUES IN MR. JACKSON'S PETITION.

In his habeas petition, Mr. Jackson alleged that he is entitled to relief based on the improper introduction of prejudicial photographs (Claim I); the double-counting of robbery both as an elevator in the culpability phase <u>and</u> as an aggravator in the penalty phase (Claim N); and the unconstitutional method of execution due to the cruelty of, and the undeveloped procedures for, administering lethal injection (Claim O).  (Doc. 1 at 88–89, 101–02, 102–03.)  Mr. Jackson continues to maintain that these errors create a grave risk that his punishment is the result of a process that failed to narrow the class of cases eligible for the death penalty, <u>see Gregg v. Georgia</u>, 428 U.S. 153 (1976); will be imposed under the influence of passion, prejudice, or other arbitrary factor, <u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976); and will be imposed in a manner that violates the Eighth Amendment, <u>Zant v. Stephens</u>, 462 U.S. 862 (1983).  Mr. Jackson maintains that he is entitled to relief and relies on the

135

authorities contained in the petition for these claims.

## CONCLUSION

For these reasons, Shonelle Jackson respectfully requests this Court to grant his habeas petition.


Respectfully submitted,


 /s/ Randall S. Susskind
RANDALL S. SUSSKIND (ASB-4930-S74R)
Equal Justice Initiative
122 Commerce Street
Montgomery, AL 36104
Phone:       (334) 269-1803
Fax:         (334) 269-1806
E-mail:      rsusskind@eji.org

August 8, 2014                *Counsel for Shonelle Jackson*

## CERTIFICATE OF SERVICE

I certify that on August 8, 2014, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will transmit such filing to the

following:

> James R. Houts (ASB-1321-T77J)
> Office of the Attorney General
> 501 Washington Avenue
> Montgomery, AL 36104

/s/ Randall S. Susskind

RANDALL S. SUSSKIND
