IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHONELLE JACKSON,      )
                       )
    Petitioner,        )
                       )
v.                     )    CASE NO. 2:13-CV-731-RAH-JTA
                       )              [WO]
JOHN Q. HAMM,          )
Commissioner, Alabama Department )
of Corrections, *et al.*,   )
                       )
    Respondents.       )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

On October 4, 2013, Petitioner Shonelle Jackson ("Petitioner" or "Jackson")
filed this federal habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his
conviction for capital murder and death sentence in the Circuit Court of Montgomery
County, Alabama.[1] The court will deny Jackson's petition in part and will set an
evidentiary hearing on the claim that he is ineligible for execution under *Atkins v.
Virginia*, 536 U.S. 304 (2002).

### II.  BACKGROUND

---

[1] When filed, this case was assigned to District Judge W. Keith Watkins.  (Doc. 1.)  On December
17, 2019, this case was reassigned to the undersigned district judge.  (Doc. 45.)

In June 1998, Jackson was convicted of intentional murder during the course of a robbery, *see* Ala. Code § 13A–5–40(a)(2), and theft of property in the first degree, see Ala. Code § 13A–8–3. On the capital murder conviction, the jury unanimously recommended a sentence of life imprisonment without the possibility of parole; however, the trial court overrode the jury's recommendation and sentenced Jackson to death.[2] (Doc. 9-37 at 3, 18.) Attorneys Ben Bruner and Robert Russell, Jr., represented Jackson at trial.

In its Sentencing Order, the Montgomery Circuit Court summarized the facts as follows:

> The events which led to [the victim, Lefrick] Moore's homicide started April 24, 1997 and were unrelated to Moore. On that evening, "Cocomo"[3] slapped Jackson at a nightclub. The next day, April 25, Jackson determined to look for Cocomo and the tendencies of the evidence are that Jackson intended to do Cocomo physical injury, should he be found.

> Jackson did not have a car. He approached Antonio Barnes about stealing a car for him.[] Barnes readily agreed, and Barnes and Jackson solicited "Wendel" to drive them to Brookview Apartments, where Jackson and Barnes stole Ms. Flowers' car. Barnes actually broke into the car and Jackson stood lookout.

> Jackson, Barnes, Eric Williams and Christopher Rudolph then commenced the search for Cocomo. Jackson was armed with a .380 caliber semiautomatic pistol; Barnes was armed with a .357 magnum handgun; Rudolph was armed with a 9 millimeter pistol;

---

[2] On the theft conviction, the Montgomery Circuit Court sentenced Jackson under the Alabama Habitual Felony Offender Act, *see* Ala. Code § 13A–5–9(c)(2), to life imprisonment.

[3] Lefrick Moore's nickname was "Cocomo."

and Williams was armed with a shotgun. The search for Cocomo was futile; however, near the Smiley Court housing neighborhood, they saw Moore driving his car. Williams told the group that he was familiar with the car and the driver, and that the car had good music. Jackson then announced that 'they' were going to rob the people in Moore's car. They stalked Moore until the opportunity presented itself to cut off Moore's car. Jackson passed Moore's car and cut in front of it to stop Moore. The cars collided and Jackson and Williams jumped out as Moore and the passenger in the car, Gerard Burdette, were getting out. At this point, Jackson and Williams fired their weapons. Before firing, however, Jackson said to Moore, "no need to run mother-fucker."[] Jackson shot Moore, and Moore ran 100 to 150 yards, at which point he collapsed and died. Jackson drove to where Moore lay, and Jackson's purpose was to rifle through Moore's pockets. Barnes and Williams got into Moore's car and left the scene. They hid the car, and Williams took the stereo from the car. The next day, Jackson wanted to strip the car, and he, Barnes and 'Fido' went to where the car was hidden; however, a Mr. Porterfield interrupted them and they left without stripping the car. On this same day, Williams told Jackson that Moore was dead, to which Jackson replied, "I don't give a f---, he didn't stay where we stayed at."

Jackson turned himself in to the Montgomery Police Department after learning that he was wanted for questioning. He gave three conflicting statements to detectives. In the first statement he denied any knowledge of the event. He later said that he was with Deon driving around looking for Cocomo in a stolen car but had no involvement in the murder. In the final statement he admitted that he was at the scene and armed with a .380 pistol; however, he denied shooting Moore.

(Doc. 9-37 at 3-5.)[4]

---

[4] The Alabama Court of Criminal Appeals summarized the trial testimony related to the firearm, finding that "Joe Saloom, the State's firearm expert, testified that the bullet recovered from Moore's body was consistent with a bullet fired from a .380–caliber gun. Saloom also testified that the bullet could have also been fired from a 9mm gun." *Jackson v. State*, 133 So. 3d 420, 434 (Ala. Crim. App. 2009).

### III.  POST-TRIAL PROCEEDINGS AND PROCEDURAL HISTORY

### A.    Direct Appeal

Bryan A. Stevenson and Randall Scott Susskind, attorneys with the Equal Justice Initiative ("EJI") in Montgomery Alabama, represented Jackson on direct appeal. The Alabama Court of Criminal Appeals ("ACCA") affirmed his capital conviction and death sentence.  *Jackson v. State*, 836 So. 2d 915 (Ala. Crim. App. 1999). However, the Alabama Supreme Court granted certiorari review and remanded with instructions for the trial court to conduct an evidentiary hearing on the admissibility of Jackson's inculpatory custodial statement. *Ex parte Jackson*, 836 So. 2d 973 (Ala. 2001). Thereafter, the ACCA remanded the case to the Montgomery Circuit Court. *Jackson v. State*, 836 So. 2d 978 (Ala. Crim. App. 2001). As instructed, the trial court conducted the hearing and ultimately found that Jackson's statement was voluntary and admissible. *See Ex parte Jackson*, 836 So. 2d 979, 983-85 (Ala. 2002) (summarizing the trial court's determination). On May 10, 2002, on return from remand, the Alabama Supreme Court affirmed. 836 So. 2d at 991. Thereafter, the United States Supreme Court denied Jackson's petition for a writ of certiorari.  *Jackson v. Alabama*, 537 U.S. 1031 (2002).

### B.    State Post-Conviction Proceedings

On July 30, 2003, Jackson, represented by attorneys Bryan A. Stevenson and Angela L. Setzer, filed a Petition for Relief from Conviction and Sentence Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure ("Rule 32 petition") in the Circuit Court of Montgomery County, Alabama ("Rule 32 court"). (Doc. 9-13 at 9-65.) In response to the Rule 32 petition, the State challenged Jackson's claims via three separate motions: (1) State's Motion for Summary Dismissal of the Claims in Jackson's Rule 32 Petition Which Present No Material Issues of Fact of Law Under Alabama Rule of Criminal Procedure 32.7(d), (doc. 9-13 at 129-135); (2) State's Motion for Jackson to Amend the Claims That Are Insufficiently Pleaded Under Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure, (*id*. at 136-147); and (3) State's Motion for Summary Dismissal of the Claims in Jackson's Rule 32 Petition That Are Procedurally Barred Pursuant to Rule 32.2(a) of the Alabama Rules of Criminal Procedure, (*id*. at 148-153).

On March 1, 2004, the Rule 32 court dismissed several claims based on Jackson's failure to present a material issue of fact pursuant to Rule 32.7(d), (doc. 9-13 at 167-74), or as procedurally barred by Rule 32.2(a), (doc. 9-13 at 160-63). With respect to several other claims the Rule 32 court deemed to have been pleaded insufficiently, the state court gave Jackson thirty days to amend the petition to comply with Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure, (doc. 9-13 at 164-66).

On March 31, 2004, Jackson filed the Amended Rule 32 Petition. (Doc. 9-13 at 175-201; Doc. 9-14 at 3-62). He also filed a Motion for Discovery of Institutional Records, Files, and Information Necessary to a Fair Rule 32 Evidentiary Hearing, (doc. 9-14 at 69-83), which the Rule 32 court granted, only to be reversed by the ACCA via a mandamus petition filed by the State.

Jackson filed a Second Amended Rule 32 Petition (doc. 9-15 at 198-202; doc. 9-16 at 3-96), which the State opposed and moved to dismiss. The Rule 32 court denied the requested relief and dismissed the amended Rule 32 petition. (Doc. 9-38 at 109.) Jackson appealed. In November 2009, the ACCA remanded the case to the Rule 32 court with instructions to consider whether Jackson's claims of juror misconduct were in fact procedurally barred and, if not, to hold an evidentiary hearing on those claims. *Jackson v. State*, 133 So. 3d 420, 432 (Ala. Crim. App. 2009).

As instructed, the Rule 32 court held an evidentiary hearing on Jackson's juror misconduct claims. Following the hearing, the Rule 32 court denied Jackson's request for post-conviction relief. (Doc. 9-38 at 110-11.)

The ACCA affirmed the Rule 32 court's decision. *Jackson v. State*, 133 So. 3d 420, opinion on return to remand May 25, 2012, *reh'rg den*., Sept. 28, 2012. The Alabama Supreme Court denied certiorari. *Ex parte Jackson*, No. 1120031, June 21, 2013.

**C.    The § 2254 Habeas Petition**

Jackson's claims, as stated in his § 2254 petition, are set out below:

1.    The trial court violated Jackson's right to present a defense by precluding him from presenting motive evidence.

2.    Jackson was denied effective assistance of counsel. Specifically,

    (a) Trial counsel failed to investigate and present even a portion of the available mitigation evidence.

    (b) Trial counsel failed to develop and present a penalty and sentencing phase strategy to convince the sentencing authority that life without parole was the appropriate sentence.

    (c) Trial counsel failed to obtain and present independent expert witnesses.

    (d) Trial counsel failed to investigate and interview eyewitnesses to the shooting.

    (e) Counsel failed to conduct a constitutionally adequate investigation of the State's capital charges.

    (f) Counsel failed to adequately object to the prosecutor's use of discriminatory strikes against the veniremembers.

    (g) Counsel failed to request or object to the trial court's failure to instruct the jury on the lesser included offense of robbery.

3.    The trial court's rejection of the jury's unanimous life verdict and instead imposition of a sentence of death violated United States Supreme Court precedent.

4.    The trial court failed to instruct the jury on the lesser included offense of robbery.

5.    The trial court's refusal to grant Jackson a continuance to secure a critical witness violated his rights to due process and a fair trial.

6.    The State withheld favorable evidence for the Defense thus violating Jackson's federal rights.

7.    The State discriminated on the basis of race in violation of clear federal law.

8.    The trial court improperly admitted into evidence Jackson's involuntary confession.

9.    The trial court improperly admitted photographs that served only to inflame and prejudice the jury.

10.    The misconduct of Juror J.B. and Juror J.G. at Jackson's trial prejudiced Jackson in violation of clear United States Supreme Court precedent.

11.    The imposition of the death penalty on one who is intellectually disabled violates the Eighth and Fourteenth Amendments.

12.    Imposing a death sentence for a crime committed when Jackson was just eighteen years old violates his federal constitutional rights to be free from cruel and unusual punishment.

13.    The death sentence in this case is disproportionate, in violation of Jackson's State and federal rights.

14.    Double counting robbery as an element of the capital offense and as an aggravating circumstance was improper.

15.    Alabama's manner of execution constitutes cruel and unusual punishment.

(*See* Doc. 1 at 14-103.)

The State filed its Response (doc. 11) to the § 2254 Petition, along with evidentiary materials (doc. 9). Jackson filed a brief on the merits (doc. 25) and additional evidentiary materials (doc. 36). The State and Jackson also filed replies. (Docs. 37, 40.)  This matter is fully submitted.

Except for Jackson's claims of ineffective assistance of counsel, all claims will be addressed chronologically in the same order as listed in Jackson's habeas petition.

## IV.  STANDARDS OF REVIEW

A federal court may issue a writ of habeas corpus for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  In other words, this Court's habeas review is limited to federal constitutional questions. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).  "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

In reviewing state court proceedings, the federal court applies different standards of review depending on whether the petitioner properly presented his claim to the state courts and whether the state courts addressed the claim.

## A.    Exhaustion and Procedural Default

A petitioner in state custody must exhaust the remedies available to him in the state courts before he can bring his claim in a federal habeas corpus action. 28 U.S.C. § 2254(b)(1). A remedy is "available" if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." *Id.* § 2254(c). The exhaustion requirement generally permits federal courts to consider only those claims that the petitioner has marshalled through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This includes filing a petition for discretionary review in the highest court of the state. *See id.* "[A]n issue is exhausted if 'the reasonable reader would understand [the] [federal] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (second alteration in original) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)). Even if exhaustion principles bar relief on a claim, an underlying lack of merit may provide an independent basis for denying the writ. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (per curiam).

A habeas petitioner who fails to properly present a claim to the state court and who therefore loses the right to raise the claim within state procedures is said to have

"procedurally defaulted" the claim and is no longer able to raise it in either state or federal court. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *see also Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (explaining that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance"). However, procedural default is not an absolute bar to federal habeas relief. To overcome a procedural default, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Under the first avenue, attorney negligence generally is not cause to excuse procedural default. *Id.* at 753. However, "[a]ttorney error that constitutes ineffective assistance of counsel" *is* such cause. *Id.* at 753–54. Attorney error may also supply cause for procedural default "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," but the prisoner did not have effective counsel in his first collateral proceeding. *See Martinez*, 566 U.S. at 14; *see also Trevino v. Thaler*, 569 U.S. 413, 429 (2013). As for "actual prejudice," a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial

disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphases in original).

Under the second avenue for overcoming procedural default, a "fundamental miscarriage of justice" occurs only when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To meet this standard, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.*

**B.    AEDPA Review of State Court Decisions**

When a state prisoner petitions a federal court for a writ of habeas corpus on grounds that were considered and rejected by the state courts, review is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA establishes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under AEDPA, a petitioner is not entitled to habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either:  (1) resulted in a decision which was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the United States Supreme Court, or (2) resulted in a decision which was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell*, 535 U.S. at 694. Under the "contrary to" clause, a federal court may grant relief if the state court "applies a rule that contradicts the governing law set forth" in United States Supreme Court cases, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Id.*; *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003). A state court's failure to cite governing Supreme Court authority does not, per se, establish that the state court's decision is "contrary to" clearly established Supreme Court precedent — "a state court need not even be aware of [the relevant] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell*, 540 U.S. at 16 (citation omitted).

Under the "unreasonable application" clause, a federal court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520

(2003). A federal court making this inquiry should ask whether the state court's application of clearly established Supreme Court precedent was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010); *Wiggins*, 539 U.S. at 520–21. An "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins*, 539 U.S. at 520.

The Supreme Court has summarized these two clauses in simple terms:  "[A] state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A legal principle is "clearly established" for AEDPA purposes if it was found in the holdings—as opposed to the dicta—of a Supreme Court decision that existed at the time of the relevant state court decision. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) (holding that AEDPA "prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly

established'"").

AEDPA also significantly restricts the scope of federal habeas review of state court findings of fact. A federal court cannot contradict state court factual findings merely because it "would have reached a different conclusion in the first instance." *Williams*, 529 U.S. at 410. Rather, the state court must have reached an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" in order for a federal court to grant habeas relief on that basis. 28 U.S.C. § 2254(d)(2). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), that is not sufficient grounds for a federal habeas court to supersede the state court's findings. *Wood v. Allen*, 558 U.S. 290, 301 (2010); *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). The state court's factual findings are "presumed to be correct," and the petitioner has the burden of rebutting these findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[5]

Deference alone, of course, does not end the inquiry. *See Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."); *Miller-*

---

[5] The precise interplay between §§ 2254(d)(2) and (e)(1) remains subject to debate. *See Collins*, 546 U.S. at 339.

*El v. Dretke*, 545 U.S. 231, 240 (2005) ("The standard is demanding but not insatiable."). However, by setting forth necessary predicates before state court judgments may be set aside, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013).

## C.    De Novo Review

For any claims properly presented to the state courts but left unaddressed, this court conducts de novo review. *Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). If reviewed de novo, a fact pleading standard is applied. *See* 28 U.S.C. § 2242 (requiring a petition for writ of habeas corpus to "allege the facts concerning the applicant's commitment or detention"). Similarly, Rule 2(c)(2) of the *Rules Governing Section 2254 Cases in the United States District Courts* also requires a petitioner to "state the facts supporting each ground" in the petition. *See also Mayle v. Felix*, 545 U.S. 644, 656 (2005) (acknowledging this particularity requirement).

## D.    Consideration of New Evidence

AEDPA generally precludes a petitioner from expanding the state court record. *See* 28 U.S.C. § 2254(e)(2). However, the limitations on new evidence set forth in § 2254(e)(2) do not apply unless the petitioner "failed to develop the factual

basis of a claim in State court proceedings." *Id.* As the Supreme Court has instructed, there is no "failure to develop" facts in state court as contemplated by subdivision (e)(2) "unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. Accordingly, a petitioner cannot be "at fault" for failing to develop a claim in state court where "the prosecution concealed the facts." *Id.* at 434–35; *see id.* at 432 ("[A] person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance."). *See also Banks v. Dretke*, 540 U.S. 668, 692–98 (2004) (explaining that, as a result of events and circumstances "external to the defense"—namely, the State's withholding as to the informant status of a key State's witness—Mr. Banks was excused of any failure to factually substantiate his *Brady* claim in state court); *Thompson v. Lumpkin*, 141 S. Ct. 977, 977 (2021) (Kagan, J., concurring in the denial of the petition for certiorari) ("[I]f an applicant's claim went 'undeveloped in state court' because of something other than his own neglect—most typically, because of 'the prosecution['s] conceal[ment of] the facts'—then § 2254(e)(2)'s restriction of evidentiary hearings would not apply . . . In that case, the habeas petitioner does not have to meet the section's stringent demands." (citing *Williams*, 529 U.S. at 434–35)).

In addition, even when 28 U.S.C. § 2254(e)(2) does apply, AEDPA provides a statutory exception which allows federal courts to consider new evidence under

certain circumstances. Pursuant to this exception, a petitioner may present new evidence to the federal court where he can show that his claim relies on a new, retroactive constitutional rule, or a factual predicate that could not have been previously discovered, *see id.* § 2254(e)(2)(A); and the facts underlying the claim would show "by clear and convincing evidence" that but for constitutional error, no reasonable factfinder would have voted to convict, *see id.* § 2254(e)(2)(B). *See also Shoop v. Twyford*, 596 U.S. 811, 819–20 (2022) (recognizing that "state prisoners may occasionally submit new evidence in federal court," and discussing the provisions of subdivision (e) which allow them to do so).

## V. DISCUSSION

### A. Motive as a Defense Theory

Jackson argues the trial court violated his constitutional right to present a defense by precluding him from introducing evidence that the victim, Lefrick Moore, was a drug dealer and that the homicide occurred in the context of a gang-related drug transaction. Specifically, he contends the trial court prevented him from presenting evidence that the motivation for the killing was due to a bad drug deal. He claims that Moore was involved with a drug gang, was a known drug dealer, and had a reputation for selling fake drugs. He maintains the motive for the killing was retaliation for a prior sale of bad drugs and that is why, as soon as the victim was killed, Jackson left the scene without taking anything. (Doc. 1 at 14-15.) The State

counters that the defense-theory claim was properly addressed on the merits and rejected by the ACCA, as well as the Alabama Supreme Court in the state court proceedings under the "plain error" standard, and therefore habeas relief must be denied pursuant to 28 U.S.C. § 2254(d).[6]

Pre-trial, the State filed a motion in limine, requesting the court "to instruct the Defendant not to raise or elucidate in any manner the alleged drug activity of the victim, Lefrick Moore, in that such evidence is immaterial and irrelevant to this case" because the "facts of this case involve the [r]obbery of the victim of his vehicle, and they do not concern any drug activity." (Doc. 9-1 at 63.) Jackson opposed the motion, contending that confrontation "is part of the *res gestae* of the crime."  (Doc. 9-1 at 85.)  The trial court granted the State's motion, ordering that "Defendant shall not mention or seek to elicit any evidence that the victim in this case dealt drugs." (Doc. 9-1 at 106.)

On the first day of trial, Jackson's counsel requested the trial court "to reconsider the order on the motion in limine and at least withhold ruling until maybe the sentencing phase." (Doc. 9-3 at 39-40.) Jackson's counsel maintained that Jackson had not yet decided whether to testify at trial and that if he did decide to do

---

[6] The State also argues that, to the extent the ACCA found the claim was not preserved at trial and that Jackson failed to make an offer of proof as to what his testimony would be in regard to the contested evidence, the findings regarding issue preservation are matters of state procedural law and beyond the scope of this court's review. (Doc. 11 at 6.)

so, his testimony would "deal[] with a drug deal." (*Id*. at 38.) In response, the trial judge stated that if Jackson did testify, the court would permit counsel to renew their motion "to reconsider it at that point." (*Id.*) Jackson, however, did not testify at trial, and his counsel did not ask the trial court to revisit its previous ruling on the motion in limine.

The Alabama Supreme Court addressed Jackson's defense-theory claim as follows:

> Jackson contends that the trial court erred in granting the State's motion in limine because, he says, its doing so improperly prevented him from presenting evidence that the motive for the murder was retaliation for a drug deal that had gone "bad," not robbery as the State alleged. He argues that by granting the State's motion, the trial court prevented him from testifying, from cross-examining witnesses, and from presenting mitigation evidence.

> A motion in limine is the proper method by which to prohibit the introduction of irrelevant evidence. *Wiley v. State,* 516 So. 2d 812, 814 (Ala. Crim. App. 1986), rev'd on other grounds, 516 So. 2d 816 (Ala. 1987). The decision to grant or deny such a motion rests within the sound discretion of the trial court and that decision will not be overturned on appeal absent an abuse of discretion. *Id.* The test for relevancy is whether the evidence "bears any logical relationship to the ultimate inference for which it is offered." *Aetna Life Ins. Co. v. Lavoie,* 470 So. 2d 1060, 1078 (Ala. 1984); see also C. Gamble, *McElroy's Alabama Evidence* § 21.01(1) (5th ed. 1996); *Garner v. State,* 606 So.2d 177 (Ala. Crim. App. 1992).

> The State filed a pretrial motion in limine requesting that Jackson be prevented from presenting evidence that the victim was involved in drug activity, because, it argued, such evidence was immaterial and irrelevant to the case. In response, Jackson argued that the victim's drug activity went to the reason for the confrontation between Jackson, his codefendants, and the victim and

that evidence of that activity was, therefore, relevant. After holding a hearing on the motion, the trial court granted the State's motion. On the day of trial, Jackson's counsel asked the court to reconsider its ruling because Jackson might decide to testify. The trial court indicated that it would reconsider its ruling if Jackson decided to testify.[] Jackson did not testify, and his counsel did not raise the issue again and did not later ask the court to reconsider its ruling. Because the trial court stated that it would reconsider its ruling, the ruling on the motion in limine was not a final order and the issue was not preserved for appeal. See *Perry v. Brakefield,* 534 So. 2d 602 (Ala. 1988); *Evans v. Fruehauf Corp.,* 647 So.2d 718 (Ala. 1994). Therefore, we review this issue under the plain-error rule. Rule 45A, Ala.R.App.P.

Nothing in the record supports Jackson's contention that the offense was the result of a drug deal gone "bad." The record indicates that the victim's wife informed the police that her husband was a small-time dealer of crack cocaine. However, neither Jackson nor the codefendants mentioned a drug deal gone "bad" in their statements to law-enforcement officers after the offense. At the hearing, defense counsel stated that he wanted to cross-examine certain witnesses about the victim's being a drug dealer to determine *if* those witnesses would testify that the victim had been killed as the result of a "bad" drug deal. Defense counsel merely speculated that there was a potential for such testimony; nothing in his proffer indicates that evidence existed to support this theory. While the statement of Gerard Burdette, a passenger in the automobile with the victim at the time of the murder, did refer to "gang" activity, the statement did not indicate that the murder was related to drug activity. Nothing in the record, other than defense counsel's speculation, supports Jackson's theory that the killing was the result of a drug deal gone "bad." Speculation and conjecture do not establish relevant evidence of the existence of a viable defense. Therefore, we hold that the trial court's grant of the State's motion in limine did not constitute error, plain or otherwise.

*Ex parte Jackson*, 836 So. 2d at 985–87 (Ala. 2002) (footnote omitted).

## 1. The Determination of the Facts

Jackson asserts the Alabama Supreme Court's determination that there was "nothing in the record, other than defense counsel's speculation, [to] support[] [his] theory that the killing was the result of a drug deal gone bad," *id*. at 986, is an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. This court's review of the state court record indicates counsel did not initially proffer specific evidence to support the defense theory of motive and did not move for the court to revisit the issue. The Alabama Supreme Court acknowledged the only evidence related to drugs was the wife's reference to the victim being a small-time drug dealer and a witness's testimony that there was mention of a "gang." Under these circumstances, this court cannot conclude that the Alabama Supreme Court's determination that the proffered defense theory was based on nothing more than "speculation and conjecture" is based on an unreasonable determination of the facts. *See* § 2254(d)(2).

## 2.  The Clearly Established Federal Law

Jackson asserts that the state courts' rejection of his claim that he should have been allowed to elicit evidence in support of his defense theory was contrary to, or an unreasonable application of, clearly established federal law, as set forth in *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); and *Washington v. Texas*, 388 U.S. 14, 19 (1967).

This court recognizes that, in the analysis of Jackson's defense-theory claim, the Alabama Supreme Court did not cite *Taylor*, *Chambers*, *Washington*, or any other United States Supreme Court cases referenced in Jackson's brief (doc. 9-9). Nonetheless, under § 2254(d)(1), this court must "review the state court's 'decision' and not necessarily its rationale." *Parker v. Secretary for Dep't of Corr.*, 331 F.3d 764 (11th Cir. 2003) (citing *Wright v. Moore*, 278 F.3d 1245 (11th Cir. 2002) ("The statutory language [of § 2254(d)(1)] focuses on the result, not on the reasoning that led to the result. . . ."), *abrogated on other grounds by*, *Parker v. United States*, 993 F.3d 1257 (11th Cir. 2021)). Consequently, to the extent the state court analyzed the constitutional issue, this court will decide whether the Alabama Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law. *See* § 2254(d)(1).

Jackson asserts the right to present a defense is clearly established by *Washington v. Texas*, 388 U.S. at 19, and its progeny. "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington*, 388 U.S. 14, 19 (1967). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers*, 410 U.S. at 302. "[T]his right is an essential attribute of the adversary system itself." *Taylor*, 484 U.S.

at 408.  *See also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (Constitution guarantees "a meaningful opportunity to present a complete defense"). "Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *See Chambers*, 410 U.S. at 295 (citing *Mancusi v. Stubbs*, 408 U.S. 204 (1972)).

Jackson contends that testimony about a drug deal was an important part of his defense theory. He argues that limiting cross-examination about his theory of the case violated his constitutional right to present a complete defense. The problem, as discussed by the state courts, is the drug-deal defense theory was based on nothing more than defense counsel's conjecture and speculation that the witnesses might testify that the motivation for the killing was related to a drug deal. Consequently, the state courts' rejection of Jackson's claim that he was deprived of the opportunity to present a complete defense is not an unreasonable application of *Taylor*, *Crane*, *Chambers*, *Washington*, or other clearly established federal law.

In addition, the Alabama Supreme Court's adjudication is not contrary to the United States Supreme Court's decisions. Jackson's case is unlike the Supreme Court cases cited by Jackson. *See Taylor*, 484 U.S. at 413-14 (holding that it was not error under the compulsory process clause of the Sixth Amendment  for the trial court to order the preclusion of a surprise defense witness' testimony); *Crane*, 476 U.S. at 690-91 (holding that Crane's right to present a defense was thwarted when,

without justification, he was barred from testifying about the manner in which his confession was obtained); and *Washington*, 388 U.S. at 23 (holding that, by preventing the defendant from having the benefit of his accomplice's testimony, "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense.").

The *Chambers* case also bears little resemblance to Jackson's case. In *Chambers*, the defendant was denied any opportunity either to cross-examine a witness whose testimony was clearly damaging to the defendant, or to call to the stand friends of that witness, each of whom was prepared to testify about a separate occasion on which the witness had confessed to committing the very crime with which the defendant was charged. *Chambers*, 410 U.S. at 295-303. The confessions were important because the evidence pointed to a single perpetrator. *Id*. at 297. The state court ruling denying the defendant the right to cross-examine the witness was based on a state evidence rule providing that parties may cross-examine only adverse witnesses. The state courts limited the definition of an "adverse" witness to witnesses called by the adverse party, regardless of the actual content of the witness's testimony. The United States Supreme Court reversed and remanded, reasoning that "the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness

was initially put on the stand by the accused or by the State." *Id*. at 297–98. The Supreme Court held that allowing such a "technicality" to determine the substantive rights of the defendant amounted to a denial of the defendant's right to a fundamentally fair trial. *Id*. at 298. Clearly, the Alabama Supreme Court's rejection of Jackson's claim that the trial court improperly limited cross-examination of witnesses based solely on counsel's speculation that testimony regarding a drug deal would be elicited is not contrary to *Chambers*.

In conclusion, Jackson has failed to demonstrate that the state court's adjudication of this claim either resulted in a decision that was contrary to, or involved an unreasonable application of, *Taylor*, *Crane*, *Chambers*, and *Washington*, or other clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. § 2254(d). Consequently, Jackson is entitled to no habeas relief on this claim.

### B. JURY-OVERRIDE

Jackson contends that the trial judge's decision to reject the jury's unanimous recommendation for life imprisonment and impose a death sentence violated his rights to due process, a fair trial, equal protection, and a reliable sentencing determination, as protected by the Fifth, Sixth, Eighth and Fourteenth Amendments

to the United States Constitution. (Doc. 35 at 121.) Specifically, Jackson claims the trial judge's override of the jury's unanimous verdict sentencing him to life imprisonment without the possibility of parole "was unconstitutional because the judge failed to make an individualized determination of the proper sentence in this case; because it conflicts with the role of juries as explained in *Ring v. Arizona*, 536 U.S. 584 (2002); and because it was an arbitrary and standardless imposition of the death penalty." (Doc. 35 at 100.)

### 1.    Trial court's alleged failure to make an individualized sentencing.

Jackson contends that the Alabama Supreme Court's rejection of his claim challenging the sentencing court's usage of a template from another sentencing order in a separate case was an unreasonable application of *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), as well as *Johnson v. Texas*, 509 U.S. 350, 367 (1993), and *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). Specifically, Jackson claims that the Alabama Supreme Court should have concluded that he did not receive an individualized sentencing, as evidenced by the trial court "liberally quoting and paraphrasing a sentencing order written by a different judge from a different state about the characteristics of a different defendant." (Doc. 35 at 101.)

On direct appeal, the Alabama Supreme Court rejected Jackson's claim challenging the drafting of the sentencing order, stating:

> Jackson further contends that the trial court improperly plagiarized the sentencing order from *Shellito v. State*, 701 So.2d

837, 843–44 (Fla. 1997), *cert. denied*, 523 U.S. 1084, . . . (1998), in its analysis of the mitigating circumstance of Jackson's age. Specifically, Jackson argues that the trial court used the sentencing order from *Shellito* as a "fill-in-the-blank" form, thereby depriving him of an individualized sentencing determination.

The record shows that in the sentencing order, the trial court stated that Jackson's case was similar to *Shellito*. Upon review of *Shellito* and of the trial court's sentencing order, we conclude that the trial court adopted only the analysis used in *Shellito*. In this case, the trial court's assessment contains a thorough analysis of the facts and the circumstances involved in this case, thereby providing an individualized sentencing determination. We find no error.

*Ex Parte Jackson*, 836 So. 2d at 988.

As part of his "individualized sentencing" argument, Jackson submits that the trial court failed to consider his youth, level of education, and personal culpability, and improperly considered his physical characteristics of height and weight. The trial court found Jackson's age (18 at the time of the offense) to be a statutory mitigating circumstance, but that for various reasons explained in the order, it was due "slight weight," noting that Jackson's case was "quite similar" to *Shellito*. (Doc. 9-37 at 8-9.)

While Jackson complains of plagiarism and a lack of particularized analysis, a comparison of the sentencing order in *Shellito* with Jackson's sentencing order shows that the trial court in Jackson's case relied on the facts specific to Jackson, and the details in the Jackson order are lengthier than comparable passages in *Shellito*. The Alabama Supreme Court noted that "the trial court adopted only the

analysis used in *Shellito*," *Jackson*, 836 So. 2d at 988, which in this case was simply that his "age is a marginal mitigating circumstance." (Doc. 9-37 at 9.) The trial court did, as Jackson suggests, discount the weight of his young age. It did so based on the particular facts of Jackson's case. Thus, the trial court's determination was not by means of rote plagiarism, but was made by analyzing "the characteristics of the person who committed the crime." *Eddings v. Oklahoma*, 455 U.S. at 112 (quoting *Gregg v. Georgia*, 428 U.S. 153, 197 (1976)).

Accordingly, the Alabama Supreme Court's determination that the trial court conducted an individualized sentencing was not an unreasonable application of *Johnson*, *Eddings*, *Woodson* or other clearly established Federal law.

## 2.    The *Ring v. Arizona* Claim

In his federal habeas petition, Jackson asserts that the state appellate court's affirmance of the trial court's decision to override the unanimous jury decision in his case was contrary to, and an unreasonable application of, *Ring v. Arizona,* 536 U.S. 584 (2002). (Doc. 1 at 61-66; Doc. 35 at 105-115.) Jackson contends that the jury's recommended sentence of life imprisonment without the possibility of parole establishes that "the jury determined that no aggravating circumstances as defined under Alabama law existed or that any existing aggravators failed to outweigh the mitigating circumstances." (Doc. 35 at 106.) He argues that "not one juror found that the alleged aggravating circumstances outweighed the mitigating circumstances in

this case" because the jury voted unanimously for a sentence of life in prison without parole.  (Doc. 35 at 109.)

There is a question whether the *Ring* decision was clearly established federal law at the time of Jackson's appeal and, if so, whether the issue was properly presented to the state courts. At the time of Jackson's trial in 1999, United States Supreme Court caselaw squarely held that the Constitution did not require a jury to make all findings underlying a sentencing decision. *Clemons v. Mississippi*, 494 U.S. 738, 745 (1990); *Walton v. Arizona*, 497 U.S. 639, 647-48 (1990), overruled by *Ring v. Arizona*, 536 U.S. at 589.

In 2000, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). The *Apprendi* Court highlighted that the rule it announced did not "render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." *Id*. at 496. The Court explained that "once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed." *Id*. at 497 (quoting

*Almendarez-Torres v. United States*, 523 U.S. 224, 257 (1999) (Scalia, J., dissenting)).

Two years later, in *Ring v. Arizona*, 536 U.S. at 589, the United States Supreme Court held that "[c]apital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." In that case, a jury found the defendant guilty of first-degree murder, an offense for which the maximum penalty was life imprisonment. *Id*. at 592. However, Arizona's capital sentencing scheme permitted the trial judge to impose a death sentence after conducting a separate sentencing hearing and finding the existence of aggravating and mitigating circumstances. *Id*. The trial judge sentenced the defendant to death based on evidence presented only to the court. *Id*. at 593–95. Relying on *Apprendi*, the United States Supreme Court held that Arizona's capital sentencing scheme was unconstitutional because it allowed the sentencing judge to find the facts necessary to impose the death penalty, which otherwise would not have been available.[7] *Id*. at 609.

---

[7] In 2017, Alabama amended its capital sentencing scheme. 2017 Ala. Laws Act 2017-131 (S.B. 16). The amended statute provides that the trial court must impose the sentence decided by the jury. Ala. Code § 13A-5-47(a). The jury can enter a death verdict only "on a vote of at least 10 jurors." *Id.* § 13A-5-46(f). But, the 2017 amendment "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017." *Id.* § 13A-5-47.1. Thus, the amended statute is not applicable to Jackson's case.

Jackson's direct appeal was pending before the state courts at the time *Ring* was pending before the United States Supreme Court. The State argues that Jackson did not raise the *Ring* claim on appeal to the ACCA and did not fairly present this claim to the Alabama Supreme Court on certiorari review. On August 31, 2001, the ACCA issued its decision affirming Jackson's conviction and sentence on direct appeal. *Jackson*, 836 So. 2d 978 (Ala. Crim. App. 2001). On February 5, 2002, appellate counsel for Jackson (Attorneys Stevenson and Susskind) sent a letter brief to the Alabama Supreme Court, informing the court of the United States Supreme Court's decision to grant certiorari in the *Ring* case and arguing that the decision was applicable to Jackson's sentence. (Doc. 9-10 at 157-59.) Although the State moved to strike the letter brief (doc. 36 at 160), the Alabama Supreme Court denied the State's motion on February 14, 2002 (*id.* at 165). Thereafter, on February 15, 2002, the Alabama Supreme Court issued an opinion. *Ex parte Jackson*, 2002 WL 227959 (Ala. 2002) (opinion withdrawn). On March 1, 2002, Jackson asserted his Sixth Amendment claim under *Ring* in his application for rehearing to the Alabama Supreme Court. (Doc. 9-10 at 172-175.) On May 10, 2002, the Alabama Supreme Court withdrew its previous opinion and issued a superseding opinion. *Ex parte Jackson*, 836 So. 2d 979 (Ala. 2002). On June 24, 2002, the United States Supreme Court decided *Ring*. 536 U.S. 584. Thus, Jackson presented a *Ring* claim to the state courts during the pendency of his direct appeal, but *before* the United States Supreme

Court entered its final opinion. Therefore, the *Ring* decision was not "clearly established Federal law, as determined by the Supreme Court of the United States" "at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). *See also*, *Cullen v. Pinholster*, 131 S.Ct. 1388, 1399 (2011).

Even assuming Jackson's *Ring* claim is deemed to have been fairly presented in state court, it is not controlling. Jackson's argument ignores the fact that the jury verdict included the jury's finding that the murder occurred during the course of a robbery. The Eleventh Circuit's decision in *Lee v. Comm'r, Alabama Dep't of Corr.*, is dispositive of the issue:

> Furthermore, *Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances. As the *Ring* Court also made clear, it was not deciding whether the Sixth Amendment: (1) required the jury to make findings as to mitigating circumstances; (2) required the jury to make the ultimate determination as to whether to impose the death penalty; or (3) forbade the state court from reweighing aggravating and mitigating circumstances. . . .

> The holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury. That occurred in Lee's case by virtue of the jury's capital robbery-murder verdict. *Ring* goes no further, and Lee points to no Supreme Court precedent that has extended *Ring's* holding to forbid the aggravating circumstance being implicit in the jury's verdict or to require that the jury weigh the aggravating and mitigating circumstances.

> Accordingly, we must conclude that the state appellate court's decision is not contrary to or an unreasonable application of *Ring*, and Lee is not entitled to habeas relief on this claim.

726 F.3d 1172, 1197–98 (11th Cir. 2013) (internal citations omitted).

In other words, the jury must find an aggravating circumstance; on that point, the jury's verdict in Jackson's case was unanimous, *i.e.*, the jury found Jackson committed capital murder by reason of robbery and while under a sentence of imprisonment pursuant to § 13A-5-40(a)(1) and (6), Ala. Code 1975. Consequently, even assuming *arguendo* that Jackson had fairly presented the claim in state court and *Ring* was clearly established at the time, the *Ring* claim would lack merit under de novo review. Consequently, Jackson is entitled to no federal habeas relief on this claim.

### 3. Judicial override was an unconstitutionally arbitrary and capricious imposition of the death penalty

On return from remand, the Alabama Supreme Court addressed the following claim:

> . . . Jackson contends that the trial court's override of the jury's unanimous recommendation of life imprisonment without parole was improper, arbitrary, and unconstitutional, and that it wrongfully negated the role of the jury." He argues that §13A-5-47(e), Ala. Code 1975[] – Alabama's judicial override statute – is standardless, unlike override statutes in other states, and that it fails to give lower courts guidance in rejecting a jury's recommendation.

*Ex parte Jackson*, 836 So. 2d at 988-89 (2002). Discussing Alabama's capital sentencing procedure set forth in Alabama Code §§13A-5-47 and 13A-5-53, the Alabama Supreme Court concluded that the statutory scheme provided sufficient

guidance to prevent the arbitrary and capricious imposition of a death sentence. 836 So. 2d at 989. In addition, the state appellate court analyzed the propriety of the jury's recommendation of life imprisonment without parole in Jackson's case, concluding:

> . . . Thus, reinstatement of a jury recommendation of life imprisonment without parole is appropriate in those circumstances where the trial court has overridden the jury's recommendation based on bias, passion, or prejudice; where the weighing of aggravating or mitigating circumstances is defective; or where the sentence is disproportionately severe under all of the circumstances. *See* § 13A–5–53(b), Ala. Code 1975.
>
> In this case, before determining the sentence, the trial court considered all the available evidence; heard arguments on aggravating circumstances and mitigating circumstances; entered written findings of fact summarizing the offense and Jackson's participation in it; made specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A–5–49, each mitigating circumstance enumerated in § 13A–5–51, and any additional mitigating circumstance offered pursuant to § 13A–5–52; weighed the advisory verdict of the jury; considered and weighed the presentence-investigation report; considered and independently weighed the mitigating circumstances and the aggravating circumstances; and stated specific reasons for giving the jury's recommendation the consideration it gave the recommendation, *see Ex parte Taylor*. After following this procedure, the trial court concluded that the aggravating circumstances outweighed the mitigating circumstance and imposed the death penalty, overriding the jury's recommendation.
>
> We commend the trial court for its thorough sentencing order and especially for its explanation for its override of the jury recommendation. The trial court found two statutory aggravating circumstances: (1) that the capital offense was committed while Jackson was engaged in a robbery or an attempted robbery, and (2) that the capital offense was committed by a person under sentence of imprisonment. The trial court found one statutory mitigating

circumstance: that Jackson was 18 years old at the time of the offense. It is evident from the trial court's sentencing order that it independently weighed the aggravating circumstances and the mitigating circumstance. Additionally, the trial court provided a detailed analysis of its consideration of the jury's recommendation of a sentence of life imprisonment without the possibility of parole and the reasons it rejected that recommendation and sentenced Jackson to death. There is no evidence in the record before us indicating that bias, passion, or prejudice were factors in the trial court's imposing the death sentence.

*Ex parte Jackson*, 836 So. 2d at 990.

Jackson asserts that, given the lack of a standard by which to measure a trial court's decision not to follow a jury's recommended sentence, the state court's adjudication of the override claim is an "unreasonable determination of the facts in light of the evidence," *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003), and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent, thus warranting habeas relief, *Williams v. Taylor*, 529 U.S. at 412-13. Specifically, Jackson asserts that the Alabama Supreme Court's rejection of his challenge to Alabama's statutory capital sentencing scheme, *see* Ala. Code § 13A-5-47(e), is contrary to, and an unreasonable application of, *Gregg v. Georgia*, 428 U.S. 153, 189, 195 (1976) (plurality opinion), and other clearly established Federal law.

In *Gregg*, the United States Supreme Court held that the Eighth Amendment forbids the arbitrary and capricious imposition of a death sentence. 428 U.S. 153 (1976). In *Harris v. Alabama*, 513 U.S. 504 (1995), the United States Supreme Court

addressed the propriety of the State of Alabama's capital sentencing scheme – including juror overrides. There, as the State notes, the Supreme Court upheld Alabama's capital sentencing scheme. Even so, Jackson argues that the override in his case was "wholly arbitrary and capricious" and was a violation of his "Sixth Amendment right to a jury, and a unanimous jury verdict for life without parole." (Doc. 35 at 118.) The dispositive nature of *Harris* is clear: "The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight." 513 U.S. at 515.

In his brief, Jackson conflates the finding of fact that is necessary to make a defendant death-eligible (*i.e.*, the existence of an aggravating circumstance, which his jury unanimously found at the guilt stage) with the trial court's decision to impose a death sentence on a death-eligible defendant—requiring the weighing of aggravating and mitigating circumstances—which is not a fact-finding exercise. In *Miller v. Comm'r, Alabama Dep't of Corr.*, 826 F. App'x 743 (11th Cir. 2020), *cert. denied sub nom. Miller v. Dunn*, 142 S.Ct. 123 (2021), the Eleventh Circuit explained this distinction:

> Furthermore, because the sentencing jury made the necessary death-eligibility finding, it would not matter whether the trial court had ultimate sentencing authority. *See id.* (holding that, under *Ring*, any states "'that leave the ultimate life-or-death decision to the judge may continue to do so'") (quoting *Ring*, 536 U.S. at 612, 122 S.Ct. 2428 (Scalia, J., concurring)).

*Miller*, 826 F. App'x at 749-50. As previously discussed, in Jackson's case, the jury unanimously found the aggravating circumstances which the sentencing judge then weighed in making the sentencing determination.

Citing *Zant v. Stephens*, 462 U.S. 862, 885 (1983), Jackson argues that Alabama's unique system allows an elected trial judge to unilaterally issue a death sentence, in violation of Federal law prohibiting capital punishment on the basis of social or political pressures, racial bias, or any other arbitrary factor. Jackson's *Zant* argument misstates Alabama law. In *Zant*, which discusses the death penalty in Georgia, the Supreme Court noted that Georgia had not "attached the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant…" 462 U.S. at 885. Like Georgia, neither has Alabama, as the unconstitutional factors to which Jackson refers are absent from the Code of Alabama. And further, there is no evidence to suggest that the trial court made its decision based on social or political pressures, racial bias, or any other arbitrary factor. Jackson's reliance on *Zant* is misplaced and unpersuasive.

Jackson has failed to demonstrate that the state court's adjudication of this claim either resulted in a decision that was contrary to, or involved an unreasonable application of, *Gregg* or other clearly established Federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(2).

As for the "unreasonable factual standard," the evaluation of Jackson's override claim is straightforward. In his petition, Jackson leaves unspecified the unreasonable factual determination. 28 U.S.C. § 2254(d)(2). In his brief, Jackson simply tracks § 2254(d)(2)'s wording verbatim. (Doc. 35 at 121.) As a result, Jackson has neither developed nor proven that the ACCA tied the denial of his override claim to an unreasonable determination under § 2254 (d)(2). Jackson therefore is entitled to no habeas relief on this claim.

## C.  THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF ROBBERY

Jackson asserts that the ACCA's rejection of his claim that the trial court erred in failing to instruct the jury on the lesser-included offense of robbery as a separate crime was contrary to, and involved an unreasonable application of, *Beck v. Alabama*, 447 U.S. 625 (1980), and was an unreasonable determination of the facts in light of the evidence presented at trial.

On direct appeal, the ACCA adjudicated the jury-instruction claim as follows:

> The appellant's fifth argument is that the trial court should have instructed the jury on the lesser included offense of robbery. However, he did not request an instruction on robbery, and he did not object when the trial court did not give one. Therefore, we review this contention for plain error. Rule 45A, Ala. R. App. P.

> Section 13A–1–9(b), Ala. Code 1975, provides: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." . . . In *Boyd v. State*, 699 So.2d 967 (Ala.Cr.App.1997), we held:

"'A defendant accused of a greater offense is entitled to have the trial court charge on any lesser included offense if there is any reasonable theory from the evidence to support the lesser charge, regardless of whether the state or the defendant offers the evidence. *Ex parte Pruitt*, 457 So.2d 456 (Ala.1984); *Parker v. State*, 581 So.2d 1211 (Ala.Cr.App.1990), *cert. denied*, 581 So.2d 1216 (Ala.1991). A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense . . . *Anderson v. State*, 507 So.2d 580 (Ala. Cr. App. 1987). . . . Section 13A–1–9(b) provides, "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."'

"*Breckenridge v. State*, 628 So.2d 1012, 1016 (Ala.Cr.App.1993)."

699 So.2d at 972.

The evidence presented at trial showed that the robbery occurred after the murder. The appellant contends that the trial court should have instructed the jury on the lesser included offense of robbery because the robbery allegedly was a mere afterthought to the murder and it was not committed during the robbery. In fact, he contended at trial that he did not have anything to do with the robbery and that Barnes and Williams stole the car only because he drove away from the crime scene without them. He now contends that, if the jury had believed his theory, it could have found him guilty of the separate offenses of intentional murder and robbery. We disagree.

The trial court instructed the jury on the lesser included offense of intentional murder, thus giving the jury the option of finding that the appellant committed the murder but not the robbery. However, under the evidence presented, the appellant did not actually rob the victim, although there was sufficient evidence to show that that was his intent in initiating the confrontation. Under the appellant's theory that the robbery was a mere afterthought and that it did not occur during the

murder, the jury could have found the appellant guilty of murder, but he would not have been guilty of the robbery. Thus, if the jury had believed the appellant's theory and determined that the robbery did not occur during the murder, there would not have been a rational basis for it to find that the appellant was guilty of robbery.

The appellant also contends that the jury could have believed that the robbery did not occur during the murder but still could have found him guilty of being an accomplice to the robbery. This contention is not supported by the record. As stated above, the evidence clearly showed that the appellant's intent when he started following the victim was to rob the victim. If the jury determined that the appellant was guilty of the robbery, even if it determined that he did not kill the victim, then it could only have convicted him of capital murder. Under the evidence presented, he was at least an accomplice to the murder and, more likely, the actual murderer. There was simply no rational basis under the evidence presented on which the jury could find the appellant guilty of robbery and not guilty of murder. Therefore, we do not find any plain error in this regard.

*Jackson v. State*, 836 So. 2d at 938–39.

Jackson first argues the ACCA's adjudication of the jury-instruction claim is contrary to, and an unreasonable application of, *Beck v. Alabama*, *supra*. Although Jackson cited *Beck* in his appellate brief (doc. 9-9 at 183, 187, 212), the ACCA did not discuss the decision in its opinion. In *Beck*, the Supreme Court declared that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id*. at 637. Pursuant to *Beck* and its progeny,

"a capital defendant is entitled to a lesser included offense instruction if there is evidence in the record to support such an instruction." *Gilmore v. Taylor*, 508 U.S. 333, 361 (1993). This is tempered, however, with the Supreme Court's instruction that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982).

In arguing a violation of *Beck*, Jackson ignores both Supreme Court and Eleventh Circuit precedent making clear that *Beck* does not apply where, as here, a capital defendant did receive charges on certain lesser-included offenses, just not on every single lesser-included offense that the evidence might support, or that the defendant might desire. In *Maples v. Allen*, 586 F.3d 879, 894–95 (11th Cir. 2009) (footnotes omitted), *rev'd on other grounds sub nom. Maples v. Thomas*, 565 U.S. 266 (2012), the Eleventh Circuit noted that *Beck* is not a blanket rule that requires lesser included instructions be given in all capital cases. Instead, *Beck's* applicability depends on the evidence at trial:

> . . . [I]n *Schad v. Arizona,*[501 U.S. 624 (1991), *overruled on other grounds by Edwards v. Vannoy*, 141 S. Ct. 1547, 1549, 209 L. Ed. 2d 651 (2021))], the Supreme Court made plain that the *Beck* rule does not apply in situations, like Maples's, where the jury was instructed on one lesser included non-capital offense that had evidentiary support, but the defendant argues the jury should have received instructions on every potential lesser included non-capital offense supported by the evidence . . . .  The Supreme Court in *Schad* concluded that *Beck* "simply is not implicated . . . , for petitioner's jury was not faced with an all-or-

nothing choice between the offense of conviction (capital murder) and innocence."

Lastly, a lesser included non-capital offense instruction is warranted only when the evidence supports such an instruction.

586 F.3d at 894–95 (internal citations omitted).

Jackson's jury did not face an all-or-nothing choice. The trial judge's instructions included three options for the jury: (1) convict Jackson of the charged capital offense (robbery-murder), or (2) convict him of the lesser-included, non-capital offense (intentional murder), or (3) acquit him of any offense. (Doc. 9-6 at 70-113.) Therefore, the jury had choices.

In addition, the ACCA's conclusion that the evidence did not warrant an instruction on robbery as a lesser-included offense is not unreasonable. Jackson contends that the trial court erred by failing to give the jury an additional instruction on the lesser-included offense of robbery[8] as a separate, non-capital offense, just as the court did on the murder offense. As he states, "even if Mr. Jackson was liable for both murder and robbery, it would have been reasonable for the jury to conclude that the two crimes were separate in this case – that any intent to rob was not formed until after the murder" and therefore "if the jury had convicted Mr. Jackson of

---

[8] Jackson acknowledges that because the evidence in this case clearly indicated that the victim's car had been taken, it was unlikely that the jury would have found the absence of robbery. (Doc. 35 at 86, n.21).

murder and robbery as separate offenses, he would not have been guilty of capital murder and thus would not have been not eligible for the death penalty." (Doc. 35 at 82-83). In other words, if the jury believed that the intent to rob was formed *after* the murder, then the jury should have had the option of convicting Jackson of robbery as the lesser-included, stand-alone offense; but without such an instruction, it had no such option and was forced to convict him of robbery, as intertwined with the robbery-murder capital offense. Therefore, he argues, if the jury had been given an instruction on the lesser-included offense of robbery, it is possible he could have been convicted on the non-capital offense of intentional murder and on the lesser-included offense of robbery as a separate offense.

Jackson's argument rises or falls on when "the intent to rob" was formed. If the intent was formed before the shooting, Jackson would not be entitled to a lesser-included robbery instruction. But if the intent were formed post-shooting, Jackson would have been entitled to such an instruction. Evidence of intent formed before the shooting is found in the testimony of Jackson's co-defendants. Co-defendant Antonio Barnes testified that while they (Jackson[9], Eric Williams, Christopher Rudolph, and himself) were riding around looking for the victim and talking about his car, Christopher Rudolph "said the guy had music" to which Jackson confirmed

---

[9]  Barnes testified that defendant Shonelle Jackson is also known as "Wendell."  (Doc. 9-4 at 104.)

that they were about to rob the victim. (Doc. 9-4 at 112, 113.) Co-defendant Eric Williams testified similarly, stating that after they saw the victim's car, Jackson mentioned "hit[ting] a lick", *i.e.*, robbing him. (Doc. 9-4 at 180.) And Williams confirmed this in his testimony, stating that Jackson said he was going to rob the victim and then turned around and started following behind the victim. (*Id*. at 181.) And finally, co-defendant Christopher Rudolph testified that while they were looking for the victim, robbing the victim was discussed, but he did not remember who brought up the subject. (Doc. 9-5 at 34–36.) Thus, the evidence established that Jackson formed "the intent to rob" the victim before the shooting, which fully supports the trial court's robbery-murder instruction.

Consequently, the ACCA's adjudication of the jury-instruction claim is neither contrary to, nor an unreasonable application of, *Beck* or other clearly established Federal law, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Consequently, Jackson is entitled to no habeas relief on this claim.

### D.    THE TRIAL COURT'S REFUSAL TO GRANT JACKSON A CONTINUANCE TO SECURE A CRITICAL WITNESS

Jackson asserts that the ACCA's rejection of his claim that the trial court violated his rights to due process and a fair trial by denying defense counsel's request for a continuance to locate Gerard Burdette, a witness, was contrary to, and involved an unreasonable application of, clearly established Federal law and resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented. The State argues that the denial of the motion to continue did not violate Jackson's Federal constitutional rights, that the Federal caselaw on which Jackson relies is inapposite, that Jackson is simply attempting to relitigate a state law claim that he raised on appeal and lost, and that the state court's decision is reasonable.

## 1.    The ACCA's Opinion

On direct appeal, the ACCA determined:

> . . . Before the trial began, the appellant requested a continuance to locate Gerard Burdette, who had been riding in the victim's vehicle at the time of the murder. Shortly after the murder, Burdette had made a statement about the crime to the police. Based on that statement, the appellant contended that Burdette's testimony could exonerate him.[] The prosecution conceded that Burdette's testimony was material, but it agreed to stipulate that Burdette's written statement could be admitted into evidence. The trial court denied the appellant's request for a continuance, and Burdette's statement was read and admitted into evidence during the appellant's case-in-chief.

> > "A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence."

> *Ex parte Saranthus*, 501 So. 2d 1256, 1257 (Ala. 1986) (citations omitted). At the hearing on the motion, both the prosecutor and defense

counsel stated that they had attempted to locate Burdette and that their efforts had not been successful. They also noted that both state and federal authorities had outstanding warrants for Burdette's arrest, that Burdette's mother stated that she did not know where he was, and that there had been some indication that Burdette was no longer in the Montgomery area. In its written order denying the appellant's motion, the trial court stated:

> "In an attempt to accommodate all parties to secure the appearance of Burdette, on February 20, 1998, investigators of the District Attorney's office and a Deputy District Attorney went to the home of Burdette's mother to inquire of his whereabouts. According to the report received from these investigators and the Deputy District Attorney, the mother informed them that she had not seen her son in a year and it was reported that he was not in Montgomery. Because there does not appear to be any reasonable likelihood that Burdette's appearance could be secured in the reasonable foreseeable future, the motion for continuance is denied.

> "The Court notes that the State stipulates that the statement of Burdette which was taken by Corporal Cunningham can be used as evidence in the Defendant's behalf."

(C.R. 100.) At the close of the State's case-in-chief, when the appellant moved for a judgment of acquittal on the ground that Burdette was not available as a witness, the trial court reiterated:

> "As for Mr. Burdette, I have issued an order from competent counsel on why I did not postpone the trial of this case because Mr. Burdette could not be found. But just for the record again, based on everything that has been reported to the Court, Mr. Burdette has charges pending against him, Class A felony charges, I believe, for robbery in the first degree and he has apparently flown the jurisdiction of this Court. And there is no way anybody could tell when Mr. Burdette would ever be [available.] So that is the basis of that. Not anything that counsel did or didn't do. But he is just gone, and nobody knows when he is going to be apprehended and brought back."

*Jackson v. State*, 836 So. 2d at 939–40.

The ACCA concluded:

> . . . [T]he appellant has not satisfied the second prong of the
> *Saranthus* test. He did not present any evidence that, even if the trial
> court granted a continuance, Burdette could be located and would
> testify. Banks, *supra*. In fact, both the prosecution and the defense had
> attempted to secure Burdette's attendance at trial, but neither had been
> successful. *Miller*, *supra*. Moreover, Burdette's statement was admitted
> into evidence by a stipulation of the prosecution and defense counsel.
> Therefore, the trial court did not abuse its discretion in denying the
> appellant's motion for a continuance.

*Jackson v. State*, 836 So. 2d at 941.

## 2. The Determination of the Facts

Jackson asserts that the ACCA's factual determination that he "did not present

any evidence" regarding whether Mr. Burdette could be located if a continuance

were granted," *Jackson*, 836 So. 2d at 941, is unreasonable.   Specifically, he

maintains defense counsel presented argument that, as a fifteen-year-old teenager

with both state and federal warrants issued for his arrest, Burdette would not be able

to escape detection for long. He also points to the prosecutor's acknowledgement

that, despite her reticence, Burdette's mother likely knew his location, and the trial

judge's expectation that continued questioning of the mother would reveal his

location. Jackson also asserts that the ACCA's determination that "both the

prosecution and defense had attempted to secure Burdette's attendance at trial, but

neither have been successful," *Jackson*, 836 So. 2d at 941, is misleading because the

defense had only searched for Burdette for one day. In other words, he argues "a single-day search does not qualify as an 'attempt' to locate him." (Doc. 35 at 98.)

This court has reviewed the record. Both the prosecution and Jackson considered Burdette a material witness. He was listed on the prosecutor's witness list, and the prosecution had issued a subpoena for his attendance at trial. A few days before the trial, Jackson's counsel learned that the prosecution's subpoena for Burdette remained outstanding. Neither the prosecutor nor Jackson's counsel were able to locate Burdette. Three days before the trial setting, Jackson moved for a continuance to find Burdette. (Doc. 9-1 at 87–88.) Counsel advised the trial court that there were outstanding arrest warrants against Burdette for both federal and state charges of first-degree robbery. The trial court heard and denied the motion, stating: "Because there does not appear to be any reasonable likelihood that Burdette's appearance could be secured in the reasonable [*sic*] foreseeable future, the motion for continuance is denied." (Doc. 9-1 at 104–05.) Despite his nonattendance, Burdette's voluntary statement was read and introduced into evidence as Defendant's Exhibit 1 at trial. (Doc. 9-2 at 92-103.) Under these circumstances, the court concludes that the ACCA's finding that the evidence did not establish a probability that Burdette could be located and would testify if a continuance was granted is not an unreasonable determination of the facts based on the evidence presented during the hearing and at trial.

Jackson also asserts the ACCA unreasonably found that the availability of Burdette's written statement was sufficient to prevent a violation of Jackson's due process rights. He points to the trial judge's own description of the written statement as "convoluted," (doc. 9-3 at 22), as well as to the judge's request for counsel to clarify who the witness said had shot the victim. Jackson, however, mischaracterizes the ACCA's findings. In its analysis, the ACCA primarily focused on the reasons for the trial court's denial of the motion to continue and noted that Burdette's statement was admitted into evidence by stipulation of both parties. This court, therefore, cannot conclude that the ACCA's decision regarding the statement was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

### 3.    The ACCA's Analysis of the Law

Jackson asserts that the ACCA's adjudication of his claim that the denial of a continuance violated his rights to due process and a fair trial is contrary to, and an unreasonable application of, *Ungar v. Sarafite*, 376 U.S. 575 (1964),[10] and *Powell v. Alabama*, 287 U.S. 45, 59 (1932).

Jackson cites *Powell* when emphasizing that the swift administration of justice should never override a defendant's right to due process and a fair trial. 287 U.S. at

---

[10] The State maintains Jackson did not cite *Ungar v. Sarafite*, 376 U.S. 575 (1964), in his brief to the ACCA on direct appeal. A review of Jackson's appellate brief, however, indicates he cited the *Ungar* case. (*See* Doc. 9-9 at 191.)

59 ("To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob.") And, citing *Ford v. Wainwright*, Jackson maintains that "factfinding proceedings aspire to a heightened standard of reliability" in death penalty cases. 477 U.S. 399, 411 (1986). He also points to *Ungar* for the general proposition that, when considering whether a trial court violated a defendant's constitutional rights by denying a defendant's request for a continuance, "[t]he answer must be found in the circumstances present in every case," "particularly in the reasons presented to the trial judge at the time the request is denied."[11] 376 U.S. at 589. Jackson argues the ACCA failed to apply these concepts despite there being compelling reasons why a continuance was necessary to locate Gerard Burdette, a material eyewitness.

In *Himes v. Secretary, Florida Department of Corrections*, 690 F. App'x 640, 646 (11th Cir. 2017), the Eleventh Circuit questioned whether *Ungar* constitutes clearly established Federal law as follows:

> In *Ungar*, a case involving a contempt proceeding, the Supreme Court held that the trial court's denial of the defendant's motions for continuance—for counsel's additional preparation and for the defendant to obtain medical proof and expert testimony—did not violate the defendant's due process rights. *Ungar*, 376 U.S. at 590–91. . . . The

---

[11] The cases of *Powell* and *Ford* are factually distinguishable from Jackson's case. In *Powell v. Alabama*, the issue did not involve the denial of a trial continuance request due to the unavailability of a witness; instead, it centered upon whether seven of the "Scottsboro Boys" were deprived of a fair trial, deprived of counsel at trial, and tried before juries from which Black jurors were systematically excluded. 287 U.S. at 50. Further, *Ford v. Wainwright*, involved the question of "whether the District Court was under an obligation to hold an evidentiary hearing on the question of Ford's sanity." 477 U.S. 399, 411 (1986).

Supreme Court noted that although the disposition of a motion for continuance is typically within the discretion of the trial judge, "a myopic insistence upon expeditiousness in the face of a justifiable request for [a] delay can render the right to defense with counsel an empty formality." *Id.* at 589–90. . . . The Court further stated that there were no tests for determining whether a "denial of a continuance is so arbitrary [that it] violate[s] due process," and that the determination must be based on the circumstances of each individual case. *Id.* Because *Ungar* did not consider whether the denial of a motion for continuance to secure an alibi witness constituted a due process violation, it arguably does not constitute clearly established federal law. *Fotopoulos* [*v. Sec'y, Fla. Dep't of Corr.*], 516 F.3d [1229], 1234–35 [(11th Cir. 2008)]. But assuming Ungar constitutes clearly established federal law, the Florida appellate court's decision was not contrary to *Ungar*, as the facts of the present case are not materially indistinguishable from the facts in *Ungar*.

*Himes*, 690 F. App'x at 646. In Jackson's case, the facts likewise are not materially indistinguishable from the facts in *Ungar*. Consequently, to the extent Jackson asserts the ACCA's adjudication of this claim is contrary to *Ungar*, he is entitled to no relief.

Jackson's assertion that the ACCA's adjudication of this due process claim involved an unreasonable application of *Ungar* is likewise unavailing. Because *Ungar* announced a general rule, the ACCA had "more leeway" in denying Jackson's due process claim. *See Hines*, 690 F. App'x at 647. On direct appeal, the ACCA applied the standard set forth in *Ex parte Saranthus*, 501 So. 2d 1256, 1257 (Ala. 1986), and specifically found no abuse of discretion because there was no evidence that Burdette could be located and would testify, neither of the parties had been able to successfully secure his attendance at trial, and Burdette's statement had

been admitted into evidence at trial. *Jackson*, 836 So. 2d at 941. This court has reviewed the record and concludes that the ACCA's affirmance of the denial of Jackson's motion to continue was not unreasonable.

In sum, Jackson has failed to demonstrate that the state court's adjudication of this claim either resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Consequently, he is entitled to no habeas relief on this claim.

### E.    THE *BRADY* CLAIM

Jackson asserts that the ACCA's adjudication of his claim that the State suppressed exculpatory material resulted in a decision that was contrary to, and an unreasonable application of, *Brady v. Maryland*, 373 U.S. 83 (1963). He also cites *Giglio v. United States*, 405 U.S. 150 (1972), and *Banks v. Dretke*, 540 U.S. 668 (2004), as support for his *Brady* claim.

On remand, the Rule 32 court ruled that Jackson's *Brady* allegations were procedurally barred from postconviction review because they could have been, but were not, raised at trial or on appeal pursuant to Rule 32.2(a)(3) and (a)(5), Ala. R. Crim. App. (Doc. 9-38 at 76.) The state post-conviction court also held that the alleged *Brady* violations were insufficiently pled because, "[f]ar from actually

asserting that specific *Brady* violations actually took place, Jackson has only alleged that they **may** exist. Furthermore, Jackson has not explained how any of the evidence allegedly withheld from the defense was either favorable or exculpatory to his defense." (*Id.* at 77 (emphasis in original).) In sum, the Rule 32 court ruled that Jackson's *Brady* allegations failed "to meet with the specificity and full factual pleading requirements of Rule 32.6(b) or are without merit pursuant to Rule 32.7(d)…" (*Id.* at 78-79.) Alternatively, the Rule 32 court concluded that Jackson's allegations of *Brady* violations failed to meet the five requirements of newly discovered evidence pursuant to Ala. R. Crim. P. 32.1(e). (*Id.* at 79.)

On appeal, the ACCA affirmed the state post-conviction court's determination, concluding that "Jackson failed to plead the requirements for newly discovered evidence" and "failed to meet his burden of pleading sufficient facts to meet the specificity requirements of Rule 32.6(b), Ala. R. Crim. P."[12] *Jackson*, 133 So. 3d at 463. Although a procedural rule, adjudications under Rule 32.6(b) constitute "merits" adjudications. *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir.

---

[12] Alabama Rule of Criminal Procedure Rule 32.6(b) provides:

> Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

2011) ("[A]n Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition [under Rule 32.6(b)] necessarily entails a determination on the merits of the underlying claim; we cannot construe such a rule to be a state procedural bar that would preclude our review."); *see also Frazier v. Bouchard*, 661 F.3d 519, 525 (11th Cir. 2011) ("[B]ecause a dismissal under Rule 32.7(d) for failure to sufficiently plead a claim under Rule 32.6(b) requires an evaluation of the merits of the underlying federal claim, the Court of Criminal Appeals's determination was insufficiently 'independent' to foreclose federal habeas review.... [T]he determination that adjudications under Rules 32.6(b) and 32.7(d) of the Alabama Rules of Criminal Procedure are on the merits comports with this court's precedent."). Thus, this court will review the ACCA's decision regarding the *Brady* claim.

In his petition, Jackson asserts that the State failed to turn over evidence of deals and agreements with three co-defendants and witnesses in violation of *Brady v. Maryland*, *supra*. (Doc. 1 at 79-80.) In addition, he asserts that trial evidence and other records establish that additional discoverable material exists, such as:

- In Burdette's statement to Corporal Cunningham, Burdette stated he thought an individual named P.J. was responsible. While interviewing witness Lacrema Moore, Detective Signore suggested that P.J.'s real name was Patrick Stinson and that someone named "Jay" hung around with an individual named "Big Leon." The offense reports do not include how the detective knew P.J's real name.

- The prosecution did not provide a map of the crime scene drawn by witness Victoria Moss.

- The Montgomery County Sheriff's Department did not provide an April 28, 1997 offense report from A.C. Porterfield, wherein he reported to a deputy that three African-American men were on his property.

- In his statement to law enforcement officials, Antonio Barnes recalled returning with Jackson and Roderick Crawford to Old Hayneville Road. No offense reports or interviews with Crawford were provided to counsel.

- Although both cars were impounded, Jackson did not receive the results of any tests or examinations of the inside of the automobiles.

- The co-defendants understood there to be a verbal agreement by which they would receive lesser sentences in exchange for their testimony. Statements made by the court during a co-defendant's court proceeding indicate that the co-defendants' sentencings were intertwined with the State having already secured a conviction and sentence against Jackson. Evidence of these deals were not disclosed to Jackson's counsel.

- No evidence or information obtained during law enforcement officials' meetings with Jackson's girlfriend, Latrice Walker, were provided to Jackson's counsel.

(Doc. 1 at 80-82.)

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 540 U.S. at 691 (quoting *Brady v. Maryland*, 373 U.S. at 87). The rule established in *Brady*, *i.e.*, the prosecution's duty to disclose evidence material to either guilt or punishment, applies even when there has been no request from the

accused. *Banks v. Dretke*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976). This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676, 685 (1985). And it encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler v. Greene*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

The defendant carries the burden of establishing a *Brady* violation. *United States v. Stein*, 846 F.3d 1134, 1145 (11th Cir. 2017); *United States v. Esquenazi*, 752 F.3d 912, 933 (11th Cir.), *cert. denied*, 574 U.S. 876 (2014). There are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," *i.e.*, prejudice must have ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691; *Strickler v. Greene*, 527 U.S. at 281-82. Evidence is "material" under *Brady* where there exists a "reasonable probability" that, had the evidence been disclosed, the result at trial would have been different. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks v. Dretke*, 540 U.S. at 698-99. A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the

likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith v. Cain*, 565 U.S. at 75; *Kyles v. Whitley*, 514 U.S. at 434.

Jackson's *Brady* claim is based on a hunch that "the evidence introduced at trial and in the records that Mr. Jackson received strongly indicates that additional discoverable material exists. . . ." (Doc. 1 at 80.) A "defendant's right to the disclosure of favorable evidence .  .  .  does not 'create a broad, constitutionally required right of discovery.'" *United States v. Jordan*, 316 F.3d 1215, 1251 (11th Cir. 2003) (quoting *United States v. Bagley*, 473 U.S. 667, 675 n.7 (1985)). The Eleventh Circuit has consistently held that a defendant "must show that there is a reasonable probability that the evidence could affect the outcome of the trial." *Baxter v. Thomas*, 45 F.3d 1501, 1507 (11th Cir. 1995); *Jordan*, 316 F.3d at 1250. Jackson merely speculates that the information may have aided his defense, and *Brady* does not create such a broad right of discovery. *Jordan*, 316 F.3d at 1251. He has not demonstrated a reasonable probability that the evidence he seeks could affect the outcome of trial. *Id*. This court therefore concludes that the ACCA's adjudication of this claim is neither contrary to, nor an unreasonable application of, *Brady, Giglio,* or other clearly established Federal law. Consequently, Jackson is entitled to no relief on this claim.

G.    *BATSON* VIOLATIONS

Jackson asserts that he is entitled to habeas relief because the State unconstitutionally used peremptory strikes to remove Black venire-members based on race. Specifically, he argues that the Alabama Court of Criminal Appeals' adjudication of his claim was either contrary to, or based on an unreasonable application of, *Batson v. Kentucky*, 476 U.S. 79 (1986). Jackson further argues that the state court's findings were an unreasonable determination of the facts.

In *Batson*, the United States Supreme Court extended the equal protection principle barring the purposeful exclusion of black persons from criminal jury service to the prosecution's use of peremptory challenges during petit jury selection. *See Batson*, 476 U.S. at 89 ("the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."). *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: first, the defendant must make out a *prima facie* case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's conduct during the defendant's own trial; second, once the defendant makes the *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging jurors within the arguably targeted class; finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution.

*Foster v. Chatman*, 578 U.S. 488, 499-500 (2016); *Snyder v. Louisiana*, 552 U. S. 472, 476-77 (2008); *Miller-El v. Dretke*, 545 U. S. 231, 239 (2005); *Batson v. Kentucky*, 476 U. S. at 94-98.

Regarding the first step, *i.e.,* establishing a *prima facie* case, the Supreme Court has described the process as follows:

> [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."

*Batson v. Kentucky*, 476 U. S. at 96 (citations omitted).

When considering whether an objector has made a *prima facie* case as a first step in the *Batson* analysis, a court must consider all relevant circumstances which include, but are not limited to: (1) a prosecutor's pattern of strikes against black jurors included in the venire; (2) the prosecutor's questions and statements during voir dire examination; (3) the failure of the prosecutor to ask meaningful questions to the struck jurors; (4) the subject matter of the case, *i.e.*, whether it is racially or ethnically sensitive; and (5) evidence of past discrimination in jury selection.[13]

---

[13] Among the other considerations a trial court may examine in determining whether an objector has satisfied the burden of establishing a *prima facie* case of racial discrimination in jury

*Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1337 (11th Cir.), *cert.*

*denied*, 568 U. S. 1019 (2012).

In *Central Alabama Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629

(11th Cir. 2000), the Eleventh Circuit explained in detail the law governing *Batson*

challenges based on numbers alone:

> A party advancing a *Batson* argument ordinarily should "come forward with facts, not just numbers alone." *United States v. Bergodere,* 40 F.3d 512, 516 (1st Cir.1994). Consequently, a showing that a party used its authorized peremptory strikes against jurors of one race does not, standing alone, establish a *prima facie* case of discrimination.
>
> That said, an inference of discrimination based on the number of jurors of a particular race may arise where there is a substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury. Thus, the number of jurors of one race struck by the challenged party may be sufficient by itself to establish a *prima facie* case where a party strikes all or nearly all of the members of one race on a venire.

*Lowder*, 236 F.3d at 636–37 (internal citations omitted).

On direct appeal, the ACCA discussed whether Jackson had demonstrated a

prima facie case of discrimination as follows:

> The appellant's ninth argument is the State improperly used its peremptory challenges to discriminate on the basis of race and gender. He contends that he showed that there was a prima facie case of discrimination in violation of *Batson v. Kentucky*, 476 U.S. 79 . . . (1986), and *J.E.B. v. Alabama*, 511 U.S. 127 . . . (1994), during his trial,

---

selection is whether the defendant is the same race or ethnicity as the jurors whom the prosecution allegedly struck for improper, race-based, reasons. *United States v. Hill*, 643 F.3d 807, 840 (11th Cir. 2011), *cert. denied*, 566 U. S. 970 (2012).

and that the trial court should have required the prosecution to provide race- and gender-neutral reasons for its strikes. For these reasons, he urges this court to remand this case to the trial court "for a hearing to determine whether the State discriminated on the basis of gender and race in its use of peremptory strikes." (Appellant's brief at p. 47.)

After the jury was struck but before it was sworn, the following occurred:

> "[Defense counsel]: Judge, at this point we would move under *Batson* and its progeny for the State to explain race-neutral reasons why it struck Numbers 116, 94, 96, 11, 26, and 165, which were the last set of jurors it struck before turning to Your Honor with the random system. Six of those seven are black. Eight of their total strikes were black.

> "The Court: That's not enough to establish a prima facie case. . . . What's your prima facie case?

> "[Defense counsel]: I don't believe they have race-neutral reasons for doing that Judge. I mean, six out of seven in a row.

> "The Court: That's not enough."

(R. 156.)

. . .

At the outset, we note that the record on appeal does not include any documents that show the race or gender of the prospective jurors in this case. Furthermore, it does not include copies of the questionnaires completed by the jurors before voir dire examination.

. . .

[T]he record before us does not raise an inference of discrimination based on either race or gender. Nevertheless, the appellant urges us to remand this case so the prosecution can provide reasons for its use of its peremptory challenges.

> "As this Court stated in *Ex parte Watkins*, 509 So.2d 1074, 1077 (Ala.1987), *cert. denied*, *Watkins v. Alabama*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), '[t]he defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.' In effect, McNair is requesting that we remand this case for a hearing on this issue, on the strength of the circuit clerk's affidavit, so that a record can be created for appellate review. We specifically decline this request, for to do otherwise would unduly enlarge the scope of the plain error review as authorized by our appellate rules. *See Watkins*, *supra*, in which we had the opportunity in a death penalty case to remand for an evidentiary hearing on a *Batson* issue, but refused to do so."
>
> *Ex parte McNair*, 653 So.2d 353, 360 (Ala.1994), *cert. denied*, 513 U.S. 1159 . . . (1995). We, too, decline the appellant's request. Because the record before this court does not raise any inference of discrimination, we do not find any reversible error in this regard.

*Jackson v. State*, 836 So. 2d at 946–48. Thus, the ACCA adjudicated the *Batson* claim, specifically concluding that the record before the state court did not raise an inference of discrimination.

Jackson contends the state court's finding that "the record on appeal does not include any documents that show the race or gender of the prospective jurors in this case" is an unreasonable determination of the facts. He argues that his counsel did ensure that the race of the 8 jurors peremptorily struck by the State were included in the record. Jackson is correct that, when challenging the State's use of its peremptory strikes, his counsel established that 8 of the 13 jurors the prosecutor selected for

peremptory strikes were black individuals. (Doc. 9-1 at 149; Doc. 9-3 at 158.) The record shows that the State's first six strikes were presumably white[14] (jurors 39, 73, 58, 138, 64, 63), its next two strikes were of black jurors (jurors 94 and 116), followed by one strike of a white juror (juror 62), and then four strikes of black jurors (juror 96, 11, 26, 165).[15] (*Id*.) The record before the ACCA, however, did not paint a complete picture. For instance, the transcript did not include the juror questionnaires or any other documentation demonstrating the total number of black persons in the potential jury pool. To the extent the ACCA found that the record on appeal did not include documents demonstrating a full understanding of the makeup of the jury pool, its finding is a reasonable determination of the facts.

Jackson also argues that the ACCA's adjudication of his claim is contrary to, or an unreasonable application of, *Batson* because, he says, he presented evidence establishing a prima facie case of racial discrimination. Specifically, he maintains he demonstrated an inference of discrimination by alerting the ACCA that 8 of the 13 jurors the prosecutor selected for peremptory strikes were African-American; that the prosecutor struck 6 out of 7 jurors in a row, suggesting a pattern; that black jurors

---

[14] With the exception of the race of the eight jurors put into the record by defense counsel, the record does not include the race of the other jurors in the venire. For purposes of discussion, the Court will presume that the State's peremptory strikes of the first six jurors and the ninth juror were white.

[15] After these jurors, the prosecution randomly selected the peremptory strikes, which included the striking of two additional black jurors. Counsel did not challenge the striking of the randomly-selected jurors.

were struck at a rate nearly twice that of white jurors; that the district attorney did not conduct meaningful voir dire of the black jurors; and that there are numerous cases showing a history of unlawful exclusion by the Montgomery County district attorney's office.

With respect to Jackson's assertion that the prosecutor's manner of striking 6 of the 8 black jurors selected by the prosecution suggested a pattern, this court cannot conclude that the ACCA's determination that Jackson failed to establish a prima facie case is unreasonable. Albeit, there are circumstances in which striking a number of black members of a venire in a row is sufficient to establish a prima facie case of discriminatory use of peremptory strikes in violation of *Batson*. *See Central Alabama Fair Hou. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629 632 (11th Cir. 2000) (district court found a prima facie case was established because "defendants' only strikes were black jurors and . . . no black jurors remained on the panel as constituted."); *Saunders v. Tennis*, 483 F. App'x 738 (3rd Cir. 2012) (trial judge's decision to stop at stage one of the *Batson* analysis where prosecutor exercised his first eight peremptory challenges in a row on black female members of the venire was contrary to clearly established federal law.) The circumstances in Jackson's case, however, are dissimilar because there is no such pattern. Here, the State exercised its first six peremptory strikes on jurors who were presumably white. Thereafter, the State struck two black jurors, followed by a white juror, and then four

black jurors. Although Jackson alleges that black jurors were struck nearly twice as often as white jurors, the jury questionnaires identifying the race of each potential juror and their answers were not included in the record before the ACCA or this court.

Jackson also points to the prosecutor's lack of meaningful questioning as a factor to consider. This Court has reviewed the transcript of jury selection. Again, the complication for Jackson is that the juror questionnaires upon which counsel relied are not included in the record. Thus, there is no way to discern whether it was necessary for counsel to ask the jurors additional questions. This court therefore cannot conclude that the ACCA's rejection of this argument is unreasonable.

With respect to Jackson's point that the history of the state circuit court should be considered, this court recognizes that, prior to Jackson's trial in 1998, there were some instances of unlawful exclusion of jurors in Montgomery County. *See Sockwell v. Comm'r, Alabama Dep't of Corr.*, 141 F.4th 1231, 1241-43 (11th Cir. 2025) (summarizing history of peremptory strikes in the Montgomery Circuit Court between 1980 and 1990). The problem, however, is the lack of evidence of unlawful exclusion in this case. Because Jackson is unable to show other facts supporting an inference of discrimination, the history alone is insufficient to establish a prima facie case. *See McNair v. Campbell*, 416 F.3d 1291, 1312 (11th Cir. 2005) ("[A]

prosecutor's history of discrimination, while a relevant consideration, is not dispositive.")

This court therefore concludes that the ACCA's adjudication of the *Batson* claim was neither contrary to, nor an unreasonable application of, clearly established Federal law. In addition, the ACCA's decision was not based on an unreasonable determination of the facts. Consequently, Jackson is entitled to no relief with respect to this claim.

## H. JACKSON'S INTERROGATION

Jackson asserts that the Alabama Supreme Court's adjudication of his claim challenging the admission of his statement to the police was an unreasonable application of *Miranda v. Arizona*, 384 U.S. 436 (1966), *Colorado v. Connelly*, 479 U.S. 157 (1986), *Moran v. Burbine,* 475 U.S. 412 (1986), and other clearly established Federal law and was based on an unreasonable determination of the facts.

In *Miranda*, the Supreme Court recognized that custodial interrogations, by their very nature, generate "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. To protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in dealing with the accused. In particular, prior to the initiation of questioning, law enforcement must fully apprise the suspect of the government's

intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." *Id.* at 468-70. Beyond this duty to inform, *Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474.

> A statement is not "compelled" within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently" waives his constitutional privilege. *Miranda v. Arizona, supra,* at 444, 86 S.Ct., at 1612. The inquiry whether a waiver is coerced "has two distinct dimensions." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986):
>
>> "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Ibid.* (quoting *Fare v. Michael C.,* 442 U.S. 707, 725 . . . (1979)).

*Colorado v. Spring*, 479 U.S. 564, 573 (1987).

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary. *Connelly*, 479 U.S. at 168; *Miranda*, 384 U.S. at 475.

The Alabama Supreme Court adjudicated Jackson's constitutional challenge to the voluntariness of his statement, in pertinent part, as follows:

> . . . The trial court's finding that a statement was voluntary need only be supported by a preponderance of the evidence. *Dixon v. State*, [588 So. 2d 903 (Ala. 1991)]. The test for the voluntariness of an extrajudicial confession or an inculpatory statement is whether, in light of all the surrounding circumstances, the statement was free from inducement, threat, or promise, either expressed or implied, that would have produced in the mind of the accused any fear of harm or hope of favor. *Ex parte Price*, 725 So. 2d 1063 (Ala.1998), *cert. denied*, 526 U.S. 1133 . . . (1999).

> Moreover, "more subtle forms of psychological manipulation, such as trickery or deception by the police, have not been considered sufficiently coercive, standing alone, to render a confession or incriminating statement involuntary." *Ex parte Hill*, 557 So.2d [838,] 841 [(Ala. 1989)].

The trial court submitted the following order on return to remand:

> ". . . Detective Signore testified that the defendant's mother signed a 'consent to search' her home wherein detectives confiscated certain items, including .380–caliber bullets. The detectives, before leaving the defendant's mother's home, told the mother that if the defendant came home she was to notify [them] that the police would like to talk to him. Later that afternoon, the defendant went to police headquarters to talk to the detectives. At the hearing, Detective Signore testified that the defendant, who was 18 years old at the time, reported to the police headquarters where Detective Signore and his partner, Detective C.D. Phillips, were on duty. Detective

Signore testified that the defendant was read his *Miranda* rights, after which he signed the waiver form indicating that he understood his rights, that he had not been promised anything or threatened in any way and that he wished to give a statement to the police. The defendant's statement was taken in Detective Signore's office at the Montgomery Police Department with Detective Phillips also present.

"Initially, the defendant denied even knowing the three other codefendants that were involved in the shooting. Detective Signore testified at the hearing that he had statements from the 3 codefendants stating that all 3 of them knew the defendant and that the defendant had been involved in the shooting. Detective Signore stated that in order to get the defendant to tell the truth about his relationship with the other 3 codefendants, he told the defendant that a Dairy Queen [fast-food restaurant] cup had been found in the vehicle with the defendant's fingerprints on it. After Detective Signore told the defendant this information, the defendant then told Detective Signore that, in fact, he did know the other codefendants, but denied any involvement in the shooting. After telling Detective Signore that he knew the other codefendants, he asked the detective if he could make another statement. In his second statement, Defendant Jackson admitted to having been with the other codefendants at the time of the murder and to possessing a .380 automatic pistol.

"The defense called Ms. Rosalyn Jordan as its first witness. Ms. Jordan is a sixth-grade teacher at Patterson Elementary School. She testified that the defendant had been a student in her classroom and her records indicated that he had failed the first and third grades. She stated that the defendant was a low-achiever and that he was 13 years old in the sixth-grade. She also stated that she had only seen the defendant a few times since he had been a sixth-grader in her class. The defense also called Ms. Thelma Owens, who is an employee at the Southern Poverty Law

Center. She is related to the defendant, as his aunt, and she stated that she helped to raise him. She went on to state that the defendant was very respectful of her and any type of authority figures.

"There was absolutely no question that Detective Signore lied to the defendant about the fingerprints on the Dairy Queen cup. It is important to recognize, however, that the lie was told by Detective Signore only in order to find out if the defendant did, in fact, have a relationship with the other codefendants. The lie was not told to induce the defendant to confess [to] a crime. Alabama Courts have repeatedly held that a confession is not inadmissible merely because it was induced by a trick or misrepresentation. As defense counsel pointed out in its Memorandum of Law, although police deception is not conclusive as to the voluntariness of a statement, it is certainly a factor to be considered in the determination of its voluntariness. *See Frazier v. Cupp*, 394 U.S. 731[, 89 S.Ct. 1420, 22 L.Ed.2d 684] (1969). This Court would again note, however, that the deception used in this case was not deception that led to a confession to the actual crime. The deception or misrepresentation used by Detective Signore was only used in order to establish whether or not a relationship existed between the defendant and codefendants. After the statement was made concerning the fingerprints on the Dairy Queen cup, Defendant Jackson admitted only to knowing the codefendants, but denied any involvement in the actual crime.

"This Court must look at the totality of the circumstances in analyzing whether or not the defendant's extrajudicial statement was voluntary or not. The Court is convinced, after conducting the hearing, that the defendant did, in fact, voluntarily come to the police station and, after being read his *Miranda* rights and signing his waiver, he agreed to talk to the detectives. There was no testimony and/or evidence presented that would indicate that the defendant could not knowingly and voluntarily waive his

rights and agree to talk with the detectives. There was also nothing unusual or extraordinary about the room in which the statement was taken, or the manner in which the statement was obtained. As Justice Stuart so ably stated in her dissent [to the Supreme Court's opinion of May 18, 2001], there is no question that Detective Signore made misrepresentations concerning the fingerprints found on the Dairy Queen cup. . . .  This trial court, however, has conducted the hearing as ordered by the majority and would point out that no new information or facts were gleaned from this hearing and this court finds that after examining the totality of the circumstances surrounding the statement of the defendant, said statement was made voluntarily and is therefore admissible.

"Detective Signore's office in which the defendant's statement was taken is a normal detective office containing a desk and two chairs positioned facing the desk. Defense counsel went into very elaborate details about the office in its Memorandum of Law trying to show that the room would imply that the statement was not voluntary. The Court found nothing unusual, deceptive, or coercive about the room in which defendant's statement was taken at Montgomery Police Department Headquarters."

*Ex parte Jackson*, 836 So. 2d 979, 983–85 (Ala. 2002).  The Alabama Supreme Court

concluded:

The trial court's findings are adequately supported by the record. We have carefully reviewed the record on return to remand to determine whether Jackson voluntarily and knowingly waived his *Miranda* rights before making the inculpatory statement to the police and whether the statement was voluntary. After considering the totality of the circumstances surrounding Jackson's statement, we conclude that the State met its burden in proving that Jackson voluntarily and knowingly waived his Miranda rights and that he made his statement voluntarily. The record does not reveal that Jackson was threatened or coerced into giving a statement. The weight and preponderance of the evidence

support the trial court's decision to deny the motion to suppress. Therefore, the trial court did not err in denying the motion to suppress Jackson's statement.

*Id.*, 836 So. 2d at 985.

Jackson asserts the Alabama Supreme Court's determination that "the State met its burden in proving that [he] voluntarily and knowingly waived his *Miranda* rights and that he made his statement voluntarily" without threats or coercion, *Jackson*, 836 So. 2d at 985, was an unreasonable application of clearly established Federal law and was based on an unreasonable determination of the facts. Jackson argues that the circumstances, including that he was unusually vulnerable to coercive tactics due to his age (eighteen), mental impairments, and learning difficulties, as well as deceptive police tactics, the duration of the interrogation, the presence of two officers, and the condition of the interrogation room coupled with the officer's misrepresentation demonstrate that his extrajudicial statement was involuntary.

In Jackson's case, the police officer admittedly misled Jackson. Thus, a significant aspect of the inquiry here involves the effect of deception in obtaining an inculpatory statement. The deception in this case involved a misrepresentation of fact, which is "not enough to render a suspect's ensuing confession involuntary, nor does it undermine the waiver of [a] defendant's *Miranda* rights." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (citing *Frazier v. Cupp,* 394 U.S. 731, 739 (1969) (police falsely told suspect that his cousin had implicated him); *Lucero*

*v. Kerby,* 133 F.3d 1299, 1311 (10th Cir. 1998) (police falsely stated that suspect's fingerprints were found at the crime scene); *Holland v. McGinnis,* 963 F.2d 1044, 1051 (7th Cir. 1992) (police misrepresented the strength of the case against the suspect)). "Even if some police tricks may be 'objectionable as a matter of ethics,' they are not relevant to the constitutional validity of a waiver unless they interfere with the defendant's "ability to understand the nature of his rights and the consequences of abandoning them." *Brenton-Farley*, 607 F.3d 1294, 1330 (11th Cir. 2010). This court concludes that the Alabama Supreme Court's determination that the officer's misrepresentation did not render the statement inadmissible is reasonable.

Likewise, with respect to Jackson's assertions regarding his age, mental abilities, and the other circumstances surrounding the interrogation, this court concludes that the Alabama Supreme Court's determination that the State met its burden in proving that Jackson voluntarily and knowingly waived his *Miranda* rights, that he made his statement voluntarily, and that the record does not reveal that Jackson was threatened or coerced into giving a statement is reasonable.

Consequently, the Alabama Supreme Court's adjudication of this claim did not result in a decision involving an unreasonable application of *Miranda*, *Connelly*, *Moran*, or other clearly established Federal law, as determined by the Supreme Court, nor did it result in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding. Thus, Jackson is entitled to no federal habeas relief on his constitutional challenge to the admission of his custodial statement.

## I.    THE PHOTOGRAPHS

Jackson asserts that the ACCA's adjudication of his claim that the State's presentation of photographs of the victim after the shooting were violative of his constitutional rights to due process and a fair trial was contrary to, and an unreasonable application of, clearly established Federal law, and was an unreasonable determination of the facts. In his brief on direct appeal to the ACCA, as well as in his petition to this court, Jackson cites *Woodson v. North Carolina*, 428 U.S. 280 (1976), *Gardner v. Florida*, 430 U.S. 349 (1977), and *Osborne v. Wainwright*, 720 F.2d 1237 (11th Cir. 1983).

The test for determining whether the admission of evidence warrants federal habeas corpus relief is whether the allegedly erroneous admission of evidence either (1) violated a specific Federal constitutional right or (2) rendered the defendant's trial so fundamentally unfair that the conviction was obtained in violation of the Due Process Clause of the Fourteenth Amendment. *Herring v. Secretary, Dept. of Corr.*, 397 F. 3d 1338, 1335 n.8 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005); *Thigpen v. Thigpen*, 926 F. 2d 1003, 1012 (11th Cir. 1991). *See Osborne*, 720 F.2d at 1238 ("[W]hen faced with a claim of fundamental unfairness as a federal constitutional

issue . . . , it is necessary for the district court to consider and determine the issue presented as a federal constitutional issue and not a state evidentiary issue."). To reiterate, federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. at 67-68 (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).

In response to Jackson's assertion on direct appeal that the trial court improperly admitted prejudicial and inflammatory photographs in violation of his rights to due process, a fair trial, and reliable sentencing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, the ACCA rejected the claim, specifically finding:

> In this case, the photographs of the victim depict the character and location of his wounds. Nevertheless, these photographs are neither unnecessarily gruesome nor gory. We have also reviewed the remaining photographs and videotapes, and we do not find that they were unduly prejudicial to the appellant. Those photographs and videotapes were relevant and admissible because they depict the crime scene, the vehicles driven by the victim and the appellant, and the evidence recovered during the investigation of the crime. The appellant has not

shown that the admission of any of the photographs or videotapes affected or probably affected his substantial rights. Accordingly, the trial court's admission of the photographs and videotapes did not constitute plain error.

*Jackson v. State*, 836 So. 2d 915, 951 (Ala. Crim. App. 1999).

Having reviewed the record, the court concludes that the ACCA's finding that the photographs were neither unnecessarily gruesome nor gory is a reasonable determination. This court therefore cannot conclude that the ACCA's determination was an unreasonable determination of the facts.

Furthermore, this court agrees that Jackson has failed to demonstrate that the admission of photographic evidence affected his substantial rights. Jackson has not shown how the admission of the photographic evidence so adversely affected his trial as to render the entire trial fundamentally unfair. Thus, Jackson is not entitled to federal habeas relief. *Jacobs v. Singletary*, 952 F.2d 1282, 1296 (11th Cir. 1992) ("The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair." (internal citations omitted).) The ACCA's rejection of Jackson's challenge to the photographic evidence was neither contrary to, nor an unreasonable application of, clearly established Federal law.

## J.    JUROR MISCONDUCT

Jackson asserts the ACCA's determination that he failed to establish juror misconduct was an unreasonable determination of the facts and resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established

Federal law.  Specifically, Jackson claims that juror misconduct prejudiced his trial in violation of his Fifth, Sixth, and Fourteenth Amendment rights to due process, equal protection, and a fair trial.  (Doc. 1 at 89-93.) The State responds, arguing that in Jackson's state post-conviction proceedings, the Alabama state courts addressed and properly rejected Jackson's juror misconduct claim on the merits, and therefore under AEDPA, he is entitled to no federal habeas relief. (Doc. 11 at 79-89.)

After conducting an evidentiary hearing, the Rule 32 court denied Jackson's request for post-conviction relief for juror misconduct.[16] (Doc. 9-38 at 110-11.) On return to remand, the ACCA adjudicated Jackson's juror misconduct claim on the merits, addressing each allegation of juror misconduct individually.

## 1.  Juror J.G.

Jackson claims that his Sixth Amendment right to an impartial jury was violated when Juror J.G. did not answer truthfully during *voir dire* regarding firearms that he owned and his familiarity with the differences in caliber.

---

[16] The Rule 32 court initially did not hold a hearing on the juror-misconduct issue.  Jackson did not assert juror-misconduct on direct appeal, but he did raise a similar assertion in his Rule 32 Petition. (Doc. 9-16 at 59-64.)  The Rule 32 Court summarily rejected Jackson's claim, finding that it was procedurally barred under the Alabama Rules of Criminal Procedure because the juror-misconduct claims could have been, but were not, raised at trial or on appeal.  (Doc. 9-38 at 73-74.)  The Rule 32 Court also found that this claim was subject to dismissal because it was deficiently pleaded.  (*Id*. at 74-75.)

On appeal, the ACCA reversed the Rule 32 court's determination, concluding that, due to practicality reasons and the Alabama Supreme Court's recent decision in *Ex parte Burgess*, 21 So. 3d 746 (Ala. 2008), the claim was not procedurally barred.  *Jackson*, 133 So. 3d at 431-32. The ACCA then remanded the case to the Rule 32 court for further consideration and to hold an evidentiary hearing on the juror misconduct issue.  *Id.* at 432.

The Rule 32 court denied Jackson's juror misconduct claim as to J.G., finding that Jackson had not presented any testimony from J.G. that would warrant a new trial and that it "did not find any strong evidence of juror misconduct." (Doc. 9-38 at 111.)

On return to remand, the ACCA discussed Juror J.G.'s alleged misconduct, in pertinent part, as follows:

> At the evidentiary hearing, J.G. testified that at the time of Jackson's trial he owned a 9–millimeter gun and a .357–caliber gun. He testified that he did not compare the bullets for the two guns. J.G. said: "I don't know if you can interchange each [magazine] or not. I never tried it or anything like that." (Record on remand, p. 40.) Jackson asked J.G. no questions concerning his responses to voir dire questions.

> The circuit court made the following findings in regard to juror J.G.:[]

> > "Counsel alleged that [J.G.] owned a nine millimeter but had failed to reveal that at the time of trial. It was also alleged that he owned a .357 and had compared the .357 ammunition to the nine millimeter ammunition. [J.G.] testified at the evidentiary hearing that he did, in fact, own a nine millimeter and a .357, but he did not know if the ammunition on these weapons was interchangeable. He also stated that he did not ever during jury deliberations of the capital murder case compare these bullets."

> (Supp. R. 6.)

> Jackson did not question J.G. concerning his responses or lack of responses to voir dire questions. Our review of the trial record shows that juror J.G. was asked if he owned any guns. (Trial R. 60.)[] J.G. answered that he had just purchased a 9mm gun. He was then asked if he knew the difference between ammunition for a 9mm gun and ammunition for a .357–caliber gun. He answered that he had "never

seen a .357 [type of ammunition]." (Trial R. 61.) At the postconviction hearing, J.G. testified that he did not compare the ammunition. Postconviction counsel stated at the hearing that neither of Jackson's trial attorneys would be testifying at the postconviction evidentiary hearing.

> "[Jackson] is not entitled to relief on this juror-misconduct claim because he neither proffered nor introduced evidence that a true answer by [J.G.] would have caused [trial counsel] to challenge [J.G.] for cause or to exercise a peremptory challenge against [him]."

*Ex parte Dobyne*, 805 So.2d [763,] 773 [(Ala. 2001)]. *See Jones v. State*, 753 So.2d 1174, 1203 (Ala. Crim. App. 1999) ("[W]e find nothing to indicate that Jones's trial counsel would have struck [the juror] had he known the information [the juror] revealed at the evidentiary hearing."). Moreover, no evidence was presented at the evidentiary hearing indicating that J.G. had compared the ammunition. Jackson failed to show by a preponderance of the evidence that any juror misconduct occurred as to juror J.G. *See* Rule 32.3, Ala. R. Crim. P.

*Jackson v. State*, 133 So. 3d at 438–39 (footnotes omitted).

Jackson asserts that the ACCA's determination is contrary to, and an unreasonable application of, clearly established federal law as determined by *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984). *See* 28 U.S.C. § 2254(d)(1). In *McDonough*, a products liability action, the plaintiff moved for a mistrial based on the failure of a juror to admit during voir dire that his son had been in a serious accident. The Supreme Court set forth the following standard for obtaining a new trial premised upon a venire member's failure to reveal information:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question

on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*McDonough*, 464 U.S. at 556 (emphasis added).

At the outset, this court must determine whether the ACCA's adjudication of the juror misconduct claim is "contrary to" *McDonough*. Alabama courts have not adopted either prong of the *McDonough* standard. *See McWhorter v. Commissioner*, 824 F. App'x 773, 784 (11th Cir. 2020) (citing *Brown v. State*, 807 So. 2d 1, 9 n.6 (Ala. Crim. App. 1999) (per curiam)). Instead, Alabama courts have held the proper standard for determining whether juror misconduct warrants a new trial "is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant." *Ex parte Dobyne*, 805 So. 2d 763, 771 (Ala. 2001). Whether this rule— and the ACCA's application of it in Jackson's case—is "contrary to" *McDonough* under § 2254(d) depends on whether it "contradicts the governing law set forth in [the Supreme Court's] cases." *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quotation marks omitted).

The ACCA's analysis is in accordance with *McDonough*. The ACCA acknowledged that under Alabama's might-have-prejudiced standard, the "form" of prejudice that would entitle Jackson to relief would be the nondisclosure's "effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror." *Jackson*, 133 So. 3d at 438. The ACCA

also considered whether the facts showed "there was probable prejudice," and looked to certain factors, including "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or in failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." *Id*. at 436 (quotation marks omitted).

This analysis by the ACCA mirrors the analysis the Eleventh Circuit has followed under *McDonough*, which looks to facts "showing . . . a close connection" between the biased juror and the circumstances of the case. *See McWhorter* (quoting *United States v. Carpa*, 271 F.3d 962, 967 (11th Cir. 2001)). In other words, both Alabama's might-have-prejudiced standard and *McDonough* depend on whether the juror's bias may have influenced the verdict against the defendant. Compare *McDonough*, 464 U.S. at 554 (holding that a "touchstone of a fair trial is an impartial trier of fact") with *Ex parte Dobyne*, 805 So. 2d at 771 (explaining that the focus of whether a defendant was prejudiced is grounded in whether the juror might have unlawfully influenced the verdict).  Consequently, the ACCA's adjudication of this claim was not contrary to clearly established law as determined by *McDonough*.

Neither did the ACCA "unreasonably apply" the *McDonough* standard. Jackson argues that, had Juror J.G. honestly stated that he owned a .357 and that he knew the difference between ammunition for a 9 mm and a .357, trial counsel would

have removed him from the jury, "as evidenced by the fact that counsel struck the only other juror (C.B.) who owned a 9 mm and a .357."[17] (Doc. 35 at 145.) In *O'Neill*, the Eleventh Circuit noted that a "defendant['s] failure to meet the *McDonough* standard precludes the claim based on the right of peremptory challenges." 767 F.2d at 785-786 n.4 (11th Cir. 1985). Thus, to the extent Jackson argues that he would have used a peremptory challenge to strike J.G. had he provided a more honest statement about the weapons and ammunition, it is strongly arguable that this possibility is not relevant under *McDonough*, which allows relief where a correct response "would have provided a valid basis for a *challenge for cause*." *McDonough*, 464 U.S. at 556. (Emphasis added.)

Furthermore, relying on the Rule 32 court's findings that Juror J.G. did not compare the ammunition during jury deliberation, the ACCA determined that any bias or knowledge this juror may have had did not influence the verdict and therefore the juror's misstatements did not rise to the level of juror misconduct. The Rule 32 court found that, although J.G. testified at the evidentiary hearing that he owned both a 9 mm and a .357, his testimony established that he did not know if the ammunition was interchangeable and that he did not compare the bullets during the deliberations. The ACCA's conclusion that J.G.'s answers during voir dire did not rise to the level

---

[17] The trial court did not remove C.B. for cause; Jackson's counsel used a peremptory strike to remove C.B. (Doc. 9-1 at 149.)

of juror misconduct is not an unreasonable application of *McDonough* as applied to Jackson's case.

Jackson also asserts the ACCA's adjudication of the claim is an "unreasonable determination of the facts." (Doc. 35 at 146.) In his brief, Jackson does not direct the court to any specific facts he believes were unreasonably determined by the ACCA in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(2). This court has reviewed the state court record. At the 2010 evidentiary hearing, J.G. testified that he remembered comparing the magazines and ammunition for both guns, but he was not clear on the exact point in time that he made this comparison, stating:

> Well, years ago when I had both guns, like I told you, it appears that the .357 was a little larger. It looked like it was different magazines as well, and I don't know if you – like I say, I ain't no expert. I don't know if you can interchange each one or not. I never tried it or anything like that.

(Doc. 9-22 at 40-41.) When Jackson's counsel asked if J.G. remembered when he made this comparison, J.G. testified, "No. It was when I – when I got the nine-millimeter, I think, that I – that I did this. And I had it before I served on the – on the trial." (*Id.* at 41.) And, concerning the bullet comparison, J.G. testified that "I think it was in deliberation that I – that they brought them back there in a plastic bag or something." (*Id.* at 42.) Jackson's counsel asked if J.G. could be mistaken about that being when he made the comparison. J.G. responded, "I doubt it." (*Id.*) Upon

review of the record, this court cannot conclude that the ACCA's adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

In sum, the ACCA's determination that Juror J.G.'s statements regarding his ownership of a .357 and his comparison of the ammunition did not rise to the level of juror misconduct is neither contrary to, nor an unreasonable application of, *McDonough*, and did not result in a decision that was based on an unreasonable determination of the facts. Thus, Jackson is not entitled to relief on this juror misconduct claim.

### 2.    Juror J.B.

Jackson claims that his constitutional right to a fair and impartial jury was violated when Juror J.B. conducted an unauthorized investigation of the crime scene and considered extraneous evidence during deliberations.

The ACCA summarized the evidence presented during the 2010 Rule 32 proceeding as follows:

> For the postconviction proceedings, the testimony of J.B. was conducted by telephonic deposition. Most of J.B.'s direct examination consisted of her reading an affidavit she had executed in April 2004. The affidavit stated, in pertinent part:
>
> > "During the trial, I drove by the Smiley Court area and the area where the shooting occurred. I also drove to the home of Ms. Flowers, where the car theft occurred. It was important for me to see the place where the shooting and the car theft occurred. During the deliberations this

information was important and I did not feel that I could not [sic] make a judgment about what happened on the night of the crime before I had visited these places."

(Record on remand, p. 98.) J.B. testified at the evidentiary hearing that she did not remember going to the Smiley Court area and did not remember anything she might have learned from going there. On cross-examination, J.B. testified that she did not write the affidavit and that her verdict was based on the evidence presented at trial—not any outside evidence.

The circuit court made the following findings concerning juror J.B.:

"The final witness, [J.B.], currently lives in Las Vegas, Nevada, and her deposition had to be taken by telephone. Counsel for both sides conducted telephonic deposition on March 1, 2010, of [J.B.]. During the telephonic deposition, [J.B.] stated that she recalled meeting with counsel for [Jackson] back in 2004 and signing an affidavit. She did not recall who wrote up the affidavit but only that she, in fact, did sign it. The affidavit stated that [J.B.] went to the area of the shooting and the area where the car theft had occurred. She stated that she went to both locations because she was concerned about whether or not [Jackson] was the shooter. During the telephonic deposition, however, [J.B.] stated that she did not recall going to the scene of the crime. She stated that she had been involved in two car accidents and was currently on medication. She went on to state that she did not believe that anything has affected her memory. The Court recognizes that there are inconsistencies regarding [J.B.'s] information; however, there is not conclusive proof as to juror misconduct on her part.

"A defendant who is seeking a new trial on the basis of juror misconduct has the initial burden to prove that a juror or jurors did, in fact, commit the alleged misconduct. See *Dawson v. State,* 710 So.2d 472 (Ala.1997). The Court heard from three witnesses at the evidentiary hearing and

reviewed the telephonic deposition taken of the final juror. The Court did not find that counsel for [Jackson] had presented any alleged misconduct that would warrant a new trial. The Court examined the juror's answers and conduct from jury selection and did not find any strong evidence of juror misconduct.

"Wherefore, it is ordered that [Jackson's] request for post-conviction relief for juror misconduct is hereby denied."

(Supp. R. 6–7.)

*Jackson*, 133 So. 3d at 440–41.

The ACCA further determined:

Even if we were to conclude that J.B. did indeed visit the crime scene, there was no testimony presented as to what evidence or insight J.B. gained by that visit. Nor did Jackson prove that J.B. shared her views with any of her fellow jurors. None of the jurors were asked about this during the evidentiary hearing. In *Reed v. State*, 547 So. 2d 596 (Ala. 1989), the Alabama Supreme Court stated:

"We cannot agree with the defendant that the verdict rendered might have been unlawfully influenced, where the results of the home experiment were known only to the one juror who conducted the experiment and that juror remained unaffected by the experiment."

547 So. 2d at 598. Based on the considerations addressed in *Taite v. State*, 48 So. 3d [1,] 9 [(Ala. Crim. App. 2009)], this case does not present a situation where prejudice is presumed as a matter of law. Jackson failed to meet his burden of proof in regard to the juror-misconduct claim related to J.B. Accordingly, the circuit court did not err in denying Jackson relief on this claim.

*Jackson*, 133 So. 3d at 441.

Jackson asserts the ACCA's adjudication of this juror misconduct claim resulted in a decision that was an unreasonable application of clearly established Federal law, as determined by *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Remmer v. United States*, 347 U.S. 227 (1954). Specifically, he argues that Juror J.B.'s reliance on extraneous evidence to determine his culpability was both presumptively and actually prejudicial to his case and that the State failed to meet its burden of demonstrating harmlessness.

It is clearly established that a jury must base its verdict only on evidence coming "from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner*, 379 U.S. at 473. Prejudice is presumed if a defendant establishes that extrinsic contact with the jury in fact occurred. *McNair v. Campbell*, 416 F.3d 1291, 1307 (11th Cir. 2005). Once a defendant makes a showing of prejudice, the burden shifts back to the state to rebut the presumption by "showing that the jurors' consideration of the extrinsic evidence was harmless to the defendant." *Id.* (quoting *Remmer v. United States*, 347 U.S. at 229).

Emphasizing Juror J.B.'s prior testimony that she "did not feel that she could make a judgment about what happened on the night of the crime [until] she visited [the crime scene]" (doc. 9-22 at 99), Jackson asserts the ACCA's determination that his "case does not present a situation where prejudice is presumed as a matter of

law," *Jackson*, 133 So. 3d at 441, is unreasonable. In its opinion, the ACCA questioned whether the juror did in fact visit the crime scene. As discussed by the ACCA, Juror J.B.'s initial testimony that she drove to the area of the crime scene was presented by reading her 2004 affidavit into evidence during the Rule 32 hearing. During the Rule 32 hearing, J.B. testified that she did not remember writing the affidavit and that she did not know who prepared it, but that she recognized her signature. Despite her statement in the affidavit that she drove to the scene of the crime, she testified that she did not recall going to the scene of the crime. She also acknowledged that her verdict was based on the evidence presented at trial and that it was not based on any evidence obtained outside of trial. Furthermore, there was no testimony establishing that J.B. shared her observations with other jurors. Given J.B.'s difficulty recalling details and the inconsistencies between her testimony and affidavit, this court concludes that the ACCA's determination that it could not presume prejudice in this instance is not an unreasonable application of *Turner*, *Remmer*, or other clearly established Federal law.

Jackson also argues the ACCA's adjudication of this claim is unreasonable because the State failed to meet its burden of demonstrating harmlessness. Because the ACCA concluded that it would not presume prejudice, it did not discuss whether the State rebutted the presumption of prejudice. Likewise, this court will not proceed to the next step. Clearly, the ACCA's adjudication of this juror misconduct claim

was not an unreasonable application of clearly established Federal law. Consequently, Jackson is not entitled to habeas relief with respect to this claim.

### K.    THE *ATKINS* CLAIM

Jackson contends that the ACCA's failure to remand for a hearing to allow him to present evidence of his intellectual deficits for the purpose of establishing his ineligibility for the death penalty is contrary to, and an unreasonable application of, *Atkins v. Virginia*, 536 U.S. 304 (2002). He asserts that the state courts' summary dismissal of his *Atkins* claim is contrary to well-settled Supreme Court law and resulted in an unreasonable determination of the facts. (Doc. 1 at 93-96; Doc. 35 at 150; Doc. 51.) The State responds that the state courts' adjudication of the *Atkins* claim was based on a reasonable determination of the facts in light of the evidence in the state court record and based on the facts as pleaded by Jackson in his Rule 32 petition.

The ACCA affirmed the Rule 32 court's summary dismissal of the *Atkins* claim as follows:

> Jackson next argues that he is mentally retarded and that his sentence of death violates the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 . . . (2002). Specifically, he argues that he made a prima facie showing that he is mentally retarded; therefore, he argues, he is entitled to an evidentiary hearing and to an opportunity to prove that claim.

> The United States Supreme Court in *Atkins v. Virginia* held that it is unconstitutional to sentence a mentally retarded defendant to death. The Court left it to the individual states to adopt a definition of mental

retardation. Alabama has yet to enact legislation addressing this issue; however, the Alabama Supreme Court in *Ex parte Perkins*, 851 So.2d 453 (Ala. 2002), adopted the most liberal definition of mental retardation as defined by those states that had adopted legislation prohibiting the execution of a mentally retarded defendant. To meet the definition of mental retardation under *Perkins*, the defendant must: (1) have significantly subaverage intellectual functioning (an IQ of 70 or below); (2) have significant deficits in adaptive behavior; and (3) these two factors must have manifested themselves before the defendant attained the age of 18. "*Atkins* applies retroactively to all cases, even those on collateral review." *Smith v. State*, 71 So. 3d 12, 17 n.2 (Ala. Crim. App. 2008).

In addressing this claim, the circuit court made the following findings:

"Jackson contends that 'records of the Alabama Department of Corrections in 1997 establish that [he] received a Full Scale IQ score of 75 on a Beta Test.' (Second Amended Petition on p. 73.) While Jackson argues his IQ score of 75 is evidence of subaverage intellectual functioning, the appellate courts of Alabama have considered similar IQ scores as evidence an individual is not mentally retarded. *See*, *e.g.*, *Ex parte Smith*, [[Ms. 1010267, March 14, 2003] —— So. 3d —— (Ala. 2003)] (holding that Smith's overall IQ of 72 'seriously undermines any conclusion Smith suffers from significant subaverage intellectual functioning as contemplated under even the broadest definitions [of mental retardation]'); *Peraita v. State*, 897 So. 2d 1161, 1207 (Ala. Crim. App. 2003) (holding that evidence Peraita, at age 19, had an IQ of 75 'does not establish [he] had significantly subaverage intellectual functioning').

"The evidence presented at trial did not raise the slightest inference Jackson suffers significant or substantial deficits in adaptive functioning. Jackson was able to maintain an interpersonal relationship for more than a year with his girlfriend and fathered a child. Jackson lied to police about his role in the victim's murder and only

admitted being at the scene after police lied about finding his fingerprints on a cup. The trial court found in his sentencing order that 'Jackson was the ring leader in this offense.' (C.R. 176.) Jackson's father testified that Jackson 'was an intelligent young man' that could do his school [work] but that 'he wasn't interested in it.' (R. 572.) While Jackson's sixth grade teacher testifying before this Court described Jackson as 'a low achiever' in school, she never indicated he suffered from subaverage intellectual functioning or mental retardation. (R. 61.)

"The Court finds that [this] allegation ... is without merit."

(R. 949–51.) (Emphasis in original.)

An evidentiary hearing on a claim of mental retardation is not necessary in every case. "However, before a circuit court finds a petitioner to be entitled to a hearing under Rule 32.9, the court must find that the petitioner met his or her burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. Rule 32.3, Ala. R. Crim. P." *Fincher v. State*, 724 So. 2d 87, 89 (Ala. Crim. App. 1998). We have held that a hearing is not necessary if it is clear from the record that the defendant does not meet the broadest definition of mental retardation adopted by the Alabama Supreme Court in *Perkins*. *See Ferguson v. State*, 13 So. 3d 418, 436–37 (Ala. Crim. App. 2008).

The record clearly shows that Jackson does not meet the broadest definition of mental retardation. By counsel's own admission, Jackson's IQ score is 75. A review of Jackson's statements to police shows an articulate young man. At the sentencing hearing, Jackson's father described Jackson as a[n] intelligent young man who was bored with school. The trial court, which had an opportunity to observe Jackson, stated in its sentencing order that there was no evidence indicating that Jackson suffered from any mental disturbance or that he was unable to appreciate the criminality of his conduct. Jackson maintained a relationship and fathered one child.

Jackson does not meet the broadest definition of mental retardation adopted by the Alabama Supreme Court in *Ex parte Perkins*.

Accordingly, *Atkins v. Virginia* does not bar the imposition of the sentence of death in Jackson's case, and this claim was correctly summarily dismissed.

*Jackson v. State*, 133 So. 3d at 463–65.

## 1. Section 2254(d)(1)

Jackson asserts that the ACCA's adjudication of his *Atkins* claim is contrary to, and an unreasonable application of, clearly established Federal law. In *Atkins*, the United States Supreme Court concluded that the execution of intellectually disabled persons failed to fulfill either of the two justifications for capital punishment, *i.e.*, retribution and deterrence, and held the Eighth Amendment forbids the execution of intellectually disabled persons.[18] 536 U.S. at 318-21. The Supreme Court cited two

---

[18] The Court in *Atkins* used the descriptive term "mentally retarded" rather than the term "intellectually disabled." The terminology in the courts and the medical community, however, has changed "because 'the term "mental retardation" has negative connotations,' and 'has become offensive to many people.'" *Jones v. Social Security Administration*, 695 F. App'x 507 (11th Cir. 2017) (quoting Change in Terminology: "Mental Retardation" to "Intellectually Disability," 78 Fed. Reg. 46499 (Aug. 1, 2013)). "But this change 'd[id] not affect the actual medical definition of the disorder or available programs or services.'" *Id.* (quoting Change in Terminology: "Mental Retardation" to "Intellectually Disability," 78 Fed. Reg. at 49500).

Following the lead of the Supreme Court and Eleventh Circuit in recent opinions, this memorandum opinion uses the terms "intellectual disability" and "intellectually disabled" to describe the identical phenomenon. *See Hall v. Florida*, 572 U.S. 701, 704-05 (2014) ("This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts, the manual is often referred to by its initials 'DSM,' followed by its edition numbers, *e.g.*, 'DSM-5.'"); *Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1310 n.1 (11th Cir. 2013) ("[W]e recognize that increasingly professionals in this field, such as the American Association on Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation), are replacing the term 'mental retardation' with 'intellectual disability' or 'intellectual developmental disability.'"). Consequently, except when directly quoting an opinion regarding the terms, the appropriate nomenclature will be followed by this court.

clinical definitions of "mental retardation" (now referred to as "intellectual disability") with approval[19] but, ultimately, left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."[20] 536 U.S. at 317. Nonetheless, the Supreme Court recognized that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. at

---

[19] In a footnote in *Atkins*, the Supreme Court identified two clinical definitions of "mentally retarded" as follows:

The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before age 18." Mental Retardation, definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The American Psychiatric Association's definition is similar. "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild mental retardation is typically used to describe people with an IQ of 50-55 to approximately 70. *Id.*, at 42-43.

*Atkins v. Virginia*, 536 U.S. at 309 n.3.

[20] In *Bobby v. Bies*, the Supreme Court pointed out that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within *Atkins'* compass." 556 U. S. 825, 831 (2009)(quoting *Atkins*, 536 U.S. at 321).

309 n.5 (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock & V. Sadock eds. 7th ed. 2000)).

Jackson asserts that the state court's determination that his full-scale IQ score of 75 establishes that he falls outside the range of intellectual disability is an unreasonable application of *Atkins*. He argues that the state court decision, which relied only on information presented prior to the *Atkins* decision to determine whether he was intellectually disabled and therefore ineligible for the death penalty, is an unreasonable application of *Atkins* itself.

The *Atkins* Court did not make such a holding. In *Atkins*, the Supreme Court held that the execution of intellectually disabled defendants is an excessive punishment and therefore unconstitutional. 536 U.S. at 321. The Court "did not provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] will be so impaired as to fall within *Atkins*' compass." *Bobby v. Bies*, 556 U.S. 825, 831 (2009) (quotation marks and alterations omitted). Therefore, the ACCA's decision was neither contrary to, nor an unreasonable application of, *Atkins*. *See* 28 U.S.C. § 2254(d)(1).

## 2. Section 2254(d)(2)

Jackson asserts the Rule 32 court and ACCA's determination that his full-scale IQ score of 75 falls outside the range of intellectual disability is an unreasonable determination of the facts in light of the evidence presented in the state

court proceedings. *See* 28 U.S.C. § 2254(d)(2). Specifically, he argues the state circuit court should have conducted an *Atkins* hearing before its summary dismissal. This court is limited to considering the "evidence presented in the State court proceeding."[21] 28 U.S.C. § 2254(d)(2). But even within that limitation, the court must find that the ACCA based its decision on an unreasonable determination of the facts. *See, e.g., Brumfield v. Cain*, 576 U.S. 305 (2015); *Burgess v. Comm'r of Ala. Dep't of Corr.*, 723 F.3d 1308 (11th Cir. 2013).

In Alabama, a petitioner is considered intellectually disabled within the context of *Atkins* if he shows (1) significantly subaverage intellectual functioning, *i.e.*, an IQ of 70 or less; (2) significant or substantial deficits in adaptive behavior; and (3) that these problems manifested themselves in the developmental period, *i.e.*, before the age of 18. *See, e.g., Burgess v. Commn'r, Ala. Dep't of Corr.*, 723 F.3d at 1321; *Thomas v. Allen*, 607 F.3d 749, 752 (11th Cir. 2010).

The State argues that Jackson's Amended Rule 32 petition failed to plead and prove by a preponderance of the evidence the facts necessary to entitle him to relief. Specifically, it argues that Jackson's allegation of an existence of a 75 IQ score and

---

[21] In response to this Court's inquiry, (*see* Doc. 61), the parties provided notice, (docs. 62, 63), that evidence of the Beta-II IQ test was not presented to the state courts and is therefore not included in the record. Because this Court is limited to the evidence presented in the state court proceeding, it will not consider the attachment to the Response, (doc. 62, Exh. A), for purposes of this opinion. The parties do not dispute that Jackson received a full-scale score of 75 on a Beta-II IQ test.

evidence of a limitations in functional academics, which is a single adaptive area in support of his claim for relief, is not enough.

### i.    *Significantly subaverage intellectual functioning*

There is no dispute that Jackson received a full-scale score of 75 on a Beta-II IQ test and that the parties agreed to this fact in the state court proceedings.[22]

In *Brumfield v. Cain,* 576 U.S. 305 (2015), a Louisiana death-row inmate with a full-scale IQ score of 75 had requested an opportunity to prove he was intellectually disabled in state court. Without affording him an evidentiary hearing or granting him time or funding to secure expert evidence, the state court rejected his claim. *Id.* at 307. The United States Supreme Court held that the state court's determination that Brumfield's IQ score was inconsistent with a diagnosis of intellectual disability was unreasonable. The Court explained that the IQ test result of 75 "was squarely in the range of potential intellectual disability," *id.* at 315, and there was not any "evidence of any higher IQ test score that could render the state

---

[22] The accuracy of the Beta-II test itself is questionable. Other courts have recognized that the Beta-II is not the best tool for measuring an individual's IQ. *See, e.g., Pruitt v. Neal*, 788 F.3d 248, 253 (7th Cir. 2015) (expert noted that Revised Beta (Beta-II) "is not an accurate test, it is not well regarded in the field, and it is not well accepted in the field as a general test of intelligence"; test "severely overestimates" an individual's IQ by "20-30 points"); *Ladd v. Thaler*, 2013 WL 593927, at *2 n.3 (E.D. Tex. Feb. 15, 2013) (state court conclusion that Ladd did not meet intellectual functioning prong of *Atkins* due to 86 Beta test score was rebutted by clear and convincing evidence because Wechsler score was 67 and Beta test is a less accurate and less reliable IQ test); *Allen v. Wilson*, 2012 WL 2577492, at *4, 10, 15 (S.D. Ind. July 3, 2012) (Beta "antiquated" and not an individualized test but group administered; court finds defendant suffers significantly subaverage intellectual functioning despite 104 score on Beta because Stanford-Binet score of 68 is "most reliable" of IQ tests administered).

court's determination reasonable," *id*. at 316. The Supreme Court held that Brumfield was entitled to have his *Atkins* claim considered on the merits in federal court because the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as provided for in 28 U.S.C. § 2254(d)(2).[23] *Id.*

As in *Brumfield*, Jackson proffered that he had received a full-scale IQ score of 75, which is squarely within the range of potential intellectual disability. Jackson was also sentenced prior to the *Atkins* decision. The Supreme Court explained that an evidentiary hearing is even more important in cases with procedural postures like this one, because "[a]t his pre-*Atkins* trial, [the petitioner] had little reason to investigate or present evidence relating to intellectual disability," and doing so actually carried a risk that a jury might find an enhanced likelihood of future dangerousness, weighing in favor of a death sentence. *Brumfield*, 576 U.S. at 321. As a result, "the state trial court should have taken into account that the evidence before it was sought and introduced at a time when [the petitioner]'s intellectual disability was not at issue." *Id*. at 322.

---

[23] Consequently, *Brumfield* did not announce a new rule but found the state court's decision was an unreasonable determination of the facts under § 2254(d)(2). *See Lynch v. Hudson*, 2016 WL 4035186, at *1 (S.D. Ohio July 28, 2016).

In Jackson's case, the state court relied on evidence from the 1998 trial, which occurred four years before the *Atkins* decision, when determining Jackson does not meet the definition of mental retardation. Although the Beta II test was not provided to the state court, it is clear that the Beta II test was administered for a limited custodial purpose prior to the *Atkins* decision and not for the purpose of determining Jackson's eligibility for the death penalty based on intellectual disability.

### ii.    *Significant Impairment in Several Areas of Adaptive Skills*

A component of a finding of intellectual disability is having significant limitations in adaptive skills. "Adaptive skills" include "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3, 318. The Eleventh Circuit has explained that, for purposes of Alabama law, "literature in the field" defines "significant or substantial deficits in adaptive behavior" to require "concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009).

> The term "adaptive behavior" is defined by the [American Association of Mental Retardation] as "the collection of *conceptual, social,* and *practical skills* that have been learned by people in order to function in their everyday lives." *Mental Retardation*[: Definition, Classification,

and Systems of Supports 5] at 41 [(Washington, D.C.: American Association on Mental Retardation 9th ed. 1992] (emphasis supplied). "Conceptual skills" include language, reading and writing, money concepts, and self-direction; in other words, a determination whether the test subject possesses a basic level of literacy and numeracy (so he can shop and make change), and remembers to do things on time. "Social skills" include interpersonal relationships, personal responsibility, self-esteem, gullibility and naiveté, following rules, obeying laws, and avoiding victimization. "Practical skills" include daily activities such as eating, personal hygiene, dressing, meal preparation, housekeeping, transportation, taking medication, money management, and telephone use, as well as occupational skills and maintaining a safe environment.

*Thomas v. Allen*, 614 F.Supp. 2d 1257, 1281 (N.D. Ala. 2009).

Jackson argues that the ACCA ignored several factors which, he says, demonstrate that he has both significantly subaverage intellectual functioning and significant deficits in adaptive functioning which manifested during the developmental period. Specifically, Jackson argues the ACCA failed to consider his sixth-grade teacher's testimony that he was a "low achiever" susceptible to suggestion by his younger peers and with a documented history of borderline intellectual functioning, that he had failed two grades, and that he earned D's and F's until leaving school in ninth grade.

The State argues that the ACCA's decision is reasonable because Jackson's reference to evidence of limitations in functional academics in a single adaptive area was not enough to support his *Atkins* claim. The State does not dispute that Jackson specifically pled limitations in the skill area of functional academics. It, however,

contends that Jackson did not sufficiently plead specific facts establishing an adaptive skill in an *additional* area.

Jackson alleged more than one limitation in an adaptive area. In his Rule 32 petition, Jackson alleged that witnesses' testimony during a suppression hearing describing that he was "susceptible to suggestion," "respectful of his elders," and "eager to please" are all consistent descriptions of an individual with intellectual disability. *See* Doc. 9-16 at 70. The State argues that these descriptions do not directly relate to limitations and do not establish by a preponderance of the evidence deficits in another adaptive skill area. In its opinion, the ACCA focused on Jackson's positive behavior but did not discuss Jackson's allegations of his susceptibility to suggestion and eagerness to please others, both of which are suggestive of a limitation in the additional adaptive skill area of "social skills." *See Thomas*, 614 F.Supp. 2d at 1281 (including self-esteem, gullibility, and naiveté as examples of limitations in social skills); *Bracewell v. State*, ___ So. 3d ___, 2024 WL 3909335 at *5 (Ala. Crim. App. 2024), *quoting Bracewell v. State*, 329 So. 3d 29, 42 (Ala. Crim. App. 2019) (referencing neuropsychologist's testimony that individuals with intellectual disability are "gullible and naive," have a "tendency to give in when under pressure," and have "a desire to please others in order to be accepted.") (cleaned up). *See also Atkins*, 536 U.S. at 318 ("[T]here is abundant evidence that

[intellectually disabled persons] . . . in group settings . . . are followers rather than leaders.").

Jackson alleged deficits in social/interpersonal skills. The fact that he also had positive behaviors, such as providing an articulate statement to the police, maintaining a relationship, and fathering a child, and that his father thought he was intelligent[24] creates a dispute of fact about his adaptive behaviors that a factfinder should have resolved after an evidentiary hearing. *See Brumfield*, 576 U.S. at 320. Just as with the intellectual functioning prong, this is especially true given the procedural posture of the case, in which Jackson was sentenced before *Atkins* and therefore "had not yet had the opportunity to develop the record for the purpose of proving an intellectual disability claim." *Id*. at 321; *see also Morrow*, 928 So. 2d 315, 321 (Ala. Crim. App. 2004) (concluding that a determination of whether the petitioner was or was not intellectually disabled could not be made based on the

---

[24] The ACCA relied on Jackson's father's testimony that he was "an intelligent man who was bored with school," *Jackson v. State*, 133 So. 3d at 463–65, when determining that Jackson did not meet the broadest definition of intellectual disability. The record is replete with references establishing the father's absence. For example, Jackson's presentence report states that he "[saw] his father on only an occasional basis." (Doc. 9-7 at 20.)  Importantly, during a pre-*Atkins* sentencing hearing, the father acknowledged that he was frequently absent from the Jackson's home. The father, Lewis Wendell Taylor, testified that he did not live in the home in 1994 and 1995 and that he had worked as a janitor when he was not incarcerated. (Doc. 9-5 at 173, 176.) Taylor testified that he had resided with Jackson "off and on," (*id*. at 176), that he "wasn't around as much as [he] should have been," (*id*. at 174), and that he was not involved with Jackson's "grades and school work," (*id*.). When asked if he was aware of any problems Jackson had in school, Taylor testified that "[he] was aware that he was an intelligent young man [and] able to do the work [but that] he wasn't interested in it." (*Id*.)  But the father's personal belief that Taylor was intelligent should not be enough to permit a summary finding from the ACCA without the benefit of an evidentiary hearing.

insufficient record and that conflicts in the evidence should be resolved by a trial court).

Furthermore, even if *Brumfield* did not require this result, the Eleventh Circuit's decision in *Burgess* would.  There, the trial record included evidence that the petitioner had intellectually disabled family members and had done poorly in school. The ACCA summarily found that the petitioner could not show deficits in adaptive behavior because he

> had completed the ninth grade; had completed one year at a training school; worked as a welder while incarcerated in Mississippi; was cooperative when interviewed by a probation officer; was a "normal child who was considerate, compassionate, and caring;" had a brother who was [intellectually disabled]; and had been in a relationship with the victim.

*Burgess*, 723 F. 3d at 1314–15 (footnote omitted).

The Eleventh Circuit held that this was an unreasonable determination of the facts because the "good character" evidence "was presented in an entirely different context and without the benefit of any explanation of how it would or would not be consistent with [intellectual disability]," thus failing to "indicate anything substantive about [the petitioner]'s adaptive abilities as that term is used clinically." *Id*. at 1316. As in *Burgess*, some of the evidence the ACCA in Jackson's case relied on—such as fathering a child—is irrelevant to "adaptive skills as that term is used clinically." *Burgess*, 723 F.3d at 1316.

Also similar to *Burgess*, Jackson had a documented history of borderline intellectual functioning. *See Burgess*, 723 F.3d at 1316–17. And the record before the ACCA showed that Jackson had serious academic difficulties, including that he failed both first and third grade, repeatedly received D's and F's, and left school in ninth grade, as well as allegations that his mother is mentally impaired.[25] In short, the ACCA's summary finding, made based on evidence that was presented in a completely different context before the United States Supreme Court had issued *Atkins*, was based upon an unreasonable determination of the facts because it was based upon an inadequate factual record.

### iii.    *Manifestation During the Developmental Period*

The ACCA made no findings about whether Jackson's deficits manifested in the developmental period, *i.e.*, before the age of 18. Consequently, there is no factual finding for the court to review for reasonableness or correctness. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1).

---

[25] The State argues that Jackson's allegation that his mother was "mentally impaired" is not diagnostic evidence of "mental retardation." (Doc. 52 at 8-9.) This court recognizes that having a mental impairment does not equate to intellectual disability; however, "many intellectually disabled people also have other mental or physical impairments . . . ." *Moore v. Texas*, 581 U.S. 1, 17 (2017) (citing DSM-5, at 40). The State criticizes Jackson's speculation that the mother had the predisposing factor of intellectual disability, but the State repeatedly blocked Jackson from obtaining the mother's mental health records. Although Jackson diligently sought to compel the State and the mental health department to provide the mother's records, the State prevented Jackson from obtaining the documentation, arguing that the mother could retrieve the documents herself. Jackson's counsel represented that mental health officials would not release the records without a court order.

### i.v.    Summary

As for the unreasonable determination of facts prong under § 2254(d)(2), the federal court "may not characterize these state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.'" *Brumfield*, 576 U.S. at 313-14 (citation omitted). "If [r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Id*. (quotation marks and citations omitted). Because the court concludes that the ACCA's decision to summarily deny Jackson's *Atkins* claim that he falls outside the range of intellectual disability was based on an unreasonable determination of the facts, the court will review the claim *de novo*.[26]  *See* 28 U.S.C. § 2254(d)(2).

---

[26] It is important to note that, in addition to, and separate from, § 2254(d) is § 2254(e). Section 2254(d)(2) is applicable to a state court's "*decision* that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." (emphasis added.) For example, this court is concluding that the state court's conclusion that Jackson falls outside the range of intellectual disability is a *decision* that was based upon an unreasonable determination of the facts pursuant to § 2254(d)(2).

Section 2254(e)(1) provides that "the determination of a *factual issue* made by a state court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (emphasis added). So, for example, the Rule 32 court's finding that "Jackson fathered a child," *see Jackson*, 133 So.3d at 464 (quoting the Rule 32 court's findings of evidence presented at trial), is a "determination of a factual issue" subject to § 2254(e)(1)'s "clear and convincing error standard" even under de novo review.  *See Pye*, 50 F.4th at 1035 (discussing distinction between § 2254(d) and § 2254(e)). Therefore, on de novo review of the *Atkins* claim, although this court owes no deference to the state court's ultimate *decision* on the *Atkins* claim, this court must presume that the state court's factual findings are correct and are subject to rebuttal only by clear and convincing evidence. *See* 28 U.S.C. 2254(e)(1).

In this case, the state court *decided* without conducting an *Atkins* hearing that Jackson does not fall within the range of intellectual disability. Jackson attempted to develop, and diligently pursued, the *Atkins* claim in the state court. Accordingly, the court exercises its discretion and will set an evidentiary hearing on the *Atkins* claim. *See* Rules Governing Section 2254 Cases, R. 8(a).

## L.    JACKSON'S AGE

Jackson claims that, because he was eighteen years old at the time of the offense, a death sentence violates his constitutional rights under the Eighth and Fourteenth Amendments. (Doc. 1 at 97-99.)  He argues that his age at the time of the crime establishes that the death penalty was disproportionately applied to him. (*Id.* at 100.) Specifically, he asserts that the ACCA's adjudication of this claim is both contrary to, and an unreasonable application of, *Roper v. Simmons*, 543 U.S. 551 (2005), and other clearly established federal law,[27] and is an unreasonable determination of the facts.

In *Roper*, the Supreme Court held that the imposition of the death penalty on those less than eighteen years old would be "cruel and unusual," in violation of the

---

[27] In the petition, Jackson also cites a footnote in *Eddings v. Oklahoma*, 455 U.S. 104, 115 n. 11 (1982) ("crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults.").  In his brief, Jackson also references *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988). (Doc. 35 at 149) ("[The Supreme] Court has . . . endorsed the proposition that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult.").

Eighth Amendment. 543 U.S. 551 at 568. The Court rested its holding in part on the fact that several differences exist between juveniles and adults. These differences include a lack of maturity, an underdeveloped sense of responsibility, a greater susceptibility to negative influences and outside pressures, and the fact that juveniles' personality traits are more transitory and less fixed. *Id*. at 569–70.

The ACCA, applying *Roper*, addressed the claim on the merits in pertinent part as follows:

> The United States Supreme Court in *Roper* stated its rationale for drawing the line at 18 years of age:
>
>> "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson* [*v. Oklahoma*, 487 U.S. 815 (1988)], drew the line at 16. In the intervening years the Thompson plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of Thompson extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest."
>
> 543 U.S. at 574.
>
> Recently we held that the United States Supreme Court's decision in *Roper v. Simmons* does not allow this Court to consider the mental age of a defendant but only the chronological age. *See Thompson v. State*, [Ms. CR–05–0073, February 17, 2012] —— So.3d ——

(Ala.Crim.App.2012). Jackson was 18 years of age at the time of the robbery/murder; therefore, *Roper v. Simmons* does not bar his sentence of death.

*Jackson v. State*, 133 So. 3d at 466.

Jackson is entitled to no relief with respect to this claim. Jackson's date of birth is May 30, 1978, and the capital offense occurred on April 25, 1997. (Doc. 9-1 at 5.) Therefore, Jackson was eighteen years old at the time of the offense. Jackson argues that his mental impairments coupled with his chronological age place him in a category of person for whom it is unconstitutional to impose the death penalty. The United States Supreme Court has not extended *Roper* to mental or emotional age. *See Barwick v. Secretary, Fla. Dept. of Corr.*, 794 F.3d 1239, 1258-59 (11th Cir. 2015); *Kearse v. Secretary, Fla. Dept. of Corr.*, No. 15-15228, 2022 WL 3661526, at *26 (11th Cir., Aug. 25, 2022).

This court therefore cannot say that the ACCA's opinion was contrary to, or an unreasonable application of, *Roper* or other clearly established federal law or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Jackson's state habeas corpus proceeding. Thus, Jackson is entitled to no federal habeas corpus relief on his claim that his age at the time of the offense renders his death sentence unconstitutional.

## M.    DISPROPORTIONALITY OF THE DEATH SENTENCE

In the Petition, Jackson asserts his sentence of death is disproportionate to the

sentences of his co-defendants. All three co-defendants were allowed to plead to, and received, lesser sentences. Jackson contends that the sentencing disparity violates his rights to due process and to be free from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United States Constitution. Citing *Roper v. Simmons,* 543 U.S. at 568, and *Spaziano v. Florida*, 468 U.S. 447, 460 (1984), he maintains the application of the death penalty must be narrowed to an ascertainable and distinct class of offenses. (Doc. 1 at 99-101; Doc. 35 at 151-52.) Jackson contends that the state courts' determination was contrary to, and an unreasonable application of, *Spaziano v. Florida*, 468 U.S. 447, 460 (1984), and other clearly established law and an unreasonable application of the facts. The State, however, asserts the claim is procedurally defaulted in this federal habeas proceeding.

## 1. The General Claim

Jackson cites *Spaziano* for the proposition that the death penalty must be narrowly tailored to a distinct class of offenses.

> If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. *Zant v. Stephens*, 462 U.S. 862, 873–880 . . . (1983); *Furman v. Georgia*, 408 U.S., at 294 . . . (BRENNAN, J., concurring). It must also allow the sentencer to consider the individual circumstances of the defendant, his background, and his crime. *Lockett v. Ohio*, supra.

*Spaziano v. Fla*., 468 U.S. at 460, overruled on other grounds by *Hurst v. Fla*., 577

U.S. 92 (2016).

In his brief on direct appeal, Jackson did not assert that his sentence was disproportionate to his co-defendants' sentences or to those imposed in similar capital murder cases. Nonetheless, because state statutory law requires the state courts to consider whether a defendant's sentence is disproportionate to sentences imposed in similar capital murder cases, both the Alabama Supreme Court and the ACCA addressed the issue. *See Ex parte Jackson*, 836 So. 2d at 990 ("[W]e agree with the Court of Criminal Appeals that in this case the punishment of death is not excessive or disproportionate to the penalty imposed in similar cases."); *Jackson v. State*, 836 So. 2d at 965 (applying Alabama Code § 13A-5-53(b)(3) when determining Jackson's sentence was not disproportionate or excessive when compared to penalties imposed in similar crimes being punished by death throughout the State). Specifically, the ACCA determined:

> As required by § 13A–5–53(b)(3), we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant murdered the victim during the course of a robbery in the first degree. Similar crimes are being punished by death throughout this state. *Gaddy v. State,* 698 So. 2d 1100 (Ala. Cr. App. 1995), aff'd, 698 So. 2d 1150 (Ala.), cert. denied, 522 U.S. 1032 . . . (1997); *Bush v. State,* 695 So. 2d 70 (Ala. Cr. App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969 . . . (1997); *Payne v. State,* 683 So. 2d 440 (Ala. Cr. App. 1995), aff'd, 683 So. 2d 458 (Ala. 1996), cert. denied, 520 U.S. 1146 . . . (1997); *Windsor v. State,* 683 So. 2d 1027 (Ala. Cr. App.1994), aff'd, 683 So. 2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171 . . . (1997); *Burton v. State,* 651 So.2d 641 (Ala. Cr. App. 1993), aff'd, 651 So. 2d 659 (Ala.1994), cert. denied, 514 U.S. 1115 . . . (1995).

Accordingly, we conclude that the sentence was neither disproportionate nor excessive.

*Jackson*, 836 So. 2d at 965.

Upon review of the ACCA's opinion, this Court concludes that, to the extent the general issue was adjudicated, the ACCA's determination concerning the disproportionate application of Jackson's sentence when compared to similar capital murder cases is neither contrary to, nor an unreasonable application of, *Spaziano* or other clearly established federal caselaw.

### 2. The Specific Argument

Whether the state courts adjudicated Jackson's more specific claim regarding his sentence being disproportionate to his co-defendants' sentences is less clear. In his state post-conviction brief to the Rule 32 court, Jackson asserted the death sentence was disproportionate, specifically arguing the sentencing court should have considered his age (18 years old) and that his co-defendants received lesser sentences. (Doc. 9-16 at 71-72.) Thereafter, the Rule 32 court found that the assertion was procedurally barred from postconviction review because it could have been but was not raised at trial, and/or because it was raised and addressed on direct appeal. (Doc. 9-38 at 83-84.) On appeal of the denial of his state post-conviction petition, Jackson conceded that the claim was previously litigated on direct appeal, but he argued that the Rule 32 court should have considered the totality of the circumstances, including the disparity between his and his co-defendants' sentences,

and whether his conviction and sentence were in accord with the requirements of the Constitution. (Doc. 9-34 at 111-12) (arguing "[l]uck of the draw does not and cannot explain why Mr. Jackson is facing death while three other people intricately involved in the crime are not. *Spaziano v. Florida*, 468 U.S. 447, 460 (1984).") On appeal from the denial of the Rule 32 petition, however, the ACCA did not address Jackson's specific claim regarding the disparity of the codefendants' sentences. *See Jackson v. State*, 133 So. 3d 420 (Ala. Crim. App. 2009).[28] Ordinarily, "[w]hen a state court ignores a procedural default and chooses to address the merits of a defendant's defaulted claims, ... federal courts cannot apply the procedural bar on the state's behalf." *Freeman v. AG*, 536 F.3d 1225, 1231 (11th Cir. 2008).

This court will not continue to puzzle over whether the state courts adjudicated the more specific challenge to the disparity between Jackson's and the co-defendants' sentences. Jackson's claim that his sentence should be proportionate to that of his co-defendants does not implicate the federal constitution. *See Bush v. Singletary*, 99 F.3d 373, 375 (11th Cir. 1996) ("Proportionality review of the kind at issue [petitioner complaining that his sentence was disproportionate to his co-

---

[28] To complicate matters, when analyzing Jackson's general claim that counsel was ineffective for failing to argue his death sentence was disproportionate to similar capital murder cases, the ACCA noted that the underlying substantive claim was "without merit." *Jackson*, 133 So. 3d at 454. But, the ACCA also determined that Jackson's mere recitation of the ineffective-assistance claim without any argument was not in compliance with the Alabama Rules of Appellate Procedure. *Jackson*, 133 So. 3d at 457.

defendant's sentence] is not required by the federal constitution."). *See also Wilson v. United States*, Nos. 1:02-cr-14-WLS and 1:06-cv-32-WLS, 2008 WL 2024966 at *3 (M.D. Ga. 2008) (disparity between federal sentences imposed on co-defendants does not rise to the level of violation of a constitutional right).  Consequently, this court cannot conclude that the state courts' determination was contrary to, or an unreasonable application of, *Spaziano v. Florida*, 468 U.S. 447, 460 (1984), and other clearly established federal law or an unreasonable application of the facts.

### N.    IT WAS IMPROPER TO DOUBLE COUNT ROBBERY AS AN ELEMENT OF THE CAPITAL OFFENSE AND AS AN AGGRAVATING CIRCUMSTANCE

Jackson claims that double-counting "robbery both as an elevator in the guilt-phase and as an aggravator in the penalty-phase failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty." (Doc. 1 at 102; *see also* Doc. 35 at 152.) He contends that the double counting of robbery in both the guilt and penalty phases violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

In response, the State asserts that the ACCA rejected this claim on the merits on direct appeal, *Jackson v. State*, 836 So. 2d at 958-959, and that its decision was neither contrary to, nor an unreasonable application of, clearly established federal law, and that the state court resolution was based on a reasonable determination of

the facts, *see* 28 U.S.C. § 2254(d).

On direct appeal, the ACCA determined:

. . . Section 13A–5–50, Ala. Code 1975, provides, in pertinent part:

> "The fact that a particular capital offense as defined in Section 13A–5–40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A–5–49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."

Accordingly, under § 13A–5–50, Ala. Code 1975, a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A–5–49, Ala. Code 1975, as an aggravating circumstance. Further, this court has held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. *Burton v. State*, 651 So. 2d 641 (Ala. Cr. App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115 . . . (1995).

"'This practice, known as "double counting" or "overlapping," has been upheld. *Haney v. State*, 603 So. 2d 368 (Ala. Cr. App. 1991), aff'd, 603 So. 2d 412 (Ala. 1992), cert. denied, 507 U.S. 925 . . . (1993). . . .

Therefore, the appellant's argument is without merit.

*Jackson*, 836 So. 2d at 958-59 (some citations omitted).

Jackson fails to show that the ACCA's decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The Supreme Court cases he cites in his petition do not stand for the proposition that the United States Constitution prohibits the use of an element of a capital murder offense as an aggravating circumstance at sentencing. (*See* Doc. 1 at 102)(citing *Gregg v.*

*Georgia*, 428 U.S. 153, 197 (1976); *Zant v. Stephens*, 462 U.S. 862, 877 (1983); and

*North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).  In sum, Jackson has failed to

show that the ACCA's decision was unreasonable, that the decision was based on an

unreasonable determination of the facts, or that any of the ACCA's factual

determinations were incorrect. *See* 28 U.S.C. § 2254(d)-(e).  Jackson therefore is not

entitled to federal relief on this claim.

### O.    ALABAMA'S MANNER OF EXECUTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

Jackson challenges Alabama's "undeveloped procedures for administering

lethal injection and the cruelty of lethal injection" as violative of the Eighth

Amendment. (Doc. 1 at 103.) He presented his challenge to Alabama's process for

imposing death by lethal injection in the Rule 32 proceedings. The Rule 32 court

summarily dismissed the claim pursuant to Rule 32.3 and Rule 32.6(b), finding that

Jackson failed to "proffer any facts or legal authority in his second amended Rule

32 petition that, if true, would establish lethal injection as a method of carrying out

a death sentence . . . violates . . . the Eighth Amendment or the Alabama

Constitution." (Doc. 9-17 at 177-78.) The Rule 32 court also dismissed the claim

pursuant to Rule 32.7(d), finding that Jackson "failed to state a claim upon which

relief may be granted because lethal injection has never been found to be cruel and

unusual punishment." (*Id*. at 178.) The ACCA, citing *Baze v. Reese*, 553 U.S. 35

(2008), in which the Supreme Court held that Kentucky's method of lethal injection

was not cruel and unusual punishment, affirmed the Rule 32 court's decision. *Jackson*, 133 So. 3d at 465.

This court need not resolve whether this claim is procedurally defaulted or whether it is subject to AEDPA or even *de novo* review. In challenging the alleged "undeveloped procedures" and alleging that imposition of the death penalty is cruel and unusual, Jackson plainly is challenging the method or, at least, the manner by which the method of execution is devised, rather than the validity of his conviction or sentence. Thus, this claim is not cognizable in habeas corpus and, instead, must be pursued via a civil action pursuant to 42 U.S.C. § 1983. *See McNabb v. Comm'r, Ala. Dep't of Corr.*, 727 F.3d 1334, 1344 (11th Cir. 2013). *See also Nance v. Ward*, 597 U.S. 159, 170 (2022) (holding that challenge to Georgia's use of lethal injection must be brought via § 1983 even where Georgia law does not authorize an alternative method of execution). Accordingly, this claim is due to be dismissed in this habeas action.

## P.    INEFFECTIVE ASSISTANCE OF COUNSEL

Jackson asserts that the ACCA unreasonably rejected his ineffective assistance of counsel claims. The State argues that the ACCA reasonably applied the clearly established Federal law when resolving Jackson's claims of ineffective assistance of counsel. In addition, the State contends that Jackson's claims that counsel was ineffective for failing to interview Gerard Burdette, adequately

investigate the capital murder charges, and properly assert a *Batson* challenge are procedurally barred.

## 1. The Law

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court established the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. *See Cullen*, 563 U.S. at 189 ("There is no dispute that the clearly established federal law here [in an ineffective-assistance case] is *Strickland v. Washington*."); *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000) (quoting *Strickland, supra* at 687).[29]

To satisfy the first prong of *Strickland*, *i.e.*, establish that counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness."

---

[29] *See also Hinton v. Alabama*, 571 U.S. 263, 264 (2014) (per curiam) (citing *Strickland*, 466 U.S. at 687).

*Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams*, 529 U.S. at 390–91; *Strickland*, 466 U.S. at 688. The defendant has the burden of proof and must overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687–91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89; *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam).

To satisfy the second prong of *Strickland*, "the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Prejudice occurs when there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In the capital sentence context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the

extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. In determining whether there is a reasonable probability of a different result, a court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams*, 529 U.S. at 397–98).

"[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Renico*, 559 U.S. at 776 ("Because AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that '[t]he more general the rule' at issue— and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" (quoting *Yarborough*, 541 U.S. at 664)).

Importantly, "whether defense counsel's performance fell below *Strickland*'s standard" is not the question before a federal habeas court reviewing a state court's decision under § 2254. *Harrington*, 562 U.S. at 101.

> Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct

review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different ... [for] [a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id*. Accordingly, where, as here, "§ 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105. Consequently, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id*.

### 2. IAC Claims at the Guilt Phase

Jackson presents four ineffective assistance subclaims related to counsels' performance in the guilt/innocence phase of his trial: 1) "counsel failed to investigate and interview the only actual witness to the shooting, Gerard Burdette" (doc. 1 at 49); 2) "counsel failed to conduct a constitutionally adequate investigation of the State's capital charges" (*id*. at 50); 3) "counsel failed to adequately object to the prosecutor's use of discriminatory strikes against the veniremembers" (*id*. at 52); and 4) "counsel failed to request and failed to object to the trial court's failure to instruct the jury on the lesser included offense of robbery" (*id*. at 53).

The State contends that three of these ineffective assistance subclaims— specifically, counsels' failure to interview Burdette, failure to adequately investigate the State's capital murder charge, and failure to adequately challenge the

prosecution's discriminatory jury strikes—are procedurally defaulted because they "were not exhausted in state court and were denied on . . . adequate and independent state law grounds." (Doc. 11 at 32.) In support, the State cites the ACCA's determination that, pursuant to Rule 28(a)(10) of the Alabama Rules of Appellate Procedure, Jackson waived review of the claims because he failed to adequately brief them in his appeal of the denial of his Rule 32 petition. *Id*. at 32–33. The State maintains that the remaining guilt phase ineffective assistance claim, Jackson's challenge of his counsels' failure to request an instruction on the lesser-included offense of robbery, was denied on the merits by the ACCA and that such decision must be sustained pursuant to § 2254(d).

Following a discussion of the general contours of the State's procedural defense, the court will examine each of Jackson's guilt phase ineffective assistance subclaims and the State's defenses thereto.

### a.    The adequacy and independence of Rule 28(a)(10)

Rule 28 of the Alabama Rules of Appellate Procedure is the state analogue to Rule 28 of the Federal Rules of Appellate Procedure and, like the federal rule, it governs the parties' briefing in Alabama's state appellate courts. The provision at issue here, Rule 28(a)(10), requires that the appellant/petitioner's brief include an "Argument" section "containing the contentions of the appellant/petitioner with

respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on."[30]

"The purpose of Rule 28 . . . is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." *Ex parte Borden*, 60 So. 3d 940, 943 (Ala. 2007) (citation omitted). "To obtain review of an argument on appeal, an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities support an argument that an error occurred and that the alleged error should result in reversal." *Alonso v. State*, 228 So. 3d 1093, 1108 (Ala. Crim. App. 2016). In general, "waiver of an argument for failure to comply with Rule 28(a)(10) . . . has been limited to those cases where there is no argument presented in the brief and there are few, if any, citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions." *Borden*, 60 So. 3d at 944. Thus, the core question when considering whether an argument is waived under Rule 28(a)(10) is whether the appellant's brief is "sufficient to apprise" the appellate court of the appellant's contentions by providing it with pertinent analysis of why cited authorities demonstrate lower court error. *Id.* at 943.

---

[30] This formulation of Rule 28(a)(10) was operative at the time of Jackson's appeal of the denial of his Rule 32 petition. *See Jackson*, 133 So. 3d at 457.

The Eleventh Circuit recently recognized that, where it is properly applied, Rule 28(a)(10) is a state procedural rule that constitutes an adequate and independent ground to support the procedural default of a federal habeas claim. *Ferguson v. Comm'r, Ala. Dept. of Corr.*, 69 F.4th 1243, 1259 (11th Cir. 2023) (finding that a claim rejected by the ACCA pursuant to Rule 28(a)(10) was "abandoned . . . during . . . state post-conviction proceedings and thus it is procedurally defaulted"). The question is thus reduced to whether, in each instance in which the State asserts a procedural default pursuant to Rule 28(a)(10), Jackson's Rule 32 appellate brief indeed failed to adequately apprise the ACCA of his contentions with respect to his guilt phase ineffective assistance claims, and, consequently, the ACCA's application of the Rule was not "arbitrary," "unprecedented," or "manifestly unfair." *See Bailey v. Nagle*, 172 F.2d 1299, 1302 (11th Cir. 1999) (explaining that procedural default may arise in federal court "where the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred"); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citation omitted) (stating test for "adequacy" of state procedural rule). This inquiry entails a careful review of the relevant portions of the appellate brief corresponding to the state appellate court's application of the state procedural rule.

### b.    Failure to investigate and interview Gerard Burdette

Jackson first claims that counsel were ineffective due to their failure to locate, interview, and present the testimony of Gerard Burdette at his trial. According to the petition, Burdette gave a police statement on the night of the crime that implicated other individuals in the shooting of Moore.  Despite this, counsel "did not find or interview him, and thus was unable to present his testimony." (Doc. 1 at 49.) Because they were unable to present Burdette as a witness at the trial, counsel were "thus forced to read Mr. Burdette's statement into the record at trial."  (*Id*. at 50.)

### i.    *Proceedings in the state courts*

As alleged in the petition, because Burdette was unavailable to testify at Jackson's trial, Jackson's attorneys were permitted to read Burdette's police statement into evidence.  Indeed, jurors were instructed by the trial judge to accept Burdette's statement "just as if Mr. Burdette were here and testifying to you." (Doc. 9-6 at 35.) Burdette's statement constituted the entirety of Jackson's case-in-chief in the guilt phase. (Doc. 9-6 at 35–36.) To provide context for understanding the state courts' disposition of Jackson's ineffective assistance claim related to Burdette, the statement is summarized in the following paragraphs.[31]

Burdette was a passenger in Moore's vehicle prior to the murder. His statement describes two separate vehicular encounters leading up to the fatal

---

[31] Although the text of the statement is not reproduced in the trial transcript, the transcript of the statement was also admitted into evidence and can be found at pages 290–301 of the Clerk's Record.  (*See* Doc. 9-2 at 92–103.)

shooting.  In the first encounter, Burdette was riding with Moore and another friend when they were nearly hit by a white van being driven by an older black woman. Burdette stated that there were three or four "boys" he estimated to be in their late teens in the van and that, as the two vehicles traveled next to each other, the occupants of the van threw gang signs and brandished a firearm in the direction of Moore's vehicle.  Moore slowed to allow the van to travel ahead, where it eventually turned off the road.

The following evening, Burdette was riding with Moore to a gas station when they noticed a car following very closely behind them. The car did not follow Moore into the gas station but, when they left the gas station, the car reappeared and rammed Moore's vehicle on the front driver's side, knocking it off the road. The occupants of the ramming vehicle then pointed guns at Burdette and Moore. Burdette saw three or four armed individuals, but could identify only one of them, a "little chubby" man called "P.J." that he knew from playing basketball at the Smiley Court gym. Burdette saw that the gunmen wore red clothing.

The gunmen opened fire in the direction of the victim's car, shattering the windshield. Burdette heard four or five shots. Burdette and Moore fled on foot. Burdette ran toward a chicken plant across the street. He saw Moore running in another direction. Some of the gunmen drove off in Moore's car. He watched them go up the road, turn around, pass the scene again, and then turn on a different road

and drive away. Burdette went back and found Moore lying in the street, suffering from a gunshot.

Burdette denied that he and Moore were affiliated with any gang. He claimed that he had previously seen the car that attacked them that night and that he knew that "Bloods" gang members used that car.

In the operative Rule 32 petition, Jackson alleged, as he does here, that counsel were ineffective in failing to "investigate and interview" Burdette in order to obtain "critical" testimony tending to "exonerate" Jackson. (Doc. 9-16 at 5.)  The Rule 32 court dismissed this claim as insufficiently specific pursuant to Rule 32.6(b) of the Alabama Rules of Criminal Procedure. In doing so, the state court found that Jackson failed to allege what more counsel could have done to secure Burdette's testimony and that, furthermore, on direct appeal, the ACCA upheld the trial court's denial of a continuance requested by the defense so that it could attempt to secure Burdette's attendance. (Doc. 9-38 at 17–18.)

On appeal of the denial of his Rule 32 petition, Jackson argued that the Rule 32 court erroneously concluded that several of his ineffective assistance claims were insufficiently specific pursuant to Rule 32.6(b).  He cited twelve such claims in his brief, including his claim related to Burdette. (*See* Doc. 9-34 at 71.) He argued, without further explication of the specifics of any of the claims, that the twelve

ineffective assistance claims were pled with sufficient specificity under Alabama law. (*Id*. at 71–72.)

The ACCA found that Jackson's appellate brief provided only a "laundry list" of the twelve ineffective assistance claims he argued were erroneously dismissed pursuant to Rule 32.6(b). *Jackson*, 133 So. 3d at 457. Applying Rule 28(a)(10), the ACCA concluded that Jackson waived appellate review of these twelve claims, including the Burdette claim, because his brief made "no argument in support of any of the cited claims" and, therefore, "totally fail[ed] to comply with the briefing requirements of Rule 28[.]" *Id*.

### ii.    The State's procedural default defense.

The State contends that this claim is procedurally defaulted due to the ACCA's ruling that Jackson waived review of the claim by failing to comply with the briefing requirements of Rule 28(a)(10). Jackson presents two primary counters to the State's procedural default defense: 1) that Rule 28(a)(10) is "inadequate to sustain a procedural default" because it is not "firmly established and regularly followed;" and 2) even if Rule 28(a)(10) was "consistently followed," his appellate brief substantially complied with the Rule. (Doc. 35 at 16–18.) On the first point, Jackson cites no federal case finding Rule 28(a)(10) "inadequate" and, as noted previously, the Eleventh Circuit Court of Appeals has at least implicitly determined that Rule 28(a)(10) is "firmly established and regularly followed," is independent of

federal law, and is adequate to sustain a procedural default. *See Ferguson*, 69 F.4th at 1259.

On the second point, Jackson contends that he "fully and fairly presented to the appellate court his factual and legal arguments that summary dismissal was inappropriate: because his petition was sufficiently specific, because the standard of review for ineffectiveness claims was not addressed on direct appeal, and because his allegations were meritorious." (Doc. 35 at 18 (citations to state court appellate brief omitted).) In support, he argues that his appellate brief presented the ACCA with "over twenty-one pages of argument on trial counsel's ineffectiveness at the guilt phase of trial," and that his brief cited "more than twenty court cases and repeatedly reference[d] allegations in the second amended Rule 32 petition[.]" (*Id.* at 16–17.)

While Jackson cites large swathes of his state court appellate brief to support these points, he does not point to any discrete portion of the appellate brief that addressed the specific deficiency the Rule 32 court described—that his Rule 32 petition failed to allege what more counsel could have done to locate, interview, and present the testimony of Burdette. Jackson thus did not provide the ACCA with the requisite analysis of why the Rule 32 court's specificity ruling was erroneous.

Furthermore, upon review, nothing in the appellate brief, or in the Rule 32 petition for that matter, explains with the requisite specificity how Jackson was

prejudiced by his counsels' failure to secure Burdette's testimony at his trial. Counsel succeeded in introducing Burdette's statement at trial. The jury was instructed to accept the statement just as if Burdette had appeared and testified at trial. The Rule 32 petition does not allege how or why Burdette's live testimony would have been different or more beneficial to Jackson's defense than was his police statement. Indeed, by introducing his police statement, counsel succeeded in obtaining whatever exculpatory benefit they perceived the statement offered without subjecting Burdette to a potentially damaging cross-examination.

Because Jackson's Rule 32 petition failed to provide specific allegations addressing counsels' deficient performance and the prejudice flowing therefrom, the Rule 32 court reasonably dismissed the claim as insufficiently pleaded. On appeal, Jackson did not point to specific allegations ignored or overlooked by the Rule 32 court to show that he adequately pleaded facts establishing deficient performance and prejudice related to Burdette. Instead, Jackson's appeal only grouped his Burdette claim with eleven others in a general challenge to the Rule 32 court's application of Rule 32.6(b). In response to the ACCA's conclusion that this was insufficient to preserve the Burdette claim for appellate review, he still does not point this court to specific allegations or appellate arguments about Burdette that the state courts should have noticed. Instead, he protests that this claim was not waived because the section of his appellate brief concerning this and the other eleven

similarly-disposed claims was twenty-one pages long and cited more than twenty cases.

Only in his merits brief in support of his federal habeas petition—which is insufficient to amend his federal petition, much less present facts, arguments, or theories that should have been presented in state court—does Jackson finally hint at a theory of prejudice related to Burdette. Mirroring his allegations in the Rule 32 and federal habeas petitions, he repeats that counsels' failure to locate and secure the presence of Burdette at trial "forced [counsel] to read Mr. Burdette's statement into the record," but he further laments that this "depriv[ed] the jury of a way to evaluate the witness's credibility." (Doc. 35 at 6.) But it is only speculative that the jury might have found Burdette's testimony more credible had he appeared at trial. Indeed, Burdette was a minor who was believed to have fled to avoid state and federal prosecutions. (Doc. 9-3 at 22 (R. 20)). The potential for impeachment and a damaging cross-examination was obvious. Nothing in the petition specifically shows why Burdette's testimony would have been more credible had he appeared at trial.[32]

At bottom, Rule 28(a)(10) of the Alabama Rules of Appellate Procedure provides an adequate and independent ground to support the procedural default of a

---

[32] In addition, at the hearing on Jackson's motion for a continuance related to the defense's effort to locate Burdette, the prosecution addressed several discrepancies in Burdette's statement that, had he testified, may have been used to impeach his testimony. (*See* Doc. 9-3 at 24 (R. 22).) These included that the windshield of Moore's car was not shot, as Burdette had indicated, and that there were fewer shots fired than he referenced in his statement.

constitutional claim in federal habeas. Jackson's appellate brief in the ACCA did not "substantially comply" with the dictates of Rule 28(a)(10) because he did not point the ACCA to specific allegations in his petition describing how counsel could have secured Burdette's testimony at trial or how he was prejudiced by counsels' failure to secure Burdette's testimony. Hence, he did not apprise the ACCA of his specific contentions respecting this claim and did not provide the specific "analysis" required by Rule 28(a)(10). Consequently, the ACCA's application of Rule 28(a)(10) to adjudicate his Burdette-related ineffective assistance claim as procedurally barred was not arbitrary, unprecedented, or manifestly unfair, and this claim is procedurally defaulted in federal habeas review.

### iii.   The ACCA's alternative merits adjudication

Jackson argues that, notwithstanding the ACCA's finding that his Burdette ineffective assistance claim was procedurally barred, the ACCA also passed on the merits of this claim when it concluded that he "'failed to meet the specificity requirements' for his claim that trial counsel did not interview family members and other witnesses, including Mr. Burdette." (Doc. 35 at 15 (quoting *Jackson*, 133 So. 3d at 460–61).) He argues that, because the ACCA affirmed the Rule 32 court's application of Rule 32.6(b) to dismiss this claim for insufficient specificity, and such a dismissal is an adjudication on the merits for purposes of § 2254(d), then his

Burdette ineffectiveness claim was decided on its merits in the ACCA. (*Id.* (citing *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011)).)

To be sure, as discussed previously, the ACCA plainly found Jackson's Burdette ineffective assistance claim procedurally barred due to his deficient appellate brief. There is no positive indication in the relevant portion of the ACCA's opinion that it was considering or otherwise resuscitating his Burdette claim when it addressed his claim that counsel were ineffective in "failing to meet with his family members and for failing to interview witnesses[.]" *Jackson*, 133 So. 3d at 460. Nevertheless, to the extent that Jackson's Burdette claim may have overlapped with another claim challenging his counsels' failure to adequately investigate and interview family members and other witnesses, including Burdette, and the ACCA did not find this larger claim waived pursuant to Rule 28(a)(10), he ultimately fares no better.

For the reasons described previously—namely, Jackson's failure to provide the state court with adequate, specific allegations demonstrating counsels' deficient performance and, more importantly, prejudice flowing from the failure to secure Burdette's testimony—the ACCA's alternative merits adjudication of this claim, if any, did not involve an unreasonable application of *Strickland* and was not based upon an unreasonable determination of fact in light of the record before the ACCA. § 2254(d)(1), (2). Accordingly, Jackson is not entitled to relief on this claim.

### c.    Failure to adequately investigate the State's capital charges

Jackson next claims that counsel "failed to conduct a constitutionally adequate investigation of the State's capital charges[.]" (Doc. 1 at 50.) He appears to allege that counsel "should have investigated and presented evidence" in support of a theory that the murder occurred as a result of a bad drug deal rather than a robbery. (*Id.*) He alleges witnesses, including Burdette and Moore's wife, would have established that Moore "was involved in gang activity" and "selling drugs." (*Id.*) Furthermore, other witnesses, including Jackson's own family members, would have established that Jackson "began selling drugs at a very young age as a 'drug gofer' for older men in the neighborhood who were gang members, and that Shonelle himself was a gang member and was involved in gang activity." *Id.* Because counsel failed to marshal such evidence, they were unable to defeat the State's pretrial motion *in limine* to prevent the defense from presenting its theory of a drug deal gone bad. (*Id.* at 51.) Had they succeeded in presenting this theory to the jury, he concludes, "the jury would not have convicted Mr. Jackson of capital murder." (*Id.*)

The State asserts that this claim is procedurally defaulted for the same reasons as the previous claim, *i.e.*, the ACCA found the claim waived pursuant to Rule 28(a)(10) of the Alabama Rules of Appellate Procedure. (Doc. 11 at 32–34.)

### i.    *Proceedings in the state courts*

Prior to trial, the State moved *in limine* to preclude the defense from attempting to "raise or elucidate in any manner the alleged drug activity of the victim" because "such evidence is immaterial and irrelevant to this case. The facts of this case involve the Robbery of the victim of his vehicle, and they do not concern any drug activity." (Doc. 9-1 at 63.) At a hearing on the motion, defense counsel argued that Moore was a known crack dealer and counsel therefore wanted to cross-examine witnesses, especially the testifying co-defendants, about whether they knew Moore and whether the confrontation was about "bad [drug] dealings" or the group's desire to rob Moore of a car stereo, as they had indicated in their police statements. (Doc. 9-3 at 29–30 (R. 27–28).) Although the defense indicated that Moore's wife could testify that Moore was a drug dealer, the defense did not provide specifics about any witness who would indicate that the confrontation with Moore was related to drug dealing rather than robbery. The trial court ultimately granted the motion *in limine*, forbidding the defense from eliciting evidence at trial about Moore's drug dealing. (Doc. 9-1 at 106.)

In the operative Rule 32 petition, Jackson alleged that counsel failed to adequately investigate the State's capital murder charge. Specifically, he alleged that counsel failed to sufficiently meet with his family members and "the State's witnesses, including the officers and investigators charged with investigating Mr. Moore's death, [and] did not attempt to meet or locate individuals whose testimony

would conflict with the testimony of the co-defendants in this case, or otherwise undermine the State's presentation of guilt." (Doc. 9-16 at 4–5.) He then identified six such witnesses by name, but did not provide any allegations about what, specifically, counsel would have learned from these witnesses. (*Id*. at 5.)

Jackson argued that an adequate investigation would have enabled counsel "to present a viable defense theory as to why Mr. Jackson was not guilty of capital murder because the motive for the killing was based on the fact that the victim was involved with gang members and was a drug dealer who was known to sell fake drugs, and thus the killing did not take place during a robbery." (*Id*. at 6.) Jackson further argued that his own family members and friends could have provided evidence of his own gang activities and drug usage on the day of the murder. (*Id*. at 7.) He concluded that all this evidence would have coalesced to support his alternative defense theory of a drug deal gone bad that would have defeated the State's capital murder theory of murder during the course of a robbery. (*Id*. at 7–8.)

In large part, the Rule 32 court found Jackson's allegations in this regard to be insufficiently specific and it consequently dismissed Jackson's claim pursuant to Rule 32.6(b). (Doc. 9-38 at 15–17.) In particular, the Rule 32 court found that the Rule 32 petition "proffers no facts . . . his trial counsel could have discovered from family and/or friend[s] that would have been admissible to prove the shooting was the result of a drug deal gone bad." (*Id*. at 15.) The Rule 32 court further found that

Jackson failed to provide specific allegations about what State witnesses or other individuals he faulted counsel for failing to interview "could have said that would have been so compelling it could have possibly made a difference in the outcome of the guilt phase of his trial." (*Id*. at 16.) Finally, the Rule 32 court found that, because the trial court's grant of the State's motion *in limine* was upheld on appeal, and because "Jackson did not proffer a single new fact . . . concerning the 'drug deal gone bad' theory that has not already been heard and rejected by" the trial and appellate courts, his claim of ineffectiveness was without merit. (*Id*. at 45.)

On appeal to the ACCA, and as discussed in conjunction with his Burdette ineffectiveness claim, Jackson grouped together in his brief twelve claims he argued the Rule 32 court erroneously dismissed pursuant to Rule 32.6(b). Among those twelve were his claims that counsel failed to adequately investigate the State's capital murder charge, failed to adequately establish a relationship of trust with Jackson and meet with members of his family, and failed to interview state witnesses. (Doc. 9-34 at 71.)

The ACCA's decision addressed Jackson's claims in two parts. As discussed previously, the ACCA found that, pursuant to Rule 28(a)(10), Jackson waived appellate review of the twelve claims he grouped in his "laundry list" challenge to the Rule 32 court's application of Rule 32.6(b). *Jackson*, 133 So. 3d at 457–58. Separately, the ACCA addressed Jackson's claim that the Rule 32 court erred in

denying his ineffective assistance claim because the "substantive issue underlying the claim had been raised and addressed on direct appeal." *Id*. at 459. The ACCA affirmed the Rule 32 court's conclusion that, because the trial court's grant of the State's motion *in limine* was affirmed on appeal, and because the Rule 32 petition presented no new allegations in support of the defense theory precluded by the grant of the motion *in limine*, the substantive issue underlying Jackson's ineffectiveness claim remained meritless. Consequently, the ACCA concluded, counsel was not ineffective for failing to develop and present additional evidence in support of the theory. (*Id*. at 459–460.)

### ii.    *The State's procedural default defense*

The contours of the State's procedural default defense and Jackson's response were discussed previously in relation to Jackson's Burdette ineffectiveness claim. The same analytical framework is applicable here. In short, correctly applied, Rule 28(a)(10) provides an adequate and independent ground for imposition of a procedural default in federal habeas. The question, then, is whether the state court correctly applied its procedural rule to bar review of Jackson's claim, or whether application of the rule was arbitrary, unprecedented, or manifestly unfair.

Upon review, it is evident that the ACCA correctly, and fairly, applied Rule 28(a)(10). This is so because Jackson's appellate brief did not address the core deficiency identified by the Rule 32 court in finding his claims insufficiently

specific. That is, he did not point the ACCA to specific factual allegations in the Rule 32 petition showing that, with adequate investigation, counsel could have proven that the confrontation with Moore stemmed from a bad drug deal. Instead, he only highlighted the Rule 32 petition's allegations that counsel were ineffective for failing to discover and present evidence about Jackson's prior drug dealing and gang activity. (*See* Doc. 9-34 at 78.) While Jackson argued in his appellate brief that the Rule 32 petition "identified ten witnesses who could have provided testimony in support of" his "bad drug deal" defense (*see id*., n. 25), neither the brief nor the Rule 32 petition attributes to any individual witness a specific claim that Jackson confronted Moore over a bad drug deal. As reviewed above, the Rule 32 court highlighted this deficiency repeatedly in its order. Notwithstanding the centrality of this deficiency in the Rule 32 court's order, Jackson did not direct the ACCA to any specific allegation in the Rule 32 petition supporting his claim.

In sum, because Jackson did not present any specific factual allegations showing a nexus between Jackson's and Moore's alleged drug activity, his claim alleging that counsel ineffectively failed to develop and present this theory of defense was insufficiently pleaded. On appeal, he did not point the ACCA to any specific factual allegations or parts of the record that the Rule 32 court overlooked in dismissing his claim. Instead, he grouped his failure to investigate claim among several other claims that he argued were improperly dismissed pursuant to Rule

32.6(b). Because he therefore did not address the lower court's specific findings as to this claim, he failed to provide the ACCA with more than an "undelineated general proposition" of lower court error. *Ex parte Borden*, 60 So. 3d a 944. Accordingly, the ACCA's application of Rule 28(a)(10) was not arbitrary, unprecedented, or manifestly unfair in this instance, and this claim is procedurally defaulted.

### iii.     The ACCA's alternative merits adjudication

As Jackson has argued (*see* Doc. 35 at 14–15), and as reviewed above, the ACCA also concluded that his claim about counsels' failure to investigate and present his theory of defense was without merit because the underlying substantive issue—the grant of the State's motion *in limine* precluding evidence about Moore's drug dealing—was upheld on direct appeal. To the extent the ACCA's adjudication constitutes an alternative adjudication on the merits of Jackson's ineffective assistance claim about counsels' failure to investigate the State's capital murder charges, Jackson cannot show that he is entitled to relief pursuant to § 2254(d).

In pertinent part, the ACCA affirmed the Rule 32 court's merits adjudication in which it found that Jackson's Rule 32 petition "proffers no facts that, if true, would demonstrate his trial counsel's performance was deficient or caused him to be prejudiced." *Jackson*, 133 So. 3d at 459 (internal quotations removed). As reviewed above, Jackson did not present specific factual allegations substantiating any contention that his confrontation with Moore stemmed from a prior bad drug deal.

Evidence about Moore's drug dealing and Jackson's own history with drugs and gangs does not provide the crucial evidentiary link and would not have permitted the jury to reasonably infer that the confrontation was about prior drug dealings rather than a motive to commit robbery. Accordingly, the state courts' conclusion that Jackson could not show deficient performance or prejudice did not involve an unreasonable application of *Strickland* and was not based upon an unreasonable determination of fact in light of the record before the ACCA.

### d.    Failure to adequately object to discriminatory jury strikes

Jackson's third claim of guilt phase ineffective assistance concerns counsels' alleged failure to "adequately object to the prosecutor's use of discriminatory strikes against the veniremembers." (Doc. 1 at 52.) He alleges that, rather than counsels' cursory objection that the prosecution struck "'six out of seven [black jurors] in a row,'" counsel "should have presented evidence and argument to show that the struck jurors were as heterogenous as the community as a whole[,]" that "there was a lack of meaningful voir dire in this case[,]" and that "the District Attorney for Montgomery County has a history of discrimination in jury selection[.]" *Id.* Had counsel presented this evidence and argument, he alleges, the trial court "would have found a prima facie case of discrimination and counsel would then have been able to show that the prosecution was removing jurors from the venire solely on the basis of race[.]" *Id.*

As with the previous claims, the State contends that this claim is procedurally defaulted because the ACCA found that Jackson waived appellate review of the claim pursuant to Rule 28(a)(10) of the Alabama Rule of Appellate Procedure. (Doc. 11 at 32.)

### i.    State court proceedings

Following challenges for cause, there were forty-two remaining prospective jurors at Jackson's trial.  (Doc. 9-3 at 154 (R. 152).)  The petition alleges that nineteen of these forty-two were black. (Doc. 1 at  52.) Each side was afforded fifteen peremptory strikes.  After the sides completed peremptory strikes, the defense raised a *Batson* challenge:

> Judge, at this point we would move under the *Batson* and its progeny for the State to explain race neutral reasons why it struck Numbers 116, 94, 96, 11, 26 and 165, which were the last set of jurors it struck before turning to Your Honor with the random system.  Six of those seven are black.  Eight of their total strikes were black.

(Doc. 9-3 at 158 (R. 156).) The trial court asked the defense to explain its prima facie case of discrimination, to which the defense responded that it did not believe the prosecution has "race neutral reasons for doing that, Judge, I mean, six out of seven in a row." (*Id*.) The trial court rejected the challenge, finding that the defense had failed to establish a prima facie case of discrimination. *Id*.

On direct appeal, the ACCA explained that, because the record "does not include any documents that show the race or gender of the prospective jurors in this

case" and "does not include copies of the questionnaires completed by the jurors before voir dire examination[,]" the record was "silent" in the requisite areas germane to assessing *Batson* error. *Jackson v. State*, 836 So. 2d 915, 947 (Ala. Crim. App. 1999). Because the record therefore did not "raise an inference of discrimination based on either race or gender[,]" the ACCA refused to find error and declined Jackson's request to remand to the trial court for further *Batson* proceedings. *Id*. at 948.

In his operative Rule 32 petition, Jackson alleged that counsel ineffectively challenged the prosecution's use of discriminatory strikes. (Doc. 9-16 at 18.)  He alleged that counsel "should have presented evidence and argument to show that ... the struck jurors were as heterogenous as the community as a whole; that there was a lack of meaningful voir dire in this case and that the District Attorney for Montgomery County has a history of discrimination in jury selection." (*Id*. 18–19.) The petition did not provide specific allegations, however, about what counsel should have argued about the "heterogeneity" of any struck prospective juror or about the character of voir dire of any prospective juror who was struck *vis a vis* any other prospective juror.

The Rule 32 court found Jackson's *Batson* ineffectiveness claim to be without merit because the underlying substantive issue—the merit of Jackson's *Batson* challenge—was decided on direct appeal. (Doc. 9-38 at 34–35.) On appeal to the

ACCA, Jackson grouped this claim among eleven other ineffective assistance claims in which he argued the Rule 32 court improperly dismissed because the underlying substantive issue had been resolved on direct appeal.  (*See* Doc. 9-34 at 76.) Although this portion of his appellate brief presented additional, specific argument about his claim challenging counsels' failure to adequately investigate the State's charges and failure to request a lesser-included offense instruction on robbery, the brief did not present additional argument about the specifics of his *Batson* ineffectiveness claim. The ACCA concluded that, pursuant to Rule 28(a)(10), Jackson's appellate brief did not preserve this issue for appeal because the brief "merely provides a laundry list of 12 issues that, he says, the court erroneously denied because the issues had been addressed on direct appeal." *Jackson*, 133 So. 3d at 459. Notably, the ACCA *did* address Jackson's claim about counsels' alleged inadequate investigation and failure to request a lesser-included offense instruction because his appellate brief "specifically argued" those issues.  *Id*. at 459-60 n.14.

### ii.    The State's procedural default defense

As discussed previously, because Rule 28(a)(10) provides an adequate and independent basis to support a procedural default, the question is whether the Rule was correctly applied by the ACCA in this instance, or whether its application was arbitrary, unprecedented, or manifestly unfair.  Upon review, it is evident that the ACCA correctly, and fairly, applied the state procedural rule.

In order to sufficiently apprise the ACCA of his contentions with respect to his argument that the Rule 32 court improperly disposed of his *Batson* ineffectiveness claim because the underlying *Batson* claim had been rejected on appeal, Jackson was obligated to alert the ACCA to the specific arguments he faulted counsel for failing to make that were not already considered by the ACCA when it disposed of the underlying *Batson* claim on direct appeal. As reviewed above, Jackson's appellate brief on appeal of the Rule 32 court's decision did not separately and specifically address his *Batson* ineffectiveness claim, as the claim was grouped with eleven other claims in a general contention that the Rule 32 court erroneously denied such claims.

Digging deeper, it is evident that Jackson's *Batson* ineffectiveness claim did not rely upon *any* specific, material factual allegation that was not considered, and rejected, by the ACCA on direct appeal. In his brief on direct appeal to the ACCA, Jackson argued that the trial court committed reversible error in rejecting the defense's prima facie case of discrimination because, in addition to the prosecution's use of eight peremptory strikes to remove eight of nineteen eligible black veniremembers, "there was a lack of meaningful voir dire and the district attorney for Montgomery County has a history of racial discrimination in jury selection." (Doc. 9-8 at 66.) As discussed previously, the ACCA rejected Jackson's challenge. *See Jackson*, 836 So. 2d at 947–48.

Jackson merely repackaged this same argument in the *Batson* ineffectiveness claim in his Rule 32 petition, this time arguing that counsel were ineffective for failing to present the arguments that had already once been rejected by the ACCA on direct appeal.  He again cited the prosecution's strikes of eight black prospective jurors, and he again complained that counsel had failed to argue "that there was a lack of meaningful voir dire in this case and that the District Attorney for Montgomery County has a history of discrimination in jury selection." (Doc. 9-16 at 18–19.) Furthermore, although the Rule 32 petition presented the additional allegation that "the struck jurors were as heterogeneous as the community as a whole[,]" *id*., there were no specific allegations supporting this conclusion.  So, in his Rule 32 petition, Jackson merely alleged that counsel were ineffective for failing to make the arguments that counsel presented to the ACCA on direct appeal. Accordingly, the Rule 32 court justifiably concluded that, because the substantive argument Jackson presented in the Rule 32 petition had already been presented to, and rejected by, the ACCA on direct appeal, Jackson could not establish deficient performance or prejudice due to counsels' failure to present such argument at trial.

As reviewed above, Jackson failed to specifically address any of this on appeal of the Rule 32 court's order, opting instead for a general, "undelineated" proposition of lower court error. Because he failed to provide specific analysis of how he was prejudiced by counsels' failure to present arguments that were rejected by the ACCA

on direct appeal, the ACCA reasonably concluded that he had failed to sufficiently apprise it of his contentions respecting this claim and that, consequently, he had waived appellate review of the claim pursuant to Alabama's procedural rules. The ACCA's application of the state procedural rule was not arbitrary, unprecedented, or manifestly unfair. Accordingly, this claim is procedurally defaulted.

### iii.   *Alternative merits adjudication*

Even assuming *arguendo* that Jackson's *Batson* ineffectiveness claim is not subject to default, this court has concluded that the state court's adjudication of the underlying *Batson* claim on the merits was reasonable. The court therefore concludes that Jackson cannot overcome *Strickland*'s prejudice prong. *See Hollis v. United States*, 958 F. 3d 1120, 1124 (11th Cir. 2020) (counsel not constitutionally ineffective for failing to raise meritless objection to use of prior drug convictions as predicate offenses under ACCA); *Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015) (citing *Freeman v. Attorney General, Florida*, 536 F.3d 1225, 1233 (11th Cir. 2008)); *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) (counsel was not ineffective for failing to raise issues clearly lacking in merit). *See also Sneed v. Florida Dep't of Corrections*, 496 F. App'x 20, 27 (11th Cir. 2012) (failure to preserve meritless *Batson* claim not ineffective assistance of counsel). Consequently, Jackson is not entitled to habeas relief based on this ineffective-assistance claim.

e.    **Failure to request and failure to object to the trial court's failure to instruct the jury on the lesser-included offense of robbery**

Jackson's final guilt phase ineffective-assistance claim challenges his counsels' failure to request a jury instruction on the lesser-included offense of robbery and counsels' failure to object to the trial court's failure to provide such instruction. (Doc. 1 at 53.) He alleges the State's evidence "showed that the [victim's] car was stolen only as an 'afterthought' and that the robbery was thus a separate crime from the murder." (*Id.* at 54.) Specifically, he argues that, had the jury been so instructed, and had it found that the robbery was an "afterthought," or at least if it had reasonable doubt whether the murder occurred "during" the robbery, then he could not have been convicted of the capital offense of murder-robbery. (*Id.*)

The State asserts that this claim was denied on its merits by the ACCA, and that such decision did not involve an unreasonable application of clearly established Federal law and was not based upon an unreasonable determination of fact in light of the record before the state court. (Doc. 11 at 35–36.)

i.    *State court proceedings*

On direct appeal, Jackson challenged the trial court's failure to instruct the jury on the lesser-included offense of robbery. Because Jackson did not request the instruction at trial and did not object to the trial court's failure to give the instruction, the ACCA reviewed only for plain error. *Jackson*, 836 So. 2d at 938. Nevertheless,

surveying the trial evidence, the ACCA concluded that there was no rational basis

for a lesser-included offense instruction for robbery. *Id*. at 939. The ACCA reasoned

as follows:

> The evidence presented at trial showed that the robbery occurred after the murder. The appellant contends that the trial court should have instructed the jury on the lesser included offense of robbery because the robbery allegedly was a mere afterthought to the murder and it was not committed during the robbery. In fact, he contended at trial that he did not have anything to do with the robbery and that Barnes and Williams stole the car only because he drove away from the crime scene without them. He now contends that, if the jury had believed his theory, it could have found him guilty of the separate offenses of intentional murder and robbery. We disagree.

> The trial court instructed the jury on the lesser included offense of intentional murder, thus giving the jury the option of finding that the appellant committed the murder but not the robbery. However, under the evidence presented, the appellant did not actually rob the victim, although there was sufficient evidence to show that that was his intent in initiating the confrontation. Under the appellant's theory that the robbery was a mere afterthought and that it did not occur during the murder, the jury could have found the appellant guilty of murder, but he would not have been guilty of the robbery. Thus, if the jury had believed the appellant's theory and determined that the robbery did not occur during the murder, there would not have been a rational basis for it to find that the appellant was guilty of robbery.

> The appellant also contends that the jury could have believed that the robbery did not occur during the murder but still could have found him guilty of being an accomplice to the robbery. This contention is not supported by the record. As stated above, the evidence clearly showed that the appellant's intent when he started following the victim was to rob the victim. If the jury determined that the appellant was guilty of the robbery, even if it determined that he did not kill the victim, then it could only have convicted him of capital murder. Under the evidence presented, he was at least an accomplice to the murder and, more likely, the actual murderer. There was simply no rational basis under the

evidence presented on which the jury could find the appellant guilty of robbery and not guilty of murder. Therefore, we do not find any plain error in this regard.

*Id.* On appeal to the Alabama Supreme Court, the majority opinion affirmed without addressing Jackson's claim about the propriety of the instruction on the lesser-included offense of robbery. Justice Johnstone, concurring in part, offered a "caveat" concerning the ACCA's disposition of this claim. In Justice Johnstone's opinion, "[h]ad the defendant requested such a jury instruction, it would have been due him. The evidence supporting this theory, however, is not so strong that the trial court committed plain error in omitting such an instruction in the absence of a request for one by the defendant." *Ex parte Jackson*, 836 So. 2d 979, 991 (Ala. 2002) (Johnstone, J., concurring-in-part).

In his Rule 32 petition, Jackson alleged that counsel were ineffective in failing to request the lesser-included instruction on robbery and in failing to object to the trial court's failure to provide the instruction. (Doc. 9-16 at 27.) The Rule 32 court denied the claim on the merits, noting the ACCA's findings on direct appeal and observing that "Jackson proffers no facts in his second amended Rule 32 petition that, if presented by his trial counsels to the trial court, would have entitled him to a jury instruction on the lesser-included offense of robbery." (Doc. 9-38 at 49–50.)

On appeal, Jackson argued that the Rule 32 court had improperly denied his ineffective assistance claim merely because the ACCA had found no plain error

when considering the underlying substantive issue on direct appeal. (Doc. 9-34 at 76.) Relying upon Justice Johnstone's partial concurrence, he further argued that "counsel's failure to request [the lesser-included offense instruction for robbery] prejudiced Mr. Jackson, as the trial court would have been required to deliver such an instruction, if requested." (*Id*. at 79.) The ACCA affirmed the Rule 32 court's judgment, concluding that, because it had previously "held that there was no reasonable basis for a jury instruction on the lesser-included offense of robbery," "Jackson cannot show that his counsel was ineffective for failing to raise an issue that has no merit."  133 So. 3d at 460.

### ii.    The ACCA's decision survives § 2254(d) review

The ACCA's decision is not an unreasonable application of *Strickland* and is not based upon an unreasonable finding of fact in light of the record before that court. Here, the *Strickland* inquiry may be resolved on either prong of the test. On the deficient performance prong, Jackson has failed to substantially rebut the ACCA's conclusion that there was no rational basis for a jury charge on the lesser-included offense of robbery. Jackson's only counter to the ACCA's analysis of why he was not entitled to the robbery instruction is to highlight Justice Johnstone's concurring opinion on direct review, in which he opined that, had counsel requested the instruction, it would have been due.  But Justice Johnstone's concurring opinion, joined by no other Justices, demonstrates only that reasonable jurists might disagree

about whether the trial evidence supported giving the instruction. Justice Johnstone's opinion does not support a conclusion that reasonable jurists may not disagree that counsels' decision not to request such an instruction was beyond the wide range of latitude afforded reasonably competent trial counsel under *Strickland*, much less that the ACCA's conclusion otherwise is unreasonable within the meaning of § 2254(d).

Putting aside the merit of his claim that he was entitled to an instruction on the lesser-included offense of robbery, Jackson also cannot show that the ACCA unreasonably concluded that he was not prejudiced by counsels' failure to request such an instruction. This is so because the evidence adduced at trial amply supported the jury's verdict of capital murder during a robbery. *See Jackson*, 836 So. 2d at 927–28 (describing the testimonies of three co-defendants who each testified that Jackson initiated the confrontation with the victim intending to rob the victim). Because the evidence substantially supported the jury's verdict, it is not reasonably probable that the result of Jackson's trial would have been different had counsel requested and succeeded in obtaining an instruction on the lesser-included offense of robbery. *See Johnson v. Alabama*, 256 F.3d 1156, 1181–83 (11th Cir. 2001) (finding no prejudice for counsel's failure to request a charge on felony murder because petitioner "failed to show a reasonable probability that the jury would have returned a different verdict on the capital murder charge").

Jackson's habeas petition appears to raise two primary points presumably in support of his theory that, notwithstanding the co-defendants' testimonies about the robbery motive, the jury still might have found that the robbery was an "afterthought" to the murder, and therefore would not have convicted him of capital murder, had it been charged on the lesser-included offense of robbery. *First*, he contends that his co-defendants' testimonies were suspect because, despite having "had an enormous incentive to testify favorably to the state[,]" they produced "flimsy and contradictory" testimony on the "during" element of the capital murder charge.  (Doc. 1 at 73.)  In support, he cites the fact that Jackson drove away from the scene without taking Moore's car or stereo and that none of his fingerprints were recovered from any items taken from the car. (*Id*.) *Second*, he contends that Moore's car was taken, not because of any motive to rob the victim, but to affect two of the co-defendants' escape from the scene of the murder. (*Id*. at 73-74.)

These points are unavailing.  On the first point, the co-defendants' "incentive" to benefit the State was obvious to the jury and was emphasized by the defense in its closing argument. (Doc. 9-6 at 54.) The jury's ability to assess their credibility was not contingent on the existence of a jury instruction on the lesser-included offense of robbery. Furthermore, the fact that Jackson drove away from the scene without taking Moore's car, while leaving other co-defendants behind to take the car, does not meaningfully impeach the co-defendants' testimony that Jackson intended to rob

Moore. Jackson was not required to personally complete the robbery that motivated his conduct. It is sufficient that his intent to rob and murder "coexisted" during the execution of his scheme. *Ex Parte Brown*, 74 So. 3d 1039, 1054 (Ala. 2011). In any event, Jackson's actions, whatever their motivation, do not preclude a jury finding that the taking of the victim's car was not part of a "continuous chain of events" that began when Jackson and his co-defendants targeted Moore for a robbery. *Freeman v. State*, 776 So. 2d 160, 191 (Ala. Crim. App. 1999). Nor is the lack of fingerprint evidence persuasive on the "during" element of Jackson's capital murder charge. The evidence showed that, the day after the murder, when Jackson first went to the car to see what he could take from it, witness A.C. Porterfield interrupted his efforts to "strip" the vehicle. *Jackson*, 836 So. 2d at 926–27.

Jackson's "afterthought" theory also is not bolstered by his claim that the co-defendants Jackson left behind at the scene of the murder stole Moore's car only to escape the scene. As set forth in the petition, this theory relies upon Jackson's claim that "the victim was killed in retaliation for a bad drug deal and then, separate from the killing, two other co-defendants—and not Mr. Jackson—decided to take the victim's car to get away." (Doc. 1 at 74.) As discussed previously, however, Jackson has never produced any specific factual allegation tending to show that his encounter with Moore had anything to do with a previous drug deal. The mere fact that both he and Moore had some prior involvement with drugs and/or gangs before the

incident does not permit the reasonable inference that the incident itself was tied to such activity. This is especially so considering the considerable evidence contradicting any such theory, including the testimony of the co-defendants.

In addition, Jackson improperly infers causation from a co-defendant's testimony about the chronology of events. He alleges as follows:

> Although two co-defendants, Antonio Barnes and Eric Williams, took the victim's car after the shooting, they did so only *because* Mr. Jackson and another co-defendant drove away in another car, leaving them at the scene. Indeed, Eric Williams testified that he took the victim's car *because* after the shooting, "they pulled off and left me and [Barnes] in the middle of the street. So that's when we jumped in [the victim's] car to pull off and get away from the scene of the crime."

(Doc. 1 at 74 (quoting R. 387) (emphasis supplied)). But Williams's full testimony about the chronology of events—Jackson proposed that the group "go hit a lick," *i.e.*, "take something, you know, from somebody" (doc. 9-4 at 189 (R. 378)); Jackson told the group he was "fixing to rob" Moore after they spotted Moore's car and discussed its audio system (*id*. at 181 (R. 379)); Jackson turned the group's stolen vehicle around to follow Moore (*id*. at 182 (R. 380)); Jackson lay-in-wait while Moore was at a gas station (*id*. at 185 (R. 383)); Jackson resumed following Moore after he left the gas station (*id*. at 187 (R. 385)); Jackson sped up and drove his vehicle into Moore's vehicle (*id*. (R. 385)); Jackson "jumped out and started shooting" at Moore (*id*. at 188 (R. 386)); Jackson drove away after Williams and Barnes exited the vehicle (*id*. at 189 (R. 387)); Williams and Barnes took Moore's

car and drove off in a direction opposite Jackson (*id*. at 189-90) (R. 387–88))—substantially supports the robbery/murder theory advanced by the prosecution. Likewise, Williams's further testimony that, immediately after taking the car, he and Barnes found a secluded spot behind some bushes so that Barnes could remove the car's radio (*id*. at 190-91) (R. 388–89)) validates his prior testimony that all these events occurred as a result of Jackson's stated desire to rob Moore of the sound system.

At bottom, the evidence before the jury showed that Jackson set all these events in motion, including the murder, because he wanted to rob Moore. Because it is not reasonably probable that Jackson would not have been convicted of capital murder had the jury been charged on the lesser-included offense of robbery, Jackson cannot show prejudice flowing from counsels' failure to request that instruction. *Johnson*, 256 F.3d at 1181–83. More importantly, he fails to show that reasonable jurists may not disagree about whether he has shown the requisite prejudice. Accordingly, the ACCA's decision did not unreasonably apply *Strickland* and is not based upon an unreasonable determination of fact in light of the record before that court.

### 3. IAC Claims at the Penalty/Sentencing Phase

Jackson presents three ineffective assistance subclaims related to counsels' performance during the penalty/sentencing phase of his trial: 1) "Trial counsel failed

to investigate and present even a portion of the available mitigation evidence" (doc. 1 at 22); 2) "Trial counsel failed to develop and present a penalty and sentencing phase strategy to convince the sentencing authority that life without parole was the appropriate sentence" (*id*. at 43); and 3) "Trial counsel failed to obtain and present independent expert witnesses" (*id*. at 45). Jackson asserts that habeas corpus relief is warranted because, he says, the state court's denial of state post-conviction relief on the basis of ineffective assistance of counsel during the penalty/sentencing phase is an unreasonable application of *Strickland* and other well-established federal law, including *Williams v. Taylor*, 529 U.S. 362 (2000), and *Wiggins v. Smith*, 539 U.S. 510 (2003), and is based on an unreasonable determination of the facts. The State argues the ACCA reasonably applied *Strickland* and its resolution was based on a reasonable determination of the facts.

### a. The Mitigation Subclaims

### i.    The ACCA Opinion

The Rule 32 court addressed Jackson's subclaims 1 and 2 separately. On appeal of the denial of the Rule 32 petition, the ACCA discussed both subclaims collectively and found, in pertinent part:

> Jackson next asserts that his counsel was ineffective for failing to investigate and present mitigation evidence at the penalty phase and the judicial sentencing phase of his trial.[] Jackson pleaded that counsel was ineffective for failing to present evidence of his impoverished childhood, evidence that his father was absent from his life when he

was a child, evidence that he had sold drugs to make money for his family, and evidence of his mental deficiency.

. . .

Jackson first contends that federal and state law recognize a defendant's right to present evidence at the judicial sentencing hearing and that the circuit court erred in relying on the case of *Boyd v. State,* 746 So. 2d 364, 397 (Ala.Crim.App.1999), to deny relief on this claim. The circuit court made the following findings:

> "As this allegation relates to the judicial sentencing, the Court finds that it is without merit. In *Boyd v. State,* 746 So. 2d 364, 397 (Ala. Crim. App. 1999), the Alabama Court of Criminal Appeals addressed the claim that '[Boyd's] trial counsel failed to present a strategy to save his life and that counsel otherwise failed to properly represent him at the sentencing hearing before the trial court.' The Alabama Court of Criminal Appeals rejected Boyd's argument because that court had previously found that Boyd's trial counsel's efforts at the penalty phase, which resulted in a 7–5 life without parole recommendation, were not ineffective. *Id.* at 398. In addition, the *Boyd* Court went on to hold that:

> "'Moreover, § 13A–5–47, Ala. Code 1975, governs the determination of sentence by the trial court. *Section 13A–5–47, Ala.Code 1975, does not provide for the presentation of additional mitigation evidence at the sentencing by the trial court.* Therefore, trial counsel did not err in failing to do so.'
> "(Emphasis added.) Because Jackson had no right to present additional evidence to the trial court at the judicial sentencing, his trial counsels were not ineffective for failing to do so."

(R. 925–26.) Jackson contends that the above-emphasized portion of the circuit court's order quoting *Boyd* conflicts with current Alabama law.

Recently, in *Woodward v. State,* 123 So.3d 989 (Ala. Crim. App. 2011), we criticized that portion of *Boyd* cited in the circuit court's order and stated:

"Woodward argues that the statute limits the evidence that can be admitted at a sentence [hearing] before the judge to only that evidence addressing any part of the PSI [presentence report] that is the subject of a factual dispute. He further argues that § 13A–5–45(d), Ala. Code 1975, stating that probative, relevant evidence shall be received at the sentencing hearing applies only to the sentencing hearing before the jury. Woodward does not cite to any controlling precedent for this proposition. Our research reveals only authority that directly contradicts Woodward's argument.

"First, the United States Supreme Court has held that a sentencing authority must consider all evidence offered as mitigating, that is, 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (footnote omitted). See also *Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ('Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.'). In Alabama the trial judge is the sentencing authority, and the jury's advisory verdict is a recommendation that is not binding on the judge. § 13A–5–47(a), (e), Ala. Code 1975; *Ex parte Carroll,* 852 So.2d 821, 826–27 (Ala.2001). If, as Woodward now argues, § 13A–5–47(d) excludes all relevant evidence except that evidence concerning a factual dispute in the PSI, a logical extension of that argument is that no additional mitigation proffered by a defendant could be admitted into evidence at a sentencing hearing before a trial judge unless that evidence, too, concerned a factual dispute in the PSI. Woodward's interpretation of the statute could result in the exclusion of relevant proffered mitigation and create reversible error because it might deny a sentencer relevant information about a defendant's character or background, in violation of *Lockett* and its progeny.

"Second, Woodward's interpretation of the statute is inconsistent with the current practice in capital cases in Alabama. Both parties at the sentencing hearing before the trial judge in a capital case routinely present additional testimony not necessarily related to the PSI. *E.g.*, *Ex parte Carroll,* 852 So. 2d 833 (Ala. 2002); *McMillan v. State,* [Ms. CR–08–1954, Nov. 5, 2010] —— So.3d —— (Ala. Crim. App. 2010); *Mitchell v. State,* 84 So. 3d 968 (Ala.Crim.App.2010); *Washington v. State,* 106 So. 3d 423 (Ala.Crim.App.2007) (opinion on return to remand), rev'd on other grounds, 106 So. 3d 441 (Ala. 2011); *Scott v. State,* 937 So. 2d 1065, 1071 (Ala. Crim. App. 2005). In *McGahee v. State,* 885 So. 2d 191 (Ala.Crim.App.2003), when reviewing a claim that counsel had rendered ineffective assistance when he failed to present additional testimony at the sentencing hearing before the trial judge, we stated: 'Trial counsel could have called more witnesses at the penalty-phase hearing before the trial judge, with the hope that the additional information would have convinced the trial judge to agree with the jury's recommendation and to sentence McGahee to life imprisonment without parole.' 885 So. 2d at 221 (footnote omitted). The United States Court of Appeals for the Eleventh Circuit has also recognized that additional evidence may be admitted at the hearing before the sentencing judge. See, e.g., *Brownlee v. Haley,* 306 F. 3d 1043, 1050 (11th Cir. 2002) ('After the jury has returned its advisory verdict at the sentencing phase, the trial judge orders and receives a presentence investigation report, hears further arguments, and may receive additional evidence concerning the aggravating and mitigating factors.')."

123 So.3d at 1030.

Nonetheless, at the time of Jackson's 1998 trial, there was no established caselaw concerning the scope of what evidence a defendant could present at the judicial sentencing hearing held pursuant to § 13A–5–47(c), Ala. Code 1975. *Boyd* was not released until one year after Jackson's trial, and the decision in *Woodward* was not released until 2011 — more than 13 years after Jackson's capital-murder trial. "We will not hold [trial] counsel ineffective for failing to forecast changes in the law." *Nicks v. State,* 783 So. 2d 895, 923 (Ala. Crim. App. 1999).

Jackson also asserts that the circuit court erred in finding, in the alternative, that Jackson was due no relief on his claim that counsel was

ineffective for failing to present more mitigation evidence at the judicial sentencing hearing because the claim had no merit.

In *McGahee v. State*, 885 So. 2d 191 (Ala. Crim. App. 2003), we stated the following concerning a petitioner's claim that counsel's performance at the judicial sentencing hearing was ineffective after the jury had recommended a sentence of life imprisonment without the possibility of parole.

"Postconviction claims that defense counsel should have conducted further investigation and presented additional evidence in mitigation are not uncommon in capital-murder cases. We have previously stated:

"""There has never been a case where additional witnesses could not have been called. The appellant presented relatives and personal friends who, upon interview, were found to testify on his behalf. We refuse to set a standard that a court may be reversed because it did not hear unoffered testimony from still more friends and relatives. We also refuse to say that a member of the bar is guilty of ineffectiveness for not calling every witness and friend who was willing to testify. To hold otherwise would clog an already overburdened system with repetitious testimony. The appellant has failed to satisfy either prong of the Strickland test.'

"'*State v. Tarver*, 629 So. 2d 14, 21 (Ala. Crim. App. 1993), cert. denied, 511 U.S. 1078 . . . (1994).'

"*Williams v. State*, 783 So. 2d 108, 118 (Ala. Crim. App. 2000).

"We have held, 'Also, counsel does not necessarily render ineffective assistance simply because he does not present all possible mitigating evidence.' *Id.* at 117.

"Trial counsel could have called more witnesses at the penalty-phase hearing before the trial judge, with the hope that the additional information would have convinced the trial judge to agree with the jury's recommendation and to sentence McGahee to life imprisonment

without parole. The same can be said after any sentencing hearing in a capital case in which a death sentence is imposed after the jury recommended a sentence of life imprisonment without parole."

885 So. 2d at 221. More recently in *Hooks v. State*, 21 So. 3d 772 (Ala. Crim. App. 2008), we stated:

> "'Appellant's contention that his trial counsel rendered ineffective assistance of counsel during the penalty phase of the trial is repudiated by the fact that the jury recommended life in this case. *Lewis v. State*, 398 So. 2d 432 (Fla. 1981); *Douglas v. State*, 373 So. 2d 895 (Fla. 1979). Further, we refuse to find counsel ineffective by relying on the jury recommendation and failing to present further mitigating evidence to the judge. *Lewis*.'"

21 So. 3d at 791, quoting *Buford v. State*, 492 So.2d 355, 359 (Fla. 1986).

Moreover, when examining claims of ineffective assistance of counsel related to the penalty phase of a capital-murder trial, the United States Supreme Court in *Wiggins v. Smith*, 539 U.S. 510 . . . (2003), stated:

> "In *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Id*., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."

539 U.S. at 534. . . . This Court may reweigh the evidence de novo to determine if any prejudice occurred. *See Wiggins v. Smith*.

At the penalty phase of Jackson's trial, counsel presented the testimony of Jackson's girlfriend, Jackson's mother, Jackson's father, and Jackson's aunt. Sonya Ringstaff, Jackson's girlfriend, testified that at the time of the offense she and Jackson had been dating for about 18 months, that they had a daughter who was 2 months old at the time of

his trial, and that the child had never seen her father. She said that she had never seen Jackson act violent toward anyone, that he was truthful, and that he was a "nice young man." Marilyn Jackson, Jackson's mother, testified that she had Jackson when she was 19 years of age, that at the time of the murder he lived with her, that Jackson completed the 9th grade and dropped out of school because he was not interested in school, that he was a respectful child who never gave her any trouble, that she had never seen him exhibit any violence toward anyone, and that Jackson had been committed to the custody of the Department of Youth Services on two occasions. She asked the jury to spare her son's life. Lewis Wendell Taylor, Jackson's father, testified that, after Jackson was born, he and Marilyn stayed together and tried to provide a decent home for Jackson, that he was not around a lot because, he said, he was always working, that Jackson was intelligent, that he got involved with the wrong group of people, and that Jackson was not a violent person. He concluded his direct examination by asking the jury to spare his son's life. On cross-examination, Taylor testified that he was incarcerated at the times that Jackson had been committed to the Department of Youth Services. Thelma Owens, Jackson's aunt, testified that she was Jackson's maternal aunt, that Jackson was a truthful person, and that Jackson was not a violent person. She asked the jury to spare Jackson's life and to let him think about what he had done for the rest of his life. Jackson's attorneys were so effective that the jury unanimously recommended that Jackson be sentenced to life imprisonment without the possibility of parole.

In overriding the jury's recommendation and sentencing Jackson to death, the circuit court found two aggravating circumstances—that the murder was committed during the course of a robbery and that Jackson was under a sentence of imprisonment at the time of the murder. The court found as mitigation that Jackson was only 18 years of age at the time of the murder. The court specifically noted that it was assigning little weight to this mitigating circumstance. In regard to nonstatutory mitigating circumstances, the circuit court found that Jackson voluntarily surrendered to police, that Jackson did not evade his probation officer, that Jackson was truthful to his family members, and that he was not violent toward his girlfriend. The court gave these circumstances "slight weight." The sentencing court also stated that it considered Jackson's statement in the presentence report indicating that he was remorseful for what happened. Last, the sentencing court

considered the jury's unanimous advisory verdict of life imprisonment without the possibility of parole, but it concluded that the aggravating circumstances outweighed the mitigating circumstances.

This Court has considered the mitigation evidence that Jackson contends should have been presented and has reweighed that evidence against the evidence that was presented at trial. We conclude that the aggravating circumstances still outweigh the mitigating circumstances and warrant the imposition of the death sentence. Thus, counsel's failure to present evidence of Jackson's impoverished childhood, the lack of a father figure, the fact that he sold drugs to help his family, and his mental health had no impact on the sentence in this case. Accordingly, the circuit court did not abuse its discretion in denying relief on this claim.

*Jackson v. State*, 133 So. 3d at 446–51.

### ii.      Subclaim 1: The Additional Mitigation at the Penalty/Sentencing Phase.

Here, the ACCA considered the additional mitigation evidence that Jackson asserts should have been presented along with other evidence in the record. After weighing both the mitigation evidence presented during the penalty phase and the evidence Jackson asserts should have been presented at both the penalty and sentencing phase against the aggravating circumstances, the ACCA concluded that counsel's failure to present additional mitigation evidence had no impact on the sentence. In effect, the ACCA concluded that counsel's omission of additional mitigation evidence did not result in prejudice to the defense under the second prong of *Strickland*, 466 U.S. at 687.

"When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the

> sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695 . . . . To assess the reasonable probability of a different result, courts must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter*, 558 U.S. at 41 . . . (alteration adopted) (quotations omitted).

*Davis v. Comm'r, Alabama Dep't of Corr.*, 120 F.4th 768, 792 (11th Cir. 2024).

Given that a Rule 32 hearing on Jackson's ineffectiveness claim was not conducted, the question is: "accepting as true the *facts* asserted in support of [Jackson's] ineffective assistance of counsel claim[], did the Alabama Court of Criminal Appeals unreasonably apply *Strickland* and its progeny," *Borden v. Allen*, 646 F.3d 785,  815 (11th Cir. 2011), when determining that the omission of the additional mitigation evidence did not result in prejudice? "Applying AEDPA to *Strickland*'s prejudice standard, [this court] must decide whether the state court's conclusion that [counsel's] performance at the sentencing phase . . . [did not] prejudice [Jackson]" – [*i.e.*,] that there was no substantial likelihood of a different result – was 'so obviously wrong that its error lies beyond any possibility for fairminded disagreement.'" *Pye v. Warden*, 50 F.4th 1025, 1041-42 (en banc) (quoting *Shinn*, 592 U.S. at 118).

Jackson asserts the ACCA's determination that any prejudice is diminished in light of the jury's recommendation that he receive a sentence of life without parole

is contrary to Supreme Court precedent. He apparently construes the jury's recommendation of a life sentence as indicating that the trial judge's verdict of death lacks substantial support in the record and that, therefore, his counsel's failure to present the additional mitigating factors he proffered in the operative Rule 32 petition "'*weighs heavily in favor of a finding of prejudice*.'" (Doc. 35 at 47 (quoting *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008)) (Jackson's emphasis). Jackson's argument is unavailing.

This court recognizes that the Eleventh Circuit previously has stated that the "fact that the jury decisively voted against the death penalty, even without the powerful evidence adduced at postconviction, weighs heavily in favor of a finding of prejudice." *Williams v. Allen*, 542 F.3d 1326, 1343 (11th Cir. 2008). Later, however, the Eleventh Circuit concluded that, where trial counsel presented the testimony of family members about the defendant's "substance abuse, his problems in school, his strange behavior, and that [the defendant] was loved and his life should be spared[,]" "the fact that the jury recommended life imprisonment counsels against a determination that [the petitioner] was prejudiced by *Strickland*." *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1196 (11th Cir. 2013). No doubt, there is some tension in these decisions regarding how to interpret a jury's life sentence recommendation in assessing prejudice. *Ferguson v. Comm'r, Ala. Dep't of Corr.*, 69 F.4th 1243, 1261 (11th Cir. 2023).

Until the Eleventh Circuit reconciles these decisions, however, the mere fact that a jury recommended life should not, as Jackson here argues, be treated as confirmation that the State's case for the death penalty is only "weakly supported." Instead, the better course is to examine the evidence that precipitated the jury's life sentence recommendation and compare it to the evidence introduced in post-conviction proceedings. Where, as here, the trial evidence may be reasonably considered a sort of broad thematic distillation of the post-conviction evidence, even if it was presented in a less impactful or meticulous fashion, it is reasonable to conclude that the jury's life sentence recommendation should not be treated as a conclusive indicator of prejudice.

And, the jury's life recommendation does not necessarily establish that the purported evidence of Jackson's exposure to violence throughout his life, his and his parents' substance abuse, his dependency on other family members for food and clothing, his history of a mental limitation, such as borderline intellectual functioning, and the history of mental impairments in his family, establishes that there is a reasonable probability that the trial judge would have accepted the jury's recommendation rather than imposing a death sentence. The jury's life recommendation just as easily reflects that counsels' focus on presenting the testimony of Jackson's family members about his character and upbringing, along with their plea for mercy, was persuasive to the jury.

Jackson also argues that the ACCA's determination that the omission of critical mitigating evidence did not result in a prejudicial outcome is an unreasonable application of clearly established law. Citing *Lockett v. Ohio*, 438 U.S. 586, 608-09 (1978), and *Eddings*, 455 U.S. at 113-114, Jackson asserts that, at some juncture, mitigation evidence must be considered by the trial judge as the ultimate sentencing authority in Alabama.[33] He maintains that Alabama's capital sentencing scheme constitutionally precludes criminal defense counsel from providing a complete picture of mitigation to the final sentencing authority. (Doc. 35 at 66.) Both *Lockett* and *Eddings* require sentencers to consider relevant mitigating circumstances when deciding whether to impose the death penalty and afford sentencers wide discretion in determining "the weight to be given relevant mitigating evidence," *Eddings*, 455 U.S. at 114-15, "[b]ut those cases do not require the sentencer to make any particular factual finding regarding those mitigating circumstances," *Jones v. Mississippi*, 593 U.S. 98, 108 (2021) (a juvenile offender case generally discussing analogous sentencing procedures). During the penalty phase in this case, the trial judge heard the mitigation testimony from some family members, including Jackson's mother and father, and other individuals. In addition, the ACCA considered the mitigation

---

[33] Jackson also cites *Graham v. Collins*, 506 U.S. 461, 475 (1993), which held that the judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest penalty for juveniles. As an eighteen year old, Jackson was treated as an adult at the time of the offense.

evidence that Jackson contends should have been presented, and the state appellate court reweighed that evidence against the evidence that was presented to the trial judge. This court therefore concludes that the ACCA's decision is not an unreasonable application of *Strickland* or other clearly established federal law and is not based upon an unreasonable finding of fact in light of the record before the state courts.

### iii.    *Subclaim 2: The Penalty and Sentencing Phase Strategy*

Jackson asserts trial counsel failed to develop a strategy to convince the sentencing authority that life without parole was the appropriate sentence. (Doc. 1 at 43.) Specifically, he argues that counsel failed to subpoena probation officer Carolyn Flack as a witness or otherwise present additional evidence to the judge during the sentencing phase. Jackson maintains his counsel should have presented the "compelling mitigating circumstances" of his "violent upbringing, impoverished community, lack of a father figure or other male [role] model, mental impairments and familial devotion in order to persuade the sentencing authority that the jury had reached the correct decision when it unanimously sentenced Mr. Jackson to life without the possibility for parole."[34] (*Id*. at 45.)

---

[34] Jackson does not specify what testimony he believes Officer Flack would have provided, but when reading his assertion in context, the Court presumes for purposes of the § 2254 petition that she would have testified about matters in the PSI, such as Jackson's childhood and family life which included poverty and violence.

The Rule 32 court concluded that this allegation of ineffective assistance was without merit for the same reasons it had rejected Jackson's claim that counsel failed to investigate and present available mitigating evidence at the sentencing phase. (Doc. 9-38 at 64.) Specifically, the state post-conviction court again determined "there [was] no reasonable probability the trial court would have found the information proffered . . . was so compelling it would have cause[d] [the sentencing judge] to find the aggravating circumstances did outweigh the mitigating circumstances causing him to follow the jury's recommendation." (Doc. 9-38 at 62-64.) As previously discussed, Jackson also raised this claim on appeal of the denial of the operative Rule 32 petition. Although the ACCA did not specifically discuss this subclaim, it generally found that, even after reweighing the evidence, the aggravating circumstances outweighed the mitigating circumstances and, therefore, counsel's failure to present evidence of Jackson's impoverished childhood, the lack of a father figure, the fact that he sold drugs to help his family, and his mental health did not result in prejudice under the *Strickland* standard. Although it is always *possible* that evidence of Jackson's childhood and family history could have influenced a sentencing judge, this court cannot conclude that the state courts' determination that there is no reasonable *probability* that the result of the proceeding would have been different was unreasonable. *See Boyd v. Allen*, 592 F.3d 1274, 1304 (11th Cir. 2010).  In other words, this court cannot conclude that the state courts'

determination that the outcome of the sentencing judge's decision to override the jury verdict would not have changed is an unreasonable application of *Strickland* or is based upon an unreasonable finding of fact.

## A. The Expert Witness (Subclaim 3)

Jackson asserts that trial counsel's failure to hire a mitigation specialist or consult with an independent expert in preparation for the penalty and sentencing hearing fell below an objective standard of reasonableness and prejudiced his case. (Doc. 35 at 48.)

In his Petition for Writ of Certiorari to the ACCA, Jackson asserted:

> Not only did counsel fail to investigate and present this evidence, but they failed to obtain expert assistance to explain how these events shaped Shonelle's life and mitigated in favor of a sentence of life without parole. These experts would have reviewed medical, social services, school, mental health, and other institutional records; interviewed Mr. Jackson and members of his family; developed a family history assessment; expressed an opinion as to the connection between Mr. Jackson's childhood and the behavior for which he was convicted; assisted counsel in understanding and presenting evidence of the effect of Mr. Jackson's background on his behavior; and testified about his or her findings and conclusions regarding Mr. Jackson's background, family history, mental health, and history of alcohol and drug abuse. In addition, trial counsel failed to present meaningful evidence concerning Mr. Jackson's mental retardation and argue that his retardation was a reason for a sentence less than death. Expert witnesses such as a social worker, an investigator, a mental health expert and an expert on drug and alcohol abuse would have explained the likely causes of Mr. Jackson's mental and emotional problems and how

those problems were relevant both to Mr. Jackson's defense and to his moral culpability.[] (PC. 647-49.)

(Doc. 9-36 at 71-72.)  In his appellate brief, Jackson also noted:

> In his Second Amended Rule 32 Petition, Mr. Jackson alleged that: 1) an investigator would have "uncovered the myriad mitigating evidence identified [in the petition]"; 2) a social worker or mitigation specialist would have "synthesized and evaluated the significance of the information obtained by the investigator," compiled a "psycho-social history of Mr. Jackson," and "explained to the judge and jury the multiple risk factors present in Shonelle's life as described [in the petition] and how they affected his actions and development"; 3) a mental health expert would have "gathered information relating to Mr. Jackson's familial history of mental impairments and his stunted mental and academic development as well as Mr. Jackson's own mental retardation," and then "explained the significance of Mr. Jackson's mental impairments and the multiple ways in which they affected his life, including, particularly how these limitations would have rendered Mr. Jackson particularly ill-equipped to overcome the milieu of poverty, drugs, alcohol, neglect and violence in which Mr. Jackson grew up"; and 4) an expert on drug and alcohol abuse would have "testified about Mr. Jackson's lifelong battle with alcohol and substance abuse and how his use of drugs and alcohol impaired his mental state," as well as "assisting counsel in recognizing the importance of finding, developing, and presenting evidence regarding Mr. Jackson's drug use and alcohol abuse, as well as that of his parents and other role models. This expert could then have synthesized this evidence for the jury and the court, and would have elucidated how these factors resulted in an impaired and suggestible individual." (PC. 647-50.)

(Doc. 9-36 at 72-73, n. 24.)

On appeal of the denial of the Rule 32 petition, the ACCA determined that, because Jackson failed to identify any experts by name who could have testified at sentencing or the content of the expected testimony, he failed to satisfy the pleading requirements of Alabama Rule of Criminal Procedure 32.6. *Jackson*, 133 So. 3d at 451–52.

Jackson argues that the ACCA's determination is unreasonable because he did set forth specific allegations of ineffectiveness based on counsel's failure to obtain expert assistance in his second amended Rule 32 petition.  In addition, he argues the ACCA's determination was unfair because he repeatedly asked for, and was denied, the opportunity to develop evidentiary support for this ineffective-assistance claim. The court has reviewed Jackson's ineffectiveness claim in the Amended Rule 32 petition, wherein he asserted that counsel failed to present "[e]xpert witnesses such as a social worker, an investigator, a mental health expert and an expert on drug and alcohol abuse [who] would have explained the likely causes of Mr. Jackson's mental and emotional problems and how those problems were relevant both to Mr. Jackson's defense and to his moral culpability." (Doc. 9-16 at 54-60.) This court recognizes that Jackson did set forth the testimony he believes each expert would have provided. The problem, however, is that Jackson did not identify a specific expert or an expert's availability to testify during the Rule 32 proceeding. *See Lee v. Thomas*, No. CIV.A. 10-0587-WS-M, 2012 WL 1965608, at *35 (S.D. Ala. May 30,

2012), aff'd sub nom. *Lee v. Comm'r Alabama Dep't of Corr*., 726 F.3d 1172 (11th Cir. 2013) (petitioner failed to identify a psychiatrist who would have testified favorably for him during the guilt or penalty phase of his trial). *See also Davis v. Allen*, No. CV 07-S-518-E, 2016 WL 3014784, at *122 (N.D. Ala. May 2016), aff'd sub nom., *Davis v. Comm'r, Alabama Dep't of Corr*., 120 F.4th 768 (11th Cir. 2024) (petitioner's general assertion that he was unable to spend hours working with experts and investigators "failed to identify any alleged crucial expert testimony that was not obtained . . . as a result of cost restraints").

Thus, this court cannot conclude that the ACCA's finding that Jackson failed to satisfy the pleading requirements was contrary to, or an unreasonable application of *Strickland* or any other clearly established Federal law or was an unreasonable determination of the facts.

## VIII. CONCLUSION

Accordingly, it is hereby

**ORDERED** that all of Petitioner Shonelle Jackson's claims in his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 except the *Atkins* claim (*see* doc. 1 at 93-96, Claim K) are DENIED. The court will set an evidentiary hearing on the *Atkins* claim. To facilitate that hearing, the court will hold a status and scheduling conference via Zoom teleconference **on March 10, 2026, at 9:00 AM**. The courtroom deputy will provide counsel with the teleconference information. The

parties should be prepared to discuss available dates for setting the evidentiary hearing.

DONE, on this the 26th day of February 2026.

_____
R. AUSTIN HUFFAKER, JR.
CHIEF UNITED STATES DISTRICT JUDGE